IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT DIABETES CARE INC. and ABBOTT DIABETES CARE LIMITED, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 21-977 (KAJ) |
| DEXCOM, INC., | ) ) | **JURY TRIAL DEMANDED** |
| Defendant. | ) ) | |

## FIRST AMENDED COMPLAINT

Plaintiffs Abbott Diabetes Care Inc. and Abbott Diabetes Care Limited (collectively "Abbott"), for their Complaint against Defendant Dexcom, Inc. ("Dexcom"), allege as follows:

## INTRODUCTION

1.      Abbott brings this action to stop Dexcom from infringing multiple Abbott patents protecting Abbott's award-winning FreeStyle Libre technology, a "life changing" "advance in the management of diabetes."[1] Diabetes is a chronic condition and global epidemic that affects nearly half a billion people worldwide. Abbott's innovations make "[r]egular blood sugar monitoring,"

---

[1] L. Leelarathna & E.G. Wilmot, *Flash forward: a review of flash glucose monitoring*, DIABET. MED., 35(4), 472–482 (2018) (describing FreeStyle Libre as "a watershed moment in the history of diabetes care" and a "significant advance in the management of diabetes" and noting that "[m]any users describe it as 'life changing'"). FreeStyle Libre has received several awards. These have included the Edison Award as the "best of the best" for "Patient Care" for the first generation FreeStyle Libre system in 2016, and as the "best of the best" for "Personal Wellness Technology" for the second-generation FreeStyle Libre 2 in 2021. *2016 Edison Best New Product Awards™ Winners*, EDISON AWARDS, https://edisonawards.com/winners2016.php; *2021 Edison Best New Product Awards™ Winners*, EDISON AWARDS, https://edisonawards.com/winners2021.php.   In addition, in 2019, FreeStyle Libre was awarded the Prix Galien for "Best Medical Technology." *The Galien Foundation Honors 2019 Prix Galien Award Recipients*, CISION PR NEWSWIRE https://www.prnewswire.com/news-releases/the-galien-foundation-honors-2019-prix-galien-award-recipients-300945409.html (Oct. 25, 2019).   "Worldwide, the Prix Galien is regarded as the equivalent of the Nobel Prize in biopharmaceutical and medical technology research." *Id.*

which is "the most important thing you can do to manage … diabetes,"[2] accessible to the world. Were it not for the protections of inventions in the United States Constitution and patent laws, medical technologies that save and improve lives like FreeStyle Libre[3] would be unavailable to people who need them. Dexcom's infringing misconduct is exactly what these laws were designed to protect against, and must be stopped.

2.      Diabetes results in blood sugar (glucose) levels that can cause severe health problems such as heart attack, stroke, kidney disease, blindness, amputation, and death. That is why regular blood sugar monitoring is so important for people with diabetes. Historically, monitoring involved "fingerstick" measurements. These required pricking and drawing blood from a finger, putting the blood on a test strip, inserting it into a monitor, and waiting for a test. That method was painful and invasive, and had to be repeated frequently. It also did not show the continuous data that people needed to make more accurate and timely decisions about their

---

[2]  Center for Disease Control and Prevention, *Monitoring Your Blood Sugar*, CDC.GOV https://www.cdc.gov/diabetes/managing/managing-blood-sugar/bloodglucosemonitoring.html.

[3] *See, e.g.*, D. Pintus, et al., *Freestyle Libre Flash Glucose Monitoring Improves Patient Quality of Life Measures in Children With Type 1 Diabetes Mellitus (T1DM) With Appropriate Provision of Education and Support by Healthcare Professionals*, DIABETES METAB SYNDR, 13(5), 2923-2926 (Jul. 30, 2019); M. Fokkert,  et al., *Improved well-being and decreased disease burden after 1-year use of flash glucose monitoring*, BMJ OPEN DIABETES RESEARCH AND CARE, 2019;7:e000809, doi: 10.1136/bmjdrc-2019-000809 (2019); S. Charleer, et al., *Quality of Life and Glucose Control After 1 Year of Nationwide Reimbursement of Intermittently Scanned Continuous Glucose Monitoring in Adults Living With Type 1 Diabetes (FUTURE): A Prospective Observational Real-World Cohort Study*. DIABETES CARE, 43(2):389–397 doi: 10.2337/dc19-1610 (Feb. 2020).

diabetes treatments, diet, and exercise.[4] Often patients would not do all the fingersticks needed to adequately monitor their glucose levels and prevent the disease's progression and deadly effects.[5]

3.      Blood sugar monitoring for diabetes improved with the introduction of continuous glucose monitors. Early continuous glucose monitoring devices, however, were inaccessible and unrealistic for many people with diabetes. They were unaffordable for many, often were not covered by insurance, and required calibration using the same problematic fingersticks they were meant to replace.[6] They were also bulky, complicated, required separate sensors and transmitters, had gaps in the glucose data they displayed, and required insertion with daunting applicators.

4.      Unlike others, Abbott focused its designs on maximizing patient access and convenience, and launched the FreeStyle Libre continuous glucose monitoring system, the first commercially available continuous glucose monitor that avoids fingersticks. FreeStyle Libre made continuous glucose monitoring simple and accessible for a broad population of people with diabetes. Its tiny glucose sensor with integrated electronics is easy to insert, can be discreetly worn for 14 days, and reliably and continuously monitors glucose levels and transmits glucose data to digitally connected devices, including smartphones and dedicated readers. FreeStyle Libre is also much more affordable, often selling for a fraction of the cost of other continuous glucose monitors. Abbott invested enormous resources, including more than a billion dollars, into developing,

---

[4] *See* W. Gonzales, et al., *The Progress of Glucose Monitoring—A Review of Invasive to Minimally and Non-Invasive Techniques, Devices and Sensors*, SENSORS, 19(4):800 doi:10.3390/s19040800 (Feb. 15, 2019) at 1, 5.

[5] *See id.* at 2, 6.

[6] *See id.* at 6; *see also* U. Hoss. & E. Budiman, *Factory-Calibrated Continuous Glucose Sensors: The Science Behind the Technology*, DIABETES TECHNOL. & THER., 19 Supp. 2, S44–S50 (May 1, 2017) doi: 10.1089/dia.2017.0025; D. Rodbard, *Continuous Glucose Monitoring: A Review of Successes, Challenges, and Opportunities*, DIABETES TECHNOL. & THER., 18 Supp. 2, S3–S13 (Feb. 2016) doi: 10.1089/dia.2015.0417; J. Hermanides, et al., *Current Application of Continuous Glucose Monitoring in the Treatment of Diabetes*, DIABETES CARE, 34 Supp. 2, S197–S201 (May 2011) doi: 10.2337/dc11-s219.

building, and expanding the market for FreeStyle Libre. It is now the most accessible and top-selling glucose monitoring system in the world.

