IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT DIABETES CARE INC. and<br>ABBOTT DIABETES CARE LIMITED, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-977-KAJ |
| | ) | |
| DEXCOM, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## **DEFENDANT'S ANSWERING CLAIM CONSTRUCTION BRIEF**

<div style="display:flex; justify-content:space-between;">
<div>

OF COUNSEL:
Robert A. Van Nest
Christa Anderson
Eugene M. Paige
Sophie Hood
Elizabeth A. Egan
Andrew S. Bruns
Sean M. Arenson
Puja Parikh
Nicholas R. Green
Yena Lee
Bilal Malik
Stephanie J. Goldberg
Jacquie P. Andreano
Matan Shacham
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
(415) 391-5400

Dated: August 3, 2022

</div>
<div>

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

</div>
</div>

## TABLE OF CONTENTS

**Page(s)**

I.      INTRODUCTION ........................................................................................................1

II.     LEGAL STANDARDS ...............................................................................................1

III.    DISPUTED CLAIM TERMS ......................................................................................3

    A.    U.S. Patent Nos. 10,881,341 ("'341 Patent"), 10,959,654 ("'654 Patent")
         & 11,000,216 ("'216 Patent") (collectively, "Curry Patents") ............................3

         1.    "first spring in a loaded position" ...............................................................3

                 a.    The '216 and '654 patents must be construed to exclude
                     "torsion springs." ........................................................................3

                 b.    The same construction applies to the '341 patent. ..........................9

    B.    U.S. Patent No. 10,973,443 ("'443 Patent" or "Funderburk Patent") ..................11

         1.    "first spring" ...............................................................................................11

    C.    U.S. Patent Nos. 10,945,649 ("'649 Patent") & 11,013,440 ("'440 Patent")
         (collectively, "Lee Patents") ................................................................................17

         1.    "slot" ...........................................................................................................17

                 a.    Operation of the Lee inserter. .......................................................19

                 b.    Abbott's broad definition fails to satisfy the claim language
                       and renders the supposed invention inoperable. ...........................21

                 c.    The relevant embodiments consistently limit "slot" to mean
                       a through-slot, opening, or passage. ..............................................24

                 d.    Construction as a "through-slot" would resolve the parties'
                       dispute. ..........................................................................................27

         2.    "rotor comprising a cylindrical shape" .......................................................28

    D.    U.S. Patent No. 10,945,647 ("'647 Patent" or "Mazza Patent") ..........................31

         1.    "insertion mechanism configured to position the sensor
            subassembly against the base of the transmitter mount by causing
            movement of the sensor subassembly" ........................................................31

                 a.    The claim term is a means-plus-function term. .............................32

                 b.    There is no sufficient corresponding structure or, at best, it
                       is insufficiently disclosed. ............................................................35

i

        c.      Abbott's proposed construction and argument is without basis.................................................................................36

E.     U.S. Patent Nos. 10,820,842 ("'842 Patent") & 10,952,653 ("'653 Patent") (collectively, "Harper Patents").......................................................37

     1.    "failure mode condition".................................................37

         a.      A "failure mode condition" is a condition that requires disabling of the output of sensor data. ...........................38

         b.      Abbott's proposed construction improperly broadens "failure mode condition" beyond the Harper patents' disclosure. ...............................................................39

     2.    "processing . . . the sensor data", "processing the sensor data", "process the sensor data" ...............................................41

     3.    "data indicative of the sensed glucose level".................................44

F.     U.S. Patent No. 10,827,954 ("'954 Patent" or "Hoss Patent") ...........................46

     1.    "chemically bonded".......................................................46

IV.    CONCLUSION.................................................................................49

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*3M Innovative Props. Co. v. Tredegar Corp.*,
    725 F.3d 1315 (Fed. Cir. 2013)................................................................29, 42, 44, 46

*In re Abbott Diabetes Care Inc.*,
    696 F.3d 1142 (Fed. Cir. 2012)..........................................................................13, 25

*Alloc, Inc. v. Int'l Trade Comm'n*,
    342 F.3d 1361 (Fed. Cir. 2003).................................................................................13

*Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*,
    288 F. App'x 697 (Fed. Cir. 2008) ..........................................................................33

*Atofina v. Great Lakes Chem. Corp.*,
    441 F.3d 991 (Fed. Cir. 2006)....................................................................................6

*Autogiro Co. of Am. v. United States*,
    384 F.2d 391 (Ct. Cl. 1967) .......................................................................................2

*B. Braun Med., Inc. v. Abbott Labs.*,
    124 F.3d 1419 (Fed. Cir. 1997)................................................................................35

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
    2011 WL 4949042 (S.D. Cal. Oct. 18, 2011) ..........................................................14

*Biogen Idec, Inc. v. GlaxoSmithKline LLC*,
    713 F.3d 1090 (Fed. Cir. 2013)........................................................................5, 7, 10

*Biogen, Inc. v. Berlex Labs., Inc.*,
    318 F.3d 1132 (Fed. Cir. 2003).............................................................................7, 8

*Bioverativ Inc. v. CSL Behring LLC*,
    2019 WL 1276030 (D. Del. Mar. 20, 2019) ............................................................31

*Casa Herrera Inc. v. JC Ford Co.*,
    No. 8-06-cv-00092, Dkt. 66 (C.D. Cal. Feb. 4, 2008) .............................................18

*Church & Dwight Co., Inc. v. Abbott Labs.*,
    2007 WL 6945864 (D.N.J. Aug. 28, 2007) ..............................................................31

*Cloud Farm Assocs. LP v. Volkswagen Grp. of Am., Inc.*,
    2017 WL 74768 (Fed. Cir. Jan. 9, 2017) .................................................................26

*Cloud Farm Assocs., L.P. v. Volkswagon Grp. of Am., Inc.*,
   2012 WL 3069405 (D. Del. July 27, 2012) ..................................................26

*Corbin Cabinet Lock Co. v. Eagle Lock Co.*,
   150 U.S. 38 (1893)..................................................................................15

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*,
   424 F.3d 1293 (Fed. Cir. 2005)..................................................................44

*Eli Lilly & Co. v. Eagle Pharms., Inc.*,
   2019 WL 1299212 (D. Del. Mar. 21, 2019) ..................................................25

*Enzo Life Scis., Inc. v. Gen-Probe, Inc.*,
   2015 WL 4101205 (D. Del. July 7, 2015) ......................................................8

*Eon Corp. IP Holdings v. Silver Spring Networks*,
   815 F.3d 1314 (Fed. Cir. 2016)............................................................18, 24

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
   2017 WL 1313851 (S.D. Ohio Apr. 10, 2017) ..........................................11, 12

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*
   535 U.S. 722 (2002).................................................................................7

*Flex-Rest, LLC v. Steelcase, Inc.*,
   455 F.3d 1351 (Fed. Cir. 2006)............................................................22, 24

*Genentech, Inc. v. Chiron Corp.*,
   112 F.3d 495 (Fed. Cir. 1997)..................................................................29

*Hewlett-Packard Co. v. Gateway, Inc.*,
   2006 WL 6142757 (S.D. Cal. Feb. 13, 2006) ................................................31

*Hormone Res. Found., Inc. v. Genentech, Inc.*,
   904 F.2d 1558 (Fed. Cir. 1990)..................................................................15

*Howmedica Osteonics Corp. v. Zimmer, Inc.*,
   822 F.3d 1312 (Fed. Cir. 2016)............................................................21, 22

*Ibormeith IP, LLC v. Mercedes-Benz USA*,
   LLC, 732 F.3d 1376 (Fed. Cir. 2013) ..........................................................35

*ICU Medical Inc. v. Alaris Medical Sys., Inc.*,
   558 F.3d 1368 (Fed. Cir. 2009)..................................................................22

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (Fed. Cir. 2004)..................................................................16

*Insul Corp. v. Airlite Plastics Co.*,
854 F.3d 1344 (Fed. Cir. 2017)..........................................................27

*Koninklijke Philips N.V. v. ZOLL Lifecor Corp.*,
2016 WL 6917268 (W.D. Pa. Mar. 2, 2016) ........................................35

*Kraft Foods, Inc. v. Int'l Trading Co.*,
203 F.3d 1362 (Fed. Cir. 2000)..........................................................10

*Laitram Corp. v. Rexnord, Inc.*,
939 F.2d 1533 (Fed Cir. 1991)...........................................................35

*Lift-U v. Ricon Corp.*,
2011 WL 5118632 (N.D. Cal. Oct. 28, 2011) .......................................11

*Luma Corp. v. Stryker Corp.*,
273 F. App'x 948 (Fed. Cir. 2008) ........................................................6

*Mars, Inc. v. H.J. Heinz Co., L.P.*,
377 F.3d 1369 (Fed. Cir. 2004)..........................................................30

*Mas-Hamilton Grp. v. LaGard, Inc.*,
156 F.3d 1206 (Fed. Cir. 1998)..........................................................35

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
959 F.3d 1091 (Fed. Cir. 2020)..........................................................18

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
344 F.3d 1205 (Fed. Cir. 2003)..........................................................36

*Meyer Intellectual Props. Ltd. v. Bodum, Inc.*,
552 F. Supp. 2d 810 (N.D. Ill. 2008) ...................................................11

*Microsoft Corporation v. Multi-Tech Systems, Inc.*,
357 F.3d 1340 (Fed. Cir. 2004)......................................................9, 10

*MTD Prods. Inc. v. Iancu*,
933 F.3d 1336 (Fed. Cir. 2019)...............................................32, 33, 34

*Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*,
831 F.3d 1350 (Fed. Cir. 2016)..........................................................30

*Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*,
403 F.3d 1364 (Fed. Cir. 2005)..........................................................30

*Neomagic Corp. v. Trident Microsystems, Inc.*,
287 F.3d 1062 (Fed. Cir. 2002).....................................................21, 23

*Nichia Corp. v. TCL Multimedia Tech. Holdings, Ltd.*,
　2017 WL 5719267 (D. Del. Nov. 28, 2017) ...........................................33

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
　521 F.3d 1351 (Fed. Cir. 2008)...........................................................18

*Omega Eng'g, Inc. v. Raytek Cor*p.,
　334 F.3d 1314 (Fed. Cir. 2003)..........................................................3, 6

*Ondeo Nalco Co. v. EKA Chemicals, Inc.*,
　2003 WL 1524661 (D. Del. Mar. 21, 2003) .............................................8

*Osram GmbH v. Int'l Trade Comm'n*,
　505 F.3d 1351 (Fed. Cir. 2007)...........................................................23

*Phillips v. AWH Corp.*,
　415 F.3d 1303 (Fed. Cir. 2005) (en banc)....................................... *passim*

*Phonometrics, Inc. v. Northern Telecom, Inc.*,
　133 F.3d 1459 (Fed. Cir. 1998)...........................................................28

*Precision Energy Services, Inc. v. ThruBit, LLC*
　4-11-cv-04492, Dkt. 109 (S.D. Tex. March 19, 2013) ...........................18

*Profectus Tech. LLC v. Huawei Techs. Co., Ltd.*,
　823 F.3d 1375 (Fed. Cir. 2016)......................................................23, 24

*Regents of the Univ. of California v. Eli Lilly & Co.*,
　119 F.3d 1559 (Fed. Cir. 1997)............................................................8

*Renishaw PLC v. Marposs Societa'per Azioni*,
　158 F.3d 1243 (Fed. Cir. 1998)....................................................1, 2, 25

*Rheox, Inc. v. Entact, In*c.,
　276 F.3d 1319 (Fed. Cir. 2002)............................................................6

*Roland Corp. v. inMusic Brands, Inc.*,
　2019 WL 5291175 (S.D. Fl. Aug. 1, 2019) .......................................7, 11

*Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*,
　824 F.3d 999 (Fed. Cir. 2016)............................................................41

*Safety Syringes Inc v. Becton Dickinson*,
　3-01-cv-02031, Dkt. 64 (S.D. Cal. March 7, 2003) ..............................18

*Sealant Sys. Intern., Inc. v. TEK Global, S.R.L.*,
　616 F. App'x 987 (Fed. Cir. 2015) ....................................................27

vi

*Schriber-Schroth Co. v. Cleveland Trust Co.*,
   311 U.S. 211 (1940) ...........................................................................4, 5, 15

