IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT DIABETES CARE INC. and ABBOTT DIABETES CARE LIMITED, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 21-977 (KAJ) |
| DEXCOM, INC., | ) ) | |
| Defendant. | ) ) ) | |

**PLAINTIFFS' REPLY BRIEF REGARDING
<u>CLAIM CONSTRUCTION</u>**

OF COUNSEL:

Edward A. Mas II
Leland G. Hansen
James M. Hafertepe
Sharon A. Hwang
Michael J. Carrozza
Manuela Cabal
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, IL 60661
(312) 775-8000

Ellisen Shelton Turner
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
(310) 552-4200

Amanda J. Hollis
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-20000

August 17, 2022

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
rsmith@morrisnichols.com

*Attorneys for Plaintiffs*

Benjamin A. Lasky
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION .................................................................................................... 1

II.    DISPUTED CLAIM TERMS ................................................................................. 1

    A.    443 Patent ................................................................................................... 1

        1.    *"first spring"* ................................................................................. 1

    B.    341, 654, and 216 Patents .......................................................................... 7

        1.    *"first spring in a loaded position"* ............................................... 7

    C.    649 and 440 Patents ................................................................................. 13

        1.    *"slot"* .......................................................................................... 13

        2.    *"rotor comprising a cylindrical shape"* .................................... 20

    D.    842 and 653 Patents ................................................................................. 23

        1.    *"failure mode condition"* ........................................................... 23

        2.    *"processing/process the sensor data"* ....................................... 28

        3.    *"data indicative of the sensed glucose level"* ............................ 29

    E.    954 Patent ................................................................................................. 31

        1.    *"chemically bonded"* .................................................................. 31

    F.    647 Patent ................................................................................................. 33

        1.    *"insertion mechanism configured to position the sensor subassembly against the base of the transmitter mount by causing movement of the sensor subassembly"* ................................................................. 33

III.    CONCLUSION .................................................................................................... 37

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Alcon Rsch., Ltd. v Apotex Inc.*,
  687 F.3d 1362 (Fed. Cir. 2012) ............................................................. 8

*Avid Tech., Inc. v. Harmonic, Inc.*,
  812 F.3d 1040 (Fed. Cir. 2016) ............................................................. 4

*Baxalta Inc. v. Genentech, Inc.*,
  972 F.3d 1341 (Fed. Cir. 2020) ............................................................. 9

*Blackbird Tech LLC v. ELB Elecs.*,
  2016 WL 7451622 (D. Del. Dec. 28, 2016) ......................................... 34

*Budde v. Harley-Davidson, Inc*.,
  250 F.3d 1369 (Fed. Cir. 2001) ........................................................... 36

*Cloud Farm Assocs. LP v. Volkswagen Grp. of Am., Inc.*,
  674 F. App'x 1000 (Fed. Cir. 2017) ..................................................... 14

*Davis-Lynch, Inc. v. Weatherford Int'l, Inc.*,
  2009 WL 1097510 (E.D. Tex. Apr. 20, 2009)....................................... 27

*Eli Lilly & Co. v. Eagle Pharms., Inc.*,
  2019 WL 1299212 (D. Del. Mar. 21, 2019) ......................................... 14

*Enzo Life Sci., Inc. v. Gen-Probe, Inc.*,
  2015 WL 4101205 (D. Del. July 7, 2015) ........................................ 7, 12

*Epistar Corp. v. Int'l Trade Comm'n*,
  566 F.3d 1321 (Fed. Cir. 2009) ............................................................. 4

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
  2017 WL 1313851 (S.D. Ohio Apr. 10, 2017) ................................. 3, 14

*Gen. Hosp. Corp. v. Sienna Biopharm., Inc.*,
  888 F.3d 1368 (Fed. Cir. 2018) ........................................................... 10

*Greenberg v. Ethicon Endo-Surgery, Inc.*,
  91 F.3d 1580 (Fed. Cir. 1996) ............................................................. 33

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
  755 F.3d 1367 (Fed. Cir. 2014) ..................................................... passim

*Hologic, Inc. v. Smith & Nephew*,
   884 F.3d 1357 (Fed. Cir. 2018) ........................................................................ 11

*Integrity Worldwide, LLC v. Rapid-EPS LTD.*,
   2018 WL 3609430 (N.D. Tex. May 29, 2018) ................................................... 35

*Invisible Fence, Inc. v. Perimetere Techs., Inc.*,
   2006 WL 1443399 (N.D. Ind. May 25, 2006) ..................................................... 4

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
   175 F.3d 985 (Fed. Cir. 1999) .......................................................................... 13

*Nanology Alpha LLC v. WITec*,
   2017 WL 5905272 (E.D. Tex. Nov. 30, 2017) .................................................. 35

*Novartis Pharms. Corp. v. Actavis, Inc.*,
   2013 WL 6142747 (D. Del. Nov. 21, 2013) ...................................................... 28

*Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*,
   161 F.3d 696 (Fed. Cir. 1998) .......................................................................... 33

*Pfizer Inc. v. Teva Pharm. USA, Inc.*,
   555 F. App'x 961 (Fed. Cir. 2014) .................................................................... 10

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ........................................................................ 26

*Regents of Univ. of Cal. v. Eli Lilly & Co.*,
   119 F.3d 1559 (Fed. Cir. 1997) ........................................................................ 11

*Ruckus Wireless, Inc. v. Innovative Wireless Sols., LLC*,
   824 F.3d 999 (Fed. Cir. 2016) .......................................................................... 25

*Samsung Elecs. v. Elm 3DS Innovations*,
   925 F.3d 1373 (Fed. Cir. 2019) ....................................................................... 6, 9

*Schriber-Schroth Co. v. Cleveland Trust Co.*,
   311 U.S. 211 (1940)........................................................................................... 12

*ScriptPro, LLC v. Innovation Assocs., Inc.*,
   762 F.3d 1355 (Fed. Cir. 2014) ........................................................................ 16

*Skky, Inc. v. MindGeek, s.a.r.l.*,
   859 F.3d 1014 (Fed. Cir. 2017) ........................................................................ 33

*Uni-Sys., LLC v. US Tennis Ass'n Nat'l Tennis Center Inc.*,
   2020 WL 3960841 (E.D.N.Y. July 13, 2020)................................................... 35

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*,
    473 F.3d 1173 (Fed. Cir. 2006) ........................................................... 16

*Wright Med. Tech., Inc. v. Osteonics Corp.*,
    122 F.3d 1440 (Fed. Cir. 1997) ............................................................. 9

*Zeroclick, LLC v. Apple, Inc.*,
    891 F.3d 1003 (Fed. Cir. 2018) ........................................................... 35

*Z-Man Fishing Prods., Inc. v. Renosky*,
    2012 WL 2264260 (D.S.C. Apr. 27, 2012) ................................... 26, 27

## TABLE OF ADDITIONAL EXHIBITS[1]

| No. | Description |
| --- | --- |
| 114 | Response to Non-Final Office Action, December 8, 2020, from the prosecution history file of U.S. Patent No. 10,973,443 |
| 115 | Notice of Allowability, March 3, 2021, from the prosecution history file of U.S. Patent No. 10,973,443 |
| 116 | U.S. Publication No. 2003/0100821 |
| 117 | Petition for *Inter Partes* Review of U.S. Patent No. 11,013,440 (IPR2022-00637) (excerpt) |
| 118 | U.S. Publication No. 2009/0099521 |
| 119 | Acxess Spring, "*Open Wound Springs*" (2022), https://www.acxesspring.com/open-wound-springs.html |
| 120 | Plaintiffs' Initial Claim Charts (non-confidential excerpt) |
| 121 | Stuart Baum, Organic and Biological Chemistry, 3rd Ed., Macmillian Publishing Co., Inc. (1982) (excerpt) |
| 122 | Bruce Alberts, et al., Molecular Biology of the Cell, 4th Ed., Garland Science (2002) |
| 123 | Marisa Alviar-Agnew, et al., MacArthur Chemistry, 3rd Ed., LibreTexts (2022), https://chem.libretexts.org/@go/page/367831 (excerpt) |

---

[1]      Exhibits 1-67 were submitted with the Joint Claim Construction Chart (D.I. 120). Exhibits 68-100 were submitted with Abbott's Opening Brief (D.I. 135.) Exhibits 101-113 were submitted with DexCom's Answering Brief (D.I. 143). Exhibits 114-123 are new and are being submitted herewith.

