IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT DIABETES CARE INC. and | ) | |
| ABBOTT DIABETES CARE LIMITED, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-977-KAJ |
| | ) | |
| DEXCOM, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## **DEFENDANT'S SUR-REPLY CLAIM CONSTRUCTION BRIEF**

OF COUNSEL:
Robert A. Van Nest
Christa Anderson
Eugene M. Paige
Sophie Hood
Elizabeth A. Egan
Andrew S. Bruns
Sean M. Arenson
Puja Parikh
Nicholas R. Green
Yena Lee
Bilal Malik
Stephanie J. Goldberg
Jacquie P. Andreano
Matan Shacham
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA  94111-1809
(415) 391-5400

Theodore Kwong
HILGERS GRABEN PLLC
10000 N. Central Expy., Suite 400
Dallas, Texas 75231
(972) 645-3097

Dated: August 31, 2022

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

# **TABLE OF CONTENTS**

**Page(s)**

TABLE OF AUTHORITIES ........................................................................................................ ii

TABLE OF EXHIBITS ............................................................................................................... iii

I.      INTRODUCTION ............................................................................................................ 1

II.     DISPUTED CLAIM TERMS ......................................................................................... 1

        A.     U.S. Patent Nos. 10,881,341, 10,959,654 & 11,000,216 (collectively, "Curry Patents") ........................................................................................ 1

        B.     U.S. Patent No. 10,973,443 .................................................................................. 3

        C.     U.S. Patent Nos. 10,945,649 & 11,013,440 (collectively, "Lee Patents") ............ 4

            1.     "slot" ........................................................................................................ 4

            2.     "rotor comprising a cylindrical shape" ................................................... 6

        D.     U.S. Patent No. 10,945,647 .................................................................................. 8

            1.     "insertion mechanism" ........................................................................... 8

            2.     Abbott fails to identify sufficient linked corresponding structure. ........... 10

        E.     U.S. Patent Nos. 10,820,842 & 10,952,653 (collectively, "Harper Patents") ............................................................................................................. 10

            1.     "failure mode condition" ....................................................................... 10

            2.     "processing/process the sensor data" ..................................................... 12

            3.     "data indicative of the sensed glucose level" .......................................... 13

        F.     U.S. Patent No. 10,827,954 ................................................................................ 15

III.    CONCLUSION ............................................................................................................. 17

# **TABLE OF AUTHORITIES**

**Page(s)**

*3M Innovative Props. Co. v. Tredegar Corp.*,
   725 F.3d 1315 (Fed. Cir. 2013)................................................................................13

*In re Abbott Diabetes Care Inc.*,
   696 F.3d 1142 (Fed. Cir. 2012).................................................................................3

*Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*,
   899 F.3d 1291 (Fed. Cir. 2018)..............................................................................8, 9

*Egenera, Inc. v. Cisco Systems, Inc.*,
   972 F.3d 1367 (Fed. Cir. 2020)................................................................................8

*Greenberg v. Ethicon Endo-Surgery, Inc.*,
   91 F.3d 1580 (Fed. Cir. 1996).................................................................................4, 9

*Koninklijke Philips N.V. v. ZOLL Lifecor Corp.*,
   2015 WL 12781199 (W.D. Pa. Aug. 28, 2015) ..........................................................8

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
   344 F.3d 1205 (Fed. Cir. 2003)...............................................................................10

*Paragon Sols., LLC v. Timex Corp.*,
   566 F.3d 1075 (Fed. Cir. 2009)................................................................................6

*Personalized Media Comms., LLC v. ITC*,
   161 F.3d 696 (Fed. Cir. 1998)..................................................................................9

*In re Stepan Co.*,
   868 F.3d 1342 (Fed. Cir. 2017)................................................................................5

*Trustees of Columbia Univ. in City of N.Y. v. Symantec Corp.*,
   811 F.3d 1359 (Fed. Cir. 2016)...........................................................................3, 4, 6

*Uni-Systems, LLC v. USTANTC Inc.*,
   2020 WL 3960841 (E.D.N.Y. July 13, 2020) ...........................................................9

### TABLE OF ADDITIONAL EXHIBITS

| Exhibit No. | Description |
|:-----------:|-------------|
| 124 | Patent Owner's Preliminary Response ("POPR"), Case No. IPR2022-00605 re U.S. Patent No. 10,945,649 |
| 125 | Petition for *Inter Partes* Review of U.S. Patent No. 10,945,649 |