5.      Dexcom's prior efforts in this space resulted in complex, expensive, and cumbersome devices that failed to achieve the substantial benefits that Abbott's transformative innovations provide. For example, prior generations of Dexcom's CGM devices (including G5) required fingersticks for calibration, had shorter wear times, and required insertion using applicators described by its CEO as "kind of scary"[7] and likened to an "intimidating" "harpoon."[8] Now, in its current G6 product, Dexcom has adopted Abbott's patented technologies, including technologies that avoid fingersticks and enable easy insertion, longer wear times, and reliable and continuous transmission of glucose readings to digitally connected devices.  But the law does not allow Dexcom to incorporate Abbott's patented technology without authorization and improperly reap the benefits of Abbott's investments.

### NATURE OF THE ACTION

6.      The Patent Office has awarded Abbott an extensive patent portfolio that protects Abbott's inventions relating to continuous glucose monitoring, including the following: United States Patent Nos. 10,820,842 ("the '842 patent"), 10,827,954 ("the '954 patent"), 10,874,338 ("the '338 patent"), 10,881,341 ("the '341 patent"), 10,945,647 ("the '647 patent"), 10,945,649

---

[7] Jonah Comstock, *Dexcom CEO Tells Investors Not to Fear New Competition From Abbott's Freestyle Libre*, MOBI HEALTH NEWS, https://www.mobihealthnews.com/content/dexcom-ceo-tells-investors-not-fear-new-competition-abbotts-freestyle-libre (Nov. 8, 2017).

[8] *See, e.g., Dexcom User Guide for Dexcom G5 Mobile Continuous Glucose Monitoring (CGM) System, Rev 009* MT24706, DEXCOM.COM, https://s3-us-west-2.amazonaws.com/dexcompdf/G5-Mobile-Users-Guide-Touchscreen-Receiver.pdf; Jonah Comstock, *Dexcom CEO Tells Investors Not to Fear New Competition From Abbott's Freestyle Libre*, MOBI HEALTH NEWS, https://www.mobihealthnews.com/content/dexcom-ceo-tells-investors-not-fear-new-competition-abbotts-freestyle-libre (Nov. 8, 2017); Dana Howe, *Comparing the Dexcom G6 to the G5*, BEYOND TYPE 1, https://beyondtype1.org/comparing-the-dexcom-g6-to-the-g5/.

("the '649 patent"), 10,952,653 ("the '653 patent"), 10,959,654 ("the '654 patent"), 10,966,644 ("the '644 patent"), 10,973,443 ("the '443 patent"), 11,000,216 ("the '216 patent"), and 11,013,440 ("the '440 patent") (collectively, the "Asserted Patents").

7.      This is an action for infringement of the Asserted Patents.

8.      This action is based on the Patent Laws of the United States, 35 U.S.C. §§ 100, *et seq.*

## PARTIES

9.      Abbott Diabetes Care Inc. ("ADC Inc.") is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business in Alameda, California. ADC Inc. holds legal title to the Asserted Patents as the assignee.

10.     Abbott Diabetes Care Limited ("ADC Ltd.") is a company organized under the laws of the United Kingdom, having its principal place of business in Witney, United Kingdom. ADC Ltd. has an exclusive license from ADC Inc. under the Asserted Patents.

11.     Dexcom, Inc. is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business in San Diego, California.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) *et seq.*

13.     This Court has personal jurisdiction over Dexcom because, *inter alia*, it is incorporated in Delaware, and thus resides in this District.

14.     Venue is proper in this District under 28 U.S.C. § 1400(b) because, *inter alia*, Dexcom is incorporated in Delaware, and thus resides in this District.

## BACKGROUND

### Diabetes

15.     Diabetes is a global epidemic. An estimated 460 million people worldwide have diabetes. By 2045 that number is expected to rise to 700 million.[9] According to the CDC, in 2020, 26.9 million people were diagnosed with diabetes in the US.[10] Diabetes results in low or high glucose (sugar) levels in the body that can cause severe health problems such as heart attacks, strokes, kidney failure, limb loss, vision loss, and skin ulcers, and can lead to death.[11]

16.     According to the CDC, "[r]egular blood sugar monitoring is the most important thing you can do to manage … diabetes. You'll be able to see what makes your numbers go up or down, such as eating different foods, taking your medicine, or being physically active. With this information, you can work with your health care team to make decisions about your best diabetes care plan."[12]

### Prior Blood Glucose Monitoring Methods

17.     Traditionally, diabetes patients and healthcare providers monitored blood glucose levels using "fingerstick" methods, often referred to as "self blood glucose monitoring" ("SBGM"), that involved pricking a finger to obtain blood, placing blood on a test strip, and inserting that test strip into a monitor that would give a glucose value. But "[i]t is challenging to

---

[9]  INTERNATIONAL DIABETES FEDERATION, *IDF Diabetes Atlas* (9th ed. 2019) https://www.diabetesatlas.org/upload/resources/material/20200302_133351_IDFATLAS9e-final-web.pdf.

[10]  Center for Disease Control and Prevention, *National Diabetes Statistics Report, 2020*, CDC.GOV, https://www.cdc.gov/diabetes/data/statistics-report/index.html.

[11]  Center for Disease Control and Prevention, *Monitoring Your Blood Sugar,* CDC.GOV, https://www.cdc.gov/diabetes/managing/managing-blood-sugar/bloodglucosemonitoring.html.

[12] *Id.*

get more than a limited set" of data from these methods "due to the inconvenience and pain associated with fingersticks, … and unforgiving requirements for specific timing. Even in the best of circumstances, SBGM data can be challenging to interpret."[13] With these traditional methods, patients and providers must frequently extrapolate from a single blood glucose value or from glucose values at scattershot time points without clear temporal relationships to the food, exercise, medication, or other things that affect blood glucose levels — temporal relationships that provide needed context. Further, the fingerstick methods suffered from low compliance, because many patients were so put off by the painful fingersticks that they simply would not test.

18.     Various companies developed continuous glucose monitoring products as an alternative to traditional fingerstick measurements. But these products had significant drawbacks including high cost, short wear times, burdensome and painful insertion techniques, non-intuitive operation requiring significant training, and calibration methods requiring regular fingersticks — the painful and invasive sampling that continuous glucose monitor technologies were designed to avoid.[14]

---

[13] T. Kompala, et. al, *A New Era: Increasing Continuous Glucose Monitoring Use in Type 2 Diabetes,* AM J. MANG. CARE, 25(4), SP123-SP126 (2019) doi: 10.1111/dme.13149.