*Shire ViroPharma Inc. v. CSL Behring LLC*,
   2019 WL 6118253 (D. Del. Nov. 18, 2019) .......................................................25

*SkinMedica, Inc. v. Histogen Inc.*,
   727 F.3d 1187 (Fed. Cir. 2013)...........................................................................31

*Team Worldwide Corp. v. Intex Recreation Corp.*,
   2021 WL 4130634 (Fed. Cir. Sept. 9, 2021) ................................................32, 34

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
   789 F.3d 1335 (Fed. Cir. 2015).............................................................................9

*Toro Co. v. White Consol. Indus., Inc.*,
   199 F.3d 1295 (Fed. Cir. 1999) ..........................................................................25

*TorPharm Inc. v. Ranbaxy Pharm., Inc.*,
   336 F.3d 1322 (Fed. Cir. 2003).............................................................................3

*Venetec Int'l Inc. v. Medical Device Grp.*,
   No. 3:06-cv-00083, Dkt. 74 (S.D. Cal. March 6, 2007) ...................................18

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*,
   473 F.3d 1173 (Fed. Cir. 2006)..........................................................................6, 9

*Vertical Doors Inc. v. Howitt*,
   2007 WL 6548859 (C.D. Cal. Dec. 14, 2007) ...................................................11

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996).............................................................................12

*Vivid Technologies, Inc. v. American Science & Engineering, Inc.*,
   200 F.3d 795 (Fed. Cir. 1999).............................................................................27

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015)................................................................32, 33, 35

*World Class Tech. Corp. v. Ormco Corp.*,
   769 F.3d 1120 (Fed. Cir. 2014)...........................................................................23

*WundaFormer, LLC v. Flex Studios, Inc.*,
   680 F. App'x 925 (Fed. Cir. 2017) ......................................................................30

**Federal Statutes**

35 U.S.C.
   § 112(f)..........................................................................................................32, 34, 35

**Other Authorities**

The Manual of Patent Examination Procedure The Manual of Patent Examination
 Procedure § 2111.03 ...........................................................................................29, 30

## I.   INTRODUCTION

Abbott's proposed claim constructions all suffer from the same flaw: they seek to expand or alter the scope of the alleged inventions to read those claims onto DexCom's continuous glucose monitoring ("CGM") products. Although Abbott boasts that its patents "revolutionized" the field, the asserted claims were **all** drafted **after** DexCom's G6 CGM system received FDA approval in March 2018. DexCom's G6 offers unparalleled sensor accuracy and safety features, and, most notably, was the first FDA-approved CGM to offer interoperability with automated insulin delivery (or "pump" therapy systems), an advance long awaited by the diabetes community.

Rather than compete in the marketplace, Abbott drafted new claims that are unsupported by patent specifications drafted over a decade ago. DexCom proposes constructions for each claim term that are "determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (citation omitted). Abbott's proposed constructions seek to divorce claim terms from the rest of the patent specifications, or to recapture claim scope that Abbott expressly abandoned. In some instances, Abbott argues for a "plain and ordinary meaning" that is anything but that. DexCom respectfully asks the Court to adopt its proposed constructions.

## II.   LEGAL STANDARDS

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) (citations omitted). Indeed, patent claims "provide the concise formal definition of the invention," and "[a]lthough courts are confined by the language of the claims, they are not [] confined to the

language of the claims in interpreting their meaning." *Autogiro Co. of Am. v. United States*, 384

F.2d 391, 395–96 (Ct. Cl. 1967).

The claims "must be read in view of the specification." *Phillips*, 415 F.3d at 1315

(citation omitted). A term's meaning "can only be determined and confirmed with a full

understanding of what the inventors actually invented." *Renishaw*, 158 F.3d at 1250 (citation

omitted). The specification may "reveal a special definition given to a claim term by the patentee

that differs from the meaning it would otherwise possess," or it may "reveal an intentional

disclaimer, or disavowal, of claim scope by the inventor"—both are dispositive as to claim

meaning. *Phillips*, 415 F.3d at 1316 (citations omitted).

A patent's prosecution history should also be considered as intrinsic evidence relevant to

a claim's meaning. *Id.* at 1317 (citations omitted). "[T]he prosecution history can often inform

the meaning of the claim language by demonstrating how the inventor understood the invention

and whether the inventor limited the invention in the course of prosecution, making the claim

scope narrower than it would otherwise be." *Id.* (citations omitted).

Extrinsic evidence, including dictionaries and expert testimony, may also be considered

for purposes of claim construction, although it is generally "less reliable than the patent and its

prosecution history." *Id.* at 1318. "[C]onclusory, unsupported assertions by experts as to the

definition of a claim term," however, "are not useful to a court. Similarly, a court should

discount any expert testimony 'that is clearly at odds with the claim construction mandated by

the claims themselves, the written description, and the prosecution history, in other words, with

the written record of the patent.'" *Id.* (quoting *Key Pharms v. Hercon Labs. Corp.*, 161 F.3d 709,

716 (Fed. Cir. 1998)).

## III.   DISPUTED CLAIM TERMS

### A.   U.S. Patent Nos. 10,881,341 ("'341 Patent"), 10,959,654 ("'654 Patent") & 11,000,216 ("'216 Patent") (collectively, "Curry Patents")

#### 1.   "first spring in a loaded position"

**('341 patent claims 1, 26; '654 patent claims 1, 20; '216 patent claims 1, 26)**

| ABBOTT'S CONSTRUCTION | DEXCOM'S CONSTRUCTION |
|---|---|
| Plain and ordinary meaning (no construction needed or "first spring that is loaded") | Compression spring loaded along its axis |

The Curry patents belong to the same patent family and share a common specification. DexCom's construction of "first spring in a loaded position" properly excludes claim scope that Abbott surrendered during prosecution.

#### a.   The '216 and '654 patents must be construed to exclude "torsion springs."

"The doctrine of prosecution disclaimer . . . preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution," *Omega Eng'g, Inc. v. Raytek Cor*p., 334 F.3d 1314, 1323 (Fed. Cir. 2003), including "subject matter that was ultimately rejected as unpatentable during prosecution," *TorPharm Inc. v. Ranbaxy Pharm., Inc*., 336 F.3d 1322, 1329 (Fed. Cir. 2003). Yet, through its plain and ordinary meaning construction, Abbott seeks to do exactly that.

The '654 and '216 patents' independent claims recite an insertion assembly including a "first spring in a loaded position." During prosecution, the patentee proposed four dependent claims reciting that the "first spring in a loaded position" is a "torsion spring." The examiner rejected these dependent claims for lacking sufficient written description support. Ex. 45 at 3; Ex. 48 at 3-4. The examiner found that "first spring in a loaded position" could *not* include a torsion spring, because of insufficient support in the specification. *See, e.g.*, Ex 45 at 3 ("Claims

28 and 44 include that the first spring . . . is a torsion spring, which does not appear to be supported in the specification as originally filed."). The examiner explained that "[a] torsion spring is disclosed only with respect to the embodiments illustrated in figs. 18-24 and 32-43, which do not read on the claims." *Id.* Additionally, the examiner explained that key features of the claimed invention "read on the embodiment shown in figs. 25-31. However, no torsion spring is disclosed in this particular embodiment. Rather, a helical compression spring (drive spring 3714) moves the sliding member within the straight track." *Id.*; Ex. 48 at 3-4 (discussing '216 patent). Thus, the examiner clearly determined that the scope of "first spring in a loaded position" could not include a torsion spring.

To overcome the rejection, Abbott canceled three of the rejected claims and amended the fourth to remove the torsion spring limitation. Ex. 46 at 5, 7, 8 ('654 patent); Ex. 49 at 7, 10. Abbott therefore acquiesced in the examiner's determination that the "first spring" excludes torsion springs, and clearly disavowed the claim scope it now seeks to recapture through claim construction.[1]

"It is a rule of patent construction consistently observed that a claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected, and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent." *Schriber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 220-21 (1940). In *Schriber-Schroth*, the claims recited an element that had been rejected in an

---

[1] The exclusion of torsion springs from the '216 and '654 patent claims is also consistent with the prosecution history of an earlier application sharing the same specification. During prosecution of the related application, the examiner found that several distinct species of invention in the specification featured "mutually exclusive structure[s]" and were "patentably distinct species" that were "not obvious variants of each other." Ex. 40 at 2. Abbott elected to proceed based on "Species B," the compression spring inserter species reflected in Figures 25-31 (the "3700" species)—not the torsion-spring-driven species reflected in Figures 18-24. Ex. 41 at 4.

interference and subsequently withdrawn by the patentee, such that the final claims did not include that element. *Id*. at 220. On appeal, the Supreme Court considered "whether in view of the amendments and their withdrawal the patent c[ould] rightly be construed as including the flexible webs in the claim allowed." *Id*. The answer was no. The Court explained: "[t]he patentee may not . . . give to an allowed claim a scope which it might have had without the amendments, the cancellation of which amount to a disclaimer." *Id*. at 221 (emphasis added); *see also id.* at 221-22 ("[T]he patentee, having acquiesced in their rejection, is no longer free to gain the supposed advantage of the rejected claims by a construction of the allowed claims as equivalent to them.").

Here, as in *Schriber-Schroth*, the prosecution history decisively demonstrates the meaning of the disputed term. The examiner found that the "first spring in a loaded position" could not include a torsion spring, else the claim would lack sufficient written description support. Having acquiesced in the rejection of the torsion spring claims, and by removing those limitations to secure allowance, Abbott cannot recapture surrendered claim scope (without which Abbott cannot hope to prove infringement here) by arguing that the "first spring" includes a torsion spring. Nothing in Abbott's opening brief supports such a misreading of the claims.

Relying on claim differentiation, Abbott argues the "first spring in a loaded position" recited in the three Curry patents cannot exclude torsion springs because two dependent claims in one of those patents (the '341 patent) recites "wherein the first spring is a torsion spring." D.I. 135 at 11. But Abbott fails to mention that the '216 and '654 patents include no such dependent claims limitations. As to the '341 patent, the Federal Circuit has repeatedly recognized that "prosecution history disclaimer can overcome the presumption of claim differentiation," *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1097 (Fed. Cir. 2013), and that such a

disclaimer may be based on the prosecution history of a related patent with common claim language, *Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1182 (Fed. Cir. 2006). Abbott's assertion that the same term should be construed consistently across patents in the same family essentially concedes that the disclaimers made in the prosecution of the '216 and '654 patents should also apply to the '341 patent. *See infra*, § IV(A)(1)(b).

Abbott next points to "general teachings" from the specification that it contends support its broad construction. But such general teachings cannot overcome Abbott's unmistakable disclaimer of claim scope during prosecution. Where, as here, "the patentee has unequivocally disavowed a certain meaning to obtain his patent, the doctrine of prosecution disclaimer attaches and narrows the ordinary meaning of the claim congruent with the scope of the surrender." *Omega Eng'g*, 334 F.3d at 1324. Such disclaimers must be enforced even where they alter the apparent meaning of a claim term or exclude embodiments described in the specification. *See Rheox, Inc. v. Entact, In*c., 276 F.3d 1319, 1327 (Fed. Cir. 2002) ("[W]here the prosecution history requires a claim construction that excludes some but not all of the preferred embodiments, such a construction is permissible.").

In *Rheox*, the Federal Circuit held that a patentee had disclaimed one member of a family of chemicals described in the claims, based on claim amendments that had specifically removed that member, even though the disclaimed embodiment was included in the specification as a preferred embodiment. 276 F.3d at 1320-21. Here, as in *Rheox*, the prosecution history requires that the claimed "first spring in a loaded position" be construed to exclude the torsion springs that the examiner rejected and that Abbott subsequently removed. *Id*.; *see also Atofina v. Great Lakes Chem. Corp.*, 441 F.3d 991, 998 (Fed. Cir. 2006) (affirming a narrow construction based on prosecution history and the specification); *Luma Corp. v. Stryker Corp.*, 273 F. App'x 948,

952 (Fed. Cir. 2008) (construing the post-rejection amended claims narrowly despite contrary language in specification).[2]

Abbott also argues that "first spring in a loaded position" must encompass torsion springs because the original proposed claims of the earliest predecessor application recited "torsion spring" in a dependent claim. D.I. 135 at 13. But Abbott fails to mention that those original claims never issued in that form; the claims of the '453 patent that resulted from this application do not contain the language upon which Abbott relies. *See* Ex. 101. Unsurprisingly, Abbott offers no authority for the notion that the patentee's initial claims from 2010 should somehow control here—despite the intervening prosecution history of that original application and the much later applications underlying the patents-in-suit.