### TABLE OF ABBREVIATIONS

| Abbreviation | Description |
|---|---|
| Abbott | Plaintiffs Abbott Diabetes Care Inc. and Abbott Diabetes Care Limited |
| DexCom | Defendant DexCom Inc. |
| 443 patent | U.S. Patent No. 10,973,443 (D.I. 120, Ex. 2) |
| 649 patent | U.S. Patent No. 10,945,649 (D.I. 120, Ex. 3) |
| 440 patent | U.S. Patent No. 11,013,440 (D.I. 120, Ex. 4) |
| 341 patent | U.S. Patent No. 10,881,341 (D.I. 120, Ex. 5) |
| 654 patent | U.S. Patent No. 10,959,654 (D.I. 120, Ex. 6) |
| 216 patent | U.S. Patent No. 11,000,216 (D.I. 120, Ex. 7) |
| 842 patent | U.S. Patent No. 10,820,842 (D.I. 120, Ex. 8) |
| 653 patent | U.S. Patent No. 10,952,653 (D.I. 120, Ex. 9) |
| 954 patent | U.S. Patent No. 10,827,954 (D.I. 120, Ex. 10) |
| 338 patent | U.S. Patent No. 10,874,338 (D.I. 120, Ex. 11) |
| 644 patent | U.S. Patent No. 10,966,644 (D.I. 120, Ex. 12) |
| 647 patent | U.S. Patent No. 10,945,647 (D.I. 120, Ex. 13) |
| POSITA | Person of ordinary skill in the art |
| Leinsing Reply Decl. | Second Declaration of Karl R. Leinsing, MSME, PE |
| Sarrafzadeh Reply Decl. | Declaration of Majid Sarrafzadeh, Ph.D., ISO Abbott's Reply Claim Construction Brief |
| Smith Reply Decl. | Declaration of John L. Smith, Ph.D., ISO Abbott's Reply Claim Construction Brief |

## TABLE OF DOCKET REFERENCES

|  | Description |
|---|---|
| D.I. 22 | DexCom's Opening Brief ISO Its Motion to Dismiss Pursuant to FRCP 12(b)(6) (§ 101 motion) |
| D.I. 135 | Abbott's Opening Claim Construction Brief |
| D.I. 136 | Declaration of Karl R. Leinsing, MSME, PE, ISO Abbott's Opening Claim Construction Brief |
| D.I. 137 | Declaration of Majid Sarrafzadeh, Ph.D. ISO Abbott's Opening Claim Construction Brief |
| D.I. 138 | Declaration of John L. Smith, Ph.D. ISO Abbott's Opening Claim Construction Brief |
| D.I. 143 | DexCom's Answering Claim Construction Brief |
| D.I. 144 | Declaration of Dr. Jeffrey Vaitekunas, Ph.D., ISO DexCom's Answering Claim Construction Brief |

*** Citations are to natural pages numbers, not ECF docket page numbers.**

## TABLE OF DISPUTED TERMS AND PROPOSED CONSTRUCTIONS

| Claim Term | Patent(s) | Abbott's Construction | DexCom's Construction |
|---|---|---|---|
| "*first spring*" | 443 patent | Plain and ordinary meaning (no construction needed or "first spring") | Compression spring loaded along its axis |
| "*first spring in a loaded position*" | 341, 653 & 216 patents | Plain and ordinary meaning (no construction needed or "first spring that is loaded") | Compression spring loaded along its axis |
| "*slot*" | 649 & 440 patents | Plain and ordinary meaning ("a narrow opening, groove, or channel") | Narrow opening through the first slidable body, through which the rotor follower projection extends |
| "*rotor comprising a cylindrical shape*" | 649 & 440 patents | Plain and ordinary meaning ("rotor having an overall cylindrical shape") | Plain and ordinary meaning |
| "*failure mode condition*" | 842 & 653 patents | Condition that adversely affects function | Condition that requires disabling of the output of sensor data |
| "*processing/process the sensor data*" | 842 & 653 patents | Converting/convert the sensor data into calibrated analyte values | Plain and ordinary meaning |
| "*data indicative of the sensed glucose level*" | 842 & 653 patents | Calibrated glucose values | Plain and ordinary meaning |
| "*chemically bonded*" | 954 patent | Bonded by attractive forces between atoms or molecules | Plain and ordinary meaning |
| "*insertion mechanism configured to position the sensor subassembly against the base of the transmitter mount by causing movement of the sensor subassembly*" | 647 patent | Plain and ordinary meaning (no construction needed or "a mechanism that inserts a sensor into position for use that is configured to position the sensor subassembly against the base of the transmitter mount by causing movement of the sensor subassembly") | 112(6) / Means-plus-function<br><br>Function: positioning the sensor subassembly against the base of the transmitter mount by causing movement of the sensor subassembly<br><br>Corresponding structure: none disclosed, or alternatively 420 in Figures 4D and 4E and 550 in Figure 5B |

*\* All emphasis added unless otherwise indicated.*

## I.   INTRODUCTION

Abbott's constructions follow basic tenets of claim construction, remain centered on the claims, and are consistent with the specifications, prosecution histories, and well-settled law. Many disputed terms are so straightforward that POSITAs, and even lay jurors, would easily understand them without construction. DexCom largely ignores Abbott's arguments and case law. It urges the Court to disregard plain claim language and import limitations cherry-picked from embodiments, resulting in constructions untethered from the claims themselves.[2] Abbott's constructions should be adopted.

## II.   DISPUTED CLAIM TERMS

### A.   443 Patent

#### 1.   *"first spring"*

As to "first spring," DexCom does not dispute that:

- The independent claims recite "a first spring" with no restriction on spring type;

- "First" in "first spring" is non-limiting;

- The term "spring" says nothing about its loading;

- "Spring" is a common term (including for lay people);

- The ordinary meaning of "spring" is not narrowly limited to "compression springs loaded along their axis," but rather encompasses a variety of well-known springs including torsion springs;

- "First spring" includes coil springs (as confirmed by dependent claims);

- Coil springs are not limited to compression springs—torsion springs are a common example; and

- The specification nowhere limits the disclosed inventions to specific springs (compression or otherwise).

---

[2]   DexCom cites more than 65 cases. Given word constraints, Abbott cannot address every DexCom case and argument, which should not be construed as a concession.

These undisputed facts should be dispositive.

Unable to overcome the facts (and law) against it, DexCom resorts to strawman and erroneous arguments.

DexCom first notes that some courts have construed "spring." (D.I. 143 at 11.) But that is a red herring. Here, ***both parties agree that the term "spring" itself need not be construed***. Indeed, DexCom circularly includes "spring" in its construction. Rather than construing "spring," DexCom adds narrowing limitations to that word not found in the claim language ("compression" spring "loaded along its axis"). This is improper, as shown by Abbott's case law. (D.I. 135 at 7-8 (citing *MBO* and *Shire*).) Tellingly, DexCom does not address—let alone refute—these cases in its "first spring" section.

Next, DexCom suggests that the specification expressly defines "first spring." (D.I. 143 at 11-12 ("[T]he specification indicates a specific meaning of the claimed 'first spring.'").) But there is no such definition. And DexCom cites none. Rather, DexCom asserts—incorrectly—that "the *only* type of spring disclosed … as the 'first spring' is a compression spring loaded along its axis." (*Id.* at 12.) DexCom also asserts—incorrectly—that Abbott did not "point to *any* portion" that is not specifically related to a "compression spring loaded along its axis." (*Id.* at 13.) Abbott's Opening Brief refutes both assertions. For example, Abbott showed that the specification:

- teaches a wide variety of drivers for advancing the needle and sensor, ***including "a spring" generally*** and a "wound spring" specifically;

- emphasizes the breadth of its teachings by using terms like "for example" and "or the like"; and

- teaches that drive forces can be provided via "stored potential energy" or "spring forces," both of which apply to springs generally, not just compression springs.

(D.I. 135 at 9 (citing Ex. 2 at 7:62-8:2, 13:1-14, 18:34-39).) Abbott also showed that the specification teaches using coil springs as an example; in fact, coil springs are recited in dependent

claims. (*Id.*; Ex. 2 at claims 3, 15.) And as DexCom does not dispute, coil springs include springs other than compression springs, such as torsion springs. (D.I. 135 at 8.) DexCom ignored these specification teachings (other than "wound spring" addressed below). Simply saying that the specification's "spring" teachings relate "only" to "compression springs" does not make it so.[3]

Ignoring the above teachings, DexCom also argues that the specification "teaches away" from torsion springs. (D.I. 143 at 13.) That is incorrect. DexCom cites one portion of the specification. (*Id.* (citing Ex. 2 at 14:29-37).) But that portion does not teach away from torsion springs (or other rotational springs) at all; it does not even mention them. It merely describes the drive spring in one sample embodiment (referring to numbered components in a figure).[4] *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1373 (Fed. Cir. 2014) (improper to narrow construction based on description of "numbered component[s] in sample embodiment). This cited portion certainly does not disclaim—let alone "clearly and unmistakably"—torsion springs.[5]

Next, unable to refute Abbott's claim differentiation argument, DexCom mischaracterizes it. According to DexCom, "Abbott argues that if DexCom's construction is applied, independent claims 1 and 13 would become equal in scope with their respective dependent claims." (D.I. 143 at 15.) But Abbott said nothing about "equal in scope." Rather, Abbott explained that the dependent claims make clear that (a) "first spring" is not limited to a specific spring type and (b) includes coil springs. (D.I. 135 at 8.) Abbott also cited Federal Circuit law and a district court "spring" case.

---

[3]     DexCom fails to distinguish *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 2017 WL 1313851 (S.D. Ohio Apr. 10, 2017). (D.I. 143 at 11-12 n.4.) There, the court rejected a narrow construction of "spring" because it excluded claimed springs, not just springs disclosed in the specification. *Id.* at *3-4. Here, DexCom's construction improperly excludes both expressly claimed springs (certain coil springs) and springs disclosed in the specification ("spring" generally, certain wound and coil springs, etc.).

[4]     The same is true of the sample spring dimensions DexCom cites. (*Id.* at 13.)

[5]     Other uncited portions refer to preventing rotation of shuttle 338, not the rotation of any spring. (Ex. 2 at 14:19-25.)