## I.      INTRODUCTION

Abbott's Reply fails to account for the controlling law and evidence that conflict with its proposed constructions. Abbott's constructions, like its asserted claims, are *post hoc* creations designed to read onto DexCom's G6 continuous glucose monitoring ("CGM") products— regardless of the actual scope of the much earlier applications to which the patents assert priority. Abbott's arguments conflict with the asserted patents' claims, specifications, and prosecution histories, and the relevant extrinsic evidence. Abbott's "plain and ordinary" meanings are not tenable. Abbott also submits additional extrinsic evidence that is conclusory and still fails to cure the fundamental problems with its constructions.

Meanwhile, Abbott dismisses much of DexCom's Answering Brief with a short footnote blaming word limits for its failure to address DexCom's cited authority. D.I. 152 at 1 n.2. This is no substitute for the reasoned arguments and evidence that Abbott lacks. DexCom thus respectfully asks the Court to adopt its proposed constructions.

## II.     DISPUTED CLAIM TERMS

### A.      U.S. Patent Nos. 10,881,341, 10,959,654 & 11,000,216 (collectively, "Curry Patents")

For the Curry Patents, Abbott's Reply ignores core authority supporting DexCom's position, mischaracterizes the issues and the cases it does address, and fails to overcome the patents' prosecution history that clearly excludes torsion springs from "first spring in a loaded position."

The Examiner excluded torsion springs from the scope of the '654 and '216 Patents, and Abbott's resulting disclaimer limits both those patents and the earlier-issued '341 Patent. Unable to refute it, Abbott either omits or mischaracterizes DexCom's cited authority (*compare id.* at 12 *with* D.I. 143 at 4–5, discussing *Schriber-Schroth*) or dismisses it as "inapposite" without actual

1

analysis (D.I. 152 at 12; *see, e.g.*, D.I. 143 at 6–7, discussing *Rheox*, etc.).

Abbott also focuses on the '341 Patent, *see* D.I. 152 at 8, despite the fact that the two **later-issued** Curry Patents (the '654 and '216 Patents) are the only ones for which the Examiner expressly addressed whether the claimed invention encompassed torsion springs. *See* D.I. 143 at 3–4. Similarly, Abbott ignores controlling law that claim differentiation must yield to the more fundamental rules of prosecution disclaimer, and a dependent claim cannot restore claim scope that has been disclaimed. Rather, a dependent claim purporting to reclaim such scope may itself be invalid. *See id.* at 5, 10 (discussing *Biogen*, *Kraft*). Abbott's repeated citations of claim differentiation cases, *see* D.I. 152 at 8–9, do not change this rule.

The Reply also repeats—but still fails to support—Abbott's other opening positions. For example, DexCom does not concede that "spring" requires no construction; it urges a narrowing construction, as other courts have appropriately adopted. *See* D.I. 143 at 7 n.2; *contra* D.I. 152 at 8, 2. Abbott still offers no authority that the "originally filed" (but never granted) claims of a predecessor application should determine claim scope here; they should not. *See* D.I. 152 at 8. And Abbott again cites inapposite Delaware disclaimer cases, *id.* at 12, without addressing controlling Federal Circuit authority that cancelling claims under protest to advance prosecution can result in disclaimer. *See* D.I. 143 at 7–8. (DexCom previously distinguished Abbott's cases, where the reasons for claim cancelations were ambiguous or unclear. *See id.* at 8.)

Moreover, Abbott offers no applicable authority for its assertion that DexCom's construction violates "basic written description law," *see* D.I. 152 at 10. One of Abbott's cited cases actually affirmed a similar finding of *no* written description (*Gen. Hosp. Corp.*); another applied a rule specifically for component ranges in chemical compounds—not "widgets," as Abbott implies (*Pfizer*; nonprecedential); another involved biotechnology and *rejected* the

argument that describing a single species necessarily supports a broader genus claim (*Regents*); and the last is irrelevant here, where the purported species have mutually conflicting structures (*Hologic*; *see* D.I. 143 at 4 n.1).

The Court should therefore adopt DexCom's proposed construction.