[14] *See, e.g.*, W. Gonzales, et al., *The Progress of Glucose Monitoring—A Review of Invasive to Minimally and Non-Invasive Techniques, Devices and Sensors*, SENSORS (BASEL), 2019;19(4):800 at 1 (Feb. 15, 2019) doi: 10.3390/s19040800; U. Hoss. & E. Budiman, *Factory-Calibrated Continuous Glucose Sensors: The Science Behind the Technology*, DIABETES TECHNOL THER , 19 Supp. 2, S–44–50 (May 1, 2017) doi: 10.1089/dia.2017.0025; D. Rodbard, *Continuous Glucose Monitoring: A Review of Successes, Challenges, and Opportunities*, DIABETES TECHNOL THER., 1; 18 (Suppl 2) S2-3–S2-13 (Feb. 2016) doi: 10.1089/dia.2015.0417; J. Hermanides, M. Phillip & H. DeVries, *Current Application of Continuous Glucose Monitoring in the Treatment of Diabetes*, DIABETES CARE, 34 (Suppl. 2): S197–S201 (May 2011) doi: 10.2337/dc11-s219.

**Abbott's FreeStyle Libre**
**Continuous Glucose Monitoring Products**

19.     In 2014, Abbott introduced the FreeStyle Libre line of continuous glucose

monitoring products, which brought new and more accessible technology to the market and

addressed problems with prior diabetes and glucose management methods. The original FreeStyle

Libre product was first approved for use in Europe in 2014, and in the United States in 2017.

Continuing to innovate, Abbott built on these product launches with the FreeStyle Libre 2, which

was approved for use in Europe in 2018 and in the United States in 2020, and the FreeStyle Libre

3, which was approved for use in Europe in 2020. These products are referred to herein collectively

as the "FreeStyle Libre."

20.     Abbott's FreeStyle Libre includes an applicator, an integrated on-body unit that

includes a glucose sensor and a transmitter, and a display device (such as a reader or smart device)

with proprietary software (see example below).



| Applicator | On-body unit (front and side view) including sensor and transmitter | Display device (reader or smart device) with proprietary software |

21.     In a single step, the applicator is used to insert a portion of the glucose sensor under

the skin and attach the on-body unit to the user's body with an adhesive patch. Data from the on-

body unit is transmitted to a display device where a glucose value and related information are

provided to the user.



| Applying the on-body unit | Reading data transmitted from the on-body unit |

22.     Abbott's FreeStyle Libre overcame significant drawbacks associated with earlier continuous glucose monitoring products. In stark contrast to other glucose monitors in the marketplace, Abbott's FreeStyle Libre eliminated the need for fingerstick calibration by the user to obtain accurate glucose measurements. The FreeStyle Libre is calibrated in the factory, and no fingersticks (or any user-initiated action) are required for calibration.

23.     Further, compared to earlier continuous glucose monitoring products, Abbott's FreeStyle Libre offered many other benefits, including:

- significantly lower cost;

- an improved applicator design and process allowing for application of the on-body unit by a user in a single, simple step;

- smaller and less obtrusive device to be positioned on the user's body;

- greater ease-of-use;

- more complete and accurate glucose data; and

- longer wear periods with accurate readings (up to 14 days of continuous use).

These advancements made continuous glucose monitoring products accessible to many people who could not or would not use them previously.

24.     Describing FreeStyle Libre, researchers have acknowledged some important advantages: "the [FreeStyle Libre] system is a very easy, painless and user-friendly way of monitoring glucose values without the need for blood. A small sensor is inserted under the skin of one arm and remains there for 14 days. The patient can insert the sensor himself/herself and can replace it with a new sensor when the current one has expired. … This can be done as often as the patient wishes and in any situation, and is very discreet and fast."[15]

25.     Users of FreeStyle Libre often describe how it has changed the way they manage diabetes and improved their lives.

- "[During the first two weeks using FreeStyle Libre,] I learned more about my diabetes and myself … than I had learned in the previous 15 years.  I suddenly had a clearer picture of how my decisions impacted me. I continued to use the product … and over the next 3 months my A1C[16] dropped from 8.6 to 5.7! The data you get and the ease of getting it makes this an indispensable tool for anyone living with diabetes. I know it changed my life!"[17]

- The FreeStyle Libre "has been the easiest and single-most positive 'medical improvement' in my diabetic journey since being diagnosed [twenty-two years ago]."[18]

---

[15] L. van den Boom & K. Kostev, *Changes In the Utilization of Blood Glucose Test Strips Among Patients Using Intermittent-Scanning Continuous Glucose Monitoring in Germany*, 22 DIABETES OBES. METAB. 6:922–28 (Jun. 2020) doi: 10.1111/dom.13977.

[16] *A1C Test*, MAYO CLINIC, https://www.mayoclinic.org/tests-procedures/a1c-test/about/pac-20384643 (The A1C test (also known as the hemoglobin A1C or HbA1c test) is a common blood test used to diagnose diabetes. An A1C test result reflects average blood glucose level for the past two to three months. A1C test results are reported as a percentage. A higher A1C percentage corresponds to higher average blood glucose levels: below 5.7% is normal, 5.7% to 6.4% indicates prediabetes, and 6.5% or higher indicates diabetes. For most adults living with diabetes, an A1C level of less than 7% is a common treatment target).

[17] William M., *Patient Stories*, FREESTYLE LIBRE, https://www.freestylelibre.us/patient-stories.html.

[18] NG, *Patient Stories*, FREESTYLE LIBRE, https://www.freestylelibre.us/patient-stories.html.

- "I love it and it helps me better understand how and what affects my glucose levels. … It's the best thing I could have ever done for my diabetes!!!  And the best part—NO MORE PAIN OF FINGER PRICKS!!"[19]

26.     In 2016, the first-generation FreeStyle Libre was chosen by top senior business executives, academics, and innovation professionals to receive the Edison Award as the "best of the best" for patient care.[20] The Edison Awards "recognize[] and honor[] some of the most innovative products … in the world and [are] among the most prestigious accolades honoring excellence in new product and service development, marketing, design and innovation."[21] In April 2021, the FreeStyle Libre 2 received another Edison Award, as "best of the best" for personal wellness technology.[22]

27.     In 2019, Abbott received the prestigious *Prix Galien* award (the equivalent of the Nobel Prize in biopharmaceutical research), recognizing FreeStyle Libre as the Best Medical Technology approved by the Food and Drug Administration in the prior five years.[23]

28.     Abbott's FreeStyle Libre is now the top selling continuous glucose monitoring product in the world. It has helped more than 3 million people across 50 countries by providing breakthrough technology that is affordable, accurate, reliable, and simple to use.

---

[19] Terri Michelle, *Patient Stories*, FREESTYLE LIBRE, https://www.freestylelibre.us/patient-stories.html.

[20] *2016 Edison Best New Product Awards™ Winners*, EDISON AWARDS, https://edisonawards.com/winners2016.php.

[21] *About the Edison Awards*, EDISON AWARDS, https://edisonawards.com/about.php.

[22] *2021 Edison Best New Product Awards™ Winners*, EDISON AWARDS, https://edisonawards.com/winners2021.php.