Abbott also contends there was no disclaimer because it canceled and amended claims reciting "torsion spring" "for the sole purpose of advancing prosecution." D.I. 135 at 14; *see also* Ex. 46 at 9, Ex. 49 at 10. But courts have consistently found such statements ineffective to avoid disclaimer. *See, e.g., Biogen, Inc. v. Berlex Labs., Inc*., 318 F.3d 1132, 1142 (Fed. Cir. 2003). In *Biogen*, the Federal Circuit found disclaimer despite the patentee's similarly stated motivation only to expedite prosecution, explaining that "claims that were deliberately limited in order to expedite prosecution by avoiding examination cannot regain that scope for infringement purposes." *Id*.; *see also Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.* 535 U.S. 722, 734 (2002) ("A rejection indicates that the patent examiner does not believe the original claim could be patented. While the patentee has the right to appeal, his decision to forgo an appeal and submit an amended claim is taken as a concession that the invention as patented does

---

[2] Courts have construed "spring" terms even more narrowly than DexCom proposes here, where the intrinsic evidence so requires. *See Roland Corp. v. inMusic Brands, Inc*., 2019 WL 5291175, at *22-23 (S.D. Fl. Aug. 1, 2019) ("conical coil spring").

not reach as far as the original claim."). A patentee's stated desire to "expedite prosecution" does not avoid disclaimer where claim scope was surrendered in order to do so. *See Biogen*, 318 F.3d at 1142.

Abbott's district court decisions are not to the contrary. In *Ondeo Nalco Co.*, for instance, the district court found no disclaimer where the applicant, without explanation, canceled a claim that the examiner had found to be "redundant." *Ondeo Nalco Co. v. EKA Chemicals, Inc.*, 2003 WL 1524661, at *1 n. 21 (D. Del. Mar. 21, 2003). Similarly, in *Enzo*, the applicant canceled a claim that the examiner had found lacking in specificity, without providing any indication as to why the amendment was made. *Enzo Life Scis., Inc. v. Gen-Probe, Inc.*, 2015 WL 4101205, at *7 (D. Del. July 7, 2015). Here, the prosecution history demonstrates that the earlier claims were amended because the examiner found insufficient support. And Abbott cannot avoid disclaimer by arguing that it "expressly disagreed" with the examiner's determination that proposed claims reciting a torsion spring were not sufficiently supported. *See* D.I. 135 at 14. "[T]he question of the correctness of the examiner's rejection is properly addressed on direct appeal from the denial of the patent, and will not be revisited in an infringement action." *Regents of the Univ. of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1572 n.6 (Fed. Cir. 1997).

Abbott also argues that DexCom's proposed construction limits the claim to only a particular type of spring from the preferred embodiment. D.I. 135 at 13. Not so. As the examiner explained, this embodiment features a "helical compression spring" as the "first spring." Ex. 45 at 3. "Compression spring loaded along its axis" includes multiple types of springs, while excluding the torsion springs that Abbott disclaimed during prosecution of the patents. *See* Vaitekunas Decl. ¶¶ 39-40. If the Court finds it more appropriate to express this scope restriction in different words than DexCom has proposed, DexCom would not object to a formulation that

makes clear that the "first spring in a loaded position" cannot be a torsion spring.

Finally, Abbott attempts to bolster its plain and ordinary meaning construction with an irrelevant expert declaration. Extrinsic evidence is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317. Here, the proffered expert testimony simply repackages attorney argument, while ignoring the singular issue in dispute: whether the claim term is subject to a disclaimer limiting its scope. Abbott's expert mentions the prosecution history in a single cursory paragraph asserting that he reviewed the histories and "did not see the Patent Office Examiner ever conclude, or the applicant ever indicate, that the generic term 'first spring in a loaded position' in the independent claims is restricted to only a compression spring loaded along its axis." Leinsing Decl. ¶ 81. In short, Abbott's extrinsic evidence has no bearing on the issues at hand and should be disregarded. *See infra* n.16.

### b.    The same construction applies to the '341 patent.

Abbott's disclaimer of claim scope in the prosecution of the '654 and '216 patents also extends to the '341 patent.[3] *Ventana*, 473 F.3d at 1182 (disclaimer based on prosecution history of related patent with common claim language); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015) ("A statement made during prosecution of related patents may be properly considered in construing a term common to those patents."). "First spring in a loaded position" should be construed for all three patents consistent with the prosecution history of the only two patents for which the examiner expressly evaluated the permissible claim scope by excluding torsion springs.

In *Microsoft Corporation v. Multi-Tech Systems, Inc.*, the Federal Circuit held that a

---

[3] Abbott agrees that this term should be construed consistently across the three Curry patents. D.I. 135 at 11.

disclaimer arising from statements made in the prosecution of one patent also applied to the same term appearing in an earlier-issued patent sharing the same specification. 357 F.3d 1340, 1349-50 (Fed. Cir. 2004). In so holding, the court expressly rejected the patentee's argument that any disclaimer could not apply to a patent that had already issued when the relevant statements were made. *Id*.

The doctrine of claim differentiation, upon which Abbott relies, does not require a different result. "[C]laim differentiation only creates a presumption that each claim in a patent has a different scope; it is not a hard and fast rule of construction." *Kraft Foods, Inc. v. Int'l Trading Co*., 203 F.3d 1362, 1368 (Fed. Cir. 2000) (quotation omitted). Courts have consistently held that claim differentiation must yield to the more fundamental rule that a patentee may not later reclaim what it disclaimed during prosecution of its patents. *Id*.; *see also, e.g., Biogen*, 713 F.3d at 1097.

Every time the examiner expressly addressed whether torsion springs could be included within the scope of the proposed claims, she found that they could not. Although Abbott asserts that "the Examiner expressly found that 'first spring' includes torsion springs" in the context of the '341 patent, D.I. 135 at 13, this supposed finding is based solely on the examiner's allowance of a set of claims that included the dependent "torsion spring" claims. In allowing the claims, the examiner did not expressly address whether torsion springs could be included within the proposed claims, as Abbott contends; she did not mention the "torsion spring" claims at all. *See* Ex. 102.

Accordingly, consistent with the express disclaimer of claim scope in the prosecution of the related '654 and '216 patents, the "first spring in a loaded position" in claims 1 and 26 of the '341 patent must also be construed to exclude torsion springs.

### B.    U.S. Patent No. 10,973,443 ("'443 Patent" or "Funderburk Patent")

The '443 patent, entitled "Sensor Inserter Assembly," was filed on April 26, 2018 and

claims priority from a November 5, 2002 provisional application. The '443 patent's purported

invention is directed to "devices and methods for inserting a subcutaneously implantable

electrochemical sensor in a patient" for monitoring of analytes like glucose. '443 patent at 2:20–

23.

### 1.    "first spring"

### (Claims 1, 13, 14)

| ABBOTT'S CONSTRUCTION | DEXCOM'S CONSTRUCTION |
| --- | --- |
| Plain and ordinary meaning (no construction needed or "first spring") | Compression spring loaded along its axis |

DexCom's proposed construction of "compression spring loaded along its axis" gives

proper scope to the claimed "first spring" based on the specification, Abbott's disclaimer of

scope during prosecution, and the extrinsic evidence. In contrast, Abbott's proposed construction

conflicts with both the intrinsic and extrinsic evidence, improperly seeking to expand the scope

of an alleged invention from two decades ago to read on to DexCom's products.

Contrary to Abbott's contention that "courts specifically have declined to construe

'spring,'" D.I. 135 at 7, multiple courts have adopted specific constructions for "spring." *See,*

*e.g.*, *Roland*, 2019 WL 5291175, at *22; *Lift-U v. Ricon Corp.*, 2011 WL 5118632, at *3–7 (N.D.

Cal. Oct. 28, 2011); *Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 552 F. Supp. 2d 810, 813

(N.D. Ill. 2008); *Vertical Doors Inc. v. Howitt*, 2007 WL 6548859, at *12–13 (C.D. Cal. Dec. 14,

2007).[4] Indeed, for the '443 patent, the specification indicates a specific meaning of the claimed

---

[4] Abbott's sole cited authority, *Ethicon*, is distinguishable. *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 2017 WL 1313851 (S.D. Ohio Apr. 10, 2017). There, the court rejected a

"first spring." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Notably, the *only* type of spring disclosed in the specification as the "first spring" is a

compression spring loaded along its axis.[5] Figures 12 and 16 are exemplary:



narrower interpretation for the claimed "spring" because the proposed narrower construction
excluded embodiments disclosed in the patent, and the prosecution history was indeterminate. *Id.*
at *3-4. Here, DexCom's proposed construction covers all disclosed embodiments and is
supported by the specification and the prosecution history.

[5] The phrase "compression spring loaded along its axis" refers to, among others, springs such as
(1) coiled compression springs; (2) wave springs; or (3) accordion springs. *See* Vaitekunas Decl.
¶ 61.

The '443 patent also discloses that the first spring of Figure 16 has certain dimensions in its preferable form—dimensions which correspond to how skilled artisans refer to compression springs.[6] *See* Vaitekunas Decl. ¶ 56. In addition to *only* disclosing compression springs loaded along their axes, the '443 patent also *teaches away* from utilizing other kinds of springs that exert rotational forces, such as torsion springs. In particular, the specification teaches constraining the first spring and the shuttle between "guides" from the housing that are meant to limit any rotational force of the spring acting on the shuttle when the first spring drives the shuttle during compression/insertion. *See, e.g.*, Ex.2 , 14:29–37; *See* Vaitekunas Decl. ¶ 58.

The Federal Circuit has explained terms may be limited to a particular scope where, as here, all the disclosures in the patent expressly disclose a term in this specific way, and never in another. *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1370 (Fed. Cir. 2003) (construing a claim to require "play" where the word "play" was not recited because "all the figures and embodiments disclosed in the asserted patents imply play, or, . . . expressly disclose play," and "the patents d[id] not show or suggest any systems without play"); *In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1150 (Fed. Cir. 2012) (limiting the scope of the claims because "Abbott's patents repeatedly, consistently, and exclusively" depicted one specific way of operating (internal quotation marks and citation omitted)). "[W]here the specification makes clear at various points that the claimed invention is narrower than the claim language might imply, it is entirely permissible and proper to limit the claims." *Alloc*, 342 F.3d at 1370. (citation omitted)

Abbott cannot point to *any* portion of the '443 patent where a spring that is not a "compression spring loaded along its axis" is disclosed. Abbott instead cites only to *a single word*—"wound"— in the patent specification to support its improperly broad construction. But

---

[6] A torsion spring, on the other hand, is usually described by at least its diameter. *See* Vaitekunas Decl. ¶ 57. No such dimensions are disclosed.

Abbott's reliance on the disclosure of a "wound spring" in the '443 patent is unpersuasive for at least two reasons. First, the reference to "wound" appears before a disjunctive "or" with the term "cocked," suggesting it is being used grammatically to describe whether the spring is in tension (i.e., as a synonym to "cocked"), and not in reference to other spring types, like torsion springs. *See* Vaitekunas Decl. ¶ 59. Even Abbott's own extrinsic evidence suggests that "compression springs" can be "helically *wound* springs." *See* D.I. 135, Ex. 72 at 4.

Second, even if the term "wound" were being used in reference to other spring types besides compression springs loaded on their axes (again, it was not), any claim scope captured by the term "wound" was *explicitly disclaimed* during prosecution. *See Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 2011 WL 4949042, at *5 (S.D. Cal. Oct. 18, 2011) ("Statements in the specification relating to limitations in originally-filed claims are not relevant when the claims as issued recite no such limitation.") (citing *Spine Sols., Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1315 (Fed. Cir. 2010)). Abbott relies on the examiner's rejection of the claims in view of a prior art reference, Heller, which the examiner characterized as teaching a "wound" spring.[7] *See* Ex. 15 at 5. Abbott thus suggests that the proper construction of the claimed "first spring" is a genus comprising wound *and* compression springs, among others. *See* D.I. 135 at 10. But Abbott fails to mention that this rejection was issued when the pending claims recited "wherein the spring is a coil spring *or a wound spring*." Ex. 24 at 1 (emphasis added).