(*Id.*); *Invisible Fence, Inc. v. Perimetere Techs.*, 2006 WL 1443399, *7 (N.D. Ind. May 25, 2006) ("***Through the doctrine of claim differentiation, the term 'a spring' as used in claim 9 is broad enough to cover various types of springs***" where a dependent claim recited a specific spring type). DexCom never refutes these cases.

Lastly, DexCom alleges that prosecution disclaimer supports its construction. Specifically, DexCom references an amendment where Abbott removed "wound spring" from a dependent claim (while making numerous other amendments). (D.I. 143 at 14-15.) According to DexCom, as a result, "first spring" excludes all wound springs. (*Id.*) DexCom's "disclaimer" argument fails for multiple reasons and is contradicted by DexCom's own positions.

There is a "heavy presumption" that claim terms carry their "full ordinary" meaning. *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1334-35 (Fed. Cir. 2009). To overcome that presumption, there must be "a clear disavowal of claim scope" by "expressions of manifest exclusion or restriction." *Id.* Prosecution disclaimer cannot be found unless the disclaimer is "clear and unmistakable"— a "high" burden. *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045-47 (Fed. Cir. 2016); *Hill-Rom*, 755 F.3d at 1371-74 (discussing the "exacting" disclaimer standard in detail).

First, DexCom's "disclaimer" argument cannot be correct given the evidence relied on by the Examiner. Specifically, Abbott submitted a declaration to "swear behind" the cited "Heller" reference. With that declaration, Abbott submitted evidence showing the inventors had reduced to practice an inserter within the claims before Heller's priority date. That sample inserter used a coil spring, which also is one form of a "wound" spring (see yellow highlighting):



(Ex. 114 at ABTDEL_00031702; Leinsing Reply Decl. ¶24.) DexCom itself acknowledges that this spring type is one form of a "wound" spring. (D.I. 143 at 14.) The Examiner allowed the claims—including the "first spring" independent claims—based on the swear behind. (Ex. 115 at 2.) By doing so, the Examiner must have understood "first spring" to include wound springs.

Second, subsequent prosecution confirms this fact and refutes DexCom's argument. After allowing the 443 patent, the Examiner allowed two related patents. (Exs. 22-23.) The independent claims in those patents recite a "first spring" like here. (Ex. 22 at claims 1, 21; Ex. 23 at claims 1, 9, 27.) Both patents further contain dependent claims specifying that the "first spring" is a "***wound spring***." (Ex. 22 at claim 20; Ex. 23 at claims 11, 12, 28.) These dependent claims show that (a) "first spring" includes wound springs and (b) neither the Examiner nor Abbott understood that wound springs were disclaimed from the scope of "first spring." *Samsung Elecs. v. Elm 3DS*

*Innovations*, 925 F.3d 1373, 1378 (Fed. Cir. 2019) (same term in related patents must be construed the same).

Third, the claims themselves refute DexCom's "disclaimer" argument. DexCom ignores that the dependent claim then—and as allowed—confirms that "first spring" encompasses coil springs, which include springs other than compression springs (*e.g.*, torsion springs). Thus, Abbott plainly did not disclaim such springs.

Fourth, DexCom's own positions refute its "disclaimer" argument. For example, according to DexCom, "wound" is a synonym for "cocked" or loaded. (D.I. 143 at 13-14.) But if that were true, and all "wound" springs were disclaimed, then DexCom's own construction—which requires a ***loaded*** spring—could not be correct. Further, DexCom states that its construction encompasses "coiled compression springs" (*id.* at 12 n.5), which DexCom acknowledges are wound springs (*id.* at 14). Again, DexCom's statement could not be correct if wound springs were disclaimed. Similarly, DexCom alleges that its construction "covers all disclosed embodiments" (*id.* at 11-12 n.4), which could not be true if wound springs were disclaimed because the Figure 16 embodiment uses a wound spring. (*Id.* at 12 (highlighted item 336).)

Finally, the relevant office action response shows there was no disclaimer. The response makes clear that there were two bases for overcoming the rejections: (1) the swear behind and (2) an amendment to the independent claim (unrelated to the "wound spring" amendment to pending dependent claim 18). (Ex. 114 at ABTDEL_00031674 ("Applicant hereby submits the aforementioned Joint Declaration for purposes of swearing behind [Heller], and also concurrently amends independent claim 16 to further distinguish over the cited references....").) The response never discusses the relevant specific rejections (against then-pending claims 17 and 18), nor does it say anything about the "wound spring" amendment in connection with patentability. As found

in this District, there can be no "clear and unmistakable" disclaimer where there is "no express statement ... indicating why the patentee made the amendments." *Enzo Life Sci. v. Gen-Probe, Inc.*, 2015 WL 4101205, *7 (D. Del. July 7, 2015). DexCom acknowledged this very point elsewhere in its brief. (D.I. 143 at 8 (noting that Delaware cases—including *Enzo*—find no disclaimer when amendments are made without explanation).) The response's silence regarding the amendment is unsurprising given that the removal of "wound spring" would not overcome the rejections.[6] And, because Abbott successfully swore behind Heller, the allowance had nothing to do with distinguishing any Heller teaching.[7]

## B.    341, 654, and 216 Patents

### 1.    *"first spring in a loaded position"*

Abbott previously established the following for "first spring in a loaded position":

- The independent claims recite "a first spring in a loaded position" with no restriction on spring type;

- In contrast, the same claims recite a "second spring" and expressly limit the second spring to a "compression spring," further demonstrating that "first spring" is not so limited;

- The ordinary meaning of "spring" is not narrowly limited to compression springs, but rather encompasses a variety of other springs including torsion springs;

---

[6]    For example, beyond wound springs, Heller taught the use of springs generally and coil springs specifically (both of which remained in the claims). (Ex. 116 at [0206], [0256]; Ex. 15 at 4 (Examiner citing same paragraphs).) Further, because many wound springs are coil springs, the cited Heller teaching would apply to claims 17 and 18 regardless of the "wound spring" amendment.

[7]    DexCom's criticisms of Abbott's extrinsic evidence lack merit. DexCom claims "a majority of the evidence" post-dates the priority date. (D.I. 143 at 16 n.8.) That is untrue. Abbott's expert cites references from 1990, 1976, and 1911. (D.I. 136 ¶47.) He cites only two references after the priority date, one which discusses the "History of the Coil Spring." (*Id.*) And far from being "inconsistent and muddled" (D.I. 143 at 15-16), Abbott's extrinsic evidence shows that POSITAs would not understand the generic term "spring" to be limited to only compression springs. Notably, DexCom itself admits that "springs come in many forms...." (*Id.* at 16.)

- The 341 patent has dependent claims stating that "first spring" includes torsion springs;

- The specification (including the originally filed claims) includes extensive general teachings about the use of springs generally, and torsion springs specifically, as the "first spring";

- The terms "spring" and "loaded" are well understood and need not be construed (indeed, DexCom circularly includes both terms in its construction); and

- The ordinary meaning of "first spring in a loaded position" is a loaded spring, which POSITAs—and lay people—would understand.

DexCom does not dispute these facts, all of which refute DexCom's construction.

Instead, the **_sole basis_** for DexCom's erroneous construction—which excludes torsion springs—is alleged prosecution disclaimer. (D.I. 143 at 9 ("[T]he singular issue in dispute [is] whether the claim term is subject to a disclaimer....").) DexCom's construction is wrong as a matter of law. Indeed, DexCom's construction violates multiple fundamental tenets of claim construction—tenets that DexCom either does not dispute or expressly concedes. Beyond the dispositive legal principles, DexCom's "disclaimer" argument is based on (1) an erroneous characterization of the Examiner's rejections and (2) a fundamental misunderstanding of written description law. Abbott addresses these points below.

First, the 341 patent makes clear that "first spring in a loaded position" includes torsion springs. The claims expressly say so. Independent claims 1 and 26 recite a "first spring in a loaded position." (Ex. 5 at claims 1, 26.) Dependent claims 4 and 27 state "wherein the first spring is a torsion spring." (*Id.* at claims 4, 27.) Given these dependent claims, "first spring in a loaded position" must include torsion springs as a matter of law and logic. (D.I. 135 at 11 (citing multiple cases).) "It is axiomatic that a dependent claim cannot be broader than the claim from which it depends." *Alcon Rsch., Ltd. v Apotex Inc.*, 687 F.3d 1362, 1367 (Fed. Cir. 2012). In other words, an independent claim "must cover at least" its dependent claims. *Id.*; *Wright Med. Tech. v.*

*Osteonics Corp.*, 122 F.3d 1440, 1445 (Fed. Cir. 1997) ("[W]e must not interpret an independent claim in a way that is inconsistent with a [dependent] claim...."); *Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1345-46 (Fed. Cir. 2020) (reversing construction because it excludes "explicitly claimed embodiments [in dependent claims]" and rejecting argument that examiner "simply overlooked" those claims). This Court has followed this basic principle, as Abbott previously noted. (D.I. 135 at 11 (citing *Shire*).)

DexCom does not refute Abbott's previously cited cases on this point. And while DexCom cites several "disclaimer" cases, ***none adopt a construction that excludes expressly claimed subject matter***. That is unsurprising. It makes no sense to say applicants "clearly and unmistakably" disclaimed subject matter that they ***expressly claim and the Examiner allowed***. The above facts and law are dispositive.