### B.     U.S. Patent No. 10,973,443

Abbott's Reply also ignores the intrinsic evidence against the '443 Patent's "first spring" term and instead offers a list of misleading "undisputed" statements. But these statements are disputed. And more importantly, they do not overcome at least the following: (1) the claimed "spring" cannot be *any* type of spring, D.I. 144 ¶¶ 47–50; (2) the specification discloses *only* compression springs loaded along their axes and *teaches away* from springs like torsion springs, D.I. 143 at 12–13; (3) Abbott's own expert does not dispute that *every* first spring disclosure in the patent is a compression spring loaded along its axis, D.I. 155 ¶ 22; (4) the prosecution history supports DexCom's construction, D.I. 143 at 14–15; and (5) the extrinsic evidence, including Abbott's conclusory expert declaration, cannot overcome the patent's clear teachings, *id.* at 15–16 n.8.

Abbott asserts the parties agree that "spring" needs no construction. This is not true. DexCom detailed myriad reasons the claimed "first spring" must be construed to be the class of springs disclosed and taught in the specification. Abbott's continued reliance on *MBO* and *Shire* ignores the fundamental canon that "[t]he only meaning that matters in claim construction is the meaning in the context of the patent." *Trustees of Columbia Univ. in City of N.Y. v. Symantec Corp.*, 811 F.3d 1359, 1363 (Fed. Cir. 2016) (citation omitted). Here, the intrinsic evidence dictates a specific meaning. *Accord In re Abbott Diabetes Care Inc.*, 696 F.3d 1142, 1150 (Fed. Cir. 2012); *see also* D.I. 143 at 13. Abbott is thus reduced to relying on the use of phrases such as "for example" and "or the like." But those phrases are insufficient support for expanding the

3

claimed first spring to encompass undisclosed and unworkable spring types. *See Trustees*, 811 F.3d at 1366, 1368.

Abbott's other arguments likewise fail. Abbott's reliance on *Ethicon* is inapposite because DexCom's construction does not exclude disclosed embodiments. *See* D.I. 143 at 11–12 n.4. And Abbott's claim differentiation argument fares no better. DexCom's construction of "compression spring loaded along its axis" remains a broader genus than the dependently claimed "coil spring," including wave and accordion springs, *see* D.I. 144 ¶¶ 61–62. Abbott's reliance on "wound" is also unpersuasive. Its use, just *once* in the patent, is insufficient to support the broad construction Abbott seeks. "Wound" does not refer to torsion springs, but rather, is synonymous with cocked, as in "cocked or wound spring." *See* D.I. 143 at 13–14. But in any event, during prosecution, Abbott *removed* the term "wound" from its claims. *See id.* at 14–15. So whatever it means, it is not within this patent's claimed invention. Abbott's argument about what later-prosecuted patent claims say is thus irrelevant, where those patents notably *include* (*i.e.*, claim) the term "wound." Based on the intrinsic evidence, a POSITA would have understood the claimed "first spring" to be a compression spring loaded along its axis.

### C.    U.S. Patent Nos. 10,945,649 & 11,013,440 (collectively, "Lee Patents")

#### 1.    "slot"

Abbott argues that because "slot" is a common word used differently in different parts of a 103-page specification, the claimed "slot" is "unrestricted" and "includes . . . non-through-slots."[1] While perhaps superficially appealing, Abbott's position is incorrect—and it would dramatically and improperly expand the scope of the Lee claims. Contrary to Abbott's assertions,

---

[1] Abbott concedes that the G6 does not include a "through-slot" in what it alleges is the first slidable body. D.I. 152 at 20.

the claimed "invention" would not function if the "slot" of the first slidable body were not a through-slot.

Abbott argues that the purported invention could function without a through-slot because Embodiments 900 and 1100B, a prior art reference, and the G6 allegedly do not have through-slots. That is beside the point. A different system than the one actually claimed could, of course, theoretically function without a through-slot. But the system that Abbott purportedly invented—one like that disclosed in Embodiment 1300—cannot. Embodiment 1300, not 900 or 1100B, is the one Abbott relied on during prosecution to support claims newly reciting a slot, rotor, and rotor follower projection. *Id.* at 23–24. Embodiment 1300, not 900 or 1100B, is the single embodiment that includes, as required by the claims, a torsion spring, rotor, and rotor follower projection for automatic insertion.