[23] *The Galien Foundation Honors 2019 Prix Galien Award Recipients*, CISION PR NEWSWIRE, https://www.prnewswire.com/news-releases/the-galien-foundation-honors-2019-prix-galien-award-recipients-300945409.html. (Oct. 25, 2019).

**Dexcom's Follow-On G6 Glucose Monitoring Product**

29.     In 2018, four years after Abbott first introduced FreeStyle Libre, Dexcom

introduced its G6 continuous glucose monitoring product, followed by the G6 Pro in 2020

(collectively the "G6"). Dexcom's G6, its sixth generation device, is a substantial departure from

its fifth generation product (*i.e.*, "G5") and earlier products. The G6 incorporates many of Abbott's

patented innovations in its design and operation, as illustrated in the attached infringement claim

charts.

30.     As described by Dexcom in the G6 user guide, the G6 includes three components:

an applicator with a sensor, a transmitter, and a display device (receiver or smart device).



G6 User Guide at 47. As part of G6, Dexcom provides software (*e.g.*, G6 App) for the display

devices.

31.     As described by Dexcom, the G6 applicator is used, in a single step, to insert a portion of the sensor under the skin and to apply a transmitter holder with an adhesive patch. After the transmitter holder is applied to the skin, the transmitter is snapped into the holder.



G6 User Guide at 77, 80, 83.

32.     With G6, Dexcom is using Abbott's breakthrough patented technologies.

33.     For example, to obtain accurate readings, all of Dexcom's earlier products required the user to calibrate the product with frequent fingerstick measurements throughout the sensor wear life. But, like Abbott's FreeStyle Libre products, Dexcom's G6 adopts factory calibration, including drift correction to allow for a longer wear period (10 days for G6 versus 7 days for G5), moving away from requiring fingerstick measurements for calibration. Dexcom heavily promotes this feature of its G6 products.[24]

---

[24] *See, e.g.*, *Better manage your Type 1 or Type 2 diabetes with the Dexcom G6 CGM System*, DEXCOM CONTINUOUS GLUCOSE MONITORING, https://www.dexcom.com/g6-cgm-system (The Dexcom G6 "lets you see your glucose and where it's heading without fingersticks.").

34.     Likewise, moving away from Dexcom's "intimidating" and complicated G5 applicator design, the G6 incorporates Abbott's patented applicator and insertion technologies. Dexcom also promotes these features of its G6 product adopted or resulting from Abbott's patented technologies.[25]

35.     As evidenced by the substantial departures from the technology in Dexcom's earlier products, Dexcom is deliberately using Abbott's patented technology in its G6 product and is infringing Abbott's valuable patent rights. Abbott is entitled to injunctive relief and to recover damages for such infringement.

## ASSERTED PATENTS

36.     Abbott has invested heavily in developing and maintaining a portfolio of patents protecting its inventions, including the Asserted Patents.

37.     The '842 patent is titled "Methods and Systems for Early Signal Attenuation Detection and Processing," and was duly and legally issued on November 3, 2020.

38.     A true and correct copy of the '842 patent is attached as **Exhibit A**.

39.     The '954 patent is titled "Continuous Analyte Measurement Systems and Systems and Methods for Implanting Them," and was duly and legally issued on November 10, 2020.

40.     A true and correct copy of the '954 patent is attached as **Exhibit B**.

41.     The '338 patent is titled "Devices, Systems and Methods for On-Skin or On-Body Mounting of Medical Devices," and was duly and legally issued on December 29, 2020.

42.     A true and correct copy of the '338 patent is attached as **Exhibit C**.

---

[25] *Id.* ("Simple auto-applicator – a one-touch applicator easily inserts a small sensor just beneath the skin."); *id.* ("The Dexcom G6 features a 10-day wear sensor that is … easy to insert with an auto-applicator.").

43.     The '341 patent is titled "Medical Device Inserters and Processes of Inserting and Using Medical Devices," and was duly and legally issued on January 5, 2021.

44.     A true and correct copy of the '341 patent is attached as **Exhibit D**.

45.     The '647 patent is titled "Analyte Sensor Transmitter Unit Configuration for a Data Monitoring and Management System," and was duly and legally issued on March 16, 2021.

46.     A true and correct copy of the '647 patent is attached as **Exhibit E**.

47.     The '649 patent is titled "Medical Device Inserters and Processes of Inserting and Using Medical Devices," and was duly and legally issued on March 16, 2021.

48.     A true and correct copy of the '649 patent is attached as **Exhibit F**.

49.     The '653 patent is titled "Methods and Systems for Early Signal Attenuation Detection and Processing," and was duly and legally issued on March 23, 2021.

50.     A true and correct copy of the '653 patent is attached as **Exhibit G**.

51.     The '654 patent is titled "Medical Device Inserters and Processes of Inserting and Using Medical Devices," and was duly and legally issued on March 30, 2021.

52.     A true and correct copy of the '654 patent is attached as **Exhibit H**.

53.     The '644 patent is titled "Devices, Systems and Methods for On-Skin or On-Body Mounting of Medical Devices," and was duly and legally issued on April 6, 2021.

54.     A true and correct copy of the '644 patent is attached as **Exhibit I**.

55.     The '443 patent is titled "Sensor Inserter Assembly," and was duly and legally issued on April 13, 2021.

56.     A true and correct copy of the '443 patent is attached as **Exhibit J**.

57.     The '216 patent is titled "Medical Device Inserters and Processes of Inserting and Using Medical Devices," and was duly and legally issued on May 11, 2021.

58.     A true and correct copy of the '216 patent is attached as **Exhibit K.**

59.     The '440 patent is titled "Medical Device Inserters and Processes of Inserting and Using Medical Devices," and was duly and legally issued on May 25, 2021.

60.     A true and correct copy of the '440 patent is attached as **Exhibit L.**

<u>**FIRST CAUSE OF ACTION**</u>
**(Infringement of the '842 Patent)**

61.     Abbott repeats and re-alleges the allegations of paragraphs 1 through 60 above.

62.     The inventions claimed in the '842 Patent save lives by providing diabetes patients who use CGM systems with more complete and accurate information about their glucose levels, even after a failure in the system. The claimed inventions thus address a problem unique to the CGM field by describing and claiming technological solutions that improve the functioning of the CGM systems themselves.

63.     Before Abbott introduced factory calibration, commercial CGM systems typically required periodic calibration, such as every 12 to 24 hours. Using the fingerstick method, patients periodically determined their glucose levels and entered this information into the system. With this information, the CGM system determined (or updated) a conversion function to convert uncalibrated data received from the glucose sensor to estimated glucose levels. The estimated glucose levels were then output to the patient's display device, for example.