---

[7] Heller, which also lists Funderburk as an inventor, has a drive spring (Fig. 33), *see* Ex. 103, identical to the spring depicted in Figure 12 of the '443 patent—definitively not a torsion spring. *See* Vaitekunas Decl. ¶ 53.

After this rejection, Abbott amended its claims to *remove* the phrase "or a wound spring":

> 18.    (Currently amended)  The method of claim 17, wherein the <u>first</u> spring is a coil spring ~~or a wound spring~~.

Ex. 25 at 1. Abbott thus explicitly disclaimed any broader scope allegedly implied by the claim language, "wound spring." *See Corbin Cabinet Lock Co. v. Eagle Lock Co.*, 150 U.S. 38, 40 (1893); *see also Schriber-Schroth Co.*, 311 U.S. at 220-21.

Abbott's claim differentiation argument similarly fails. Abbott argues that if DexCom's construction is applied, independent claims 1 and 13 would become equal in scope with their respective dependent claims, 3 and 15, violating principles of claim differentiation. *See* D.I. 135 at 8–9. *First*, this is incorrect. Under DexCom's proposed construction for "first spring," the independent claims remain broader than their dependent claims. Claims 1 and 13 encompass a "first spring" that is "a compression spring loaded along its axis," including sub-types such as coil springs, accordion springs, and wave springs. *See* Vaitekunas Decl. ¶ 61; *see also infra* n.2. Claims 3 and 15 are narrower, covering only the coil sub-type.

*Second*, Abbott's clear disavowal of claim scope is itself sufficient to defeat its claim differentiation argument. Claim differentiation principles cannot restore a broader scope to claims that Abbott sacrificed through amendment during prosecution, even if those amendments left the independent claims and dependent claims commensurate in scope. Claim differentiation is not an absolute canon; it "cannot overshadow the express and contrary intentions of the patent draftsman." *Hormone Res. Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1567 n.15 (Fed. Cir. 1990); *see also supra* § IV(A)(1)(b).

Finally, Abbott's inconsistent and muddled discussion of its extrinsic evidence

underscores why "first spring" must be construed in light of the patent's specification. Abbott first asserts that the meaning of the claimed "spring" is "basic," "common," and "understandable . . . to lay people." D.I. 135 at 6. But Abbott also submits an expert declaration, which in turn cites various pieces of extrinsic evidence, discussing different technical understandings of springs. *See* Leinsing Decl. ¶¶ 47–50. According to Abbott, the term is both so basic that no construction is needed, yet so technical that an expert, with the aid of extrinsic evidence, is required to discern its meaning. Notably, even the extrinsic evidence Abbott cites supports DexCom's position that there is *not* one common understanding of the term "spring."[8] *See, e.g.*, D.I. 135, Ex. 72 at 3 (explaining that "many structural and machine elements, discussed throughout various sections of th[e] book, can easily be put into the general category of springs"). Dictionaries (from the relevant time period) confirm this understanding, that is, that springs come in many forms, shapes, and sizes, for many different uses, and are not understood as one-size-fits-all solutions. *See* Vaitekunas Decl. ¶ 49, *see also* Ex. 104 ("A device capable of deflecting so as to store energy"); Ex. 105 ("A piece of bent or coiled metal with elastic properties").

In sum, "[b]ecause the meaning of [the] claim term ["spring"] . . . is often not immediately apparent, and because patentees frequently use terms idiosyncratically," this Court should look to "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean," including the specification and the prosecution history. *Phillips*, 415 F.3d at 1314 (citation omitted). The specification and

---

[8] Abbott's extrinsic evidence also lacks probative value because a majority of the evidence is from an irrelevant time period, including sources released *twenty years after* the alleged priority date for the '443 patent. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) (The relevant inquiry into the meaning of claim terms is to "a person of skill in the art *at the time of the invention*.") (emphasis added).

prosecution history here demonstrate that the best understanding of the claimed "first spring" is a "compression spring loaded along its axis." Abbott should not be allowed to stretch its claim scope merely because it now realizes that DexCom's products utilize a different spring than what Abbott purportedly invented two decades ago.

### C. U.S. Patent Nos. 10,945,649 ("'649 Patent") & 11,013,440 ("'440 Patent") (collectively, "Lee Patents")

The Lee patents are directed to an inserter that uses a torsion spring and rotor follower projection to advance first and second slidable bodies towards an insertion site. More specifically, the first slidable body "compris[es] a slot" in which the rotor follower projection "is received." Ex. 3, claims 1, 18; Ex. 4, claim 1. A "torsion spring is configured to cause rotation of … the rotor follower projection," which in turn, "causes the first slidable body [and] a second slidable body … to advance … towards an insertion site." *Id.* Although the patents claim priority from a March 24, 2010 provisional application, claims reciting a rotor, torsion spring, and slot were submitted for the first time on April 5, 2018—after DexCom's accused G6 received FDA approval. *See* Ex. 34.

#### 1. "slot"

**('649 patent claims 1, 6, 8, 18; '440 patent claim 1)**

| ABBOTT'S CONSTRUCTION | DEXCOM'S CONSTRUCTION |
|---|---|
| Plain and ordinary meaning ("a narrow opening, groove, or channel") | Narrow opening through the first slidable body, through which the rotor follower projection extends |

Abbott contends the term "slot" should be given a "plain and ordinary" meaning while simultaneously proposing its own definition for which it adduces an expert declaration, dictionaries, and technical guides as support. According to Abbott, the parties' "fundamental[]" "dispute" is not whether "slot" should be construed, but "whether, . . . the term 'slot' encompasses *both* through-slots and non-through-slots" instead of, as DexCom proposes, only a

through-slot. D.I. 135 at 16. Abbott thus concedes that construction is necessary. "When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd*., 521 F.3d 1351, 1362 (Fed. Cir. 2008); *see also Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1321 (Fed. Cir. 2016); *see also, McRO, Inc. v. Bandai Namco Games Am. Inc*., 959 F.3d 1091, 1099 (Fed. Cir. 2020) ("What matters is the meaning most appropriate in the *context* of the particular patent.") (emphasis added).

Despite Abbott's insistence that the broadest possible dictionary definition is the term's ordinary meaning, courts applying *Phillips*—not a "broadest reasonable interpretation" standard—have regularly construed the term "slot" more narrowly in the context of the patents at issue.[9] Here, Abbott ignores that context and seeks to expand the scope of the patent beyond "what the inventors actually invented." *Phillips*, 415 F.3d at 1316. A through-slot allows the Lee inserter to perform both insertion and retraction; a groove (or in Abbott's phraseology, a "non-through-slot") does not. Effectively, Abbott claimed a mail slot–but now attempts to claim a letter holder too:

  

---

[9] *See, e.g.*, *Casa Herrera Inc. v. JC Ford Co.*, No. 8-06-cv-00092, Dkt. 66 at 8 (C.D. Cal. Feb. 4, 2008) ("a defined passage"); *Venetec Int'l Inc. v. Medical Device Grp.*, No. 3:06-cv-00083, Dkt. 74 at 6 (S.D. Cal. March 6, 2007) ("a passage"); *Precision Energy Services, Inc. v. ThruBit*, LLC, 4-11-cv-04492, Dkt. 109 at 14 (S.D. Tex. March 19, 2013) ("the openings at the end of the slot"); *Safety Syringes Inc v. Becton Dickinson*, 3-01-cv-02031, Dkt. 64 at 8 (S.D. Cal. March 7, 2003) ("a narrow opening into which something can be inserted").

Abbott's own dictionary definitions establish that in some contexts a slot *cannot* be a groove–but Abbott ignored those portions of their definitions in its brief. *See, e.g.*, Ex. 76 ("a narrow, elongated depression, groove, notch, slit, or aperture, *esp. a narrow opening for receiving or admitting something, as a coin or a letter*"); D.I. 135 at 15 (omitting italicized portion). And as evident from the claim language, the specification, and the prosecution history, this is one such context.

### a. Operation of the Lee inserter.

"The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." *Phillips*, 415 F.3d at 1313. The claim language recites that a slot in the first slidable body "receive[s]" a rotor follower projection, and that rotation of the rotor and/or its projection "***causes*** the first slidable body [and] a second slidable body… to advance within the inserter housing in a linear direction towards an insertion site . . . ." Ex. 3, Claim 1.

A skilled artisan would understand that the claimed "slot" plays some functional role in "caus[ing] … advance[ment]" of both slidable bodies. *See* Vaitekunas Decl. ¶¶ 70-72. However, the claim language alone does not specify how the slot would perform that role. *Id.* ¶ 73. A skilled artisan would therefore consult the context of the patent for further clarification. *Id.*; *see also Phillips*, 415 F.3d at 1313.

The only figures or embodiments that include a rotor follower projection, as required by the claims, are found in Figures 26 through 46, which depict portions of two embodiments, Embodiment 1200 (Figures 26-36) and Embodiment 1300 (Figures 37-46); *see also* '649 patent at 29:25-30:6; *see* Vaitekunas Decl. ¶¶ 74-76. Because embodiment 1200 relies on manual insertion, Embodiment 1300 is the only embodiment that uses a torsion spring as claimed to

effectuate advancement. *See* Ex. 3 29:40-49; *See* Vaitekunas Decl. ¶¶ 75-82.

In Embodiment 1300, as shown in, *e.g.*, Fig. 45, a rotor follower projection (1364) engages with a slot (1360 on the first slidable body (inserter 1334).



**FIG. 45 (Embodiment 1300) (annotated)**

As further shown in, *e.g.*, Fig. 38, the rotor follower projection extends through the first slot to reach a second slot located on the second slidable body (needle retractor 1328). *See* Vaitekunas Decl. ¶¶ 83, 85.



**FIG. 38 (Embodiment 1300) (annotated)**

The insertion of the sensor and retraction of the needle in Embodiment 1300 operates as follows: Release of the torsion spring causes the rotor, and thus the rotor follower projection, to rotate. The rotor follower projection, in turn, engages both the first slidable body through its slot and the second slidable body through its slot. Ex. 3 29:65-30:6. As the rotor rotates, the rotor follower projection, sliding within these two slots, initially advances both slidable bodies down toward the skin but later pulls only the second slidable body (with the needle) up from the skin via its slot. *See id*. 30:3-6; *see* Vaitekunas Decl. ¶ 83.

### b.    Abbott's broad definition fails to satisfy the claim language and renders the supposed invention inoperable.

"We begin, as always, with the language of the claim." *Neomagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1071 (Fed. Cir. 2002). The asserted claims require that the rotation of the rotor follower projection "cause[] the second slidable body … to advance within the inserter housing." As shown in Embodiment 1300, the only way rotation of the rotor follower projection could cause that advancement in this type of system is if the projection extended *through a slot in the first slidable body* and into a second slot on the second slidable body. *See* Vaitekunas Decl. ¶¶ 83, 85. For that to happen, the claimed slot must be a through-slot. If the "slot" were merely a "groove" or "channel," the rotor follower projection could not physically extend through the slot on the inserter (1360) and into the slot on the retractor (1362). That is, the rotor follower projection could not contact, let alone advance, the second slidable body. *Id.*

DexCom's construction "satisf[ies] the entirety of the claim." *Howmedica Osteonics Corp. v. Zimmer, Inc.*, 822 F.3d 1312, 1321 (Fed. Cir. 2016). In *Howmedica*, the Federal Circuit affirmed a narrower construction of "juxtaposed" as meaning two elements were placed "midway" on a taper instead of near each other (as the ordinary meaning would suggest) because the claim required that the placement of the elements "maintain[]" the "effectiveness" of the

taper. *Id.* at 1321-22. Because "the only instances" of the specification discussing "effectiveness" placed the two elements midway, the court rejected a broader definition for "ignor[ing] the other claim language at issue" and failing to "satisfy the entirety of the claim." *Id.* Likewise here, to satisfy the limitation that the rotation of rotor follower projection causes advancement of the second slidable body, the "slot" on the first slidable body *must* be a through-slot, as described in the only discussions in the patent discussing a rotor follower projection. *See* Vaitekunas Decl. ¶¶ 83-85.