Second, another fundamental principle equally applies. "Where multiple patents derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents." *Samsung*, 925 F.3d at 1378; (D.I. 135 at 11 (citing *Samsung*)). DexCom agrees. (D.I. 143 at 9 n.3.) Accordingly, given the 341 patent dependent claims and the above controlling legal principles, "first spring in a loaded position" must encompass torsion springs in all three related patents and not vice versa as DexCom suggests.

DexCom's construction fails for additional reasons. DexCom's entire "disclaimer" argument rests on mischaracterizing the Examiner's rejections and a flawed understanding of written description law. Specifically, DexCom repeatedly alleges that "[t]he Examiner found that 'first spring in a loaded position' could *not* include a torsion spring." (D.I. 143 at 3, 4, 9.) That is untrue. The Examiner never found that the generic term "first spring" ***in the independent claims***

excludes torsion springs (and DexCom cites no such finding). Indeed, the Examiner expressly found otherwise in allowing the "torsion spring" dependent claims in the 341 patent.

Rather, during prosecution of the 654 and 216 patents, the Examiner questioned whether there was sufficient written description to specifically claim a "torsion spring"—in dependent claims—in conjunction with the other claim elements. (D.I. 135 at 14 (citing Ex. 45 at 3).) Critically, under basic written description law, even assuming there were insufficient written description to specifically claim a particular species (torsion spring), *that does not mean the disclosed genus (first spring) excludes that species* (especially with known mechanical technologies like springs). Stated differently, even where (as here) there is written description for a genus (first spring) that encompasses a particular species (torsion spring), an applicant might not be permitted to specifically claim that particular species. To do so, the specification must also disclose or provide "blaze marks" to that specific species. *Gen. Hosp. Corp. v. Sienna Biopharm., Inc.*, 888 F.3d 1368, 1372 (Fed. Cir. 2018) ("The disclosure of a broad range of values does not by itself provide written description support for a particular value within that range."). A simple example illustrates this principle. If a specification discloses a device comprising 1 to 15 widgets, the applicant can claim a device having a range of 1 to 15 widgets (genus). Such a genus claim obviously would cover a device having 9 widgets (species). However, the applicant may not claim 9 widgets specifically unless the specification also discloses or provides "blaze marks" to 9 widgets specifically. But even if the patent does not disclose (and thus cannot claim) 9 widgets specifically, the properly supported genus claim (1-15 widgets) still covers 9 widgets. *See, e.g.*, *Pfizer Inc. v. Teva Pharm. USA, Inc.*, 555 F. App'x 961, 968 (Fed. Cir. 2014) (finding that, even if inventors did not adequately describe a specific species, there was sufficient support for the genus covering the species). DexCom's cited law confirms this point. *Regents of Univ. of Cal. v.*

10

*Eli Lilly & Co.*, 119 F.3d 1559, 1568 (Fed. Cir. 1997) ("[E]very species in a genus need not be described in order that a genus meet the written description requirement" especially in mechanical arts).

Other law further highlights this flaw in DexCom's "disclaimer" argument. With known mechanical technologies, the disclosure of a single species can support a broader genus if the disclosed species is well-known and other members of the genus are also well-known.[8] *Hologic, Inc. v. Smith & Nephew*, 884 F.3d 1357, 1362-64 (Fed. Cir. 2018). In such situations, applicants obviously cannot specifically claim undisclosed species, but the genus claim would still cover them.

In sum, when the Examiner's actual assertions are viewed in the context of basic written description principles, it is clear that, at most, she questioned whether there was sufficient written description to specifically claim the "torsion spring" species in a dependent claim. Critically, she never found that the "first spring" genus in the independent claims excludes torsion springs (indeed, as noted above, she expressly found otherwise in the 341 patent). For that same reason, Abbott did not—and could not have—"clearly and unmistakably" acquiesced to such a finding. Thus, DexCom's "disclaimer" argument fails for this reason too.

Finally, Abbott's responses to the rejections further show there was no "clear and unmistakable" disclaimer. As previously explained, Abbott expressly disagreed with the Examiner's dependent claim rejections. (D.I. 135 at 14 (citing Ex. 46 at 9).) Nevertheless, as is common prosecution practice, Abbott canceled the species dependent claims "without prejudice," and "without conceding the merits" of the rejections, to "advanc[e] prosecution." (*Id.*) This

---

[8]     Thus, even if the only exemplary spring disclosure in the specification were a compression spring (which it is not), that disclosure would still support the broader "spring" genus claim.

response is not a "clear and unmistakable" disclaimer of the genus "spring" in the 654 and 216 independent claims.

Multiple Delaware cases have reached the same conclusion under similar circumstances, as previously cited. (D.I. 135 at 14 (citing *Enzo* and *Ondeo*).) DexCom fails to distinguish those cases. (D.I. 143 at 8.) For example, DexCom alleges "in *Enzo*, the applicant canceled a claim that the examiner had found lacking in specificity, without providing any indication as to why the amendment was made." (*Id.*) But the facts of *Enzo* are nearly identical to here: a narrower species claim was rejected on non-prior art grounds, and the applicant proceeded with a broader genus claim to expedite prosecution. Consistent with the legal principles above, the Court found that canceling the species claim did not exclude the species from the claimed genus. *Enzo*, 2015 WL 4101205, *7 ("Defendants have failed to persuade the Court that the patentee's tactical decision to cancel claims expressly covering partial strandedness means that the claims it was issued require the Court to construe 'double stranded' in a manner that excludes partial strandedness.").

Finally, DexCom's 1940 Supreme Court decision in *Schriber* does not adopt the position DexCom advocates. Rather, *Schriber* unremarkably held that where a patentee canceled narrower claims reciting "flexible webbing" and proceeded with broader claims to "webbing" (without a "flexible" modifier), the claims could not later be construed as ***limited*** to "flexible webbing" to distinguish them from prior art. *Schriber-Schroth Co. v. Cleveland Trust Co.*, 311 U.S. 211, 221-23 (1940). *Schriber* did not address whether the genus "webbing" still covered the species "flexible webbing." *Schriber*—and DexCom's other cases—are also inapposite because none (a) found disavowal of ***expressly claimed*** subject matter (as noted above), (b) involved the above-described genus/species written description issue for known mechanical technology, or (c) involved statements of express disagreement with the Examiner.

C.      **649 and 440 Patents**

1.      "*slot*"

The unrestricted term "slot" includes both through-slots and non-through-slots. DexCom argues "slot" means only one subset of "slots," i.e., through-slots. The fact that DexCom effectively seeks to add a non-existent narrowing modifier speaks volumes.

The following facts are uncontested:

- "Slot" is a common term;

- Dictionaries, technical guides, and common knowledge confirm that "slot" ordinarily includes through-slots and non-through-slots;[9]

- The claims only say "slot" without restricting the type of slot; and

- The specification uses "slot" to refer to both through-slots and non-through-slots.

These facts are dispositive. Courts depart from the ordinary meaning of claim terms "in only two instances: lexicography and disavowal." *Hill-Rom*, 755 F.3d at 1371. DexCom argues neither.

Unable to overcome the decisive facts and law, DexCom resorts to arguments that are contrary to both.

First, DexCom says that the specification uses "slot" inconsistently, sometimes referring to a through-slot and other times a non-through-slot. (D.I. 143 at 28 n.13.) Far from inconsistent, the specification consistently uses "slot" in accordance with its ordinary meaning—to include through-slots and non-through-slots. *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 991 (Fed. Cir. 1999) ("Varied use of a disputed term ... demonstrates the breadth of the term rather than providing a limited definition."). Federal Circuit and Delaware decisions are clear: it is

---

[9]      Even DexCom's mail slot and letter holder slot show that "slot" ordinarily includes through-slots and non-through-slots. (D.I. 143 at 18.) Another common example is "slot" cars, which ride in a "slot" of a track (a non-through-slot).

improper to (a) narrow an unmodified general term and (b) exclude disclosed uses of that term. (D.I. 135 at 18 (citing *Renishaw* and *Shire*).) Although DexCom briefly discusses Abbott's cases, it never refutes these basic legal principles.

Second, DexCom's construction conflicts with another fundamental principle: ordinarily "terms are to be construed consistently throughout a patent." (D.I. 135 at 17-18 (citing *Phil-Insul* and *Eli Lilly*)); *see also Ethicon*, 2017 WL 1313851, *2 (basic "canon of construction" is "the same word in a patent has the same meaning"). In other words, generally, "slot" should not have one meaning in one part of the specification, and a different meaning elsewhere. Yet, that is what DexCom advocates.

DexCom asks the Court to consider only the "relevant" use of "slot," which according to DexCom, is where "slot" is used with a particular embodiment. (D.I. 143 at 24-27.) That is just another way of trying to improperly incorporate limitations from sample embodiments. DexCom cites only one case for its "relevant use" argument—*Cloud Farm Assocs. v. Volkswagen Grp. of Am.*, 674 F. App'x 1000 (Fed. Cir. 2017); (D.I. 143 at 26). But that case does not support DexCom's assertion. There, the disputed terms were "seal" and "prevent." Critically, the specification portion deemed irrelevant ***did not use those claim terms***. Rather, it used different words (*e.g.*, "cushioning"). *Cloud Farm*, 674 F. App'x at 1007; *see also Eli Lilly & Co. v. Eagle Pharms., Inc.*, 2019 WL 1299212, *2 (D. Del. Mar. 21, 2019) (refusing to limit "administration" of pemetrexed disodium to ***liquid*** administration based on specification's use of "administration" with other compounds, citing the "well-established" rule that terms "be construed consistently throughout a patent.").