Acknowledging that these non-1300 embodiments lack key claim elements, Abbott proposes *post hoc* that embodiments could be "combined" to satisfy claimed features. D.I. 152 at 19. But Embodiments 900 and 1100B are different insertion mechanisms from what is claimed: there, manual depression of a handle or bar advances insertion and the slot plays no functional role in that advancement. *See* Vaitekunas Second Decl. ¶¶ 4–6. Abbott does not explain how the patent teaches, suggests, or motivates a skilled artisan at the time of the invention to combine these alternative systems with the *claimed* invention. *Cf. In re Stepan Co.,* 868 F.3d 1342, 1345–46 n.1 (Fed. Cir. 2017) (to combine embodiments to argue invalidity, "there must be a motivation to make the combination and a reasonable expectation that such a combination would be successful"); *see also* Vaitekunas Second Decl. ¶¶ 7–10, 15. Abbott previously argued strenuously against combining embodiments in IPR proceedings—but now argues for a combination, with no explanation for why one is warranted. *See* Abbott's POPR, Ex. 124 at 24–

25. Indeed, if a POSITA were to attempt to combine Embodiments 900 or 1100B with Embodiment 1300 in a way that would satisfy the claims, such a hypothetical combination would still use a through-slot. *See* Vaitekunas Second Decl. ¶¶ 11–15.

Abbott's mischaracterization of DexCom's IPR positions aside, *see* Ex. 125 at 45–46 (arguing Gravesen *has* through-slot), its points regarding Gravesen and the G6 are similarly misguided: that other systems could allegedly function without a through-slot does not establish that Abbott invented such a system.

Abbott's remaining arguments are equally unavailing. Abbott contends that "unmodified" terms cannot be narrowed but fails to address the *seven* decisions DexCom cites in which courts accepted a narrower construction of an "unmodified" term as necessary in light of intrinsic evidence. *See* D.I. 143 at 21–25. Abbott also argues that terms should be construed "consistently" throughout a patent—but controlling authority contradicts its position. The Federal Circuit has explained "the specification and prosecution history" may make clear that terms have "different meanings in different portions" of the patent. *Paragon Sols., LLC v. Timex Corp.*, 566 F.3d 1075, 1087 (Fed. Cir. 2009); *cf. Trustees*, 811 F.3d at 1368 & n.4. So too here. DexCom does not "read in" limitations from embodiments, but as in myriad cases, *see* D.I. 143 at 24–27, limits the claim language to its proper meaning in the context of the Lee patents. Claim constructions must also be "consistent" with what is actually claimed.

### 2. "rotor comprising a cylindrical shape"

Abbott first proposed the construction "rotor having an overall cylindrical shape" for this term. Then it purported to abandon that construction—while nevertheless *including it in parentheses behind "plain and ordinary meaning."* D.I. 120 at 3. Now, Abbott argues that it is "untrue" that it says "comprising" means "having an overall." D.I. 152 at 20. The Court should reject Abbott's logical gymnastics. Abbott now apparently agrees with DexCom that the Manual

6

of Patent Examination Procedure (MPEP)'s definition of "comprising" is correct, and that plain and ordinary meaning should govern. *See id.*; MPEP § 2111.03 (comprising is "synonymous with 'including,' 'containing,' or 'characterized by,'" and "inclusive or open-ended"). The inquiry should end there: the plain and ordinary meaning of "comprising" should govern.

Abbott nonetheless insists that the "true dispute" relates to whether the rotor itself or any sub-component thereof comprises a cylindrical shape. But this argument (not DexCom's, as Abbott claims) is a strawman. Abbott did not propose the construction "the rotor *itself* comprises a cylindrical shape." And DexCom never suggested a tortured construction involving "sub-components." Rather, DexCom simply argues for plain and ordinary meaning—Abbott's hypothetical examples of the broadest possible reading of the term thus have no bearing on the dispute at hand. Indeed, it is Abbott's (de facto) proposed construction of "having an overall" that would render the claim language unintelligible, including the numerous uses of "comprises" throughout the claims. *See* D.I. 143 at 28.

Nothing in the intrinsic evidence warrants straying from the plain and ordinary meaning. As previously explained, the depiction of cylindrical rotors in some embodiments and prior art cited by the Examiner is entirely consistent with the plain and ordinary meaning of "comprising": cylindrical rotors, by definition, include (or comprise) a cylindrical shape. *See id.* at 29. Indeed, the Examiner never "specifically equated" the term "rotor comprising a cylindrical shape" with "a cylindrical rotor[,]" but merely identified certain prior art as disclosing the "comprising a cylindrical shape" limitation. Ex. 30 at 3. Similarly, it is irrelevant that the Examiner did not cite a cylindrical sub-component. Moreover, Abbott's unsupported assertion that the rotor must have an "overall cylindrical shape" to "receive a torsion spring" is meritless. Rotors of various "overall" shapes (all of which comprise a cylindrical shape) can "receive"

7

torsion springs. Abbott has provided no evidence to the contrary.