64.     The display device could convey information about the patient's glucose levels in different ways. For one, a graph could be provided depicting glucose levels over time. From the graph, patients could determine their current glucose levels, how their levels fluctuated in the recent past, whether the patient's glucose levels were stable or trending toward dangerous levels and how their levels were impacted by food, medicine, and physical activity. The display device also could provide a numerical value of the patient's current glucose level and a trend arrow

indicating the direction of the patient's glucose levels and the rate at which the levels were changing. Examples of this information from Abbott's FreeStyle Navigator product is provided below.



*Graph Depicting Glucose Levels Over Time*



*Current Glucose Level in Numerical Form*



*Trend Arrow*

65.     The continuity and accuracy of information received from CGM systems is critical for patients to manage their diabetes. Falling outside of a target glucose range can have adverse

consequences on the patient, including reduced brain function that can lead to confusion and an inability to reason, remember, or react. Some diabetic patients also use medication, such as insulin, to regulate their glucose levels. Having more complete and accurate information about glucose levels is important for patients to optimize their glycemic control and minimize the frequency and severity of hypo- or hyperglycemic conditions.

66.     The named inventor of the '842 Patent, Wesley Scott Harper, recognized that in CGM systems there are instances when a patient's glucose levels cannot be accurately reported by the system, which could lead a patient to act on inaccurate or incomplete information. For example, the specification of the '842 Patent explains that "[t]here are time periods when the sensor characteristics or the user's physiological condition renders the condition unsuitable for a sensor calibration event." (Ex. A, '842 Patent at 11:6-8.) For the time period associated with the failed calibration event, there can be "a gap in the output display during which the necessary calibration did not occur." (*Id.* at 12:32-34.) This is illustrated below in FIG. 7A of the '842 Patent.



**FIG. 7A**

(*Id.* at FIG. 7A.)

67.     Data gaps in a patient's estimated glucose levels was a known issue that plagued CGM systems, as the patient could not recover the lost data. For example, a user guide for Dexcom's STS-7 CGM system explained that "[a]t times [the] STS-7 System will not display glucose information or provide alerts," which can happen when the system "needs another [blood glucose] fingerstick reading[] for calibration because the STS-7 Sensor readings do not match [the

patient's] blood glucose meter readings." (Ex. Y, STS-7 Continuous Glucose Monitoring System User's Guide [hereinafter, "STS-7 User Guide"] at 33.) When this occurs, "Glucose Data Gaps" appeared in the patient's glucose levels on the display device. (*Id.*)

68.     During a clinical study involving 72 participants who wore the Dexcom STS-7 CGM System for seven days, more than 25% of the data was lost for 31% of the systems and more than 50% of the data was lost for 18% of the systems. (*Id.* at 58.) The STS-7 User Guide explained that "[s]ometimes sensors fail to provide readings after calibration" and therefore the readings were simply "skipped." (*Id.*) An illustration of "'Poor' STS-7 System Performance" with numerous data gaps is provided below, showing how the glucose concentration measured with the STS-7 system (y-axis) failed to track the actual glucose concentration measured with a YSI analyzer (x-axis).



Figure 4.  Example of "Poor" STS-7 System Performance

(Ex. Y, STS-7 User Guide at 60.)

19

69.     The inventor of the '842 Patent solved the data-gap problem unique to CGM systems by devising technological solutions that improved the functionality of the CGM systems themselves, increasing their accuracy and safety. For example, the '842 Patent describes a system where the data gap associated with a calibration failure could be filled by storing the unprocessed sensor data during the calibration failure and then processing the data after a subsequent and successful calibration event. Specifically, the '842 Patent explains that, "based on the parameters associated with the successful calibration, the previously unprocessed data during the display time out period [that caused the sensor data gap] may be retrieved . . . and processed using calibration data, such as the sensitivity ratio for conversion of the [glucose] related sensor data to [glucose] levels." (Ex. A, '842 Patent at 12:47-54.) Thereafter, "the gap in [the] output display . . . may be filled." (*Id.* at 12:59-61.) Figure 7B of the '842 Patent, reproduced below, shows the sensor data gap backfilled with processed sensor data after the failure mode condition was corrected.



**FIG. 7B**

(Ex. A, '842 Patent at FIG. 7B.)

70.     The inventor of the '842 Patent further recognized that a failed calibration was only one type of error that could interrupt a patient's glucose monitoring and cause data gaps. The '842 Patent explains that a failure mode condition can result from "an inability to promptly calibrate the sensor, system malfunction, sensor dislodging, signal errors associated with the sensor, transmitter unit, receiver unit, and the like, or other variables or parameters that result in the

inability of the [glucose] monitoring system to display or output the real-time monitored [glucose] level." (Ex. A, 842 Patent at 13:19-27.)

71.     Such failure mode conditions were issues that plagued CGM systems. For example, Dexcom's STS-7 User Guide explains that, in addition to calibration failures, the "STS-7 System will not display glucose information or provide alerts" when "[t]he Transmitter and Receiver are out of range" or when "[t]he STS Receiver does not understand the STS-7 Sensor signal." (Ex. Y, STS-7 User Guide at 33.)

72.     In the STS-7 User Guide, Dexcom advised users that "[a]nytime [they] see the Antenna Icon 'Y' in the Status Box instead of a glucose reading the STS Receiver has 'missed' the last glucose reading sent by the Transmitter to the Receiver." (*Id.*) This will result in a sensor data gap output to the display device:



(*Id.*)

73.     Also, "[d]uring continuous glucose monitoring [the] STS® System may get a reading that it does not understand." (*Id.* at 34.) "When this occurs [the patient] will see 3 question marks (???) in the STS Receiver Status Box" along with sensor data gaps output to the display device:



(*Id.*)

74.     The '842 Patent solved these technological problems plaguing CGM systems with inventions capable of recovering what would otherwise be lost data when there is a failure mode condition in the system. The innovative technological solution is reflected in the claims of the '842 Patent.

75.     For example, claim 14 of the '842 Patent is directed to an "analyte monitoring system." (Ex. A, '842 Patent at 16:29-41.) As explained in the specification, glucose is one such analyte. (*Id.* at 4:35-55.) The claimed analyte monitoring system comprises "an analyte sensor," "one or more processors," and "a memory device." (*Id.* at 16:30-32.) The memory device stores "instructions which, when executed by the one or more processors, causes the one or more processors to: detect a failure mode condition, wherein the failure mode condition causes one or more sensor data gaps to be outputted to a display of the analyte monitoring system." (*Id.* at 16:32-38.) The claimed system detects that a failure mode condition has occurred that is causing a gap in the data displayed to the patient. To resolve the data gap, the instructions, "when executed by the one or more processors," further "cause[] the one or more processors to . . . store sensor data received from the analyte sensor for at least a portion of a time period associated with the failure mode condition," "process the sensor data for the at least a portion of the time period associated with the failure mode condition," and "in response to a correction of the failure mode condition, output the processed stored sensor data to the display of the analyte monitoring system such that the one or more sensor data gaps are at least partially filled by the processed stored sensor data." (*Id.* at 16:39-49.) Thus, instead of merely "skipping" glucose readings during a failure mode condition as in Dexcom's STS-7, the improved monitoring system of claim 14 is able to recover glucose data from the time period associated with the failure mode condition, thereby providing

the patient with a more complete and accurate record of their glucose levels. As illustrated by this example, the claimed system is a technological improvement over prior art CGM systems.