Similarly, in *Flex-Rest, LLC v. Steelcase, Inc.*, where the district court had construed a claimed "sidewall" in a computer keyboard as extending "upward," the patentee on appeal argued that the "sidewall" contained no directional limitation and could therefore include a "downwardly extending []wall." 455 F.3d 1351, 1361-62 (Fed. Cir. 2006). The Federal Circuit rejected the argument, noting that the sole figure that "mention[ed] this structure" depicted upwardly extending walls. *Id.* Downwardly extending walls, contrary to the function shown in the figure, "would not interact with or play any role in supporting the keyboard." *Id.* Here, Abbott's construction of a "groove" or "channel" would not allow the rotor follower projection to "interact with or play any role in" advancing or retracting the second slidable body, as the patent describes.

But the problem with Abbott's broad construction runs deeper than ignoring a claim limitation. Without that limitation—that is, without the advancement of the second slidable body that "is coupled with a needle"—the inserter would fail to insert at all, let alone retract. *See* Vaitekunas Decl. ¶ 85. "[I]t is entirely proper to consider the functions of an invention in seeking to determine the meaning of particular claim language." *ICU Medical Inc. v. Alaris Medical Sys., Inc.*, 558 F.3d 1368, 1375 (Fed. Cir. 2009). Where a proposed construction would fail to allow

the invention to achieve a key purpose or objective of the invention, it is disfavored. *See, e.g.*, *World Class Tech. Corp. v. Ormco Corp.*, 769 F.3d 1120, 1124-26 (Fed. Cir. 2014) (affirming a narrower construction of "when" because the specification's discussion of the problem the invention solved was achieved only with such construction); *cf. Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) ("[A] claim interpretation that would exclude the inventor's device is rarely the correct interpretation.").

DexCom's proposed construction does not, as Abbott suggests, seek to import a limitation "from an embodiment." *See* D.I. 135 at 19. As long as the claimed slot receives a rotor follower projection therethrough, the slot could be a different shape, size, or dimension, or could be placed in a different location on the first slidable body. *Cf. NeoMagic Corp.*, 287 F.3d at 1070–73 (limiting "coupling" to being between two different voltages as shown in a single example and noting "[w]hile it would be improper to limit the claims to the particular voltages used in the preferred embodiment (zero and -1.5 volts), it is perfectly clear that the specification contemplates that the two voltages be different from each other"); *Profectus Tech. LLC v. Huawei Techs. Co., Ltd.*, 823 F.3d 1375, 1380-82 (Fed. Cir. 2016) (limiting "mountable" frame to mean "having a feature for mounting" and noting that the construction "leav[es] open what types of features could be sufficient to be deemed 'mountable'").

The prosecution history further confirms that a through-slot is "what the inventors actually invented" and not an arbitrarily favored embodiment. *Phillips*, 415 F.3d at 1316. Claims related to a slot, rotor, and rotor follower projection appeared for the first time in an April 2018 application that additionally claimed a "retractor body compris[ing] a slot adapted to receive the rotor follower projection." Ex. 34 at 3. As support for that new claim, Abbott cited to what is now Embodiment 1300 and the corresponding description in the specification. Ex. 35; *see also*

Ex. 106, ¶¶ [00198]-[00200]; Ex. 107, Figs. 37-46; Ex. 108. That is, pointing to Embodiment 1300 as support, the April 2018 amendment expressly claimed a second slot receiving the rotor follower projection—a limitation possible only if the first slot is a through-slot. Subsequent continuations also claimed a "slot" in a second slidable body that "received" a "projection." *See* Exs. 31, 33.

After the G6 had been publicly available for over two years, however, Abbott amended its claims in August 2020 to omit references to this second slot for the first time. Ex. 109. That application, and a continuation of it, matured into the '649 and '440 patents, respectively. Although Abbott removed the claimed second slot after the accused G6 was public, the prosecution history nevertheless sheds light on "what the inventors actually invented," *Phillips*, 415 F.3d at 1316—a through-slot. If the rotor follower projection is to extend through to a slot on the second slidable body to affect the claimed insertion and retraction, the slot on the first slidable body *must* be a through-slot.

### c.   The relevant embodiments consistently limit "slot" to mean a through-slot, opening, or passage.

DexCom's proposed construction is also grounded in the patents' embodiments. Where a patent's embodiments "consistently" limit the scope of a term, courts construe the term in keeping with those embodiments. *See, e.g.*, *Eon Corp.*, 815 F.3d at 1321 (construing term narrowly where "[t]he patents consistently describe the 'portability' feature of the invention" in a narrower way than "theoretically capable of being moved"); *Profectus*, 823 F.3d at 1380-82 (affirming narrower construction of "mountable" to mean "having a feature for mounting" because "[i]n every embodiment disclosed in the specification, the picture display or frame includes a feature for mounting the device to a wall or on a tabletop"); *Flex-Rest*, 455 F.3d at 1361-62 (affirming sidewall must be only upwardly extending where single figure mentioning

24

the sidewall showed only an upwardly extending sidewall); *Toro Co. v. White Consol. Indus.,
Inc.*, 199 F.3d 1295, 1301 (Fed. Cir. 1999) (construing the disputed term as requiring the
restriction ring and cover be attached because "[n]owhere in the specification, including its
twenty-one drawings, is the cover shown without the restriction ring attached to it"). None of
these cases required a modifier limiting the disputed term, as Abbott suggests. *See* D.I. 135 at 17-
18 (arguing that DexCom's position would require "through-" to qualify "slot").[10]

"Here, Abbott's patents repeatedly, consistently, and exclusively depict" the relevant slot
as an opening, passage, or through-slot. *Abbott Diabetes*, 696 F.3d at 1150 (limiting scope of
"electrochemical sensor" to exclude certain structures). That is, the only "slot" through which a
rotor follower projection is received is described or shown as a through-slot. *See* Vaitekunas
Decl. ¶ 83; *see* Figs. 38, 39, 45, 46; Ex. 3 29:17-30:6. Conversely, "*nowhere* in the specification,
including its [137] drawings," is there a groove that receives a rotor follower projection. *Toro
Co.*, 199 F.3d at 1301 (emphasis added); *see* Vaitekunas Decl. ¶ 86. The slot here, therefore, is
properly understood as a "narrow opening through the first slidable body, through which the
rotor follower projection extends."

Abbott's arguments to the contrary are unavailing. *First,* Abbott points to two examples
in the specification to argue that, because the specification sometimes uses "slot" to mean a

---

[10] Abbott's cited cases are all inapposite. *See* D.I. 135 at 17-18. In *Shire ViroPharma Inc. v. CSL
Behring LLC*, the court refused to limit "pharmaceutical compositions" to *liquid* pharmaceutical
compositions because the specification *expressly provided* that the "pharmaceutical
composition" could "be prepared … in dried powder form." 2019 WL 6118253, at *10 (D. Del.
Nov. 18, 2019). Similarly, in *Eli Lilly & Co. v. Eagle Pharms., Inc.*, the court refused to limit
"administration" to "liquid administration" where the specification expressly provided for, *e.g.*,
administration "in the form of a vitamin supplement, namely as a tablet administered orally."
2019 WL 1299212, *4 (D. Del. Mar. 21, 2019). Here, the specification does not include a slot
that receives a rotor follower projection and is a groove; indeed, a groove slot would mean that
Abbott's claimed inserter would not work. Abbott cites as further support *Renishaw PLC*, which
again does not support Abbott's broad construction. *See* 158 F.3d at 1252 (limiting term scope
where patentee's "broad" construction "would require us to ignore the abounding statements in
the written description that point decidedly the other way").

25

"non-through-slot," the claim term must encompass that usage. D.I. 135 at 17-18.  But the two

isolated references to "slot" are used in entirely different contexts, and are therefore immaterial

to the *claimed* slot. *See* Vaitekunas Decl. ¶ 93. By the language of the claim, a relevant "slot" is

one in the first slidable body that receives a rotor follower projection. Neither of the two grooves

is such a slot.[11]

      The Federal Circuit has rejected an argument similar to Abbott's here. *See Cloud Farm*

*Assocs. LP v. Volkswagen Grp. of Am., Inc.*, 2017 WL 74768 (Fed. Cir. Jan. 9, 2017). There, the

court upheld a narrower definition of "seal" and "prevent" in patents directed towards vehicular

tilt control to mean the full "stopping," rather than "minimizing" or "hindering" of flow. The

patentee objected that "the district court essentially imposed the word 'hermetic' on the 'seal'

terms," as evidenced by an embodiment in which an opening separating fluid could be adjusted

in size to allow fluid to continue to flow. *Id.* at *5. Both the Delaware district court and the

Federal Circuit rejected the argument, the Federal Circuit noting that "citations which allow for

partial closure are in relation to the invention's shock absorption function, not its tilt controlling

function, *which is what is relevant to the asserted claims*." *Id.* at *5-6 (emphasis added); *see also*

*Cloud Farm Assocs., L.P. v. Volkswagon Grp. of Am., Inc.*, 2012 WL 3069405 (D. Del. July 27,

2012). "Thus, any language discussing 'damping' or 'cushioning' is *irrelevant* to the claim

constructions here because the asserted claims are directed only towards the tilt controlling

function." *Cloud Farm*, 2017 WL 74768 at *5 (emphasis added). Here, as in *Cloud Farm*,

citations to slots that do not receive a rotor follower projection are simply "irrelevant to the claim

constructions here." *Id.*

---

[11] The first set of "slots" (1254) "engage[s]" with tabs on the first slidable body to join together two parts of the device. Ex. 3, 29:31-33. In the second example, a spring that engages a sensor contacts said sensor by sitting atop the "slot" (5994), which "receive[s]" the sensor. *Id.* at 38:29-33; *see* Vaitekunas Decl. ¶ 92.

*Second,* Abbott argues that, because not every slot in the specification extends "through a first slidable body" nor receives a rotor follower projection, DexCom's construction is therefore "wrong." *See* D.I. 135 at 17-18. This argument is exactly backwards. DexCom does not offer its proposed construction as a general definition of the word "slot"—it offers it to define the claimed slot. There are multiple uses of "slot" in the specification, but only one use of slot that is relevant to the claims here. Abbott's citation to *Insul Corp. v. Airlite Plastics Co.*, 854 F.3d 1344, 1359 (Fed. Cir. 2017) only further supports the point. *See* D.I. 135 at 17. There, the appellant argued that certain terms could be construed differently between two claims. *Insul Corp.* 854 F.3d at 1359. Here, in contrast, DexCom's construction properly and consistently construes all the recited claimed "slot[s]."

### d.    Construction as a "through-slot" would resolve the parties' dispute.

Finally, Abbott contends that DexCom's proposed construction fails because it purportedly reads in other "structural relationships" with "slot." D.I. 135 at 17. But as Abbott concedes, the "fundamental dispute" between the parties is whether the "slot" should be construed as a "through-slot" or something broader. Disputed terms "need to be construed … only to the extent necessary to resolve the controversy." *Vivid Technologies, Inc. v. American Science & Engineering, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999).

DexCom's construction (or a simplified variant thereof) satisfies the entirety of the claims, allows the claimed invention to work, finds support in the prosecution history, and reflects the "consistent" use of the relevant slot in the specification. This court should reject Abbott's attempt to broaden its claim language in order to "claim more than the patentee actually invented." *Sealant Sys. Intern., Inc. v. TEK Global, S.R.L.*, 616 F. App'x 987, 993 (Fed. Cir. 2015).