Third, DexCom's construction runs afoul of additional legal principles. For example, it states that the slot is "through the first slidable body, through which the rotor follower extends."

But there is no textual basis in the common term "slot" for this part of DexCom's construction. This is contrary to law—law that DexCom does not refute. (D.I. 135 at 17 (citing *MBO*).) Moreover, the claims already expressly recite any required structural relationships between the "slot" and the first slidable body and rotor follower projection. For example, the claims require that "the first slidable body compris[es] a slot" (Ex. 3 at claim 1), yet via "slot," DexCom seeks to require that the slot go completely "through" the first slidable body. Similarly, the claims require that "the rotor follower projection is received within the slot" (*id.*), yet via "slot," DexCom seeks to require that the rotor follower projection go completely "through" the slot. As confirmed by Abbott's uncontested law, DexCom's attempt to inject different structural requirements via "slot" should be rejected. (D.I. 135 at 17 (citing *Greatbatch*)); *Hill-Rom*, 755 F.3d at 1376-77 (rejecting requirements beyond those expressly claimed).

Fourth, DexCom claims that it does not seek to import limitations from a sample embodiment. (D.I. 143 at 23.) But that is exactly what DexCom tries to do via nearly every argument. For example:

- DexCom depicts and describes in detail the operation of a sample embodiment (*id.* at 19-21);

- DexCom argues (incorrectly) that Abbott's construction renders the invention "inoperable," but bases that assertion on details of the sample embodiment (*id.* at 21-24 ("As shown in Embodiment 1300, the only way [it could work]....")); and

- DexCom urges the Court to consider only the "slot" in the sample embodiment and ignore all other uses of "slot" (*id.* at 22-27).

DexCom's efforts are explicit. For example, DexCom argues that, without "slot" being limited to a through-slot, there is no way the claimed rotor follower projection could "extend[] … into a slot on the second slidable body" nor could it "contact ... the second slidable body." (*Id.* at 21.) DexCom elsewhere similarly agues that "slot" must be a through-slot for the rotor follower

projection to "interact with" the second slidable body and "extend through to a slot on the second slidable body." (*Id.* at 22, 24.) But critically, ***the claims do not recite a "slot" in the second slidable body, nor do they require the rotor follower projection to "contact" or "interact with" the second slidable body***.[10] Rather, the claims merely require that rotation of the rotor/rotor follower projection causes advancement of the first slidable body, second slidable body, and sensor ***without restricting how it does so***. (Ex. 3 at claim 1.) Thus, when looking at the "entire claim" (as DexCom urges), there is no reason that "slot" must be a through-slot.

The law is clear. It is improper to read limitations from sample embodiments into claims. This is true even where the specification discloses only one embodiment. (D.I. 135 at 10, 19 (citing *Enercon*)); *Hill-Rom*, 755 F.3d at 1371-75 (discussing law; general term "datalink" not limited to ***wired*** datalink simply because sole embodiment uses a wired datalink). Moreover, when a claim recites only a subset of described features, "it is improper to limit the claim to other, unclaimed features." *Ventana Med. Sys. v. Biogenex Labs.*, 473 F.3d 1173, 1180-82 (Fed. Cir. 2006) (refusing to limit general term "dispensing" to ***direct*** dispensing); *see also ScriptPro, LLC v. Innovation Assocs., Inc.*, 762 F.3d 1355, 1359 (Fed. Cir. 2014). In fact, the specification states that the depicted embodiments are only "illustrative," show "various aspects and features," are non-limiting, and may "vary." (Ex. 3 at 3:28-37, 6:33-41); *Hill-Rom*, 755 F.3d at 1373 (citing similar language).

Fifth, DexCom's argument rests on a flawed premise. DexCom asserts that the claimed inserter "would not work" unless the claimed "slot" is a through-slot.[11] (D.I. 143 at 25 n.10, 21-

---

[10]     DexCom notes that earlier related pending claims recited a second slot in the second slidable body. (D.I. 143 at 23-24.) But that fact cuts against DexCom because the claims here do not recite a second slot. DexCom effectively tries to re-insert a "second slot" limitation.

[11]     DexCom's "would not work" argument appears to be an improper attempt to inject invalidity arguments (albeit meritless) via claim construction. *Hill-Rom*, 755 F.3d at 1374 (Courts should "not allow claim construction to morph into a mini-trial on validity.").

22, 24.) Specifically, DexCom asserts that, without a through-slot, the rotation of the rotor/rotor follower projection could not cause advancement of the second slidable body (as claimed) because the rotor follower projection ***must extend into a second slot in the second slidable body***. (*Id.*) That is untrue. There are other ways the rotor/rotor follower projection could cause advancement without the rotor follower projection extending into a second slot in the second slidable body. Indeed, the specification expressly teaches such concepts. (Leinsing Reply Decl. ¶¶56-70.)

For instance, the specification depicts at least two sample embodiments (inserters 900 and 1100B) where a second slidable body is releasably coupled with a first slidable body such that an advancing force applied to the first slidable body causes advancement of both the first and second slidable bodies (and the second slidable body then disengages and retracts). Here are sample figures from the two embodiments showing the initial, advanced, and retracted configurations (with the first slidable bodies in orange and second slidable bodies in blue):



(Ex. 3 at Figs. 15-17, 23-25; *see also id.* at 27:8-11 ("Initially, needle carrier 934 [second slidable body] is coupled to inner rail 928 [first slidable body] through inter-engagement of finger 986 of needle carrier 934 with shoulder 987 of inner rail 928."), 28:54-66.) These examples show that the claimed "slot" need not be a through-slot for the claimed inserter to work. With the claimed inserter, rotation of the rotor/rotor follower projection causes the first slidable body to advance (*e.g.*, via the rotor follower projection within the slot). As long as the second slidable body is

18

releasably coupled to the first slidable body in some way, the second slidable body will advance with the first slidable body. And as the above specification examples show, such coupling can be achieved in various ways *without the rotor follower projection extending through the slot of the first slidable body into a slot of the second slidable body*. And notably, the specification specifically teaches that the various features of each embodiment "may be readily separated from or combined with the features of any" other embodiment. (*Id.* at 7:25-33; Leinsing Reply Decl. ¶¶56-70.)

DexCom's "would-not-work" argument is particularly misguided given its IPR positions. There, DexCom relies on an allegedly operable prior art embodiment that purportedly invalidates the claims. Notably, DexCom's relied-upon embodiment *does not have a slot in the second slidable body, nor does the alleged rotor follower projection (item 213 below) extend completely through the first slidable body "slot" (item 214 below)*:



(Ex. 117 at 25; Ex. 118 at Fig. 12.) DexCom's "would-not-work" argument cannot stand in view of its IPR positions.

19

Finally, DexCom's argument is also refuted by the accused G6 product. That product works even though the slot in its first slidable body (which receives the rotor follower projection) is not a through-slot. (Ex. 120 at 17.)

Given the above facts, DexCom's cited cases are inapposite and do not change the long-standing principle that limitations from sample embodiments should not be read into claims.

## 2.   *"rotor comprising a cylindrical shape"*

For this term, DexCom's entire argument is a strawman. Knowing that its view of the "plain and ordinary meaning" is strained, DexCom manufactures a dispute so its view will sound more palatable relative to Abbott's. Specifically, DexCom alleges that the parties dispute the meaning of "comprising." Citing the MPEP and case law, DexCom says "comprising" is synonymous with, *e.g.*, "characterized by" and is open-ended. (D.I. 143 at 29-30.) On the other hand, DexCom alleges that Abbott says "comprising" means "having an overall." (*Id.* at 28.) That is untrue. As Abbott previously made clear, Abbott agrees that "comprising" means "characterized by" and is open-ended in accordance with the MPEP:

> "[R]otor comprising a cylindrical shape" ... means the rotor itself has a cylindrical shape, **but can have other features as well. MPEP §2111.03 ("comprising" is open-ended and means, inter alia, "characterized by")**.

(D.I. 135 at 19.) In short, DexCom's argument is directed to a non-existent dispute.

As previously explained, the true dispute is whether the full phrase "rotor comprising a cylindrical shape" means **the rotor itself** has (or is characterized by) a cylindrical shape but can also have other features (as Abbott urges), or whether it means the rotor **or any sub-component thereof** has a cylindrical shape (as DexCom urges). (*Id.*) When the true dispute is considered, Abbott is correct.

The natural reading of the claim supports Abbott. It says the rotor itself—not a sub-component—comprises a cylindrical shape. And the use of open-ended "comprises" make sense

20

because, in the claims, the rotor has more than one feature (a cylindrical shape and a rotor follower projection):

> [An] inserter assembly comprising ... a rotor comprising a cylindrical shape, ... and wherein the rotor comprises a rotor follower projection....

(Ex. 3 at claim 18.) As previously noted, in context, the use of "rotor" plainly refers to the rotor itself, not a sub-component thereof, and certainly not the separately-recited rotor follower projection, as DexCom contends. (D.I. 135 at 20.)

Abbott also previously showed that the exemplary rotors depicted in the specification comport with Abbott's construction. (*Id.* at 21-22.) According to DexCom, those figures equally support DexCom. (D.I. 143 at 29.) But DexCom ignores a fundamental purpose for the cylindrically-shaped rotor taught by the claims and specification—to receive a torsion spring (which often is cylindrical):



(D.I. 135 at 21-22 (citing Ex. 4 at Fig. 45, claim 1.) These teachings strongly indicate the rotor itself is cylindrically shaped.