Abbott claimed to argue one thing (plain and ordinary meaning), then argued another (its abandoned, parenthetical construction). But its arguments fail—and Abbott's conclusory "expert testimony" remains irrelevant. *See* D.I. 143 at 31 n.15. As Abbott admits, the plain and ordinary definition should govern.

### D.     U.S. Patent No. 10,945,647

#### 1.     "insertion mechanism"

Abbott does not dispute that "mechanism" is a nonce word that may invoke § 112(6), D.I. 152 at 34; D.I. 143 at 33, but argues that adding the word "insertion" before "mechanism" connotes structure to a POSITA. D.I. 152 at 33–35. Not so.

Abbott's only support is Mr. Leinsing's declarations, which rely on a handful of patents and patent applications using the term "insertion mechanism." *See* D.I. 136 ¶¶ 153, 154. This does not establish that "insertion mechanism" is understood by POSITAs to connote structure, let alone structure *sufficient to perform the claim-recited function*. *Egenera, Inc. v. Cisco Systems, Inc.*, 972 F.3d 1367, 1374 (Fed. Cir. 2020) (even if term connoted structure, it did not connote structure sufficient to perform claim-recited function); *Koninklijke Philips N.V. v. ZOLL Lifecor Corp.*, Case No. 2:12-cv-1369, 2015 WL 12781199, at *12 (W.D. Pa. Aug. 28, 2015) ("[U]sing 'connecting mechanism' in claims in another patent does not indicate that the phrase has an art-understood structural meaning. . . . . [T]hat does not show that 'practitioners in the art knew of and used the term 'connecting mechanism' to refer to structure[.]'"); *see also Diebold Nixdorf, Inc. v. Int'l Trade Comm'n*, 899 F.3d 1291, 1302 (Fed. Cir. 2018). Mr. Leinsing does not, for example, assert that any extrinsic "insertion mechanism" he cites to positions a sensor subassembly in the claim-recited manner. They, therefore, are irrelevant. *See* D.I. 143 at 32–34.

Importantly, Abbott cites *no* academic literature or dictionary definitions, even though (1) Mr. Leinsing cites such sources for other terms, *see, e.g.*, D.I. 136 ¶¶ 110–21; and (2) Abbott's cited cases relied on such evidence in concluding terms were used in common parlance. *See, e.g.*, *Greenberg v. Ethicon Endo-Surgery, Inc.*, 91 F.3d 1580, 1583 (Fed. Cir. 1996) ("detent mechanism," citing three dictionaries, including the *Dictionary of Mechanical Engineering*); *Personalized Media Comms., LLC v. ITC*, 161 F.3d 696, 704–05 (Fed. Cir. 1998) ("detector," citing dictionary definitions); *Uni-Systems, LLC v. USTANTC Inc.*, Case No. 17-cv-147, 2020 WL 3960841, at *13 (E.D.N.Y. July 13, 2020) ("retention mechanism," citing two dictionaries, including the *McGraw-Hill Dictionary of Scientific and Technical Terms*). Mr. Leinsing's attempt to analogize an insertion mechanism to a screwdriver, D.I. 155 ¶¶ 76–78, thus fails—screwdriver is a commonly understood word; insertion mechanism is not. Vaitekunas Second Decl. ¶¶ 16–18. Indeed, Abbott fails to address Dr. Vaitekunas' opinion that "the terms 'inserter' and 'insertion device' . . . describe components in the CGM field with materially different function and structure from the insertion mechanism in the '647 patent." D.I. 144 ¶ 107.

Abbott's contention that each of Mr. Leinsing's insertion mechanisms inserts a sensor into position for use, D.I. 152 at 34–35, proves the point: the only unifying characteristic is the function. Thus, failure to construe "insertion mechanism" as means-plus-function could mean that *anything* that performs the claim-recited function is covered by the '647 patent, including novel structures invented years later. That is not the appropriate construction. *See, e.g.*, *Diebold Nixdorf*, 899 F.3d at 1300–01 ("cheque standby unit" is means-plus-function because expert "failed to offer any structural limitation that might serve to cabin the scope of the functional term" and "did little more than opine that a skilled artisan would understand the functional term . . . to be *any* structure capable of performing the claimed function"); *see also* Vaitekunas

9

Second Decl. ¶ 18.