76.    Claims 3 and 25 of the '842 Patent, which depend from independent claims 1 and 23, respectively, claim methods and systems for backfilling sensor data gaps resulting from "an inability to calibrate the sensor." (*Id.* at 15:46-48, 18:8-11.) The system detects when the sensor cannot be calibrated, which will cause "one or more sensor data gaps" to be output to a display, stores and processes the sensor data from that time period, then outputs the processed sensor data (*e.g.*, glucose levels) after the failure mode condition is corrected.

77.    Dependent claims 2, 4, 13, 15, and 22, which depend from independent claims 1 and 14, respectively, recite other failure mode conditions that can be detected and from which the system can recover otherwise lost data. For example, claims 2 and 15 recite that "the failure mode condition comprises signal errors associated with a transmitter unit of the analyte monitoring system or a receiver unit of the analyte monitoring system." (*Id.* at 15:42-45, 16:50-53.) Claim 4 recites that the failure mode comprises "one or more of a sensor data value being outside a predetermined sensor data value range, a rate of change of one or more sensor data values being above a predetermined rate-of-change threshold, or a temperature measurement outside a predetermined temperature range." (*Id.* at 15:49-54.) Claims 13 and 22 recite that the failure mode condition "comprises an inability of the analyte monitoring system to display or output the sensor data." (*Id.* at 16:26-28; 17:25-27.)

78.    Thus, using a specific combination of components, the '842 Patent is directed to an improved glucose monitoring system capable of detecting if and when a failure mode condition occurs and recovering what would otherwise be lost glucose data—something that no previous system was able to achieve.

79.     Several advantages are realized from these technological improvements. An important advantage is that a diabetes patient is provided with a more complete and accurate record of their glucose levels. (Ex. A, '842 Patent at 12:54-61.) This includes having a continuous glucose graph, trend data, and current glucose levels output to the display device. Gaps in the patient's glucose data caused by a failure mode condition can be "retrospectively filled or reprocessed so that the data gap is closed" and "the continuously monitored [glucose] level does not have any or substantially [any] missing data." (*Id.* at 13:27-30.) As the specification explains, this "advantageously" provides "additional robustness . . . to the user and/or healthcare provider to improve therapy or health management decisions." (*Id.* at 13:39-42.)

80.     Another advantage realized by the invention claimed in the '842 Patent is that patients are protected from making uninformed or misinformed decisions about their glucose levels and trends. For example, claims 7 and 16 of the '842 Patent recite that the system "wait[s] a predetermined period of time before outputting . . . the processed stored sensor data to the display." (*Id.* at 15:63-67, 16:54-59.) As the specification explains, this is to "avoid possible unnecessary or incorrect action by a user in response to the backfilled processed sensor data." (*Id.* at 13:10-13.)

81.     Dexcom incorporated Abbott's patented backfilling technology into the G6. As shown in the claim chart in **Exhibit M**, Dexcom's G6 meets each and every limitation of at least claim 14 of the '842 patent, either literally and/or under the doctrine of equivalents. Thus, Dexcom has infringed and continues to infringe one or more claims of the '842 patent by making, using, selling, and/or offering to sell G6 in the United States and in this District.

82.     Unless enjoined by this Court, Dexcom will continue to infringe the '842 patent and as a direct result Abbott will continue to suffer harm, including irreparable harm for which

there is no adequate remedy at law. Accordingly, Abbott is entitled to injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

83.     Abbott has suffered and will continue to suffer damage as a direct and proximate result of Dexcom's infringement of the '842 patent. Thus, in addition to injunctive relief, Abbott is entitled to recover damages for such infringement pursuant to 35 U.S.C. § 284 in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**(Infringement of the '954 Patent)**

84.     Abbott repeats and re-alleges the allegations of paragraphs 1 through 83 above.

85.     As shown in the claim chart in **Exhibit N**, Dexcom's G6 meets each and every limitation of at least claim 1 of the '954 patent, either literally and/or under the doctrine of equivalents. Thus, Dexcom has infringed and continues to infringe one or more claims of the '954 patent by making, using, selling, and/or offering to sell G6 in the United States and in this District.

86.     Unless enjoined by this Court, Dexcom will continue to infringe the '954 patent and as a direct result Abbott will continue to suffer harm, including irreparable harm for which there is no adequate remedy at law. Accordingly, Abbott is entitled to injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

87.     Abbott has suffered and will continue to suffer damage as a direct and proximate result of Dexcom's infringement of the '954 patent. Thus, in addition to injunctive relief, Abbott is entitled to recover damages for such infringement pursuant to 35 U.S.C. § 284 in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**(Infringement of the '338 Patent)**

88.     Abbott repeats and re-alleges the allegations of paragraphs 1 through 87 above.

89.     As shown in the claim chart in **Exhibit O**, Dexcom's G6 meets each and every limitation of at least claim 23 of the '338 patent, either literally and/or under the doctrine of equivalents. Thus, Dexcom has infringed and continues to infringe one or more claims of the '338 patent by making, using, selling, and/or offering to sell G6 in the United States and in this District.

90.     Unless enjoined by this Court, Dexcom will continue to infringe the '338 patent and as a direct result Abbott will continue to suffer harm, including irreparable harm for which there is no adequate remedy at law. Accordingly, Abbott is entitled to injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

91.     Abbott has suffered and will continue to suffer damage as a direct and proximate result of Dexcom's infringement of the '338 patent. Thus, in addition to injunctive relief, Abbott is entitled to recover damages for such infringement pursuant to 35 U.S.C. § 284 in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### (Infringement of the '341 Patent)

92.     Abbott repeats and re-alleges the allegations of paragraphs 1 through 91 above.

93.     As shown in the claim chart in **Exhibit P**, Dexcom's G6 meets each and every limitation of at least claim 1 of the '341 patent, either literally and/or under the doctrine of equivalents. Thus, Dexcom has infringed and continues to infringe one or more claims of the '341 patent by making, using, selling, and/or offering to sell G6 in the United States and in this District.

94.     Unless enjoined by this Court, Dexcom will continue to infringe the '341 patent and as a direct result Abbott will continue to suffer harm, including irreparable harm for which there is no adequate remedy at law. Accordingly, Abbott is entitled to injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

95.     Abbott has suffered and will continue to suffer damage as a direct and proximate result of Dexcom's infringement of the '341 patent. Thus, in addition to injunctive relief, Abbott is entitled to recover damages for such infringement pursuant to 35 U.S.C. § 284 in an amount to be proven at trial.