### 2. "rotor comprising a cylindrical shape"

### ('649 patent claim 18; '440 patent claim 1)

| ABBOTT'S CONSTRUCTION | DEXCOM'S CONSTRUCTION |
|---|---|
| Plain and ordinary meaning ("rotor having an overall cylindrical shape") | Plain and ordinary meaning |

The plain and ordinary meaning of the phrase "rotor comprising a cylindrical shape" should govern. Abbott's proposed construction—"rotor having an overall cylindrical shape"— lacks support in the patents and should be rejected.[12]

The intrinsic evidence of the '649 and '440 patents shows that the plain and ordinary meaning of "comprising" should apply. First, the plain language of the claims supports DexCom's position. It is black-letter law that "[a] word or phrase used consistently throughout a claim should be interpreted consistently." *Phonometrics, Inc. v. Northern Telecom, Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998).[13]  Applying this principle, Abbott's proposed construction of "having an overall" would render nonsensical the numerous uses of "comprises" throughout the claims. For example, claim 18 of the '649 patent recites the word "comprising" or "comprises" six different times. But the phrase "wherein the rotor *comprises* a rotor follower projection" in claim 18 becomes incomprehensible applying Abbott's construction: "wherein the rotor *has an*

---

[12] On May 27, 2022, the parties exchanged proposed claim constructions. Abbott's proposed construction for this term was designated as "[r]otor having an overall cylindrical shape." *See* Ex. 110 at 4. Not once did Abbott assert that its construction was the plain and ordinary meaning of this term., presumably because Abbott's proposal seeks the opposite—a specific, narrower construction. Abbott altered its proposed construction in its filing to this Court on June 22, 2022, asserting for the first time that its construction of "rotor having an overall cylindrical shape" is the "plain and ordinary meaning" of the term. The Court should reject Abbott's attempts to improperly couch its construction as "plain and ordinary." If Abbott believes that "plain and ordinary meaning" (absent some specific definition to the contrary) is the appropriate scope of this term, then plain and ordinary meaning governs—but that meaning is not what Abbott suggests.

[13] Unlike the term "slot," the Lee patents use the term "comprising" consistently throughout the patent.

*overall* rotor follower projection." DexCom's construction of plain and ordinary meaning, on the other hand, is consistent with the claim language and accords with common sense.

Second, the specification and prosecution history do not suggest that the patentee intended anything other than the plain and ordinary meaning of "comprising." Abbott's few references to the intrinsic evidence do not prove otherwise. Abbott cites first to two embodiments it contends depict the claimed rotor. *See* D.I. 135 at 21. These "rotors" prove nothing. They may be "rotors having an overall cylindrical shape"—but they are also "rotors comprising a cylindrical shape," as the rotors include, or are comprised of, at least one cylindrical shape. Thus, these embodiments equally support DexCom's position. Without context suggesting otherwise (and here there is none), the plain and ordinary meaning should apply. *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1333 (Fed. Cir. 2013) ("It is axiomatic that we will not narrow a claim term beyond its plain and ordinary meaning unless there is support for the limitation in the words of the claim, the specification, or the prosecution history."). The same can be said of Abbott's references to the prosecution history. That the examiner cited references with cylindrical rotors as meeting the claimed rotor limitation is unsurprising, as these prior art rotors would also be "rotors comprising a cylindrical shape," under the plain and ordinary meaning of the term. Accordingly, nothing in the intrinsic evidence warrants straying from the plain and ordinary meaning of the term. *See id.*

Moreover, comprising is a well-understood term in patent law: "'Comprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim." *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) (citation omitted). The Manual of Patent Examination Procedure (MPEP) describes the term as "synonymous with 'including,' 'containing,' or

29

'characterized by,'" and "is inclusive or open-ended and does not exclude additional, unrecited elements." MPEP § 2111.03. The Federal Circuit has repeatedly affirmed this understanding. *See, e.g.*, *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1358 (Fed. Cir. 2016) ("'[C]omprising' creates a presumption that the recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements." (quotation omitted)); *Nazomi Commc'ns, Inc. v. Arm Holdings, PLC*, 403 F.3d 1364, 1370 (Fed. Cir. 2005) ("'Comprising' is often synonymous with 'including.'") (citation omitted).

The Federal Circuit has also interpreted the term "comprising" in the same way when it appears in other claim elements. In *WundaFormer, LLC v. Flex Studios, Inc.*, the Federal Circuit construed the term "transverse end comprising . . . a transverse member" as contemplating "one or more transverse members," because "the term 'comprising' indicates the claim is open-ended and does not exclude additional, unrecited elements." 680 F. App'x 925, 931 (Fed. Cir. 2017) (citations omitted). In *Mars, Inc. v. H.J. Heinz Co., L.P.*, the claim recited "animal food product *containing* a mixture of lipid and solid ingredients." 377 F.3d 1369, 1372 (Fed. Cir. 2004). The court likened the term "containing" to "comprising" and "including." Citing to dictionaries, the MPEP, and binding case law for "comprising," the court concluded that "containing" did not require the ingredients to be limited only to those listed in the claim, but rather found the term "containing" to be open-ended. *Id.* at 1375–76. So too here. The meaning of the term "rotor comprising a cylindrical shape" is plainly and ordinarily understood by skilled artisans as being open-ended; it does not have a specialized meaning that *requires* it to "hav[e] an overall cylindrical shape."

Abbott does not cite a single case to the contrary.[14] Nor has DexCom found a single case

---

[14] Instead of citing relevant case law, Abbott's brief continually references DexCom's *inter*

where Abbott's proposed "having an overall" construction was adopted for "comprising." Indeed, courts and adjudicative bodies regularly construe the term "comprising" as variants of the plain and ordinary meaning of "including but not limited to." *See, e.g.*, *Bioverativ Inc. v. CSL Behring LLC*, 2019 WL 1276030, at *8 (D. Del. Mar. 20, 2019); *Church & Dwight Co., Inc. v. Abbott Labs.*, 2007 WL 6945864, at *1 (D.N.J. Aug. 28, 2007); *Hewlett-Packard Co. v. Gateway, Inc.*, 2006 WL 6142757, at *1 (S.D. Cal. Feb. 13, 2006).

Simply put, Abbott seeks to improperly rewrite the claim language. Abbott could have claimed a "cylindrical rotor," or a "rotor having an overall cylindrical shape." It did not. Abbott instead claimed "a rotor comprising a cylindrical shape." The plain and ordinary meaning of "comprising" should govern.[15]

### D.     U.S. Patent No. 10,945,647 ("'647 Patent" or "Mazza Patent")

####     1.     "insertion mechanism configured to position the sensor subassembly against the base of the transmitter mount by causing movement of the sensor subassembly"

**(claim 1)**

| ABBOTT'S CONSTRUCTION | DEXCOM'S CONSTRUCTION |
|---|---|
| Plain and ordinary meaning (no construction needed or "a mechanism that inserts a sensor into position for use that is configured to position the sensor subassembly against the | §112 ¶ 6 / Means-plus-function<br><br>Function: positioning the sensor subassembly against the base of the transmitter mount by |

---

*partes* review petitions (one of which has since been instituted) as if to suggest Dexcom has conceded something or done something nefarious. Not so. DexCom's presentation of alternative grounds for unpatentability, beyond proving that the claimed rotor was clearly disclosed by the prior art, does not suggest anything of consequence for the claim construction issues before this Court. Abbott's citations to DexCom's petition only highlight Abbott's attempt to stretch the scope of its claims to overcome relevant prior art. In any event, Abbott misstates DexCom's position in the proceedings: DexCom asserts that its cited references demonstrate the unpatentability of the claims, however the rotor claim limitation is construed, and DexCom has never conceded otherwise.

[15] Abbott's conclusory expert declaration, replete with attorney argument, should not be credited. *See SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1195 (Fed. Cir. 2013) ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court. Thus, a court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history.") (citation and internal quotation marks omitted).

| base of the transmitter mount by causing movement of the sensor subassembly") | causing movement of the sensor subassembly<br><br>Corresponding structure: none disclosed, or alternatively 420 in Figures 4D and 4E and 550 in Figure 5B |
| --- | --- |

### a.  The claim term is a means-plus-function term.

This element of the '647 patent recites function without disclosing structure to perform that function; therefore, the term is subject to means-plus-function construction under 35 U.S.C. § 112(f).

A claim element is in means-plus-function form when it claims what it does rather than what it is. See 35 U.S.C. § 112(f). "Use of the word 'means' creates a presumption that § 112 ¶ 6 [now 112(f)] applies." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015) (quotation omitted). In the absence of the word "means," "[t]he standard is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.* (citation omitted). Consequently, "[w]hen a claim term lacks the word 'means,' the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term . . . recites 'function without reciting sufficient structure for performing that function.'" *Id.* (quotation omitted).

Here, Abbott's proposed plain and ordinary meaning construction recites the function that the element performs word-for-word. *See MTD Prods. Inc. v. Iancu*, 933 F.3d 1336, 1343 (Fed. Cir. 2019) ("[T]he claim language reciting what the [structure] is 'configured to' do is functional."); *see also Team Worldwide Corp. v. Intex Recreation Corp.*, 2021 WL 4130634, at *5 (Fed. Cir. Sept. 9, 2021) (holding that "configured to" denotes functional language). Thus, the only question is whether the remaining two words—"insertion mechanism"—connote "sufficiently definite structure" to a person of ordinary skill in the art. *MTD Prod.*, 933 F.3d at

1341. They do not.

The nonce words doctrine, which Abbott ignores, applies here to overcome the presumption ordinarily created by the absence of the word "means" in a claim term. *See* D.I. 135 at 35. The Federal Circuit has repeatedly held that "mechanism" is a generic, nonstructural nonce term "that is tantamount to [] the word 'means.'" *See Williamson*, 729 F.3d at 1350 ("Generic terms such as 'mechanism,' 'element,' 'device,' and other nonce words that reflect nothing more than verbal constructs may be used in a claim in a manner that is tantamount to using the word 'means' because they 'typically do not connote sufficiently definite structure' and therefore may invoke § 112[f]") (citation omitted).

Adding the word "insertion" to create the term "insertion mechanism" does not transform the nonstructural nonce term "mechanism" into a term that connotes sufficient structure to perform the claimed function. Indeed, Dr. Leinsing's declaration confirms the term "insertion mechanism" does not connote such structure. Dr. Leinsing admits that "devices for inserting a sensor into position for use" were "varied" in structure and used "different internal components and mechanics." Leinsing Decl. ¶ 152. He does not claim that the term "insertion mechanism" "bring[s] to mind any specific structure to a person of ordinary skill in the art." *MTD Prod.*, 933 F.3d at 1343-44. Instead, his declaration confirms that "insertion mechanism" is a "generic label for a collection of parts" performing the function of inserting a sensor. *Id*; *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 288 F. App'x 697, 703–04 (Fed. Cir. 2008) (holding "retaining mechanism" is means-plus-function where expert testified he had no "mental picture of a specific structure when [he heard] the term" and inventor testified "there were multiple types of retaining mechanisms that could retain lenses"); *Nichia Corp. v. TCL Multimedia Tech. Holdings, Ltd.*, 2017 WL 5719267, at *8 (D. Del. Nov. 28, 2017) (holding "dispersive member"

33

and "reflective member" to be means-plus-function terms where expert testified they "may take various structural forms" and opined "essentially [] any structure made to disperse light could be a 'dispersive member'" and "any structure made to reflect light could be a 'reflective member'").

Dr. Leinsing's assertion that these words connote a "class of structures" well known in the industry is just that—an assertion. Leinsing Decl. ¶ 152. Dr. Leinsing does not point to anything (other than phrases from cherry-picked patents and patent applications) to support his assertion. Nor does he acknowledge that very similar phrases, such as "inserter" and "insertion device," describe a variety of structures with varying functions. *See* Vaitekunas Decl. ¶ 107; *see also MTD Prod.*, 933 F.3d at 1344 (crediting expert testimony that claim term "describe[d] a wide variety of structures with varying functions" and holding "mechanical control assembly" was a means-plus-function term). To the extent the identified structures are part of a "class," the only unifying element is the phrase itself. *See* Vaitekunas Decl. ¶¶ 104-06 (discussing exemplary structural differences in Dr. Leinsing's cited patents and applications).[16]

And, because the generic descriptor "insertion mechanism" is "configured to" position the sensor subassembly, "which is plainly an explanation of function rather than an identification of structure or reference to a class of structures," *id.*, "the claim format supports the applicability of § 112 [¶ 6]." *Team Worldwide*, 2012 WL 4130634, at *5 ("[T]he generic term 'assembly' preceded by the functional descriptor—'pressure controlling'—supports a conclusion that the term itself is purely functional."). Therefore, the Court should conclude the claim term is in

---

[16] Abbott's reliance on examiner's actions during prosecution history should be disregarded. *Team Worldwide*, 2012 WL 4130634, at *6 (finding examiner's citation to pressure sensors in prior art references during prosecution unpersuasive); *id.* at n.8 (finding examiner's silence during prosecution as to applicability of § 112(f) unpersuasive).

means-plus-function form.[17]

> **b.      There is no sufficient corresponding structure or, at best, it is insufficiently disclosed.**

When a term is in means-plus-function form, the Court must determine what corresponding structure, if any, the specification discloses for the function. *Williamson*, 792 F.3d at 1351–52. A structure disclosed in the specification qualifies as "'corresponding structure'" only if the intrinsic evidence "clearly links or associates that structure to the function recited in the claim." *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). "Thus, it is not enough that 'corresponding structure' be disclosed somewhere in a specification. Rather, that 'corresponding structure' must be 'clearly linked' or associated with the claimed function. Conversely, structure that is not 'clearly linked' or associated with the claimed function is not properly deemed 'corresponding structure.'" *Koninklijke Philips N.V. v. ZOLL Lifecor Corp.*, 2016 WL 6917268, at *8 (W.D. Pa. Mar. 2, 2016) *adopted in part* 2016 WL 6920395 (W.D. Pa. May 24, 2016).