In contrast, under DexCom's view, as long as the rotor has any cylindrically-shaped sub-component—no matter how small, incidental, and lacking in purpose—the rotor still is a "rotor comprising a cylindrical shape." That is nonsensical. To illustrate this point, the following square-shaped and triangular-shaped examples that rotate around a central axis—with tiny cylindrically-shaped sub-components serving no purpose—would meet the term under DexCom's view:



Abbott's construction is the more natural reading of the term.

Abbott also previously showed that, during prosecution, the Examiner understood the disputed term to refer to the overall shape of the rotor. (D.I. 135 at 22-23.) DexCom again says this evidence equally supports them. (D.I. 143 at 29.) That is incorrect. The Examiner's language specifically equated "rotor comprising a cylindrical shape" with "a cylindrical rotor." (D.I. 135 at 22 (citing Ex. 30 at 3).) Moreover, when identifying the "rotors" of the prior art meeting the term, the Examiner cited specific item numbers in figures (items 514 and 206 in yellow below):



Tellingly, as support for the cylindrical shape, the Examiner pointed only to the overall rotors; she did not cite the cylindrically-shaped sub-component 516 (orange). (Ex. 30 at 3; Ex. 88 at Fig. 7A; Ex. 89 at Fig. 2.)

Finally, **_unrebutted_** expert testimony supports Abbott. (D.I. 136 ¶¶124-144.)

**D.     842 and 653 Patents**

**1.     "_failure mode condition_"**

Abbott's construction should be adopted for the reasons explained in the Opening Brief and below. DexCom's construction is refuted by the claims themselves, addresses the wrong element, imports limitations into the claims, and sheds no light on what a "failure mode condition" is. These considerations compel only one conclusion—a "failure mode condition" is a "condition that adversely affects function."

The specification broadly describes numerous conditions that can cause data gaps, including:

23

> [an] inability to promptly calibrate the sensor, system malfunction, sensor dislodging, signal errors associated with the sensor, transmitter unit, receiver unit, and the like, or any other variables or parameters that result in the inability of the analyte monitoring system to display or output the real-time monitored analyte level…
>
> a sensor instability condition, a calibration failure condition, or a monitoring system failure condition…
>
> an early signal attenuation condition of the sensor, sensor misposition error, sensor communication error, temperature measurement outside a predetermined range, or a combination thereof…
>
> an analyte level exceeding a predetermined threshold, a rate of change of analyte level exceeding a predetermined threshold, a signal error associated with the reference data, a data unavailability condition, or a combination thereof…
>
> a failure mode of a sensor, sensor data outside a predetermined acceptable range, a rate of change of sensor data above a predetermined level, a requirement for calibration of a sensor, a temperature measurement outside a predetermined range, or any combination thereof…

(Ex. 8 at 13:21-27, 13:61-62, 13:64-67, 14:2-5, 14:27-31.) When these or other conditions occur and cause data gaps on the patient's display, the analyte monitoring system has experienced a condition that adversely affects function, consistent with Abbott's construction.

DexCom insists the invention is limited to only conditions that render data "unreliable." (D.I. 143 at 37-39.) DexCom is wrong. As an initial matter, "unreliable" appears nowhere in the specification despite DexCom's repeated efforts to add it. (D.I. 143 at 37 ("conditions that may result in unreliable data"); 38 ("condition that may result in unreliable data"); 38-39 ("conditions that render that data unreliable").) More importantly, while some failure mode conditions might render data unreliable, others cause data to be ***unavailable*** such as "a data unavailability condition," "system malfunction," or "signal errors associated with the sensor, transmitter unit, receiver unit, and the like." (Ex. 8 at 13:22-24, 14:5; Sarrafzadeh Reply Decl. ¶¶4-6.) Indeed, after a failure mode condition is corrected, data corresponding to the data gap "may be retrospectively ***filled*** or ***reprocessed*** so that the data gap is closed." (Ex. 8 at 13:27-28.) This was also DexCom's

24

understanding before claim construction. In its §101 motion to dismiss, DexCom explained the "sensor system has the ability to 'backfill' *missing* or uncalibrated analyte data." (D.I. 22 at 4.)

DexCom further argues "[t]he patents never discuss losing wireless connectivity or how that concept would fit into the alleged invention." (D.I. 143 at 40.) But the specification is replete with descriptions of wireless communication that fit squarely within several failure mode conditions. For example, it teaches using close proximity, short range, and bi-directional wireless communication between the transmitter and receiver units (Ex. 8 at 4:4-34), radio-frequency (RF) communication and data paths through which signals propagate from the sensor, to the transmitter, and to the receiver (*id.* at 6:1-18, 8:5-27, FIGS. 1-3), hardware for wireless communication (*id.* at 5:58-64, 6:19-33, 10:53-58, 9:22-28, FIGS. 2-3), pairing techniques for wireless communication (*id.* at 6:34-49), wireless communication protocols (*id.* at 7:25-33), and wireless modulation techniques (*id.* at 9:22-28). (Sarrafzadeh Reply Decl. ¶¶17-24.) A POSITA would understand that these and other aspects of wireless communication could fail, and such failure would be a claimed "failure mode condition." Such failure mode conditions could comprise "signal errors associated with the sensor, transmitter unit, receiver unit, and the like," a "system malfunction," or "a monitoring system failure condition." (*Id.* ¶25.)

DexCom asserts that Abbott's construction would result in a lack of written description if the recited failure mode conditions encompassed "any 'condition that adversely affects function.'" (D.I. 143 at 41.) This argument fails for at least two reasons. First, DexCom merely relies on *Ruckus Wireless, Inc. v. Innovative Wireless Sols.*, 824 F.3d 999, 1004 (Fed. Cir. 2016), but that case is inapposite. There, the Federal Circuit held that "no intrinsic or extrinsic evidence suggests that [the disputed term] 'communications path' encompasses wireless communications." *Id.* at 1004. By contrast, the 842 and 653 patents provide lengthy discussions of wireless

communication and identify numerous failure mode conditions that can adversely affect function, including those that affect wireless communication. Second, the claims are limited to failure mode conditions that cause "one or more sensor data gaps to be outputted to a display" and do not encompass just "any 'condition that adversely affects function.'" DexCom's example of "display flickering" (D.I. 143 at 40-41) is misplaced for that reason. Unless "display flickering" causes "one or more sensor data gaps to be outputted to a display," it is not a failure mode condition within the scope of the claims. (Sarrafzadeh Reply Decl. ¶¶9-12.)

The prosecution history of the 842 patent is also informative. The Examiner explained that a "failure mode condition may be interpreted as a form of an adverse condition effecting [sic] an analyte monitoring system." (Ex. 54 at 3-4); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) ("[P]rosecution history provides evidence of how the PTO and the inventor understood the patent."). DexCom has no response to this. (D.I. 143 at 39-40 (stating, "[w]hat the examiner actually said," and then merely repeating the Examiner's description of a failure mode condition).)

DexCom's reliance on the prosecution of related patents is irrelevant because those claims use terms that differ from the asserted claims. DexCom argues the asserted claims are limited to "disabling the output of sensor data" based on Abbott's response to an office action for the original application in the family. (D.I. 143 at 39.) This argument is unavailing because the claims in that application actually recited "disabling the output of sensor data," but the asserted claims do not. "There is presumed to be a difference in meaning and scope when different words or phrases are used in separate claims." *Z-Man Fishing Prods., v. Renosky*, 2012 WL 2264260, *12 (D.S.C. Apr. 27, 2012). It is also irrelevant that the Examiner rejected the 842 patent claims for nonstatutory double-patenting over the claims of that application. (D.I. 143 at 39.) A species limitation (*e.g.*, "disabling the output of sensor data") may render a genus limitation (*e.g.*, "causes

26

one or more sensor data gaps") "not patentably distinct," thereby requiring a terminal disclaimer, which is what the applicant filed to overcome the rejection. (Ex. 54 at 2.) But "the filing of a terminal disclaimer does not require a Court to construe the claims of a terminally disclaimed patent identically with the claims of the older patent." *Davis-Lynch, Inc. v. Weatherford Int'l*, 2009 WL 1097510, *8 (E.D. Tex. Apr. 20, 2009); *Z-Man*, 2012 WL 2264260, *11-12 (declining to construe earlier and later claims the same in light of terminal disclaimer).

DexCom's construction, on the other hand, is incorrect at least because it limits a failure mode condition to a circumstance that could never occur. The claims recite outputting "processed stored sensor data" (842 patent) and "data indicative of the sensed glucose level" (653 patent) ***to a display***. But DexCom's construction requires "disabling the output of ***sensor data***," which is never "output" according to the claims. DexCom attempts to save its flawed construction by arguing that it "focuses on disabling the output of sensor data, not the display of data…. It follows that if data is not output, it cannot be displayed." (D.I. 143 at 41.) This argument is nonsensical. (Sarrafzadeh Reply Decl. ¶8.) The only claimed "outputting" is ***to a display***. (*Id.*) This was also DexCom's understanding in its §101 motion to dismiss: "[T]he system may stop outputting data for display to a user when certain adverse conditions are present." (D.I. 22 at 4.) DexCom's argument to save its flawed construction adds a new level of confusion: If the construction refers to an "output" other than to a display as DexCom now contends, DexCom fails to explain what that "output" is, where it is allegedly "disabled," how it relates to outputting to a display, and what intrinsic evidence allegedly that supports it. (Sarrafzadeh Reply Decl. ¶8.)