### 2. Abbott fails to identify sufficient linked corresponding structure.

Abbott fails to identify any depiction of an "insertion mechanism" configured to position a *sensor subassembly*. Abbott contends that because the specification states "modifications and alterations in the structure and method of operation" would be apparent to a POSITA, the *separate* depictions—of (1) a sensor subassembly and (2) an insertion mechanism configured to position solely a sensor—disclose corresponding structure. This is not the law. *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1212 (Fed. Cir. 2003) ("It is important to determine whether [a POSITA] would understand the specification itself to disclose the structure, not simply whether that person would be capable of implementing that structure."). And Abbott ignores that the specification *also* must "clearly link" the corresponding structure to the claim-recited function. *See* D.I. 143 at 35. There is no evidence here of the required clear link. Vaitekunas Second Decl. ¶ 19. But if the Court finds the cited figures sufficient, then, as detailed in DexCom's answering brief, the disclosed structure is limited to the disclosures in Figures 4D and 4E at 420 and Figure 5B at 550. *See* D.I. 143 at 36.

### E. U.S. Patent Nos. 10,820,842 & 10,952,653 (collectively, "Harper Patents")

### 1. "failure mode condition"

Abbott's response regarding "failure mode condition" confuses issues of claim construction with issues of infringement, and finds no support in the intrinsic evidence. DexCom's proposed construction should be adopted.

First, Abbott's own expert doesn't support Abbott's claim construction. He says in his reply declaration that "not every condition that adversely affects the functioning of the system would be a 'failure mode condition' within the scope of the claims. . . ." D.I. 156 ¶ 10. But "condition that adversely affects function" is precisely Abbott's definition. Abbott contradicts its

own construction when it says that "the claims . . . do not encompass just 'any "condition that adversely affects function."'" D.I. 152 at 26. DexCom agrees – but that simply shows that its construction, and not Abbott's, is correct. The parties are construing the term "failure mode condition." Once one determines that something is a failure mode condition, the fact that such a condition does not "cause[] one or more sensor data gaps to be outputted" does not mean that it is not a failure mode condition—it means that the system at issue does not practice the claims. Abbott's construction has simply confused questions of claim construction with questions of infringement, and has resulted in a construction that even its own expert does not support. D.I. 156 ¶ 10.

The conditions Abbott cites as constituting "failure mode conditions" (though the phrase is never used in the specification) are conditions of the sort that require disabling the output of sensor data. *See* D.I. 152 at 24. Conditions like "system malfunction" or "signal errors associated with the sensor, transmitter unit, receiver unit, and the like" suggest unreliable data, not unavailable data. *See, e.g.*, D.I. 145 ¶ 46. Further, the "data unavailability condition" cited by Abbott is one of many conditions that could be included in a "calibration failure condition." *See* Ex. 8 at 14:1–5. A "calibration failure condition" would suggest unreliable rather than merely unavailable data. *See* Villasenor Second Decl. ¶¶ 4–7. Importantly, none of Abbott's examples relate to a loss of wireless connectivity.

Nonetheless, Abbott argues that the specification is "replete with descriptions of wireless communication . . . ." D.I. 152 at 25. That is true, but none of the lengthy quotes in Abbott's expert declaration mention any sort of failures of wireless communication. The specification says nothing about wireless communications failure, but instead discusses at length failures of calibration and sensor instability. *See, e.g.*, Ex. 8 at 11:19–25; 12:26–39; 13:60–14:20. Simply

11

because the specification discusses wireless connectivity, and it is theoretically possible that anything described in the specification could fail, that does not mean that any sort of failure could constitute the claimed "failure mode condition."

Finally, Abbott is incorrect that DexCom's construction limits "failure mode condition" to a circumstance that could never occur, or that there can be only one instance of an "output" in a system like the one described in the patent. DexCom's positions here and in its Section 101 motion are consistent: a failure mode condition is a condition that requires disabling the output of sensor data. A system like in the patents would necessarily output data multiple times, not just during the claimed "output[]to the display." *See* Villasenor Second Decl. ¶¶ 8–13.