### FIFTH CAUSE OF ACTION
### (Infringement of the '647 Patent)

96.     Abbott repeats and re-alleges the allegations of paragraphs 1 through 95 above.

97.     As shown in the claim chart in **Exhibit Q**, Dexcom's G6 meets each and every limitation of at least claim 1 of the '647 patent, either literally and/or under the doctrine of equivalents. Thus, Dexcom has infringed and continues to infringe one or more claims of the '647 patent by making, using, selling, and/or offering to sell G6 in the United States and in this District.

98.     Unless enjoined by this Court, Dexcom will continue to infringe the '647 patent and as a direct result Abbott will continue to suffer harm, including irreparable harm for which there is no adequate remedy at law. Accordingly, Abbott is entitled to injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

99.     Abbott has suffered and will continue to suffer damage as a direct and proximate result of Dexcom's infringement of the '647 patent. Thus, in addition to injunctive relief, Abbott is entitled to recover damages for such infringement pursuant to 35 U.S.C. § 284 in an amount to be proven at trial.

### SIXTH CAUSE OF ACTION
### (Infringement of the '649 Patent)

100.    Abbott repeats and re-alleges the allegations of paragraphs 1 through 99 above.

101.    As shown in the claim chart in **Exhibit R**, Dexcom's G6 meets each and every limitation of at least claim 1 of the '649 patent, either literally and/or under the doctrine of

equivalents. Thus, Dexcom has infringed and continues to infringe one or more claims of the '649 patent by making, using, selling, and/or offering to sell G6 in the United States and in this District.

102.    Unless enjoined by this Court, Dexcom will continue to infringe the '649 patent and as a direct result Abbott will continue to suffer harm, including irreparable harm for which there is no adequate remedy at law. Accordingly, Abbott is entitled to injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

103.    Abbott has suffered and will continue to suffer damage as a direct and proximate result of Dexcom's infringement of the '649 patent. Thus, in addition to injunctive relief, Abbott is entitled to recover damages for such infringement pursuant to 35 U.S.C. § 284 in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION
### (Infringement of the '653 Patent)

104.    Abbott repeats and re-alleges the allegations of paragraphs 1 through 103 above. In particular, the allegations of paragraphs 61-83 concerning the unique problem of sensor data gaps resulting from failure mode conditions, and the technological solutions described and claimed in the '842 Patent, are specifically repeated and re-alleged here, as the '653 Patent is a continuation of the '842 Patent and shares a common specification. In particular, the descriptions of the technological problems plaguing prior art CGM systems, the evidence of those technological problems, the inventor's creative, technological solution that solved these problems and enabled recovering what would otherwise be lost glucose data in CGM systems, the benefits and advantages gained from the solution, and Dexcom's incorporation of Abbott's patented backfilling technology, as alleged in paragraphs 61-83, apply as well to the '653 Patent.

105.    As with the '842 Patent, these technological solutions are reflected in the claims of the '653 Patent. For example, claim 1 of the '653 Patent is directed to a "glucose monitoring

system." (Ex. G, '653 Patent at 15:25-62.) The claimed glucose monitoring system comprises "an on body unit," "a glucose sensor," "a data processing and transmitter unit," "memory," and "a receiver unit." (*Id.* at 15:27-62.) The memory of the data processing and transmitter unit stores "instructions that, when executed by the processor, cause the processor to: store, in the memory of the data processing and transmitter unit, at least a portion of the data indicative of the sensed glucose level corresponding to a time period associated with a failure mode condition, and cause wireless transmission of the at least a portion of the data indicative of the sensed glucose level to a receiver unit after the failure mode condition is corrected." (*Id.* at 15:47-49.) The claimed system detects that a failure mode condition has occurred that is causing a gap in the data displayed to the patient (as recited in dependent claim 2). Moreover, the memory device of the receiver unit stores instructions that, "when executed by the one or more processors, cause the one or more processors to output the at least a portion of the data indicative of the sensed glucose level to a display of the receiver unit after the failure mode condition is corrected." (*Id.* at 15:53-59.) As a result, "the one or more sensor data gaps are at least partially filled" as recited in dependent claim 3. (*Id.* at 15:66 to 16:3.) Thus, instead of merely "skipping" glucose readings during a failure mode condition as in Dexcom's STS-7, the improved monitoring system of claim 1 is able to recover glucose data from the time period associated with the failure mode condition, thereby providing the patient with a more complete and accurate record of their glucose levels. As illustrated by this example, the claimed system is a technological improvement over prior art CGM systems.

106.    Claim 4 of the '653 Patent, which depends from independent claim 1, claims systems capable of backfilling sensor data gaps resulting from "a sensor communication error." (*Id.* at 16:4-6.) The system detects the communication error, stores and processes the sensor data

from that time period, then outputs the processed sensor data (*e.g.*, glucose levels) after the failure mode condition is corrected.

107.    Dependent claims 5-10, which also depend from independent claim 1, recite other failure mode conditions that can be detected and from which the system can recover otherwise lost data, such as a "signal error," "system malfunction," "sensor dislodgment," or an "inability of the receiver unit to output the data indicative of the sensed glucose level to the display (*Id.* at 16:7-24.)

108.    As shown in the claim chart in **Exhibit S**, Dexcom's G6 meets each and every limitation of at least claim 1 of the '653 patent, either literally and/or under the doctrine of equivalents. Thus, Dexcom has infringed and continues to infringe one or more claims of the '653 patent by making, using, selling, and/or offering to sell G6 in the United States and in this District.

109.    Unless enjoined by this Court, Dexcom will continue to infringe the '653 patent and as a direct result Abbott will continue to suffer harm, including irreparable harm for which there is no adequate remedy at law. Accordingly, Abbott is entitled to injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

110.    Abbott has suffered and will continue to suffer damage as a direct and proximate result of Dexcom's infringement of the '653 patent. Thus, in addition to injunctive relief, Abbott is entitled to recover damages for such infringement pursuant to 35 U.S.C. § 284 in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
### (Infringement of the '654 Patent)

111.    Abbott repeats and re-alleges the allegations of paragraphs 1 through 110 above.

112.    As shown in the claim chart in **Exhibit T**, Dexcom's G6 meets each and every limitation of at least claim 1 of the '654 patent, either literally and/or under the doctrine of

equivalents. Thus, Dexcom has infringed and continues to infringe one or more claims of the '654 patent by making, using, selling, and/or offering to sell G6 in the United States and in this District.

113.    Unless enjoined by this Court, Dexcom will continue to infringe the '654 patent and as a direct result Abbott will continue to suffer harm, including irreparable harm for which there is no adequate remedy at law. Accordingly, Abbott is entitled to injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

114.    Abbott has suffered and will continue to suffer damage as a direct and proximate result of Dexcom's infringement of the '654 patent. Thus, in addition to injunctive relief, Abbott is entitled to recover damages for such infringement pursuant to 35 U.S.C. § 284 in an amount to be proven at trial.