Here, the specification nowhere discloses a structure configured to position a sensor *subassembly*, which has a sensor *and* an attached seal. Ex. 13, claim 1 (claiming "a sensor subassembly comprising an analyte sensor and a sensor seal"). And Abbott's expert, Dr. Leinsing, points only to examples in the specification disclosing the positioning solely of a sensor, not a sensor subassembly. *See, e.g.*, Decl. of Leinsing at ¶ 156. Consequently, there is no corresponding structure, and the claim is indefinite. *Ibormeith IP, LLC v. Mercedes-Benz USA*,

---

[17] Abbott argues, without authority, that because the claim contains structural terms, including "subassembly" and "transmitter mount," it recites more than function. This is not the law. *See Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535-36 (Fed Cir. 1991) ("The recitation of some structure in a means plus function element does not preclude the applicability of section 112(6). For example, in this case, the structural description in the joining means clause merely serves to further specify the function of that means. The recited structure tells only what the means-for-joining *does*, not what it *is* structurally."); *see also Mas-Hamilton Grp. v. LaGard, Inc.*, 156 F.3d 1206, 1213–14 (Fed. Cir. 1998).

LLC, 732 F.3d 1376, 1378 (Fed. Cir. 2013) (citation omitted) ("To comply with section 112(f), the specification . . . has to disclose a structure for performing the functions claimed . . . . If there is no such structure, the claim limitation is indefinite . . . ."); *see also Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003) (similar).

To the extent the specification discloses any structure corresponding to the function, the only conceivable disclosure is shown in Figures 4D and 4E at 420 and in Figure 5B at 550, naming an "insertion mechanism." *See* Ex. 13, 6:47-51 ("[t]he insertion mechanism has deployed the introducer 430 so as to place at least a portion of the sensor 410 in fluid contact with the patent's analytes"); *id.*, 6:58-67 ("During deployment of the sensor 510 for example, using an insertion mechanism 550 . . . the sensor 510 is positioned relative to the transmitter mount 520 . . . ."). However, as explained above, the structures depicted in all of these figures show positioning only a sensor, not a sensor subassembly as required by the claim. Nonetheless, this structure is the only potential corresponding structure disclosed in the specification for the function. Accordingly, if the Court determines that the corresponding structure is disclosed in Figures 4D and 4E at 420 and Figure 5B at 550, the claim term is thus limited to this disclosed corresponding structure and its equivalents.

In the alternative, if the Court determines that the claim term is not subject to means-plus-function treatment, the claim would be indefinite as it is an unbounded functional claim without any limitation on how the disclosed function is performed.

### c.   Abbott's proposed construction and argument is without basis.

Abbott argues that "insertion mechanism" means "a mechanism that inserts a sensor into position for use." But this simply rearranges the same generic, nonstructural terms, meaning that anything capable of inserting a sensor falls within Abbott's proposed definition. As such, "a mechanism that inserts" also does not connote structure to one skilled in the art. Abbott's

proposed construction should be rejected and the claim term should be construed in means plus function form.

**E.  U.S. Patent Nos. 10,820,842 ("'842 Patent") & 10,952,653 ("'653 Patent") (collectively, "Harper Patents")**

**1.  "failure mode condition"**

**('842 patent claims 1, 14; '653 patent claim 1)**

| ABBOTT'S CONSTRUCTION | DEXCOM'S CONSTRUCTION |
|---|---|
| Condition that adversely affects function | Condition that requires disabling of the output of sensor data |

The '842 and '653 patents generally claim an analyte monitoring system and relate to identifying one or more conditions that may result in unreliable data and then "disabling the output of sensor data" during that time period. Ex. 8, Abstract. The conditions discussed by the specification include, for example, "a sensor instability condition, a calibration failure condition, or a monitoring system failure condition." *Id.*, 13:60-63. The claims use the term "failure mode condition" to describe these conditions, though that term is not found in the shared specification of the patents, or anywhere in the claims or file histories of the chain of related patents dating back to 2010. Abbott first concocted the term "failure mode condition" when these two patents were filed in 2020, well after DexCom's G6 product came on the market.

Abbott does not contest that there is no plain and ordinary meaning of "failure mode condition." Thus, the term must be construed in the context of the specification and other intrinsic evidence. Abbott seeks a broad construction that departs from the intrinsic evidence in an attempt to cover functionality never contemplated by the patentee. Specifically, Abbott maintains that DexCom's G6 product infringes because a "failure mode condition" occurs when the G6 transmitter goes out of range of the receiver device that displays glucose data, and the data is subsequently backfilled when it comes back within range. Importantly, nothing in the

37

specification contemplates a "failure" based on loss of wireless connectivity.

By contrast, DexCom's proposed construction tracks what the patentee actually disclosed about his alleged invention. The specification repeatedly explains that the invention relates to disabling the output of analyte levels when that data may have become unreliable. *See, e.g.* Ex. 8, Abstract; 1:50-2:28 (Summary).

> ### a.   A "failure mode condition" is a condition that requires disabling of the output of sensor data.

A claim term is to be given its ordinary and customary meaning, when read "in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. "Failure mode condition" does not have any accepted meaning in the field. *See* Declaration of John Villasenor ("Villasenor Decl."), ¶ 37. The specification consistently describes an analyte monitoring system detecting a condition that may result in unreliable data and then "disabling the output of the sensor data" in response. *See, e.g.* Ex. 8, Abstract; 1:58-2:2 (". . . detecting one or more adverse conditions associated with the sensor monitoring system, disabling the output of the sensor data during a adverse condition time period. . . ."); 2:3-11 ("Embodiments include detecting a condition unsuitable for calibration of an analyte sensor for a predetermined time period, disabling output of information associated with the analyte sensor. . . ."); 2:13-28 (". . . where the processor is further configured to detect a condition unsuitable for calibration of a sensor for a predetermined time period, disable display of processed sensor data. . . ."); *see also*, Ex. 8, 12:9-15; 12:26-30; 12:41-45;12:62-13:5; 13:30-38; 13:43-55; 14:9-20; 14:30-38; 14:39-55; 15:4-11.

There is a good reason that the purported invention requires disabling the output of analyte monitoring data during conditions that render data unreliable. Analyte monitoring devices are designed to help people with diabetes understand whether their blood glucose level is

appropriate or not. The problems that these patents address, such as sensor instability, calibration failures, and situations that render conditions unsuitable for calibration, all create situations where the resulting analyte data may be inaccurate. The patents' goal is to "improve therapy or health management decisions." Ex. 8, 13:39-42. A person of skill in the art would recognize that it could be medically problematic to display inaccurate data to a user. Consequently, the utility of the alleged invention is in disabling the output of data to a user when the data may be inaccurate. *See also* Villasenor Decl., ¶ 39.

The patent file histories also confirm that the invention involves disabling the output of sensor data during conditions that may result in unreliable data. For example, during prosecution of the original application of the chain of patents, Abbott argued that the invention "is now directed to a combination including . . . disabling the output of the sensor data during an adverse condition time period. . . ." Ex. 61 at 7-8. In response to Abbott's argument, the examiner allowed the patent because "the prior art does not teach disabling the output of a sensor data during an adverse condition," which was the claim term employed in several previous patents before "failure mode condition" was introduced. Ex. 52 at 2. Notably, the independent claims of the earlier patents in the family also contained claim limitations that specifically recite disabling the output of sensor data. *See* Exs. 57 (Claims 1, 7, 14); 58 (Claims 1, 8, 13); 59 (Claims 1, 10).

> **b.      Abbott's proposed construction improperly broadens "failure mode condition" beyond the Harper patents' disclosure.**

Abbott's proposed construction departs from the teachings of the specification, broadening the patent far beyond what one of skill in the art would have understood the inventor to have possessed.

Abbott and its expert place great weight on the examiner supposedly equating a "failure mode condition" with an "adverse condition." D.I. 135 at 27. What the examiner actually said is

that a "failure mode condition" could be interpreted as "a form of an adverse condition effecting an analyte monitoring system." *See* Ex. 54 at 3. The examiner also stated that the patents' "claims are not patentably distinct" from the claims of the prior patents in the family, all of which require disabling the output of sensor data. *Id.* Further, Abbott pulls a sleight of hand when it takes the previous claim term "adverse condition" and reworks it as "a condition that adversely affects function." An "adverse condition," as contemplated by the patent, is not the same as the overbroad concept advocated for by Abbott. *See* Villasenor Decl., ¶¶ 41-42. As Dr. Villasenor explains, even display flickering is a condition that adversely affects the function of the system but does not result in a data gap being output to the display. It would be improper to broaden these patents' claims through claim construction. *See* Villasenor Decl., ¶ 43.

Abbott primarily relies on a single catch-all sentence that mentions a "system malfunction" and "signal errors associated with the sensor, transmitter unit, receiver unit, and the like. . ." to support the idea that loss of wireless connectivity is a "failure mode condition." Ex. 8, 13:21-27. However, there is no reason to believe a "signal error" is the same thing as a signal loss, or that a "system malfunction" in the context of the specification has anything to do with loss of wireless connectivity. Going out of range of a receiving device does not create a "signal error." *See* Villasenor Decl., ¶ 46. The patents never discuss losing wireless connectivity or how that concept would fit into the alleged invention. Further, after the sentence following the one mentioning "signal errors" and "system malfunction" clarifies that the invention relates to conditions requiring disabling the output of sensor data. Ex. 8, 13:30-38 (explaining that "the analyte monitoring system disable[s] the output results associated with the monitored real time analyte levels"). Indeed, if there is no connectivity, there is no need to disable the output of sensor data. And as Dr. Villasenor explains, not all conditions that adversely affect function

40

would cause data gaps to be outputted. *See* Villasenor Decl., ¶¶ 41-43. Consequently, Abbott's attempt to equate "failure mode condition" to any condition adversely affecting function cannot be correct.

Further, if Abbott's construction were accepted, the patents would lack written description support. Construing the claims to encompass any condition that adversely affects function goes far beyond what is disclosed in the specification. The specification does not demonstrate that the inventor had possession of an invention related to any "condition that adversely affects function." Abbott's construction should therefore be rejected. *See, e.g., Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*, 824 F.3d 999, 1004 (Fed. Cir. 2016) ("Because the specification makes no mention of wireless communications, construing the instant claims to encompass that subject matter would likely render the claims invalid for lack of written description. The canon favoring constructions that preserve claim validity therefore counsels against construing 'communications path' to include wireless communications.") (cleaned up).

Finally, Abbott complains that DexCom's proposed definition does not include "processed, stored sensor data" or "data indicative of the sensed glucose levels," and that it is redundant of other claim language. But DexCom's construction focuses on disabling the output of sensor data, not the display of data. The specification repeatedly emphasizes that the system disables output of sensor data. It follows that if data is not output, it cannot be displayed. Consequently, DexCom's construction is not redundant to other claim language.

    2.    **"processing . . . the sensor data", "processing the sensor data", "process the sensor data"**

    **('842 Patent, Claims 1, 14)**

| ABBOTT'S CONSTRUCTION | DEXCOM'S CONSTRUCTION |
|---|---|
| Converting/convert the sensor data into calibrated analyte values | Plain and ordinary meaning |

|  |  |
|--|--|

The claims of the '842 patent refer repeatedly to the processing of sensor data. *See* Ex. 8, claims 1, 8, 14. For instance, Claim 1, describes a system engaged in "processing . . . the sensor data[.]" Claim 8 includes the same phrase, as does Claim 14. Ex. 8, 15:24-41. "Processing" is a common and broad term that reaches essentially every task that an analyte monitoring system might perform. *See* Villasenor Decl., ¶ 52. That plain and ordinary meaning is consistent with references to various forms of "processing" throughout the specification, yet Abbott has proposed a much narrower construction that would limit the term to a particular type of processing–i.e., calibration. Abbott's construction is not supported by the intrinsic evidence and should be rejected.