DexCom's construction is wrong also because it addresses a ***different*** claim limitation: it addresses how data gaps can be displayed. (D.I. 135 at 29.) But that is not the disputed claim term as shown below:



DexCom's construction is redundant with, and impermissibly limits, a different claim limitation. *Novartis Pharms. Corp. v. Actavis, Inc.*, 2013 WL 6142747, *4 (D. Del. Nov. 21, 2013) (rejecting construction that "would render other portions of the claim redundant and inject confusion, rather than clarity, into the understanding of this term's meaning").

> ### 2. *"processing/process the sensor data"*

Abbott's construction accords the proper meaning of "processing" in the claims because sensor data must be converted into calibrated analyte values before being displayed to the patient. Abbott's Opening Brief demonstrated this. (D.I. 135 at 24-26.) Notably, DexCom agrees. (D.I. 143 at 43 ("calibration is *a* type of processing that sensor data must undergo prior to being displayed to a user").)

The parties' positions diverge, however, based on DexCom's mischaracterization of Abbott's construction. DexCom argues that Abbott's construction is "narrow" and would limit the disputed term "to a particular type of processing-i.e., calibration." (D.I. 143 at 42.) DexCom then cites law relating to lexicography and disavowal of claim scope (*id.*), but none of it is relevant because Abbott's construction is not an attempt to "narrow" the term.

To the contrary, Abbott's construction does not preclude various forms of processing that can play a role in "converting sensor data into calibrated analyte values," such as processing to remove noise, smooth the signal, digitize the signal, adjust for temperature, etc. (Sarrafzadeh Reply Decl. ¶¶27-28.) But as Abbott previously explained, the processing, in whatever form, must convert sensor data into calibrated analyte values, because only calibrated analyte values are output

to the display. (D.I. 143 at 52 (agreeing with Abbott).) DexCom's argument thus largely rests on a faulty premise.

DexCom's argument that the 842 patent's Abstract "shows the opposite of what Abbott suggests" is plainly wrong—it aligns perfectly with Abbott's construction. (D.I. 143 at 44.) The Abstract discloses "methods and apparatus for receiving sensor data from an analyte sensor of a sensor monitoring system, processing the received sensor data with time corresponding calibration data, [and] outputting the processed sensor data." (D.I. 135 at 25 (citing Abstract).) The middle phrase, "processing the received sensor data with time corresponding calibration data," which DexCom contends is the problem for Abbott's construction, refers to "converting the sensor data into calibrated analyte values" (Abbott's construction) using "time corresponding calibration data" (remainder of the phrase). The "processed sensor data" (*i.e.*, calibrated analyte values) are then output to the display. Abbott's construction causes no redundancy and DexCom's argument to the contrary is incorrect.

### 3.     "*data indicative of the sensed glucose level*"

As explained in the Opening Brief, the analysis is the same for this term as for the previous term.[12] In the 653 patent, the term used for data that is displayed in a useful form is "data indicative of the sensed glucose level." (Ex. 9 at claim 1.) As DexCom admits, this must be "calibrated glucose values" because only calibrated glucose levels are output to the display. (D.I. 143 at 43 ("calibration is *a* type of processing that sensor data must undergo prior to being displayed to a

---

[12]     DexCom contends that Abbott cited "no supporting intrinsic evidence" for this term in the Opening Brief. (D.I. 143 at 44.) This is baseless. Abbott clearly explained that "the same reasons" apply to both this term and "processing the sensor data." (D.I. 135 at 26.) For brevity, Abbott did not repeat all of the intrinsic support showing that sensor data must undergo processing to convert it into calibrated analyte values. The same applies here and the analysis is not repeated.

user").) Like the previous term, this does not preclude various types of processing that can play a role in converting the data into calibrated glucose values.

DexCom mischaracterizes Abbott's expert's opinions. It asserts that "nothing in Dr. Sarrafzadeh's declaration provides support for his conclusion that the only data that could be 'indicative' of sensed glucose values is calibrated data." (D.I. 143 at 45.) But Dr. Sarrafzadeh never stated that conclusion. (D.I. 137 ¶¶71-74.) As he explained, because the claim requires outputting "data indicative of the sensed glucose level" to the user, the data must be "calibrated glucose values" because that is the only glucose data that would be useful to the user. (*Id.* ¶73.)

DexCom further argues that "data beyond calibrated data, such as raw data, can provide some indication of a sensed glucose value." (D.I. 143 at 45.) But that would be inconsistent with the claims. Raw sensor data (*e.g.*, electrical current) is not output to the user, which DexCom concedes. (*Id.* at 43 ("calibration is *a* type of processing that sensor data must undergo prior to being displayed to a user").) Thus, if "data indicative of the sensed glucose level" were merely raw sensor data, it would not be displayed, yet the 653 patent clearly calls for ***displaying*** "data indicative of the sensed glucose level." (Ex. 9 at claim 1; Sarrafzadeh Reply Decl. ¶31.)

DexCom also makes irrelevant arguments about disavowal of claim scope. (D.I. 143 at 45-46.) Abbott does not contend the patentee disavowed claim scope—Abbott's construction simply accounts for what must occur in the system (*i.e.*, conversion to calibrated glucose values) according to the claims as understood by a POSITA. Indeed, this was also DexCom's understanding before claim construction. In its §101 motion to dismiss, DexCom explained: "The '653 patent claims a system where a sensed glucose value associated with a failure mode condition is stored in memory on the transmitter and then transmitted to a receiver unit and displayed after the failure mode condition is corrected." (D.I. 22 at 4.)

30

Finally, DexCom's argument that "Abbott's proposed construction is inconsistent with the claim language" is baseless. DexCom asserts that if a "failure mode condition includes an inability to calibrate data, then data stored during such a condition cannot be calibrated glucose values." (D.I. 143 at 46.) But claim 1 of the 653 patent recites storing "at least a portion of the data indicative of the sensed glucose level *corresponding to a time period associated with a failure mode condition*" (Ex. 9 at claim 1), not necessarily *during* a failure mode condition as DexCom argues.

### E.    954 Patent

#### 1.    *"chemically bonded"*

When the parties met and conferred, DexCom would not propose a construction of this term or explain why it disagreed with Abbott's construction. (D.I. 120 at 13.) DexCom now argues that the genus (chemical bonds) should be limited to a species (covalent and ionic bonds). DexCom also argues that "chemically bonded" excludes certain "weaker 'attractive forces' … includ[ing] van der Waals forces, dipole-dipole interactions, London dispersion forces, and others." (D.I. 143 at 47.) But the ordinary meaning of "chemically bonded" is not so narrow.

Significantly, the same "weaker 'attractive forces'" that DexCom would exclude are recognized by POSITAs as chemical bonds. As described in one college chemistry textbook:

> Chemical bonds range from strong ionic and covalent bonds to weaker metallic bonds to very much weaker dipole-diploe interactions, hydrogen bonds, and [London] dispersion forces.

(Ex. 121 at 3; *see also* Smith Reply Decl. ¶¶5-7 (referencing many other textbooks and academic sources).)

DexCom suggests that the dictionaries cited by Abbott limit chemical bonds to *intra*molecular, because they refer to "attractive forces" between "atoms … or groups of atoms *in a molecule* or crystal." (*See* D.I. 143 at 47-48.) But a "group of atoms" can itself be a "molecule" which in turn can chemically bond with others to form a larger molecule or crystal. As previously

explained by Dr. Smith, "[w]here the interactions involve groups of atoms (*i.e.*, ***molecules***), they are also considered attractive forces ***between*** molecules." (D.I. 138 ¶¶41-42 (explaining how molecules can chemically bond to form other molecules).)

Moreover, many molecules and crystals are held together by the same "weaker attractive forces" that DexCom excludes. "Each molecule of DNA," for example, is formed from "strands of nucleotides held together by hydrogen bonds." (Ex. 122 at 5.) And "molecular crystals are held together by weak intermolecular forces" like "[London] dispersion forces" or "dipole-dipole forces." (Ex. 123 at 2-4.)

DexCom relies on a chemical glossary. (D.I. 143 at 48.) But DexCom's "definition" does not exclude "weaker attractive forces." (D.I. 146-11 at 174.) To the contrary, it broadly encompasses "forces acting between" "groups of atoms," regardless of their strength. (*Id.*)

DexCom also tries to limit Dr. Smith to the exemplary chemical bonds in his original declaration. (D.I. 143 at 46.) But Dr. Smith was not addressing DexCom's new arguments. Regardless, Dr. Smith explained that "chemical bonds occur at the atomic level (*i.e.*, attractive forces between atoms)" and "at the molecular level (*i.e.*, attractive forces between molecules)," and provided further explanation in his second declaration. (D.I. 138 ¶45; Smith Reply Decl. ¶¶5-10.)

For the foregoing reasons, POSITAs would understand "chemically bonded" to mean "bonded by attractive forces between atoms or molecules."