Thus, there are multiple points at which the output of sensor data could be disabled. DexCom's construction does not require disabling the output of sensor data to the display, but simply says that a failure mode condition is a type of condition that requires disabling the output of sensor data. For these reasons and those explained in DexCom's answering brief, that is consistent with the specification and what the inventor actually claimed to invent.

## 2.    "processing/process the sensor data"

Abbott argues that to "process the sensor data" is to "convert the sensor data into calibrated analyte values[.]" D.I. 135 at 24. But, as DexCom explained in its answering brief, "processing" encompasses more than merely calibrating. That is true of the term both generally and as it is used in the '842 patent, which refers to many conventional forms of "processing" that are performed by the claimed invention. *See* D.I. 143 at 42–44.

Abbott's Reply concedes as much, admitting that calibration is just one form of processing performed by the claimed invention. *See* D.I. 152 at 28 ("Abbott's construction does not preclude various forms of processing . . . ."). But as Abbott would have it, these other forms of processing (*e.g.*, filtering, clipping, digitizing, and/or encoding, Ex. 8 at 11:37–46) count as

processing if and only if the end result is calibrated data. In other words, according to Abbott, filtering is processing if done in service of calibrating data, but it is not processing if the purpose of the filtering is unrelated to calibration. This interpretation has no basis in either intrinsic or extrinsic evidence and is at odds with the plain and ordinary meaning of the term "processing." *See* D.I. 145 ¶ 52. Abbott's justification for its proposed construction of this term is that "processing, in whatever form, must convert sensor data into calibrated analyte values, because only calibrated analyte values are output to the display." D.I. 152 at 28–29. But this argument is a non-sequitur. Moreover, Abbott offers no explanation as to why an action that falls within the plain and ordinary meaning of processing is considered "processing" when done in service of calibrating data but not considered "processing" when it is done for another purpose. Nor could it. Abbott's construction should be rejected, and this term should be given its plain and ordinary meaning, as DexCom has proposed.

### 3.    "data indicative of the sensed glucose level"

"[D]ata indicative of the sensed glucose level" requires no construction and the Court should give those words their plain and ordinary meaning. None of Abbott's arguments to the contrary justify its narrow proposed construction.

Primarily, Abbott contends that "data indicative of the sensed glucose level" is "the term used for data that is displayed in a useful form" in the '653 patent. *Id.* at 29. But the claim language does not support that narrow interpretation of the word "indicative," and the phrase "useful form" is a limitation Abbott invents; it appears nowhere in the specification (or the claims). Despite Abbott's protestations, *see id.* at 30, its proposed narrowing of the ordinary meaning of the word "indicative" lacks support in the patent. *See 3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1322 (Fed. Cir. 2013); D.I. 145 ¶ 57.

13

Abbott also contends that, because data indicative of the sensed glucose level is "output" to "a display of the receiver unit," the data must be calibrated glucose values. This is inconsistent with the plain meaning of the claim language, which is broad in scope and encompasses the output of data that are in any way "indicative" of the sensed glucose level. For example, the output of changing raw sensor data to a display would be indicative of changes in the sensed glucose levels over time and satisfies the claim language. *See* Villasenor Second Decl. ¶¶ 21–26. Abbott's construction seeks to read a calibration requirement into the claims that is not present. *See* D.I. 145 ¶¶ 57–58. DexCom's position in its Section 101 motion is not to the contrary. DexCom noted there that the claims include outputting data indicative of the sensed glucose level to a display, but never asserted that such data must be calibrated glucose values.

Finally, Abbott's attempts to reconcile its unduly narrow construction with the claim language fail to persuade. Claim 1 of the '653 patent requires storing "at least a portion of the data indicative of the sensed glucose level *corresponding to a time period associated with a failure mode condition*." Ex. 9 at 13:44–45 (emphasis added). Abbott does not dispute that a calibration error constitutes a failure mode condition, *see* D.I. 152 at 31, but struggles to explain how data "corresponding to a time period associated with" a calibration error could themselves be calibrated glucose values, as Abbott's proposed construction would require.

In fact, data corresponding to a time period associated with a calibration error cannot be calibrated glucose values, because the failure mode condition occurring during the relevant time period *is the failure to calibrate*. The most Abbott can say in response is that the claims do not necessarily require storing data "***during*** a failure mode condition," *id.*, but this explanation defies the plain language of the claim. If "data corresponding to a time period associated with a failure mode condition" means something *other* than data collected during the time period during which

the failure mode condition occurred (as the plain language makes clear), Abbott does not point to a single piece of evidence to support that view—indeed, the lack of any citation in Abbott's response on this point is telling. And Abbott fails to explain what other time period *could possibly* be "associated with a failure mode condition" other than the time period during which the failure occurred.