## NINTH CAUSE OF ACTION
### (Infringement of the '644 Patent)

115.    Abbott repeats and re-alleges the allegations of paragraphs 1 through 114 above.

116.    As shown in the claim chart in **Exhibit U**, Dexcom's G6 meets each and every limitation of at least claim 1 of the '644 patent, either literally and/or under the doctrine of equivalents. Thus, Dexcom has infringed and continues to infringe one or more claims of the '644 patent by making, using, selling, and/or offering to sell G6 in the United States and in this District.

117.    Unless enjoined by this Court, Dexcom will continue to infringe the '644 patent and as a direct result Abbott will continue to suffer harm, including irreparable harm for which there is no adequate remedy at law. Accordingly, Abbott is entitled to injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

118.    Abbott has suffered and will continue to suffer damage as a direct and proximate result of Dexcom's infringement of the '644 patent. Thus, in addition to injunctive relief, Abbott

is entitled to recover damages for such infringement pursuant to 35 U.S.C. § 284 in an amount to be proven at trial.

## TENTH CAUSE OF ACTION
### (Infringement of the '443 Patent)

119.     Abbott repeats and re-alleges the allegations of paragraphs 1 through 118 above.

120.     As shown in the claim chart in **Exhibit V**, Dexcom's G6 meets each and every limitation of at least claim 13 of the '443 patent, either literally and/or under the doctrine of equivalents. Thus, Dexcom has infringed and continues to infringe one or more claims of the '443 patent by making, using, selling, and/or offering to sell G6 in the United States and in this District.

121.     Unless enjoined by this Court, Dexcom will continue to infringe the '443 patent and as a direct result Abbott will continue to suffer harm, including irreparable harm for which there is no adequate remedy at law. Accordingly, Abbott is entitled to injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

122.     Abbott has suffered and will continue to suffer damage as a direct and proximate result of Dexcom's infringement of the '443 patent. Thus, in addition to injunctive relief, Abbott is entitled to recover damages for such infringement pursuant to 35 U.S.C. § 284 in an amount to be proven at trial.

## ELEVENTH CAUSE OF ACTION
### (Infringement of the '216 Patent)

123.     Abbott repeats and re-alleges the allegations of paragraphs 1 through 122 above.

124.     As shown in the claim chart in **Exhibit W**, Dexcom's G6 meets each and every limitation of at least claim 1 of the '216 patent, either literally and/or under the doctrine of equivalents. Thus, Dexcom has infringed and continues to infringe one or more claims of the '216 patent by making, using, selling, and/or offering to sell G6 in the United States and in this District.

125.    Unless enjoined by this Court, Dexcom will continue to infringe the '216 patent and as a direct result Abbott will continue to suffer harm, including irreparable harm for which there is no adequate remedy at law. Accordingly, Abbott is entitled to injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

126.    Abbott has suffered and will continue to suffer damage as a direct and proximate result of Dexcom's infringement of the '216 patent. Thus, in addition to injunctive relief, Abbott is entitled to recover damages for such infringement pursuant to 35 U.S.C. § 284 in an amount to be proven at trial.

## TWELFTH CAUSE OF ACTION
### (Infringement of the '440 Patent)

127.    Abbott repeats and re-alleges the allegations of paragraphs 1 through 126 above.

128.    As shown in the claim chart in **Exhibit X**, Dexcom's G6 meets each and every limitation of at least claim 1 of the '440 patent, either literally and/or under the doctrine of equivalents. Thus, Dexcom has infringed and continues to infringe one or more claims of the '440 patent by making, using, selling, and/or offering to sell G6 in the United States and in this District.

129.    Unless enjoined by this Court, Dexcom will continue to infringe the '440 patent and as a direct result Abbott will continue to suffer harm, including irreparable harm for which there is no adequate remedy at law. Accordingly, Abbott is entitled to injunctive relief against such infringement pursuant to 35 U.S.C. § 283.

130.    Abbott has suffered and will continue to suffer damage as a direct and proximate result of Dexcom's infringement of the '440 patent. Thus, in addition to injunctive relief, Abbott is entitled to recover damages for such infringement pursuant to 35 U.S.C. § 284 in an amount to be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Abbott prays for the following relief:

a.      a judgment that Dexcom has infringed and is infringing each of the Asserted Patents;

b.      an order permanently enjoining Dexcom, its officers, agents, servants, employees and attorneys, all parent, subsidiary, and affiliate corporations and other related business entities, and all other persons or entities acting in concert, participation or in privity with one or more of them, and their successors and assigns, from infringing the Asserted Patents;

c.      a judgment against Dexcom for money damages sustained as a result of Dexcom's infringement of the Asserted Patents in an amount to be determined at trial as provided under 35 U.S.C. § 284;

d.      an award of pre-judgment and post-judgment interest on the damages caused by Dexcom's infringing activities and other conduct complained of herein;

e.      a finding that this case is an exceptional case under 35 U.S.C. § 285;

f.      a judgment awarding Abbott reasonable attorneys' fees and its costs and reimbursements in this action, as provided by 35 U.S.C. § 285;

g.      an accounting for infringing sales not presented at trial and an award by the Court of additional damages for any such infringing sales;

h.      a compulsory future royalty; and

i.      any and all other and further relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Abbott hereby respectfully requests trial by jury under Rule 38 of the Federal Rules of Civil Procedure of all issues in this action so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

_____

OF COUNSEL:

Edward A. Mas II
Leland G. Hansen
James M. Hafertepe
Sharon A. Hwang
Michael J. Carrozza
Manuela Cabal
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, IL  60661
(312) 887-8000

Ellisen Shelton Turner
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, CA  90067
(310) 552-4200

Amanda J. Hollis
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
(312) 862-2000

Benjamin A. Lasky
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY  10022
(212) 446-4800

October 4, 2021

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
rsmith@morrisnichols.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2021, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on October 4, 2021, upon the following in the manner indicated:

John W. Shaw, Esquire                                      *VIA ELECTRONIC MAIL*
David M. Fry, Esquire
Nathan R. Hoeschen, Esquire
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
*Attorneys for Defendant*

Christa Anderson, Esquire                                  *VIA ELECTRONIC MAIL*
Eugene M. Paige, Esquire
Sophie Hood, Esquire
Elizabeth A. Eagan, Esquire
Andrew S. Bruns, Esquire
Sean M. Arenson, Esquire
Jee Young (Grace) Kim, Esquire
Puja Parikh, Esquire
Nicholas R. Green, Esquire
Yena Lee, Esquire
Bilal Malik, Esquire
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
*Attorneys for Defendant*

*/s/ Jack B. Blumenfeld*

_____

Jack B. Blumenfeld (#1014)