Because this term uses words that are well-understood in the field of wireless communication and signal processing, it should be given its plain and ordinary meaning in the context of the entire patent. *See Phillips*, 415 F.3d at 1313. Indeed, a construction should depart from plain and ordinary meaning only when a patentee acts as its own lexicographer or disavows claim scope during prosecution. *See Phillips*, 415 F.3d at 1316. To *narrow* the scope of an otherwise broad term, such as "processing," the patentee must demonstrate a "clear and unmistakable disavowal" of the full scope of the claim term's ordinary meaning. *3M Innovative Props. Co.*, 725 F.3d at 1322. In contrast to the Curry, Funderburk, and Lee patent specifications, which make clear the specific meaning of the claim language at issue, the Harper patents' common specification supports no such exception to the general rule.

The '842 patent specification shows that the term "processing of sensor data" is not nearly so narrow as Abbott's construction requires. *See* Villasenor Decl. ¶ 54. Abbott itself acknowledges that "the specification uses the term 'processing' to include other types of

actions." D.I. 135 at 26. For instance, the specification refers to "predetermined data processing routines," which include "filtering, clipping, digitizing, and/or encoding, and/or any other further processing and/or conditioning." Ex. 8, 11:37-46; Villasenor Decl. ¶ 54. It further describes a "processing section" of the receiver unit that "process[es] data by performing data decoding, error detection and correction, data clock generation, and data bit recovery." Ex. 8, 6:28-33.

Despite ample evidence to the contrary, Abbott argues that "the specific type of processing claimed must refer to converting the sensor data into calibrated analyte values because only calibrated analyte values are output to the display, which the claims refer to as 'processed sensor data.'" D.I. 135 at 26. For support, Abbott points to the following passage of an expert declaration:

> The claims, however, indicate the type of processing that is referenced. The claims state that "processed stored sensor data" is output "to the display of the analyte monitoring system." Therefore, the claimed "processing" must convert the sensor data into a form that can be displayed to and understood by the user."

Sarrafzadeh Decl. ¶¶ 60. But just because calibration is *a* type of processing that sensor data must undergo prior to being displayed to a user, that does not mean calibration is the *only* action that constitutes processing within the meaning of the claims. Villasenor Decl. ¶¶ 52-54. The flaw in Abbott's logic is particularly clear in light of repeated discussion in the specification of other forms of "processing." *Id.*

None of the intrinsic evidence cited in Abbott's brief shows that the patentee gave this term a narrower meaning. For instance, Abbott argues that "parts of the specification . . . teach that 'processing the sensor data' refers to converting the sensor data into calibrated analyte values to be output to the display." D.I. 135 at 25. For support, Abbott points to the Abstract, which "explains that the disclosure provides 'methods and apparatus for receiving sensor data from an analyte sensor of a sensor monitoring system, processing the received sensor data with

43

time corresponding calibration data, [and] outputting the processed sensor data.'" *Id.* (quoting Ex. 8, Abstract.) But this passage shows the opposite of what Abbott suggests. If, as Abbott would have it, "processing" means converting data into calibrated form, the passage above would contain a redundancy, such that the middle clause would read: "converting the received sensor data into calibrated analyte values with time corresponding calibration data." Such constructions are disfavored. *See Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1307 (Fed. Cir. 2005).

In short, the intrinsic evidence on which Abbott relies at most suggests that calibration is a *form* of processing. There is no support in the specification for the notion that "processing" refers *only* to converting data into calibrated values. This is a far cry from the "clear and unmistakable disavowal" of the full scope of the claim term's ordinary meaning required to narrow the scope of a claim term. *3M Innovative Props. Co.*, 725 F.3d at 1322. "Process the sensor data'" should be given its plain and ordinary meaning.

### 3.    "data indicative of the sensed glucose level"

### ('653 patent, Claim 1)

| ABBOTT'S CONSTRUCTION | DEXCOM'S CONSTRUCTION |
|---|---|
| Calibrated glucose values | Plain and ordinary meaning |

The '653 patent claims a system that includes an "on body unit" comprising "a glucose sensor" and a "data processing and transmitter unit" that is "configured to transmit data indicative of the sensed glucose level" to a receiving device. Just like the term "process the sensor data" in its immediate parent, the '842 patent, this phrase in the '653 patent requires no construction. Villasenor Decl. ¶ 56.

Abbott argues—despite citing no supporting intrinsic evidence—that this "data indicative

44

of the sensed glucose level" means "calibrated glucose values." D.I. 135 at 26. To fashion its restrictive construction, Abbott relies almost entirely on a single expert opinion. Abbott presents a faulty syllogism that at bottom reduces to this: (a) the '653 patent describes a system that transmits data *indicative* of the sensed glucose level; (b) data indicative of the sensed glucose level is eventually output to a display; so (c) therefore, the indicative data can only be *calibrated* glucose values. The conclusion does not follow from the premises; as explained below, data beyond calibrated glucose values can be indicative of the sensed glucose level.

Dr. Sarrafzadeh states that "data that is output to a user must have undergone a conversion from sensor data to calibrated glucose values," Sarrafzadeh Decl. ¶ 73, but does not explain why he believes calibrated data is the *only* form of data that can be "indicative" of the sensed glucose level. Just like Abbott's argument regarding "processing the sensor data," nothing in Dr. Sarrafzadeh's declaration provides support for his conclusion that the *only* data that could be "indicative" of sensed glucose values is calibrated data–indeed, this opinion plainly departs from the ordinary meaning of "indicative," since data beyond calibrated data, such as raw data, can provide some indication of a sensed glucose value. Villasenor Decl. ¶ 55-58. Dr. Sarrafzadeh fails to even engage with this issue, let alone explain the basis for his much narrower view of the claim language.

Abbott's failure to identify any intrinsic evidence in support of its proposed construction is unsurprising; there is none. Indeed, the specification does not use the phrase "data indicative of the sensed glucose level" *anywhere*. *See generally* Ex. 8. The patentee could not disclaim the full scope of that phrase when the specification does not use it at all. And nothing in the claims themselves suggests that the patentee gave the term "data indicative of the sensed glucose value" a narrower meaning limited to *calibrated* glucose data; the words "calibrate" and "calibration"

45

do not appear in *any* of the claims of the '653 patent. Indeed, Abbott's proposed construction is inconsistent with the claim language. Claim 1 requires that the analyte monitoring system "store . . . at least a portion of the data indicative of the sensed glucose level *corresponding to a time period associated with a failure mode condition*[.]" If, as Abbott claims, a failure mode condition includes an inability to calibrate data, then data stored during such a condition *cannot* be calibrated glucose values. In short, there is nothing approaching the ""clear and unmistakable disavowal" of the full scope of the claim term's ordinary meaning" required to narrow the scope of "data indicative of the sensed glucose value," *3M Innovative Props. Co.*, 725 F.3d at 1322, and the Court should give those words their plain and ordinary meaning.

**F.    U.S. Patent No. 10,827,954 ("'954 Patent" or "Hoss Patent")**

**1.    "chemically bonded"**

**('954 patent claim 17)**

| ABBOTT'S CONSTRUCTION | DEXCOM'S CONSTRUCTION |
|---|---|
| Bonded by attractive forces between atoms or molecules | Plain and ordinary meaning |

Neither the term "chemically bonded," nor any variant thereof, appears in the specification of the '954 patent. The only use of "chemically bonded" in the patent is in two dependent claims—17 and 20—wherein the term is used in its ordinary sense. Nonetheless, Abbott has proposed a construction of "chemically bonded" that is both insolubly vague and far broader than what the intrinsic or extrinsic evidence can support.

"Attractive forces between atoms or molecules" come in myriad types, with varying strength and stability, among other characteristics. Abbott's expert identifies only two specific types of attractive forces that can form "chemical bonds": ionic bonds and covalent bonds. He also identifies "one subset of chemical bonds . . . called 'crosslinking.'" Smith Decl. ¶¶ 37-39.

DexCom agrees that ionic bonds and covalent bonds are types of "chemical bonds," and that intermolecular crosslinking by covalent bonds is a subtype of covalent bonds. But Abbott's proposed construction, which places no discernable limit on the types of "attractive forces" that can form chemical bonds, goes far beyond ionic and covalent bonds, and could be read to encompass a slew of other, weaker "attractive forces" between atoms or molecules that a skilled artisan would not consider capable of forming "chemical bonds." These include van der Waals forces, dipole-dipole interactions, London dispersion forces, and others. *See, e.g.*, Ex. 111 at 1588 (defining "van der Waals forces" as "[t]he attractive or repulsive forces between molecular entities (or between groups within the same molecular entity) *other than those due to bond formation* or to the electrostatic interaction of ions or of ionic groups with one another or with neutral molecules") (emphasis added). Abbott's proposed construction provides no guidance on whether it includes or excludes those, or many other types of attractive forces. Therefore, it is too vague to be useful.

Moreover, to the extent Abbott's proposed construction is intended to encompass "attractive forces" weaker than ionic or covalent bonds, Abbott has not provided *any* intrinsic or extrinsic evidence to support that construction, nor carried its burden to demonstrate that any skilled artisan would understand the term "chemically bonded" to have that meaning.

Abbott relies on two definitions of "bond" from nontechnical dictionaries. Tellingly, these definitions are far narrower than Abbott's own proposed construction (notwithstanding that they define the term "*bond*" rather than the purportedly more specific "*chemical bond*"). Merriam-Webster's Collegiate Dictionary defines "bond" as "an attractive force that holds together the atoms, ions, or groups of atoms in a molecule or crystal." Ex. 69. The New Penguin English Dictionary provides a substantially identical definition: "a force of attraction by means

of which atoms, ions, or groups of atoms are held together in a molecule or crystal." Ex. 70. Both of these definitions require not only an "attractive force," but one that holds atoms, ions, or groups of atoms together "***in a molecule or crystal***." These definitions are much closer to the technical definition of "chemical bond" provided by the International Union of Pure and Applied Chemistry (IUPAC), an international standards organization responsible for standardization of nomenclature in the field of chemistry. According to the IUPAC, "there is a chemical bond between two atoms or groups of atoms in the case that the forces acting between them are such as to lead to the formation of an aggregate with sufficient stability to make it convenient for the chemist to consider it as an independent 'molecular species'." Ex. 111 at 174.

DexCom contends that the term "chemically bonded" requires no construction because it is used in the '954 patent in its ordinary sense. But to the extent the Court is inclined to construe the term, Abbott's proposed construction should be rejected because it is much broader and vaguer than Abbott's intrinsic and extrinsic evidence can support, and it does not comport with the understanding of a skilled artisan. By contrast, the IUPAC definition of "chemical bond," which is similar to the dictionary definitions offered by Abbott, would have been familiar to a skilled artisan at the relevant time. Thus, if any construction of "chemically bonded" is to be adopted, the IUPAC definition should be applied.

48

## IV.     CONCLUSION

For the foregoing reasons, DexCom respectfully asks the Court to adopt DexCom's

proposed constructions.

Respectfully submitted,

/s/ Nathan R. Hoeschen
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)

OF COUNSEL:
Robert A. Van Nest
Christa Anderson
Eugene M. Paige
Sophie Hood
Elizabeth A. Egan
Andrew S. Bruns
Sean M. Arenson
Puja Parikh
Nicholas R. Green
Yena Lee
Bilal Malik
Stephanie J. Goldberg
Jacquie P. Andreano
Matan Shacham
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA  94111-1809
(415) 391-5400

SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

Dated: August 3, 2022

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Paragraph 12 of the Scheduling Order (D.I. 35), undersigned counsel certifies

that the foregoing brief consists of 14,917 words as calculated by the word-count feature of

Microsoft Word.  This total does not include tables, cover page, or signature blocks.

<div align="right">

*/s/ Nathan R. Hoeschen*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

</div>