F.      **647 Patent**

1.      ***"insertion mechanism configured to position the sensor subassembly against the base of the transmitter mount by causing movement of the sensor subassembly"***

a.      **"insertion mechanism"**

As explained in Abbott's Opening Brief, "insertion mechanism" is readily understood by POSITAs as referring to a class of structures for inserting a sensor into position for use. This is evidenced by use of "insertion mechanism" (and similar terms) in other patents in the field. (D.I. 135 at 35-36; D.I. 136 ¶¶153-155.) DexCom argues that "insertion mechanism" is means-plus-function because it does not define a specific structure and identifies structure by function. (D.I. 143 at 32-35.) But DexCom's arguments are legally flawed. Section 112(f) is inapplicable where a term "is used in common parlance or by [POSITAs] to designate structures, ***even if the term covers a broad class of structures*** **and** ***even if the term identifies the structures by their function***." *Skky, Inc. v. MindGeek*, 859 F.3d 1014, 1019 (Fed. Cir. 2017). "Insertion mechanism" is such a term with a plain and ordinary meaning in the field.

In the seminal case *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580 (Fed. Cir. 1996), the Federal Circuit considered "detent mechanism," holding:

> Many devices take their names from the functions they perform.… It is true that the term "detent" does not call to mind a single well-defined structure, but the same could be said of other commonplace structural terms such as "clamp" or "container." ***What is important is not simply that a "detent" or "detent mechanism" is defined in terms of what it does, but that the term, as the name for structure, has a reasonably well understood meaning in the art***.

*Id.* at 1583. Here, "insertion mechanism" has a "reasonably well understood meaning in the art," as previously established by Abbott and Mr. Leinsing. (D.I. 135 at 35-37; D.I. 136 ¶¶152-158, 167-175.) DexCom ignores fundamental principles and binding authority cited by Abbott. For

example, *Personalized Media Commc'ns, LLC v. Int'l Trade Comm'n*, 161 F.3d 696 (Fed. Cir.

1998) held "digital detector" is not means-plus-function because:

> [N]either the fact that a "detector" is defined in terms of its function, nor the fact that the term 'detector' does not connote a precise physical structure in the minds of [POSITAs] detracts from the definiteness of structure. Even though the term "detector" does not specifically evoke a particular structure, it does convey to one knowledgeable in the art a variety of structures known as "detectors."

*Id.* at 705; *see also Skky*, 859 F.3d at 1019; *Greenberg*, 91 F.3d at 1583; *Blackbird Tech LLC v.*

*ELB Elecs.*, 2016 WL 7451622, *5 (D. Del. Dec. 28, 2016) ("'Fastening mechanism' is sufficient

structure even though it invokes a class of structures, rather than a specific structure, and it uses a

functional name to do so."). The cases cited by DexCom for its "specific structure" argument are

distinguishable. (D.I. 143 at 33-34.) Unlike here, the disputed terms in those cases were not

understood as connoting a class of structures.

DexCom also relies on Dr. Vaitekunas's declaration, which is similarly flawed. Dr.

Vaitekunas contends that insertion mechanisms have varying structures and recites structural

differences among those analyzed by Mr. Leinsing. (D.I. 144 ¶105.) But Abbott does not argue

"insertion mechanism" would be understood by POSITAs as connoting one *specific* structure.

Rather, Abbott asserts that it would be understood as designating a *class* of structures for inserting

a sensor into position for use. (D.I. 135 at 36-37; D.I. 136 ¶¶152-158, 167-168; Leinsing Reply

Decl. ¶¶73-78.) This is demonstrated by intrinsic and extrinsic evidence, including patents and

applications (including those owned by DexCom) using "insertion mechanism" to connote

structure. (*Id.*) Notably, Dr. Vaitekunas acknowledges that each insertion mechanism in the

extrinsic record inserts a sensor into position for use. (D.I. 144 ¶105.)

The lack of "means" in the term creates a presumption against § 112(f), which DexCom

has not overcome. DexCom argues "mechanism" is a "nonce" word. (D.I. 143 at 33.) But

"insertion mechanism" is not because it refers to a known class of structures. Many courts have

found similar terms, which include "mechanism" and take their name from their function, are not means-plus-function. For example, "fastening mechanism" was not means-plus-function because "'fastening' provides sufficient structure when modifying the term mechanism to place the claim outside the scope of § 112(f)." *Blackbird*, 2016 WL 7451622, *5; *see also Greenberg*, 91 F.3d at 1583 ("detent mechanism"); *Uni-Sys., LLC v. US Tennis Ass'n Nat'l Tennis Center*, 2020 WL 3960841, *13-15 (E.D.N.Y. July 13, 2020) ("retention mechanism"); *Nanology Alpha LLC v. WITec*, 2017 WL 5905272, *10-11 (E.D. Tex. Nov. 30, 2017) ("movement mechanism"); *Integrity Worldwide, LLC v. Rapid-EPS*, 2018 WL 3609430, *4-6 (N.D. Tex. May 29, 2018) ("locking mechanism").

In this field, "insertion mechanism" refers to structure for inserting a sensor into position for use. The remaining language in the term recites an additional feature unique to the claimed insertion mechanism, including additional structural components that help define the structural character of the insertion mechanism by describing how components are arranged and interact. (D.I. 135 at 37-38); *Uni-Sys.*, 2020 WL 3960841, *13 ("retention mechanism" not means-plus-function as claim "provide[d] sufficient detail as to how the retention mechanism interacts with other components ... in a way that informs the structural character of the retention mechanism"). Moreover, "the mere fact that the disputed limitations incorporate functional language does not automatically convert the words into means for performing such functions." *Zeroclick, LLC v. Apple, Inc.*, 891 F.3d 1003, 1008 (Fed. Cir. 2018).

### b.    If the term is subject to § 112(f), sufficient structure is disclosed

DexCom recognizes that the specification describes structures for positioning a sensor in a transmitter mount, but argues it fails to disclose structure configured to position a sensor subassembly, comprising a sensor and a seal. (D.I. 143 at 35; D.I. 144 ¶¶110-112.) The

specification, however, teaches embodiments with a sensor subassembly comprising a seal. (Ex. 13 at 5:38-39 ("analyte sensor 330 is provided with a seal 340"), 5:48-6:21, 8:51-55; Leinsing Reply Decl. ¶¶81-82.) Figures 3A, 3D, and 6D, depicted below, show sensor subassemblies positioned in a mount.



The specification also identifies embodiments of an "insertion mechanism," explaining that it places the sensor into position for use. (D.I. 135 at 34-35.) Moreover, it states "[v]arious other modifications and alterations in the structure and method of operation of this invention will be apparent to those skilled in the art…." (Ex. 13 at 9:42-44.) Reading the specification as a whole, POSITAs would understand that structures disclosed and identified therein are configured to position a sensor subassembly against the base of a transmitter mount. (Leinsing Reply Decl. ¶¶80-85); *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379 (Fed. Cir. 2001) ("[S]pecification must be read as a whole to determine the structure capable of performing the claimed function.").

36

## III.   CONCLUSION

For the foregoing reasons, the Court should adopt Abbott's proposed constructions.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Rodger D. Smith II*

Jack B. Blumenfeld (#1014)
Rodger D. Smith II (#3778)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@morrisnichols.com
rsmith@morrisnichols.com

OF COUNSEL:

Edward A. Mas II
Leland G. Hansen
James M. Hafertepe
Sharon A. Hwang
Michael J. Carrozza
Manuela Cabal
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, IL 60661
(312) 775-8000

*Attorneys for Plaintiffs*

Benjamin A. Lasky
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800

Ellisen Shelton Turner
KIRKLAND & ELLIS LLP
2049 Century Park East, Suite 3700
Los Angeles, CA 90067
(310) 552-4200

Amanda J. Hollis
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-20000

August 17, 2022

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby confirm that this brief complies with the word limitation of 10,000 words as set forth in the Court's Scheduling Order. (*See* D.I. 35 at 8.) I certify that this brief contains 9,953 words, which were counted using Microsoft Word's word counting feature. The word count does not include the cover page, table of contents (page i), table of authorities (pages ii-iv), table of additional exhibits (page v), table of abbreviations (page vi), table of docket references (page vii), table of disputed terms and proposed constructions (page viii), or the counsel blocks.

*/s/ Rodger D. Smith II*

Rodger D. Smith II (#3778)

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 17, 2022, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on August 17, 2022, upon the following in the manner indicated:

| | |
|---|---|
| John W. Shaw, Esquire<br>Nathan R. Hoeschen, Esquire<br>SHAW KELLER LLP<br>I.M. Pei Building<br>1105 North Market Street, 12th Floor<br>Wilmington, DE 19801<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |
| Robert A. Van Nest, Esquire<br>Christa Anderson, Esquire<br>Eugene M. Paige, Esquire<br>Sophie Hood, Esquire<br>Elizabeth A. Eagan, Esquire<br>Andrew S. Bruns, Esquire<br>Sean M. Arenson, Esquire<br>Puja Parikh, Esquire<br>Nicholas R. Green, Esquire<br>Yena Lee, Esquire<br>Bilal Malik, Esquire<br>Stephanie J. Goldberg, Esquire<br>Jacquie P. Andreano, Esquire<br>Matan Shacham, Esquire<br>KEKER, VAN NEST & PETERS LLP<br>633 Battery Street<br>San Francisco, CA  94111-1809<br>*Attorneys for Defendant* | *VIA ELECTRONIC MAIL* |

Theodore Kwong, Esquire                                      *BY ELECTRONIC MAIL*
HILGERS GRABEN PLLC
10000 North Central Expy., Suite 400
Dallas, TX  75231
*Attorneys for Defendant*


*/s/ Rodger D. Smith II*

Rodger D. Smith II (#3778)