### F.     U.S. Patent No. 10,827,954

Finally, Abbott still fails to justify its overbroad construction of "chemically bonded." Instead, it doubles down, contending that *any* "forces acting between groups of atoms" constitute a chemical bond "***regardless of their strength***." *Id.* at 32 (emphasis added). This is unsupportable for several reasons.

***First***, this is inconsistent with Abbott's proposed construction, which requires that "atoms or molecules" be "***bonded by*** attractive forces." *Id.* (emphasis added). Abbott still begs the question of exactly *when* attractive forces constitute a "bond."

***Second***, Abbott's construction is contradicted by the intrinsic evidence. The only portions of the specification cited by Abbott that describe chemical bonding involve "crosslinking." D.I. 135 at 31–32; *see also* D.I. 138 ¶¶ 39, 43–45. The same portions of the specification also make clear that the fundamental purpose of that crosslinking, and of the claimed chemical bonding, is to *stably* hold analyte-responsive enzyme near the working electrode to facilitate efficient electron transfer. *See* D.I. 135 at 31–32; D.I. 120-1 Ex. 10 at 18:11–13 ("This sensing layer uses an osmium (Os)-based mediator designed for low potential operation and is ***stably anchored*** in a polymeric layer.") (emphasis added); *id.* at 18:58–60 ("Preferably, the components of the sensing layer are non-leachably disposed within the sensor.") Indeed, the specification identifies only three types of bonds as suitable for this purpose, all of them strong: "covalent, coordinative, or ionic." *Id.* at 16:54–56. The patent *teaches away* from weak attractive forces that permit

diffusion of transiently bound species away from each other.  *See id.* at 16:48-51 ("In certain embodiments, electron transfer agents have structures or charges which *prevent or substantially reduce the diffusional loss* of the electron transfer agent during the period of time that the sample is being analyzed.") (emphasis added). In this context, attractive forces that cannot *hold together* the analyte-responsive enzyme and the working electrode serve no purpose. Abbott's miscellaneous extrinsic citations bear no relation to this context and cannot override the intrinsic evidence.

**Third**, Abbott's extrinsic evidence contradicts its construction. Abbott cites a dictionary definition that requires "an attractive force that ***holds together*** the atoms, ions, or groups of atoms in a molecule or crystal," Ex. 69 (emphasis added), and a chemistry textbook that defines chemical bonds as "the forces or interactions that cause atoms ***to be held together as molecules*** or cause atoms, ions, and molecules ***to be held together as more complex aggregates***, D.I. 154 ¶ 6 (citing Attachment A at 3) (emphasis added). These definitions exclude transient attractive forces that do not stably "hold together" atoms or molecules, and are therefore consistent with the IUPAC definition previously cited by DexCom. *See* Ex. 111 at 3 (requiring "formation of an aggregate with ***sufficient stability*** to make it convenient for the chemist to consider it as an independent 'molecular species.'") (emphasis added).

As Abbott's extrinsic evidence confirms, a chemical bond requires the stable formation of molecules or aggregates; any contrary construction should be rejected.

## III.     CONCLUSION

For the foregoing reasons, DexCom respectfully asks the Court to adopt DexCom's proposed constructions.

Respectfully submitted,

*/s/ Nathan R. Hoeschen*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

OF COUNSEL:
Robert A. Van Nest
Christa Anderson
Eugene M. Paige
Sophie Hood
Elizabeth A. Egan
Andrew S. Bruns
Sean M. Arenson
Puja Parikh
Nicholas R. Green
Yena Lee
Bilal Malik
Stephanie J. Goldberg
Jacquie P. Andreano
Matan Shacham
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA  94111-1809
(415) 391-5400

Theodore Kwong
HILGERS GRABEN PLLC
10000 N. Central Expy., Suite 400
Dallas, Texas 75231
(972) 645-3097

Dated: August 31, 2022

17

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Paragraph 12 of the Scheduling Order (D.I. 35), undersigned counsel certifies

that the foregoing brief consists of 4,981 words as calculated by the word-count feature of

Microsoft Word. This total does not include tables, cover page, or signature blocks.

*/s/ Nathan R. Hoeschen*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*
