IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ABBOTT DIABETES CARE INC. and
ABBOTT DIABETES CARE LIMITED,          )
                                       )
                    Plaintiffs,        )
                                       )
          v.                           )          Civil Action No. 21-977 (KAJ)
                                       )
DEXCOM, INC.,                          )          REDACTED - PUBLIC VERSION
                                       )
                    Defendant.         )
                                       )

MEMORANDUM OPINION

———————

John W. Shaw, and Nathan R. Hoeschen, SHAW KELLER LLP, 1105 N. Market Street,
12th Floor, Wilmington, DE 19801, *Counsel for DexCom, Inc.*
    Of Counsel:  Robert A. Van Nest, Leo L. Lam, Eugene M. Paige, Sophie Hood,
                 Elizabeth A. Egan, Andrew S. Bruns, Sean M. Arenson, JD
                 Schneider, Puja Parikh, Nicholas R. Green, Yena Lee, Bilal Malik,
                 Stephanie J. Goldberg, Oliver J. Fong, Jacquie P. Andreano, Matan
                 Shacham, KEKER, VAN NEST & PETERS LLP,
                 633 Battery Street, San Francisco, CA  94111-1809
                 Theodore D. Kwong, HILGERS GRABEN PLLC, 10000 N. Central
                 Expy – Ste. 400, Dallas, TX  75231

Jack B. Blumenfeld, Rodger D. Smith, II, Anthony D. Raucci,, MORRIS, NICHOLS,
ARSHT & TUNNELL LLP, 1201 N. Market Street, Wilmington, DE 19801, *Counsel for
Abbott Diabetes Care, Inc., Abbott Diabetes Care Sales Corp.*
    Of Counsel:  Ellisen Shelton Turner, KIRKLAND & ELLIS LLP, 2049 Century
                 Park East – Ste. 3700, Los Angeles, CA  90067
                 Amanda J. Hollis, KIRKLAND & ELLIS LLP, 300 North LaSalle,
                 Chicago, IL 60654
                 Benjamin A. Lasky, KIRKLAND & ELLIS LLP, 601
                 Lexington Ave., New York, NY  10022
                 Leland G. Hansen, James M. Hafertepe, Sharon A. Hwang, Michael
                 J. Carrozza, Manuela Cabal, Eligio C. Pimental, Alexander M.
                 Vogler, Rocco J. Screnci, McANDREWS, HELD & MALLOY,
                 LTD., 500 West Madison St. – 34th Fl., Chicago, IL  60661

_____

August 15, 2023
Wilmington, Delaware



JORDAN, *Circuit Judge*, sitting by designation.

## I.   INTRODUCTION

Plaintiffs Abbott Diabetes Care Inc. and Abbott Diabetes Care Ltd. (collectively, "Abbott") filed suit against DexCom, Inc. ("DexCom") for infringement of twelve United States patents (collectively, "the patents-in-suit").[1]  (D.I. 108 at ¶¶ 6-7.)  Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1338.  Before me are the parties' competing motions for summary judgment, motions to exclude expert testimony under *Daubert*, and motions to strike untimely defenses and expert opinions.  (D.I. 330, 334, 336, 339, 394, 407.)

For the reasons set forth herein, DexCom's Motion for Summary Judgment (D.I. 330) will be GRANTED-IN-PART insofar as DexCom argues that the asserted '954 Patent claims are invalid under 35 U.S.C. § 101.  DexCom's Motion for Summary Judgment (D.I. 330) will be DENIED-IN-PART insofar as DexCom argues that: the asserted '954 Patent claims are invalid under 35 U.S.C. § 112; the asserted '842 and '653 Patent claims are invalid under 35 U.S.C. § 101; Abbott is not entitled to an earlier invention date for the '842 and '653 Patents; claim 18 of the '649 Patent and its dependent claims are indefinite; and it is entitled to summary judgment of no willful

---

[1] The patents-in-suit are United States Patents Nos. 10,820,842 ("the '842 Patent"), 10,827,954 ("the '954 Patent"), 10,874,338 ("the '338 Patent"), 10,881,341 ("the '341 Patent"), 10,945,647 ("the '647 Patent"), 10,945,649 ("the '649 Patent"), 10,952,653 ("the '653 Patent"), 10,959,654 ("the '654 Patent"), 10,966,644 ("the '644 Patent"), 10,973,443 ("the '443 Patent"), 11,000,216 ("the '216 Patent"), and 11,013,440 ("the '440 Patent").  (D.I. 108 at ¶ 6.)  I will describe the subject matter of the patents-in-suit in more detail below.

3

infringement.  DexCom's Motion to Strike Plaintiffs' Untimely Damages Contentions (D.I. 334) will be DENIED.  DexCom's Motion to Exclude Expert Testimony Under *Daubert* (D.I. 336) will be DENIED-IN-PART insofar as DexCom moves to exclude Lawton's royalty and lost profits opinions and certain opinions of Smith and Leinsing. DexCom's Motion to Exclude Expert Testimony Under *Daubert* (D.I. 336) will be DISMISSED-IN-PART AS MOOT insofar as DexCom moves to exclude Lawton's opinions that DexCom copied Abbott.  DexCom's Motion to Strike Plaintiffs' Untimely Expert Opinions (D.I. 407) will be GRANTED-IN-PART insofar as DexCom argues to strike portions of the declaration of Majid Sarrafzadeh (D.I. 347), and DENIED-IN-PART insofar as DexCom argues to strike: portions of the declaration of Neil Sheehan (D.I. 348); the entirety of the declaration of Karl Leinsing (D.I. 351); and portions of the declaration of John Smith (D.I. 379).

Abbott's Motion for Summary Judgment and Exclusion of Expert Opinions Under *Daubert* (D.I. 339) will be GRANTED-IN-PART insofar as Abbott argues that: claim 18 of the '649 Patent and its dependent claims are not invalid for indefiniteness under 35 U.S.C. § 112; the asserted claims of the '649 and '440 Patents are not invalid for lack of written description under 35 U.S.C. § 112; the hypothetical negotiation date for purposes of reasonably royalties is March 31, 2021; and Ms. Stamm's reasonably royalty analysis should be excluded to the extent it relies on the wrong hypothetical negotiation date.[2]

---

[2] As explained herein, I will permit Ms. Stamm to supplement her report.

Abbott's Motion for Summary Judgment and Exclusion of Expert Opinions Under *Daubert* (D.I. 339) will be DENIED-IN-PART insofar as Abbott argues that: the asserted claims of the '649 and '440 Patents are not invalid as obvious under 35 U.S.C. § 103 based on the Guardian-Omnipod-Accu-chek and Yodfat-Omnipod prior art references; the asserted claims of the '443 Patent are not invalid for lack of written description under 35 U.S.C. § 112; the '443 Patent is not invalid for improper inventorship and is not unenforceable for inequitable conduct; the inventions claimed in the '443 patent were conceived and reduced to practice before August 1, 2002; the asserted claims of the '649 and '440 Patents, claims 3 and 6 of the '216 Patent, claim 15 of the '842 Patent, the asserted claims of the '338 Patent, and the asserted claims of the '644 Patent are infringed; and Ms. Stamm's opinions on non-infringing substitutes should be excluded under *Daubert*.

Abbott's Motion for Summary Judgment and Exclusion of Expert Opinions Under *Daubert* (D.I. 339) will be DISMISSED-IN-PART AS MOOT insofar as Abbott argues that the asserted claims of the '216, '341, and '654 Patents are not invalid as obvious under 35 U.S.C. § 103 based on the Yodfat-Brister and Brister-Bachynsky prior art references and that it is entitled to summary judgment of no prosecution laches.[3] Abbott's Motion to Strike DexCom's Untimely Enablement Defense (D.I. 394) will be

---

[3] DexCom has voluntarily withdrawn both its invalidity defenses for the '216, '341, and '654 Patents based on the Yodfat-Brister and Brister-Bachynsky combinations and its second affirmative defense of prosecution laches. (D.I. 388 at 2.)

DENIED.[4]  Abbott's Motion to Strike DexCom's New Claim Constructions (D.I. 466)

will be DENIED.[5]

---

[4] During oral argument on June 30, 2023, I granted Abbott additional depositions of several of DexCom's witnesses related to DexCom's enablement defense. (*See* D.I. 454 at 94-95.) As that discovery will ameliorate any prejudice caused by DexCom's late disclosure, I deny Abbott's motion to strike.

[5] Abbott submitted, among other things, four expert declarations in relation to the pending motions that DexCom moves to strike as containing new infringement and validity opinions. (D.I. 408 at 1-2.) Abbott says that it is entitled to submit those declarations because DexCom filed what Abbott characterizes as new invalidity positions and twenty-two new claim construction positions. (D.I. 416 at 1.) Abbott seeks to strike DexCom's new claim construction positions, (D.I. 466), to which DexCom responds that it is merely applying the plain and ordinary meaning of the claim terms (D.I. 476 at 2.)

There is some truth in both side's positions.  DexCom contends that it is applying the plain and ordinary meanings of terms, which it is entitled to do, yet it never disclosed that any of its defenses were based on those newly proposed constructions, and seventeen of its twenty-two disputed terms were never even identified as requiring construction. (D.I. 467 at 1-2.) Abbott, in turn, responded to the merits of DexCom's newly proposed constructions (before moving to strike them) while simultaneously shoehorning in a raft of new expert opinions.  Both parties assert that they are prejudiced because they did not have the opportunity to depose each other's experts, yet both sides tackled the merits of each other's allegedly new opinions before crying foul.  For that reason, among others, I am not inclined to grant either side's motions to strike.

I will, however, grant DexCom's motion only to the extent that it argues to strike paragraphs 223-34 of the declaration of Majid Sarrafzadeh (D.I. 347).  In that declaration, Sarrafzadeh states that he reviewed the source code of the G6. (D.I. 347 at ¶ 231.) Sarrafzadeh acknowledges that DexCom's counsel never deposed him on the G6's source code, stating that, "[h]ad I been questioned about it, I would have explained that I reviewed the code and confirmed infringement with it." (D.I. 347 at ¶ 231.) Abbott, however, cannot point to anywhere in Sarrafzadeh's opening report where he discussed the G6's source code.  Instead, it only cites to the materials Sarrafzadeh considered in forming his infringement opinions, which lists "Excerpts of DexCom's Source Code." (D.I. 416 at 3.) Additionally, Abbott does not mention any allegedly new claim construction that justified submitting the declaration.  I will therefore strike those portions of Sarrafzadeh's declaration.

## II.    BACKGROUND

As discussed in previous opinions in this case, the technology at issue relates to

continuous glucose monitoring ("CGM") systems, which help diabetic patients constantly

track their blood sugar levels.[6]  Abbott manufactures the FreeStyle Libre CGM product,

---

[6] In my claim construction opinion, I provided a brief overview of diabetes and CGM technology:

> Diabetes is a chronic disease characterized by prolonged periods of low or high glucose (sugar) levels in the body, which can cause severe health problems such as heart attacks, strokes, organ failure, loss of vision and limbs, skin ulcers, and even death. (D.I. 108 at ¶ 15.) Regular blood sugar monitoring is the most important thing a patient can do to manage his diabetes.  That has traditionally been done using the "fingerstick" method, whereby a patient pricks his finger to obtain blood, places the blood on a test strip, and inserts the test strip into a monitor that would display the patient's blood glucose value. (D.I. 108 at ¶¶ 16–17.)  But the "fingerstick" method is inconvenient and painful, and it only provides a blood glucose value at one specific point in time, requiring patients to frequently prick their fingers to update their understanding of their blood glucose level. (D.I. 108 at ¶ 17.)  As an alternative, various companies sought to develop CGMs to constantly monitor glucose levels to eliminate the need for patients to regularly prick their fingers. (D.I. 108 at ¶ 18.)
>
> CGMs systems typically include three components: (1) an inserter (or applicator) that "implants the glucose sensor partially beneath the skin and into contact with interstitial fluid"; (2) a glucose sensor and transmitter that is attached to the patient's body and senses and transmits electrical signals; and (3) a display device, such as a reader or smart device, with proprietary software that displays the patient's blood glucose level. (D.I. 135 at 1–2.)  But early CGMs products "had significant drawbacks including high cost, short wear times, burdensome and painful insertion techniques, non-intuitive operation requiring significant training, and calibration methods requiring regular fingersticks – the painful and invasive sampling that [CGMs] technologies were designed to avoid." (D.I. 108 at ¶ 18.)  Abbott's patents-in-suit sought to remedy those issues by improving upon CGM technology.

*Abbott Diabetes Care Inc. v. DexCom, Inc.*, No. 21-977 (KAJ), 2023 WL 2599516, at *1-2 (D. Del. Mar. 22, 2023).

7

and it accuses DexCom, which manufactures the G6 CGM product line, of infringing the patents-in-suit.[7]   (D.I. 108 at ¶¶ 19-61.)

Abbott filed its lawsuit against DexCom in July 2021 and later amended its complaint in October 2021.   (D.I. 1, 17.)   DexCom sought to dismiss Abbott's amended complaint in November 2021 for failure to state a claim under Federal Rules of Civil Procedure 12(b)(6), (D.I. 21), which I denied (D.I. 49).   Abbott filed a Second Amended Complaint, the operative complaint, in May 2022.   (D.I. 108.)   I held a *Markman* hearing in October 2022 and construed seven claim terms related to ten of the twelve patents-in-suit.   *See generally Abbott Diabetes Care Inc. v. DexCom, Inc.*, No. 21-977 (KAJ), 2023 WL 2599516 (D. Del. Mar. 22, 2023).   The parties have completed fact and expert discovery, and a ten-day trial is scheduled to begin in November of this year.

## III.   Summary Judgment Motions[8]

### A.   Invalidity

DexCom moves for summary judgment that the asserted claims of the '954, '842, and '653 Patents are invalid, and that claim 18 of the '649 Patent and its dependent

---

[7] DexCom makes various CGMs accused of infringement: the G6 CGMs, the Pro Q CGMs, the G6 Pro CGMs, the G6 Glucose Program CGMs, and the ONE CGMs. (D.I. 108 ¶ 62.) As used in this opinion, "G6" refers to all those CGMs unless otherwise noted.

[8] "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment

claims are invalid.[9]  (D.I. 331 at 1–2.)  Abbott moves for summary judgment that the

asserted claims of the '649, '440, '216, '341, '654, and '443 Patents are not invalid.  (D.I.

340 at 46–75.)

      *1.*    *The '954 Patent*

     The '954 Patent is titled "Continuous Analyte Measurement Systems and Systems

and Methods for Implanting Them."[10]  (D.I. 108 at ¶ 39.)  Abbott asserts infringement of

independent claim 1 and dependent claim 15.  (D.I. 331 at 3.)  Claim 1 provides as

follows:

---

stage, courts must view the facts and draw reasonable inferences "in the light most
favorable to the party opposing the [summary judgment] motion." *Scott v. Harris*, 550
U.S. 372, 378 (2007) (quoting *Unites States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)
(per curiam)).

   [9] DexCom previously moved to dismiss Abbott's first and seventh causes of action
of patent infringement on the basis that the '842 and '653 Patents are ineligible under 35
U.S.C. § 101. (D.I. 21.)  After conducting oral argument, I denied its motion on the
grounds that Abbott had plausibly alleged that the claims contain an inventive concept
sufficient to render them patent-eligible subject matter.  (D.I. 49.)

   [10]I previously provided the following overview of the '954 Patent:
[The '954 Patent] is aimed at improving the user experience by removing
user     calibration,     which     "typically     involve[ed]     fingerstick
measurements." (D.I. 135 at 5.)  Early CGMs suffered a phenomenon known
as "drift," defined as "a change over time to the relationship between the
glucose concentration and the sensor signal." (D.I. 135 at 5.)  That drift
necessitated repeated user re-calibration to reduce inaccuracies. (D.I. 135 at
5.)  The '954 patent is generally directed to "continuous analyte monitoring
systems utilizing implantable or partially implantable analyte sensors which
have a relatively small profile (as compared to currently available
implantable sensors)." (D.I. 108, Exhibit B at 4:20–24.)
*Abbott*, 2023 WL 2599516, at *14.

> A continuous analyte measurement system, comprising:
> a memory;
> a base unit configured for mounting on a skin surface;
> an analyte sensor comprising a proximal portion configured for positioning within the base unit and a distal portion configured for insertion through the skin surface, wherein the analyte sensor is configured to generate one or more signals related to an analyte level; and
> a conductive member positionable within the base unit and in electrical contact with the analyte sensor;
> wherein the continuous analyte measurement system is configured to determine the analyte level using at least a drift correction factor associated with the analyte sensor, the drift correction factor determined by an algorithm of the continuous analyte measurement system using a drift profile; and
> wherein the drift profile is programmed into the memory of the continuous analyte measurement system prior to insertion of the distal portion of the sensor through the skin surface.

(D.I. 108, Exhibit B at 34:62–35:15.)  Put slightly more simply, claim 1 is directed to a CGM that determines an analyte level by using a drift correction factor calculated by an algorithm using a drift profile that is preprogrammed into the device before it is attached to a patient.[11]  Dependent claim 15 of the '954 Patent claims the "system of claim 1, wherein the analyte sensor does not require a user-initiated calibration during in vivo use of the analyte sensor."  (D.I. 331 at 3; D.I. 108, Exhibit B at 36:27–29.)

The specification elaborates that, for CGMs experiencing drift, "a drift profile is contemplated ... by an algorithm of the monitoring system to determine a drift correction factor that may be applied to [the] sensor signal to obtain a glucose measurement

---

[11] The system described in claim 1 is a continuous analyte monitoring system but, as the technology at issue relates to CGMs, I refer to continuous analyte monitoring systems as CGMs, for simplicity.

(mg/dL)." (D.I. 108, Exhibit B at 25:36-40.) In CGMs with computer programmable products, "the programming may use the drift profile to apply a correction factor to the system to eliminate the need for user-based calibration." (D.I. 108, Exhibit B at 5:26-29.) Although patients with diabetes must monitor a particular analyte, glucose, the '954 Patent specification discloses "but [is] not limited to" thirty different analytes. (D.I. 108, Exhibit B at 8:3-12.) The specification does not, however, claim an algorithm that calculates a drift profile or drift correction factor, does not depict an example of one, and does not disclose sensors capable of detecting the concentrations of all thirty listed analytes.

DexCom moves for summary judgment that the '954 Patent's asserted claims are directed to patent ineligible subject matter and are invalid under 35 U.S.C. § 101, and that, as the specification does not disclose sensors capable of detecting all thirty listed analytes, the full scope of '954 Patent's asserted claims are not sufficiently enabled under 35 U.S.C. § 112. (D.I. 331 at 2-14.)

Although laws of nature, natural phenomena, and abstract ideas are not patent eligible subject matter, "an *application* of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection." *Mayo Collaborative Services v. Prometheus Labs., Inc.*, 566 U.S. 66, 71 (2012) (quoting *Diamond v. Diehr*, 450 U.S. 175, 187 (1981)). To transform an unpatentable abstract idea into a patent-eligible application of that idea, an invention must do more than simply apply the abstract idea. *Id.* at 72. In determining patent eligibility under 35 U.S.C. § 101,

11

the Supreme Court has articulated a two-step test: "[f]irst, [courts] determine whether the claims at issue are directed to one of those patent-ineligible concepts" and, if they are, courts then "search for an 'inventive concept' – *i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 217-218 (2014) (quoting *Mayo*, 566 U.S. at 72–73).

"The 'abstract idea' step of the inquiry calls upon [courts] to look at the 'focus of the claimed advance over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject matter." *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016). At the next step, the "inventive concept" step, the court must "look with more specificity at what the claim elements add, in order to determine 'whether they identify an "inventive concept" in the application of the ineligible subject matter' to which the claim is directed." *Id.* at 1258 (quoting *Elec. Power Grp., LLC v. Alston S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016)). That second step is satisfied "when the claim limitations involve more than performance of well-understood, routine, [and] conventional activities previously known to the industry." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367 (Fed. Cir. 2018) (internal quotation marks omitted). Whether a claim element or combination of elements is "well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact" that "must be proven by clear and convincing evidence." *Id.* at 1368.

12

The '954 Patent's asserted claims are directed towards an abstract idea. As Abbott admits, claim 1 of the '954 Patent is "directed to correcting for sensor drift – not types of 'sensors.'" (D.I. 376 at 22.) The asserted claims correct for sensor drift by using a "drift correction factor determined by an algorithm … using a drift profile." (D.I. 108, Exhibit B at 35:9-11.) The claims do not cover any new or improved physical component, nor any specific drift correction factor, algorithm, or drift profile. And that is a fundamental problem. "Without additional limitations, a process that employs mathematical algorithms to manipulate existing information to generate additional information is not patent eligible." *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014); *see also Parker v. Flook*, 437 U.S. 584, 595 (1978) ("If a claim is directed essentially to a method of calculating, using a mathematical formula, even if the solution is for a specific purpose, the claimed method is nonstatutory."). As the claim language does nothing more than suggest use of an undisclosed algorithm that employs a preprogrammed drift profile to calculate a drift correction factor, the process is employing a mathematical algorithm that manipulates existing information to create new information in the form of the drift correction factor. That is an abstract idea and nothing more.

The purely functional character of the language of the asserted claims bolsters that conclusion. In *Affinity Labs of Texas*, 838 F.3d at 1268, the patent at issue was directed to "a network-based media system with a customized user interference, in which the system delivers streaming content from a network-based resource upon demand to a

handheld wireless electronic device having a graphical user interface." The patent's

claims and specification, however, did not disclose any mechanism for performing that

claimed function. *Id.* at 1269. The Federal Circuit held that "the purely functional nature

of the claim confirms that it is directed to an abstract idea" as opposed to a "concrete

embodiment of that idea" because "the claims do no more than describe a desired

function or outcome, without providing any limiting detail that confines the claim to a

particular solution to an identified problem." *Id.*; *see also Interval Licensing LLC v.*

*AOL, Inc.*, 896 F.3d 1335, 1344 (Fed. Cir. 2018) (noting that patent claims "fail[] to pass

section 101 muster" when "the elements of the asserted invention were so result-based

that they amounted to patenting the patent-ineligible concept itself.").

The asserted claims of the '954 Patent and its specification do not disclose any

specific algorithm or the way that algorithm is employed to calculate a drift correction

factor. Rather, the patent simply claims the idea of employing those steps. In fact, Dr.

Udo Hoss, the inventor of the '954 Patent, testified that the patent does not claim "any

particular algorithm[,]" (D.I. 332 at 148) and that the patent "covers any and all ways to

calculate a drift correction factor from a drift profile" (D.I. 332 at 150-51). As in *Affinity*

*Labs*, where the claims recited a function without any embodiment or mechanism for

performing that function, the claims at issue simply recite a function that covers any

method of using any algorithm to calculate a drift correction factor from a drift profile.

Such broad functional language that preempts the entire field of using algorithms to

correct for drift serves to reinforce my conclusion that the asserted claims of the '954

14

Patent are claiming the abstract idea of using an algorithm to calculate a drift correction factor from a drift profile.

Abbott's arguments to the contrary are unconvincing. Its primary contention is that, by correcting for drift without requiring fingerstick measurements, the '954 Patent constitutes a significant and important improvement to CGMs. (D.I. 376 at 8; D.I. 454 at 50–51.) Abbott points out that independent claim 1 therefore does not claim an abstract idea because that claim describes an entire system for a CGM with the novel drift correcting technology. (D.I. 376 at 2-4; D.I. 454 at 52-53.) But the system described in independent claim 1, if it is such, was well known in the art. The novel portion of independent claim 1, according to Abbott itself, relates to the configuration of the system to correct for drift. (*See* D.I. 454 at 52-53 (Abbott noting that the components of CGMs "were known in [the prior] art" and that "[i]t would be strange to claim a solution to a CGM system without claiming the CGM system."); D.I. 376 at 22 ("[T]he 'novel aspects' of claim 1 [of the '954 Patent] are directed to correcting for sensor drift – not types of 'sensors.'").) And although the correction of drift in CGMs was no doubt a helpful step, that consideration is irrelevant when considering if the patent claims are directed towards an abstract idea. *See SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1163 (Fed. Cir. 2018) ("We may assume that the techniques claimed are '[g]roundbreaking, innovative, or even brilliant,' but that is not enough for eligibility.").

Having concluded that the asserted claims of the '954 Patent are directed towards an abstract idea, I turn to whether the claimed elements supply an inventive concept.

15

They do not.  As previously mentioned, the '954 Patent recites conventional CGM

components that were well known in the prior art.  (D.I. 454 at 52-53.)  And the claims

do not recite any specific algorithm or how the algorithm determines the drift correction

factor using a drift profile.  (D.I. 108, Exhibit B at 35:9-11.)  Not only do the claims

provide no specific guidance on how to achieve the desired result – the elimination of

drift – the claims simply contemplate applying the abstract idea of employing an

algorithm to correct glucose monitoring data.  Because the '954 Patent's asserted claims

describe a function-oriented result without explaining how to achieve that result, and

apply the abstract idea on conventional components in a routine manner, there is no

genuine dispute of fact that the claims do not provide an inventive concept.  *See Yu v.

Apple Inc.*, 1 F.4th 1040, 1045 (Fed. Cir. 2021) (holding that a claim that "is recited at a

high level of generality and merely invokes well-understood, routine, conventional

components to apply the abstract idea" fails at the inventive concept step of *Alice*);

*Berkheimer*, 881 F.3d at 1368 (holding that whether a claim element or combination of

elements is well-understood, routine, and conventional to a skilled artisan in the relevant

field is a question of fact).

Abbott attempts to avoid that conclusion by positing that, "[w]hen viewed as a

combination, the components provide a framework for the claimed improvement to

analyte sensor calibration." (D.I. 376 at 9.)  It argues, for example, that the "memory" of

the CGMs, a well-known component of the system,  "is used to store a 'drift profile,'

which in turn is used to determine a 'drift correction factor.'" (D.I. 379 at 9.)  As another

16

example, it states that the "analyte sensor" "is the component with which the 'drift

correction factor' is 'associated.'" (D.I. 379 at 9.) But the fact that well-known

components of CGMs are used to perform the drift correction function does not refute

that the claimed combined elements are directed to applying an abstract idea within

conventional CGM components to correct for drift in glucose monitoring data. *See Two-*

*Way Media Ltd. V. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1339 (Fed. Cir.

2017) (noting that patent claims that use functional language to achieve an innovative

result did not supply an inventive concept because "[n]othing in the claims or their

constructions … requires anything other than conventional computer and network

components operating according to their ordinary functions."). The asserted claims thus

do not provide an inventive concept, and they are invalid under 35 U.S.C. § 101.[12]

2.   *The '842 and '653 Patents*

The '842 Patent and '653 Patent belong to the same patent family, share a

common specification, and are both titled "Methods and Systems for Early Signal

Attenuation Detection and Processing." (D.I. 108 at ¶¶ 37, 49; D.I. 108, Exhibits A, G.)

The '653 Patent is, in fact, a continuation of the '842 Patent. (D.I. 108, Exhibit G at 1:7-

8.) Both are aimed at solving the "data-gap problem" by employing "backfilling."[13]

---

[12] Because I conclude that the asserted claims of the '954 Patent are invalid under
35 U.S.C. § 101, I do not consider DexCom's enablement argument under 35 U.S.C.
§ 112.

[13] In my claim construction opinion, I provided the following overview of the '842
and '653 Patents:

Abbott asserts infringement of dependent claims 3 and 15 of the '842 Patent and dependent claims 7 and 8 of the '653 Patent. (D.I. 331 at 15.)

Independent claim 1 of the '842 Patent recites "a method of backfilling one or more sensor data gaps in an analyte monitoring system" (D.I. 108, Exhibit A at 15:24-25) which "involves detecting a failure mode condition, storing sensor data received from the analyte sensor, processing the sensor data, and outputting the processed stored sensor data in response to a correction of a failure mode condition." *Abbott*, 2023 WL 2599516, at *10. Dependent claim 3 contemplates "[t]he method of claim 1, wherein the failure mode condition comprises one or more of an inability to calibrate the sensor, a system malfunction, or a sensor dislodgement." (D.I. 108, Exhibit A at 15:46-48.)

---

CGMs are designed to continually report glucose information – typically in the form of a numerical value, a trend arrow, or a graph of glucose concentration over time – but there are periods when the CGMs cannot report an accurate glucose reading. (D.I. 135 at 4.) Those periods are typically caused by a patient's failure to recalibrate the system by taking a fingerstick measurement reading, by a system malfunction, by the sensor being dislodged from the patient's body, or by signal errors, and, during that period, CGMs will not report data. (D.I. 135 at 4.) That is sometimes referred to as the "data-gap problem." (D.I. 135 at 4.) The '842 and '653 patents solve the "data-gap problem" "by processing uncalibrated data using calibration parameters from a subsequent successful calibration event" so that the gap in data can be filled. (D.I. 135 at 4.) Those patents generally relate to identifying conditions that may result in unreliable data, "disabling the output of the sensor data" during that period, and then, once the adverse condition is no longer present, retrieving and outputting the processed sensor data from that period. (D.I. 108, Exhibits A, G at Abstract.)

*Abbott*, 2023 WL 2599516, at *10.

18

Independent claim 14 of the '842 Patent describes an analyte monitoring system comprising, among other things, a memory device "for storing instructions" to detect a failure mode condition, store sensor data, process the stored sensor data, and output that data after the failure mode condition is corrected. (D.I. 108, Exhibit A at 16:29-49.) Dependent claim 15 describes "[t]he system of claim 14, wherein the failure mode condition comprises signal errors associated with a transmitter unit of the analyte monitoring system or a receiver unit of the analyte monitoring system." (D.I. 108, Exhibit A at 16:50–53.)

Independent claim 1 of the '653 Patent provides a glucose monitoring system comprising, among other things, a data processing and transmitter unit that wirelessly transmits glucose data and contains a memory with programmed instructions causing the processor to store glucose data during a failure mode condition and then wirelessly transmit that data after the failure mode condition is corrected. (D.I. 108, Exhibit G at 15:26-49.) Dependent claims 7 and 8 describe the system of claim 1 wherein the failure mode condition is caused by "a system malfunction associated with the data processing and transmitter unit" and "a system malfunction associated with the receiver unit[,]" respectively. (D.I. 108, Exhibit G at 16:13-18.)

DexCom moves for summary judgment that the '842 and '653 Patents are directed to patent ineligible subject matter and are invalid under 35 U.S.C. § 101. (D.I. 331 at 14-21.) If the patents' asserted claims are not invalid as a matter of law, DexCom asks for

19

summary judgment that Abbott is entitled to an invention date no earlier than April 29, 2009, the filing date of the patents' first provisional application.  (D.I. 331 at 21-27.)

Assuming arguendo that the '842 and '653 Patents are directed towards the abstract idea of collecting, storing and transmitting data to backfill gaps, as DexCom suggests, DexCom's motion fails because there is a factual dispute regarding whether the claimed inventions provide an inventive concept.  DexCom contends that the claims "were well understood and *practiced in the field of continuous glucose monitoring* before the patents' priority dates" because certain CGMs manufactured by Medtronic, a competitor who is not a party in this case, practiced a form of backfilling like that claimed in the patents in 2006.  (D.I. 331 at 20.)

DexCom only points to a user guide for the Medtronic Paradigm insulin pump and CGMs to demonstrate that backfilling was a well understood, routine, and conventional process in CGMs technology.  (D.I. 331 at 20; D.I. 332 at 73-78.)  In an explanation of the Paradigm's three-hour glucose monitoring graph, the guide explains that the graph may contain gaps where no glucose measurement is recorded.  (D.I. 332 at 75-76.)  When DexCom deposed Medtronic's 30(b)(6) witness Michael Ivey, he explained that, if the Paradigm misses eight or fewer packets of information because the CGM was out of range from the transmitter, then, when the CGM receives a new packet of information,

20

"the gap in the graph will be filled."[14]  (D.I. 332 at 97.)  Ivey, however, also explained

that, when the Paradigm suffered a calibration error, "[t]he Paradigm system would leave

a one-hour gap … [and] would only use calibrations to calculate new values once [new

calibrations were] entered."  (D.I. 391, Exhibit 98 at 153.)  Similarly, he also explained

that, when the Paradigm experiences a sensor error, "it will display a gap for that period"

that cannot be backfilled "because [the CGM doesn't] have good data from the sensor at

that time."  (D.I. 391, Exhibit 98 at 154.)

DexCom's evidence that backfilling was a well understood, routine, and

conventional process in CGMs as of 2006 is fairly disputable.  The testimony DexCom

relies upon only discusses backfilling data when the failure mode condition is caused by a

CGM being out of range from the transmitter and fewer than eight packets of information

are lost.  (D.I. 332 at 97.)   The '842 and '653 Patents' asserted claims, however, disclose

failure mode conditions caused by a calibration error, a system malfunction associated

with the data processing and transmitter or receiver units, sensor dislodgement, and signal

errors associated with the transmitter or receiver units.  (D.I. 108, Exhibit A at 15:46-48,

16:50-53; D.I. 108, Exhibit G at 16:13-18.)  According to Ivey's testimony, Medtronic's

Paradigm CGMs could not backfill data when the failure mode condition was caused by

calibration or sensor errors; rather, a CGM must first be calibrated to calculate new

_____

[14] I understand a "packet" of information to be glucose data sent from the
transmitter to the CGMs during a set interval of time.

21

values and it would not backfill the gaps in its glucose monitoring graph. (D.I. 391,

Exhibit 98 at 153-54.)  In light of that testimony, I am not persuaded that a rational jury

would have to find, by clear and convincing evidence, that the claim elements or

combination of elements in the '842 and '653 Patents' asserted claims were well-

understood, routine, and conventional to a skilled artisan in the CGM-field at the time the

patent issued. *See Berkheimer*, 881 F.3d at 1368.

Turning to DexCom's motion that the claims are entitled to an invention date no

earlier than April 29, 2009, i.e., the filing date of patents' first provisional application,

(D.I. 331 at 21-27), I will deny that motion because a reasonable juror could conclude

that the invention was conceived before the stated date.

Abbott asserts that Wesley Scott Harper, the inventor of both patents, conceived of

the inventions on August 14, 2007, and diligently worked to reduce them to practice.

(D.I. 331 at 22.)  As Abbott seeks an invention date earlier than the filing of the patents'

provisional application, it bears the burden to prove by a preponderance of the evidence

"prior conception coupled with reasonable diligence in reducing the invention to

practice[.]" *Singh v. Brake*, 317 F.3d 1334, 1340 (Fed. Cir. 2003) (citing 35 U.S.C.

§ 102).  Conception requires that the inventor formulate every feature or limitation of the

invention in a complete and operative manner. *Kridl v. McCormick*, 105 F.3d 1446, 1449

(Fed. Cir. 1997).  "Conception is complete only when the idea is so clearly defined in the

inventor's mind that only ordinary skill would be necessary to reduce the invention to

practice, without extensive research or experimentation." *Burroughs Wellcome Co. v.*

*Barr Labs., Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994).  An inventor's testimony of conception "can be corroborated through several pieces of evidence, even though no one piece of evidence proves conception, and even circumstantial evidence, so long as the evidence supports that the 'inventor's story is credible.'"  *E.I. du Pont De Nemours & Co. v. Unifrax I LLC*, 921 F.3d 1060, 1076 (Fed. Cir. 2019).  Corroborating evidence does not need to disclose every claim limitation; rather, corroboration "is a flexible, rule-of-reason demand" that "makes credible" the inventor's conception and reduction to practice testimony.  *Fleming v. Escort Inc.*, 774 F.3d 1371, 1377 (Fed. Cir. 2014).

Harper testified that he worked on the calibration algorithm, which converts sensor data into glucose readings, in the Freestyle Navigator CGM products.  (D.I. 391, Exhibit 101 at 23:25-24:10, 26:19-27:3, 29:8-15, 37:25-39:4; D.I. 332 at 112-113.)  He explained that he "recognized that when calibration for a CGM system was delayed due to unacceptable conditions, continuous glucose data could not be provided to the user in realtime [sic] until another calibration could be performed."  (D.I. 391, Exhibit 101 at 61:6-11.)  Abbott asserts that by August 14, 2007, Harper conceived of the inventions to solve that data gap issue claimed in the '842 and '653 Patents and that he spent most of 2006 to 2010 reducing the inventions to practice.[15]  (D.I. 376 at 30; D.I. 332 at 112-13.)

---

[15] That Harper began reducing at least some of the inventions claimed in the '842 and '653 Patents to practice before conceiving of all the inventions may at first blush appear odd, as conception requires that the inventor formulate every claim limitation. *Kridl*, 105 F.3d at 1449.  But Harper may have fully conceived and begun reducing to practice some claims in 2006 only to later conceive others in 2007.

23

To corroborate Harper's testimony, Abbott points to twenty-nine contemporaneous documents. (D.I. 376 at 34-35.) One such document is a PowerPoint presentation that depicts data gaps in glucose monitoring values as well as Harper's work investigating algorithms to ameliorate glucose sensitivity estimates. (*See, e.g.,* D.I. 391, Exhibit 111; 112.)

DexCom urges that the corroborating documents do not satisfy the requirement of conception because "none of the documents that Abbott relies upon use the term 'backfilling[,]'" the documents do not discuss "backfilling" by a different name, and they do not "hint at how backfilling could be accomplished." (D.I. 331 at 24.) I disagree. The documents, dated during the relevant time period, depict the sensor gap problem and detail attempts to remedy that issue, despite not using the exact term "backfilling." Corroboration is a "flexible, rule-of-reason demand[,]" *Fleming*, 774 F.3d at 1377, and, reviewing those documents in the light most favorable to the non-movant, Abbott, a reasonable juror can conclude that Harper's invention story is credible.

### 3.   *The '649 and '440 Patents*

The '649 and '440 Patents, titled "Medical Device Inserters and Processes of Inserting and Using Medical Devices," belong to the same family and share a common specification. (D.I. 108 at ¶¶ 47, 59; Exhibits F, L.)   The patents are directed to improving the inserter technology in CGMs.[16]

---

[16] I provided a more detailed description of the '649 and '440 Patents' claims in my claim construction opinion:

Abbott moves for summary judgment that the '649 and '440 Patents are not obvious in light of certain prior art references under 35 U.S.C. § 103, that the patents are not invalid for lack of written description under 35 U.S.C. § 112, and that claim 18 of the '649 Patent and its dependent claims are not invalid for indefiniteness under § 112. (D.I. 340 at 46-58.) DexCom, on the other hand, moves for summary judgment that claim 18 of the '649 Patent and its dependent claims are invalid as indefinite. (D.I. 331 at 27-29.)

First, I address Abbott's argument that the two patents are not obvious based on "Medtronic's Guardian [CGMs] in combination with Insulet's Omnipod and Accu-chek" ("Guardian-Omnipod-Accu-chek") and "Yodfat 2008/0319414 … in combination with Omnipod" ("Yodfat-Omnipod"). (D.I. 340 at 46, 50.) Obviousness is a question of law based on factual determinations, including whether "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success

---

The patents are aimed at further improving the inserter technology by using a rotor with a torsion spring "configured to cause rotation of the rotor, which causes first and second slidable bodies and the glucose sensor to advance within the inserter housing in a linear direction, thereby inserting the sensor" in a quick and less painful manner than previous CGMs. (D.I. 135 at 3.) The '649 and '440 patents are generally directed to "[a]n apparatus for insertion of a medical device in the skin of a subject ... as well as methods of inserting medical devices." (D.I. 108, Exhibits F, L at Abstract.) The '649 patent claims two inserter assemblies for inserting a glucose sensor into a patient, and the '440 patent claims a glucose monitoring system comprising a glucose sensor within an inserter housing. (D.I. 108, Exhibit F at 43:36–61; 44:45-45:19; Exhibit L at 43:37-44:7.)
*Abbott*, 2023 WL 2599516, at *8.

25

in doing so." *CRFD Research, Inc. v. Matal*, 876 F.3d 1330, 1340 (Fed. Cir. 2017).  In making that determination, the prior art does not need to expressly teach each claim limitation if "the record contains some reason why one of skill in the art would modify the prior art to obtain the claimed invention." *Nike, Inc. v. Adidas AG*, 812 F.3d 1326, 1335 (Fed. Cir. 2016), *overruled on other grounds by Aqua Prods., Inc. v. Matal*, 872 F.3d 1290, 1296 n.1 (Fed. Cir. 2017) (en banc).  I conclude that genuine disputes of material fact preclude granting summary judgment that the '649 and '440 Patents are not obvious in light of Guardian-Omnipod-Accu-chek and Yodfat-Omnipod.

All independent claims of the '649 and '440 Patents recite an inserter comprising of "a first slidable body" that, along with a second slidable body coupled with a needle and a glucose sensor,  "advance within the inserter housing in a linear direction towards an insertion site on [the/a] skin surface of the subject[.]" (D.I. 108, Exhibit F at 43:36-54, 44:45-45:2; Exhibit L at 43:37-55.)  A compression spring is also "configured to expand and to retract the second slidable body and the needle in a linear direction away from the insertion site[.]" (D.I. 108, Exhibit F at 43:58–60, 45:8–10; Exhibit L at 43:61-63.)

Abbott contends the two elements – that the glucose sensor "advance[s] … in a linear direction towards an insertion site" and that the needle retracts "in a linear direction away from the insertion site" – are absent from Guardian-Omnipod-Accu-chek. (D.I. 340 at 47-49.)  DexCom's expert, Dr. Vaitekunas, relies on Omnipod to disclose or render obvious those limitations, which Abbott argues fails because the Omnipod's inserter assembly "advances its cannula and retracts its needle ***across multiple axes in a bending***

26

*direction*[.]" (D.I. 340 at 47.)  In support, Abbott cites to the deposition of Mr. Jason O'Connor, Insulet's 30(b)(6) witness, who testified that the cannula (the Omnipod's equivalent of a glucose sensor) and needle move long multiple axes.  (D.I. 343, Exhibit 53 at 94:9-12, 97:4-7, 97:19-21.)  Abbott's argument, however, oversimplifies the Omnipod's insertion mechanism.  Mr. O'Connor explained that a gear inside the Omnipod rotates, which "allows a trigger to release [a] spring force, and it drives both the slide insert and slide retract – so basically holding the cannula and the needle together – forward[,]" which, in turn, "drives the needle down at an angle into the patient's skin." (D.I. 390 at 1547.)  Vaitekunas opines that, although the cannula and needle are bent, they must still necessarily travel in a linear direction because they are bound to the slide insert and slide retract, which travels towards and away from the insertion site.  (D.I. 388 at 30-32.)  Thus, it is conceivable that a properly instructed and reasonable jury could conclude that the '649 and '440 Patents are obvious in light of Guardian-Omnipod-Accu-chek.

Abbott also argues that the limitation requiring a first slidable body to advance in a "linear direction" towards the insertion site is absent from Yodfat-Omnipod.  (D.I. 340 at 50-53.)  DexCom's expert relies on a pivoting lever in Yodfat to disclose or render obvious that limitation, which Abbott argues is insufficient because that lever "undisputably [sic] moves in a ***nonlinear*** direction towards the insertion site."  (D.I. 340 at 51.)  Abbott characterizes the motion as "pivoting … like the hands of a clock" that "pivot[s] from roughly a two o'clock position [prior to insertion] to roughly a three

27

o'clock position during insertion." (D.I. 340 at 52.) Vaitekunas, however, says that

Yodfat explains the lever's "rotation is converted into linear vertical motion of the

insertion lever (916) by means of a crank protrusion[.]" (D.I. 390 at 1560 (emphasis

removed).) Upon review, I conclude that Abbott's characterization of the insertion

lever's movement is not beyond reasonable dispute.

      The '649 and '440 Patents' independent claims also require a "rotor

compris[es/ing] a rotor follower projection[.]" (D.I. 108, Exhibit F at 43:42-43, 44:53-

54; Exhibit L at 43:43-44.) The Manual of Patent Examining Procedure defines

"comprising" as "synonymous with 'including,' 'containing,' or 'characterized by,' [and]

is inclusive or open-ended and does not exclude additional, unrecited elements[.]" MPEP

§ 2111.03. Applying that definition, a "rotor comprising a rotor follower projection"

must, at a minimum, mean a rotor including/containing/characterized by a rotor follower

projection. Therefore, the "rotor follower projection" can itself be part of the "rotor."

      In his expert report, Vaitekunas provided an annotated diagram of the Omnipod to

visually depict the CGMs's rotor and rotor follower projection:



(D.I. 341, Exhibit 25 at ¶ 720.)

Abbott contends that this limitation is absent from the Guardian-Omnipod-Accu-chek combination, as "DexCom and its expert identify a 'rotor follower projection' that is necessarily separate from the rotor." (D.I. 340 at 49.)  DexCom responds that Abbott has not demonstrated "why this particular embodiment should control the scope of the claim language" or "that the claim requires the rotor and rotor follower projection to be a 'unitary structure' injection-molded together or that they cannot be separate parts."  (D.I. 388 at 32–33.)  I agree that saying the "rotor follower projection" is part of the "rotor" does not mean that the components cannot be physically separate pieces that work together.  A reasonable juror could conclude that the "rotor comprising a rotor follower projection" limitation is obvious in light of Guardian-Omnipod-Accu-chek.

Abbott's next argument is that the '649 and '440 Patents are not invalid for lack of written description.  (D.I. 340 at 53–57.)  DexCom contends that the limitation "the

rotation of the rotor [and the rotor follower projection] causes the first slidable body, a

second slidable body, and the glucose sensor to advance within the inserter housing in a

linear direction towards an insertion site on [the/a] skin surface of the subject[,]" which

appears in both patents' independent claims, lacks adequate written description.  (D.I.

340 at 53-57; D.I. 108, Exhibit F at 43:50-54, 44:65-45:2; Exhibit L at 43:51-55.)  The

written description requirement is satisfied when the patent specification "reasonably

conveys to those skilled in the art that the inventor had possession of the claimed subject

matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351

(Fed. Cir. 2010) (en banc).  Written description is a question of fact that can be decided

on summary judgment if no reasonable juror "could return a verdict for [DexCom]." *Bos.*

*Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1361 (Fed. Cir. 2011).

Abbott argues that during Vaitekunas's deposition, he stated that every limitation

of the independent claims of both patents were described or depicted in the patents'

specification.  (D.I. 343, Exhibit 52 at 467:8-469:13.)  In response, DexCom recites

Vaitekunas' opinion for why the patents lack written description, but it does not contend

that the deposition statements Abbott highlights were incorrectly made.  (D.I. 388 at 36-

38.)  As DexCom's expert admits that every limitation of the claim is found within the

specification, no reasonable juror could conclude that Abbott lacked possession over the

claimed subject matter, so I will grant Abbott's motion for summary judgment on this

point.

I now turn to whether claim 18 of the '649 Patent and its dependent claims are invalid as indefinite. A patent claim is indefinite under 35 U.S.C. § 112 if, "viewed in light of the specification and prosecution history," it fails to inform "those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). I conclude that claim 18 of the '649 Patent and its dependent claims are not indefinite.

Independent claim 18 of the '649 Patent claims an inserter assembly with numerous components including two "projections." (D.I. 108, Exhibit F at 44:45-45:19.) The inserter assembly includes an inserter housing and a rotor "wherein the rotor comprises a rotor follower projection[.]" (D.I. 108, Exhibit F at 44:53-54.) The inserter assembly also contains "a torsion spring received within the rotor" that is "configured to cause rotation of the rotor and the rotor follower projection, wherein the torsion spring comprises a center aperture configured to receive a second projection of the inserter assembly[.]" (D.I. 108, Exhibit F at 44:55-61.)

DexCom contends that independent claim 18 of the '649 Patent, and its dependent claims, are indefinite "because the patent does not adequately define the bounds of 'the second projection of the inserter assembly.'" (D.I. 331 at 27.) Specifically, DexCom says that the claim's "plain language is circular" because "the second projection protrudes from 'the inserter assembly,' which is defined as comprising the second projection, which protrudes from 'the inserter assembly,' and so on." (D.I. 331 at 28.) DexCom also argues that the claim fails to recite a first projection of the inserter

31

assembly, as the only other projection contemplated by claim 18 is one that protrudes

from the rotor, which is part of the inserter assembly. (D.I. 331 at 28.) As an example of

the supposed indefiniteness of the claim, DexCom asserts that Abbott takes conflicting

positions, contending for infringement purposes that the second projection protrudes from

a portion of DexCom's G6 CGMs which Abbott refers to as the inserter housing, but for

invalidity Abbott contends that the second projection protrudes from the rotor. (D.I. 331

at 28; D.I. 388 at 39.)

Claim 18's language and the '649 Patent's specification refute DexCom's

argument. The claim language is not circular. It is, as Abbott notes, not inconsistent or

circular to say that a balcony protrudes from a building and yet is part of the building.

Figure 45 of the patent demonstrates that the second projection is readily understood as a

projection protruding from inside the rotor:



(D.I. 108, Exhibit F at Fig. 45.)

In that figure, the torsion spring (1365) is "received within the rotor" (1308). (D.I. 108, Exhibit F at 44:55.) That hollow circular torsion spring (1365) "comprises a center aperture configured to receive a second projection of the inserter assembly[,]" that "second projection" being the solid circular projection inside the rotor (1308) that mates with the torsion spring. (D.I. 108, Exhibit F at 44:58–59.) I do not believe that a skilled artisan would have difficulty understanding the scope of the "second projection of the inserter assembly." Any allegedly inconsistent position that Abbott is adopting with respect to infringement is relevant, if at all, to the merits of Abbott's infringement argument rather than the supposed indefiniteness of the claim.

4.    *The '443 Patent*

The '443 Patent is titled "Sensor Inserter Assembly." (D.I. 108 at ¶ 55.)  Its

inventive concept is also directed towards improving the inserter assembly by using a

novel insertion system.  The patent is "generally directed to 'devices and methods for

inserting a subcutaneously implantable electrochemical sensor in a patient' for 'the in

vivo monitoring of an analyte, such as glucose or lactate, using a sensor to provide

information to a patient about the level of the analyte.'" *Abbott*, 2023 WL 2599516, at

*3.  The patent claims an inserter device that comprises, among other things, "a first

spring." *Id.*

Abbott moves for summary judgment that the '443 Patent is not invalid for lack of

enablement and written description under 35 U.S.C. § 112, that the patent is not invalid

for improper inventorship or unenforceable for inequitable conduct, and that the

invention in the '443 Patent was conceived and reduced to practice before August 1, 2002

(the date of a prior art reference referred to as the "Heller Reference").  (D.I. 340 at 65-

75.)  I address each of those arguments in turn.

During claim construction, DexCom proposed that "first spring" as used in the

'443 Patent means "compression spring loaded along its axis." *Abbott*, 2023 WL

2599516, at *4.  I declined to adopt its limiting construction, holding that "first spring" be

given its plain and ordinary meaning. *Id.*  Applying that construction, DexCom's expert

Gary Fletcher opined that the '443 Patent's specification does not "provide adequate

written description that would indicate to a person of ordinary skill in the art that the

34

inventors were 'in possession' of an invention of that breadth." (D.I. 390 at 1506-07.) Specifically, Fletcher concluded that a skilled artisan would read the specification to only disclose compression springs, noting that he found "no evidence to indicate that the inventors contemplated the use of any other type of spring in their invention, much less the details that would be required to adequately describe the use of extension or torsion springs." (D.I. 390 at 1508.) To show that the inventors were in possession of all springs, Fletcher continued, "the specification would have needed to include additional teachings about how to load and translate the force of non-compression springs" such as explaining "how the torque or rotational force of a torsion spring could be converted into a linear force such that the torsion spring" could perform its desired function. (D.I. 390 at 1509.)

Relying on the same "first spring" argument just discussed, Fletcher also concludes that "the specification provides no teaching that would enable a [person of ordinary skill in the art] to make and use an inserter having a non-compression type 'first spring,' such as a torsion spring, without undue experimentation." (D.I. 390 at 1514.) Specifically, he provides that "significant re-engineering of the disclosed inserter" is required because torsion springs exert rotational or torque force but the patent teaches advancement of the shuttle, needle, and sensor in a linear direction. (D.I. 390 at 1514.) Fletcher also argues that the housing restraints of the device require a person of ordinary skill in the art to conduct undue experiment to figure out where to place a torsion spring. (D.I. 390 at 1514.)

35

Fletcher has presented a detailed analysis explaining why he believes the '443 Patent is invalid for lack of written description and enablement. His analysis raises several factual issues concerning, for example, whether the specification discloses how torque and rotational force can be converted into a linear force. Because of those factual issues, I will deny Abbott's motion that the asserted claims of the '443 Patent are not invalid for lack of written description and enablement under 35 U.S.C. § 112.

I now consider Abbott's argument that the '443 Patent is not invalid for improper inventorship or unenforceable for inequitable conduct. The '443 Patent was prosecuted by attorney Glen Liu, and it names four inventors, two of whom were employed in 2001 by TheraSense, a precursor company of Abbott Diabetes Care, and worked on its "Messenger" CGMs project. (D.I. 340 at 66–67.) The '443 Patent is part of a series of nine patents and patent applications that all, except for the '443 Patent, list Brad Kelemen as a joint inventor. (D.I. 390 at 1517.) Kelemen was employed by TheraSense from April 2002 until May 2003 as a manager of the Messenger project, but he does not claim that he is a joint inventor for the '443 Patent. (D.I. 340 at 67.) During the prosecution of the '443 Patent, Kelemen was originally listed as an inventor. (D.I. 340 at 69.) The patent applicants, however, submitted a joint declaration declaring that the invention was conceived and reduced to practice before August 1, 2002. (D.I. 390 at 1515.) The applicants also filed a request to correct inventorship, stating that Kelemen was "added through error[.]" (D.I. 390 at 1515-1516.) The PTO agreed, and Kelemen was removed because he did not join TheraSense until after conception. (D.I. 340 at 69.) Despite that

36

prosecution history, and Kelemen's own admission that he is not a joint inventor,

DexCom argues that is a joint inventor of the '443 Patent, and that Liu committed

inequitable conduct because he did not name him as a joint inventor.  (D.I. 338 at 40-44.)

As the inventors named on a patent are presumed correct, *Hess v. Advanced*

*Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997), DexCom must "meet the

heavy burden of proving its case by clear and convincing evidence, and must provide

evidence to corroborate the alleged joint inventor's conception," *Eli Lilly & Co. v.*

*Aradigm Corp.*, 376 F.3d 1352, 1358 (Fed. Cir. 2004) (internal citations omitted).  To be

a joint inventor, an individual must make a contribution to at least one claim of the

patent. *See CODA Develop. S.R.O. v. Goodyear Tire & Rubber Co.*, 916 F.3d 1350,

1358 (Fed. Cir. 2019).  Abbott contends that summary judgment is warranted because

DexCom cannot meet its burden.  I disagree.

Fletcher opined that, based on Kelemen's deposition testimony, the Messenger

CGMs design history file and lab notebooks, and other corroborating documents and

testimony, a person of ordinary skill in the art would understand that Kelemen

contributed to the claimed invention in the '443 Patent.[17]  (D.I. 390 at 1518-27.)  Fletcher

---

[17] During his deposition, Kelemen explained that he made numerous design
contributions to the Messenger, including, for example, changing the material used in the
inserter, changing the design of the mechanism inside the inserter, changing the design of
a portion of the adhesive system, changing the shape and size of the sensor, and changing
the retraction spring and implantation spring forces.  (D.I. 390 at 1518-19.)  He explained
that those changes were necessary to commercialize the product and "to ensure the
Messenger project could pass phase 2 clinical trials."  (D.I. 390 at 1519.)  Fletcher's

37

also concluded that the evidence demonstrated that Kelemen's contributions to the

Messenger project are claimed in the '443 Patent, and that a person of ordinary skill in

the art "wouldn't be able to identify a reason Kelemen is named on the related patents but

not the '443 [P]atent, *i.e.*, there is no evidence that Kelemen contributed to a unique

claim element in all the other related patents that is not in the '443 [P]atent."[18] (D.I. 388

at 42.)  Given that evidence, a reasonable juror could conclude that Kelemen contributed

to the conception of the '443 Patent's invention because, prior to his involvement,

extensive research or experimentation was necessary to reduce the invention to practice.

*See Burroughs*, 40 F.3d at 1228 (noting that conception "is complete only when" a person

of ordinary skill in the art can reduce the invention to practice "without extensive

research or experimentation").[19]  As Kelemen may be a joint inventor, summary

judgment against DexCom's inequitable conduct defense is not warranted.

––––––––––––––––––––

testimony traces all of Kelemen's design changes to various limitations in the '443
Patent's claims.  (D.I. 390 at 1518-19.)

[18] Abbott's expert Karl Leinsing attempted to explain why Kelemen is listed on all
the related patent and patent applications except the '443 Patent, contending that
Kelemen "potentially could have" conceived the material or properties of materials used
in various CGMs components.  (D.I. 389 at 400.)  DexCom disputes that evidence,
pointing to documents demonstrating those advancements prior to Kelemen's
employment at TheraSense.  (D.I. 388 at 42.)  DexCom also contends that Liu, when
deposed, could not articulate why Kelemen was named as a joint inventor on the related
patents and patent applications but not on the '443 Patent.  (D.I. 388 at 43.)

[19] Because a dispute of fact exists regarding whether Kelemen is a joint inventor, I
will deny Abbott's motion that the inventions claimed in the '443 Patent were conceived
and reduced to practice before August 1, 2002.  If Kelemen, who worked at TheraSense

### B.     Infringement

Abbott moves for summary judgment that the G6 infringes the following: the

asserted claims of the '649 and '440 Patents; claims 3 and 6 of the '216 Patent; claim 15

of the '842 Patent; the asserted claims of the '338 Patent; and the asserted claims of the

'644 Patent.  (D.I. 340 at 5-46.)  To prove infringement, Abbott must prove that every

element or its equivalent is disclosed in the accused G6.  *Uniloc USA, Inc. v. Microsoft*

*Corp.*, 632 F.3d 1292, 1301 (Fed. Cir. 2011).  The Federal Circuit has cautioned that,

when approaching a motion for summary judgment of infringement or non-infringement,

"a district court must proceed 'with a care proportionate to the likelihood of its being

inappropriate.'"  *Chemical Eng'g. Corp. v. Essef Indus., Inc.*, 795 F.2d 1565, 1571 (Fed.

Cir. 1986) (quoting *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1575 (Fed. Cir. 1983).

Summary judgment of infringement is appropriate when a comparison of a claim with an

uncontested description of the accused device reflects no genuine dispute of material fact.

*Id.*

### 1.     The '649 and '440 Patents

Abbott asserts infringement of claims 25 and 28 from the '649 Patent and claim 24

from the '440 Patent.[20]  (D.I. 340 at 5.)  All asserted claims depend from an independent

_____

from April 2002 until May 2003, contributed to the invention's conception, that
contribution may have occurred after August 1, 2002.

[20] Abbott also asserted infringement of claim 17 of the '649 Patent.  That claim,
however, was invalidated by the Patent Trial and Appeal Board's inter partes review of
the patent.  (D.I. 456.)  Abbott has since represented to the court that it "intends to drop

claim that recites an "inserter housing" that contains a "glucose sensor," "rotor," "first slidable body," and "second slidable body." (D.I. 108, Exhibit F at 44:45-45:19; Exhibit L at 43:37-44:7.) DexCom contends that a material dispute of fact exists over whether the G6 meets that limitation.[21] (D.I. 388 at 24-28.) Because I agree, I will deny Abbott's motion.

The parties' experts agree that the plain and ordinary meaning of "inserter housing" is a component that covers or protects, like a case or enclosure.[22] (*See* D.I. 340 at 8 ([Abbott's expert Leinsing opining that "inserter housing's"] ordinary meaning in this context is "something that covers or protects: as … a case or enclosure (as for a mechanical part or an instrument").); D.I. 388 at 24 ("[DexCom's expert Vaitekunas] describes the plain and ordinary meaning of 'inserter housing' as a simple enclosure that defines a longitudinal cavity therein.").) Abbott states that the "G6 plainly has such an inserter … housing, which includes the gray and white pieces below:"

---

claim 17[.]" (D.I. 458 at 5.)  The Board upheld the patentability of asserted claims 25 and 28.  (D.I. 456.)

[21] DexCom also disputes that the G6 meets the "recess" limitation contained in all three asserted claims and the "second projection" limitation contained in claims 25 and 28 of the '649 Patent.  (D.I. 388 at 22-29.)   Because I conclude that a factual dispute exists regarding whether the G6 meets the "inserter housing" limitation, I do not address those arguments.

[22] Abbott characterizes Vaitekunas's opinion as requiring that the "inserter housing" be a unitary structure but, for the reasons discussed herein, I do not agree that he takes that position.  (D.I. 340 at 8.)

Inserter
Housing





(D.I. 340 at 6.)  In support, it only points to DexCom and Stress Engineering's

(DexCom's G6 design consultant) Rule 30(b)(6) witnesses who both colloquially referred

to the G6's white top component and bottom gray component as a "housing."  (D.I. 340

at 7 (quoting D.I. 341, Exhibit 4 at 171:24-172:2; Exhibit 5 at 39:7-19).)

Those statements do not conclusively establish that the two components of the G6

satisfy the "inserter housing" limitation in the asserted claims.  DexCom's expert

Vaitekunas explained that the top component includes the drive wheel and rotor and

serves as the applicator's "engine" while the bottom case serves as the applicator's

"frame" and its components direct the needle and sensor.  (D.I. 388 at 26.)  He thus

concludes that a person of ordinary skill in the art "would understand the G6 to have *two*

distinct housings, which wouldn't satisfy the claimed 'inserter housing' limitation"

because "neither holds all the requisite elements of the inserter as claimed, *e.g.*, 'housing'

both the 'rotor' and the 'sensor.'"  (D.I. 388 at 27-28.)

41

Abbott characterizes Vaitekunas's opinion as essentially "argu[ing] that 'inserter housing' in the ['649 and '440 Patents] requires the housing to be a unitary structure (i.e., it cannot be formed from multiple pieces)." (D.I. 340 at 8.)  I do not read Vaitekunas's opinion in that way.  Rather, I understand his position to be that because the top and bottom cases are functionally and physically distinct, a person of ordinary skill would understand the G6 to have two distinct housings, and, if the G6 does in fact have two distinct housings, the elements of "inserter housing" are not met because no singular housing component contains both the rotor and sensor.  That is a factual dispute that precludes granting summary judgment.

>    2.    *The '216 Patent*

Abbott asserts infringement of claims 3 and 6 of the '216 Patent, which both depend from independent claim 1.  (D.I. 340 at 22.)  Independent claim 1 recites a glucose monitoring system comprising an insertion assembly that includes, as relevant here, "a button configured to be pressed along a first axis toward the interior of the insertion assembly[.]"  (D.I. 108, Exhibit K at 34:36-37.)  DexCom disputes that it practices four elements of independent claim 1, one of which provides:

> wherein the button is further configured to release the first spring from the loaded position upon being pressed, such that the first spring causes the sliding member to move within the straight track along a second axis different from the first axis, wherein the second axis is defined by the length of the straight track[.]

(D.I. 108, Exhibit K at 34:38-44.)   I conclude that whether the G6 meets that element is a disputed fact, and therefore will deny Abbott's motion for summary judgment.[23]

In particular, the parties dispute whether the G6's "sliding member … move[s] within the straight track along a second axis different from the first axis, wherein the second axis is defined by the length of the straight track[.]" (D.I. 108, Exhibit K at 34:41–44.)  Abbott's infringement theory is that the "second axis … defined by the length of the straight track" is perpendicular to the length of the G6, as shown in this figure from its briefing:



(D.I. 340 at 28.)

_____

[23] As I conclude that Abbott is not entitled to summary judgment, I decline to address the other three contested elements in the '216 Patent.

DexCom's expert Jack Griffis, however, disagreed, stating that Abbott's "depiction is misleading because it fails to account for the fact that the groove itself moves as the accused sliding member moves within it." (D.I. 390 at 1384.) He explained that the G6's "sliding member" is a pin on the G6's drive wheel, which rotates around the center of that wheel. (D.I. 390 at 1384–85.) According to Griffis, when the G6's button is pressed, the "straight track" of the G6 "moves longitudinally relative to the outer frame of the applicator as the ["sliding member"] moves laterally within the groove." (D.I. 390 at 1384.) The result of that movement is that "a skilled artisan would understand that the length of the [straight track] defines an infinite number of axes along its distance of travel" because "the [straight track] (and thus any axis defined by the length of the [straight track]) moves continuously as the [sliding member] moves within [the straight track]." (D.I. 390 at 1386.)

Abbott argues that whether the straight track moves is irrelevant because the second axis is continuously defined by the straight track.[24] (D.I. 340 at 30.) It analogizes to an airplane aisle, stating that "the longitudinal axis of an airplane is defined by the length of the airplane. As a person walks up and down the aisle, the person is moving

---

[24] Abbott also argues that DexCom is proposing a new construction for the disputed term, adding the limitations that the straight track must be stationary and that the second axis cannot move. (D.I. 340 at 29.) DexCom disagrees and states that, because of the G6's internal movement, there can be no second axis defined by the length of the straight track. (D.I. 454 at 33.) To avoid ambiguity regarding the scope of the claim element, I ruled during oral argument that "[i]t's not the case that the straight track must be stationary." (D.I. 454 at 31.)

44

along the longitudinal axis of the airplane (defined by the length of the airplane) even if the airplane is ascending, descending, turning, or level." (D.I. 340 at 30.)  But the sliding member must "move within the straight track *along a second axis* … defined by the length of the straight track[.]" (D.I. 108, Exhibit K at 34:41-44 (emphasis added).) Referring to Abbott's analogy, however, a reasonable juror might not conclude that a passenger walks down a single longitudinal axis of the airplane regardless of the airplane's movement; rather, the juror might conclude that, as the passenger walks down the straight track of the aisle while the plane turns, ascends, or descends, that passenger does not simply move "along a second axis" because the axis necessarily changes as the straight track moves.[25]  In other words, a jury might be persuaded that a person of ordinary skill in the art would not understand the operation of the G6 to involve movement along a second axis but instead movement along multiple axes.  Thus, there is a disputed fact that a jury must resolve.

### 3.    The '842 Patent

Abbott moves for summary judgment that the G6 infringes claim 15 of the '842 Patent.[26]  The brevity of Abbott's argument is fatal to its motion.  In just one sentence that cites to over 100 paragraphs of an expert declaration, Abbott asserts that, "[a]s shown

---

[25] Abbott acknowledges that the "frame of reference is fundamental" to an infringement determination.  (D.I. 414 at 11.)  That inherently implicates a question of fact about which the parties' experts vehemently disagree.

[26] For a description of that claim, *see supra* Section III.A.2.

in Sarrafzadeh's supporting declaration, the G6 meets each and every element of claim 15

of the [']842 [P]atent, and therefore directly infringes this claim." (D.I. 340 at 39.)

Abbott has shirked its duty to "cit[e] to *particular parts of materials in the record*" to

"support [its] assertion" that the G6 infringes. Fed. R. Civ. P. 56(c)(1)(A) (emphasis

added); *cf. United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not

like pigs, hunting for truffles buried in briefs."). Abbott states, without citation, that

DexCom does not dispute that any claim limitations are absent from the G6, but DexCom

contends that Abbott has not demonstrated that the G6 is capable of executing the

limitation "signal errors associated with a transmitter unit of the analyte monitoring

system or a receiver unit." (D.I. 388 at 13-16; D.I. 108, Exhibit A at 16:50–53.); *see*

*Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010) (holding

that a device accused of infringing "a claim that recites capability and not actual

operation … 'need only be capable of operating'" in the infringing mode). Abbott has

failed to meet its burden of establishing infringement, and I decline Abbott's invitation to

wade through over one hundred paragraphs of its expert report and come up with legal

arguments on its behalf.

### 4.     The '338 Patent

Abbott asserts infringement of claims 3 and 22 of the '338 Patent, which depend

from independent claims 1 and 10, respectively. (D.I. 340 at 39.) Those two independent

claims both recite "a support body compris[ing] a first portion and a second portion, the

first and the second portions provided within a same plane[.]" (D.I. 108, Exhibit C at

46

12:65-67; 13:55-57.)  DexCom only disputes the limitation "displacing the second

portion of the support body to a different plane relative to the first portion of the support

body to at least partially release the medical device[.]"[27]  (D.I. 108, Exhibit C at 13:3-5.)

Specifically, DexCom, through its expert Dnyanesh Talpade, asserts "that displacing the

G6 disposable housing does not 'at least partially release the medical device[.]'"  (D.I.

388 at 17.)  Because a dispute of material fact exists concerning whether that limitation is

met, I will deny summary judgment.

Abbott's expert Neil Sheehan asserts that the second portion of the G6's support

body contains a "wall … that prevents removal of the transmitter (*i.e.*, medical

device)[.]"  (D.I. 340 at 40.)  He explains that when that second portion is displaced, the

transmitter can be pulled out of the holder because nothing on the G6's support body

contacts a portion of the transmitter, and that action "constitutes at least partially

releasing the transmitter[.]"  (D.I. 340 at 40.)  Sheehan acknowledges that the G6's

transmitter "interacts with two mechanical mating features[,] an opening that mates with

a tab on the transmitter and two latches that mate with specific catches on the sides of the

transmitter[,]" that "are not disengaged during displacement of the second portion of the

G6 support body," but he contends that the transmitter is still partially released from the

support body for the reasons just described.  (D.I. 340 at 41.)

_____

[27] Independent claim 10 does not use that exact wording, but it recites a
substantially similar limitation.  (*See* D.I. 108, Exhibit C at 13:60-64.)

Talpade disagrees.  He explains that the latches in the housing that Sheehan described "interact with indentations in the transmitter … [to] keep the transmitter in the support body."  (D.I. 388 at 18 (citing D.I. 389 at 1305-06).)  Because those latches "are not disengaged or dissociated when a user displaces the G6 disposable housing," Talpade asserts that the transmitter is not at least partially released.  (D.I. 388 at 19); (*see* D.I. 389 at 1307 ("[T]he displacement of the disposable housing merely allows the user to access the transmitter to allow the user to then remove the transmitter by pulling it out of the disposable housing.  Therefore, in my opinion, this displacement does not 'at least partially release' the transmitter.").)

Abbott does not dispute that the latches keep the transmitter in the support body and are not disengaged when the G6's disposable housing is displaced.  Instead, it states that "[c]onstruing 'at least partially release' to require disengagement of mechanical features" adds a limitation to the claim not apparent in its language.  (D.I. 340 at 42.)  I disagree with that characterization.  The latches, not the wall of the second portion of the G6's support body, maintain the transmitter within the support body.  Even though displacement of the second portion of the support body removes that wall so that the transmitter can be manually removed, the latches are still engaged with the transmitter.  Because those latches are engaged, and it is the latches that maintain the transmitter's position, a reasonable jury could conclude that the transmitter is not at least partially released as the claim limitation requires.  I will therefore deny Abbott's motion.

48

5.   *The '644 Patent*

Abbott asserts infringement of claim 15 of the '644 Patent, which depended on

independent claim 1. (D.I. 340 at 43.) Claim 1 recites an assembly comprising, among

other things, a "support body compris[ing] a first portion, a second portion, and a

frangible area between the first portion and the second portion[.]" (D.I. 108, Exhibit I at

13:4–6.) That support body "further comprises at least one opening configured to mate

with at least one corresponding tab of the on-body medical device to secure the on-body

medical device to the support body[.]" (D.I. 108, Exhibit I at 13;11–14.) DexCom,

through its expert Talpade, disputes that the G6 meets that limitation, arguing that the

transmitter (i.e., medical device) is not secured to the disposable housing (i.e., support

body) by the opening. (D.I. 388 at 21.) I conclude that a material fact prevents summary

judgment.

There is no dispute that the G6's disposable housing contains an opening and pair

of latches. Sheehan asserts that "mating between the tab on the G6 transmitter and

opening in the support body secures the transmitter." (D.I. 340 at 44.) He cites to the

deposition testimony of a DexCom engineer who was asked if the opening in the

disposable housing interacts with the tab in the transmitter to hold it in place. The

engineer confirmed "[t]hat is one of the features that retains the transmitter." (D.I. 341,

Exhibit 4 at 212:16-21.)

In support of Talpade's opinion that the transmitter is not secured by the opening

in the support body, he conducted an experiment where he "removed the latches on the

disposable housing of the G6 to test whether the slot on the G6 housing and the tab on the

G6 transmitter secure the transmitter to the disposable housing." (D.I. 389 at 1322.)

Talpade testified that it "immediately became clear" that the slot does not secure the

transmitter because the "transmitter was pushed out of the housing by the seal carrier as

shown in the images below:"

 

(D.I. 380 at 1322–23.)

Abbott's only response is that the claim does not require that the "tab mating with

an opening is the only feature involved in securing the transmitter[,]" but, as the

transmitter was pushed out of the housing, a reasonable juror could conclude that the tab

mating with the opening does not secure the transmitter whatsoever. (D.I. 414 at 17.) I

will therefore deny Abbott's motion because a reasonable jury could conclude that the

transmitter is not secured by the opening in the support body.

### C.   Damages

DexCom moves for summary judgment of no willful infringement. (D.I. 331 at

29-35.) Abbott moves for summary judgment that no non-infringing substitutes exist,

that the hypothetical negotiation date for purposes of reasonable royalty calculations is March 31, 2021, and that DexCom's damage's expert Ms. Stamm's reasonable royalty analysis should be excluded to the extent that it relies on the wrong hypothetical negotiation date. (D.I. 340 at 86-90.)

1. *Willful Infringement*

Willful infringement is an issue of fact that is established if "the patentee [can] show [by a preponderance of the evidence that] the accused infringer had a specific intent to infringe at the time of the challenged conduct." *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 987 (Fed. Cir. 2021) (citing *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 105 (2016)). As a finding of willfulness requires an examination of "the totality of the circumstances of the case[,]" conduct that occurred prior to the issuance of a patent may support a finding of willfulness. *Minnesota Min. and Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1581 (Fed. Cir. 1992); *see also Pelican Int'l, Inc. v. Hobie Cat Co.*, No. 3:20-cv-02390-RSH-MSB, 2023 WL 2127994, at *17 (S.D. Cal. Feb. 10, 2023) ("Thus, in assessing willfulness, the factfinder must look to [the alleged infringer's] knowledge and intent at the time it obtained notice of the patent" and "in doing so, the factfinder may look at pre-issuance conduct – for example, pre-issuance copying of the claimed invention – to determine what the accused infringer's state of mind was after issuance and notice of the patent." (citing *Minnesota Min. & Mfg.*, 976 F.2d at 1581)); *Hologic, Inc. v. Minerva Surgical, Inc.*, 325 F. Supp. 3d 507, 534 (D. Del. 2018), *aff'd, vacated, remanded, and reinstated-in-part on other grounds* ("There is no

51

*per se* rule that a finding of willful infringement cannot stand whenever manufacture of an accused device begins prior to the issuance of a patent, instead courts must look to the totality of the circumstances presented in the case."). Although pre-issuance conduct can be relevant to the willfulness infringement that occurred after a patent issued, "[i]t is obvious that a party cannot be held liable for 'infringement', and thus not for 'willful' infringement of a *nonexistent* patent, i.e., no damages are payable on products manufactured and sold before the patent issued." *Gustafson, Inc. v. Intersystems Indus. Prods., Inc.*, 897 F.2d 508, 510 (Fed. Cir. 1990); *see also Bioverativ Inc. v. CSL Behring LLC*, No. 17-914-RGA, 2020 WL 1332921, at *2 (D. Del. Mar. 23, 2020) ("There can be no willful infringement before a patent issued.").

DexCom asserts that "[t]he requisite specific intent to infringe cannot exist when, like here, the G6 [CGMs] was designed, tested, approved, and put on the market not only *prior to the issuance of the patents-in-suit* but *prior to the filing of the asserted claims*."[28] (D.I. 331 at 29-30.) As its G6 CGMs received FDA approval on March 27, 2018, but the first of the patents-in-suit to issue (the '842 Patent) did not issue until November 3, 2020, DexCom argues that Abbott cannot establish that DexCom had the specific intent to infringe, or even had knowledge of, the patents-in-suit when it developed the G6. (D.I. 331 at 30-35.) DexCom admits that it became aware of the patents-in-suit "around the

---

[28] Only the '954 Patent of the twelve patents-in-suit has an application filing date that predates the G6's March 27, 2018, FDA approval date. (D.I. 331 at 31.) The '954 Patent was filed October 20, 2017. (D.I. 108, Exhibit B.)

time that they issued, but that was years after DexCom started selling the G6." (D.I. 331 at 32.)

Although acknowledging that the G6 was developed before the patents-in-suit issued, Abbott contends that a reasonable jury could find that DexCom willfully infringed the patents because "DexCom had access to Abbott's technology and changed its designs [of the G6] to incorporate that technology." (D.I. 376 at 41.) It tells a story of how DexCom's pre-G6 CGMs "were plagued with problems" that DexCom solved by "incorporat[ing] Abbott's patented technology[.]" (D.I. 376 at 37-38.) For instance, Abbott alleges that "[i]n 2009, Udo Hoss, a [']954 [Patent] inventor, presented clinical trial results demonstrating feasibility for factory calibration (no fingersticks) at a conference with DexCom representatives present." (D.I. 376 at 39.) After the conference, according to Abbott, DexCom "set goals directed to factory calibration" and finalized its factory calibration algorithm two years earlier than its internal estimates. (D.I. 376 at 39.)

Viewing those facts and drawing reasonable inferences in the light most favorable to Abbott, no reasonable juror can conclude that DexCom willfully infringed the patents-in-suit *before* those patents issued. DexCom cannot have infringed, let alone possessed the specific intent to infringe, patents that had not yet issued. *See Gustafson*, 897 F.2d at 510. A reasonable juror could conclude, however, that, *after* the patents issued, DexCom's pre-issuance conduct – its alleged predilection for closely following and copying Abbott's technology – in combination with DexCom's admission that it had

53

knowledge of the patents-in-suit around the time they issued, demonstrate it had the specific intent to infringe. The pre-infringement conduct is therefore potentially relevant. And, even if DexCom demonstrated that it did not believe that the G6 infringed upon the patents-in-suit until Abbott filed its complaint, DexCom has not alleged that it took any steps to halt its allegedly infringing sales of the G6.[29] *See Extang Corp. v. Truck Accessories Grp., LLC*, No. 19-923-KAJ, 2022 WL 607868, at *2 n.1 (D. Del. Feb. 18, 2022) (noting that the defendant's conduct after the filing of the patentee's complaint "could still be found to be willful infringement, particularly if there is no evidence that [the defendant] halted its allegedly infringing activities even after receiving notice of the … patent upon being served with the complaint"); *Tonal Sys., Inc. v. iFit Inc.*, No. 20-1197-LPS-CJB, 2022 WL 951549, at *2–3 (D. Del. Mar. 30, 2022) (holding that the filing of a complaint can demonstrate "post-suit knowledge of a patent's existence and infringement").

### 2.   *Non-Infringing Substitutes*

As Abbott seeks lost profits damages, it must establish, among other things, the "absence of [an] acceptable non-infringing substitute" for DexCom's G6 CGMs. *Rite-*

---

[29] DexCom contends that, as its G6 entered the market before Abbott had filed the asserted claims, DexCom's conduct after Abbott filed its complaint cannot demonstrate a specific intent to infringe. (D.I. 412 at 22.) That is plainly incorrect as DexCom's continued sale of the G6 may constitute an act of infringement. *See* 35 U.S.C. § 271 ("Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention … infringes the patent.").

54

*Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (citing *Panduit Corp. v.*

*Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978). The existence of

such substitutes is a question of fact focused on the "accounting period[,]" or when the

infringement occurred for which Abbott claims lost-profit damages. *Grain Processing*

*Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1353 (Fed. Cir. 1999). The Federal

Circuit has provided that,

> [w]hen an alleged alternative is not on the market during the accounting period, a trial court may reasonably infer that it was not available as a noninfringing substitute at that time. The accused infringer then has the burden to overcome this inference by showing that the substitute was available during the accounting period. Mere speculation or conclusory assertions will not suffice to overcome the inference. After all, the infringer chose to produce the infringing, rather than noninfringing, product. Thus, the trial court must proceed with caution in assessing proof of the availability of substitutes not actually sold during the period of infringement.

*Id.* (internal citations omitted)*; see also Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d

1119, 1123 (Fed. Cir. 2003) ("[The Federal Circuit has] noted that the finding that an

infringer had to design or invent around the patented technology to develop an alleged

substitute weighs against a finding of availability." (citing *Grain Processing*, 185 F.3d at

1356)).

DexCom asserts five categories of non-infringing substitutes: a redesigned G6

CGM that does not infringe any of the patents-in-suit's asserted claims; a redesigned G5

CGM with modifications to its transmitter and automated manufacture; manufacturing

the G6 product in Mexico for G6 products sold outside of the United States; Medtronic's

Guardian Connect and MiniMed 770G CGMs; and traditional blood glucose monitoring.

55

(D.I. 340 at 86-87.)  Issues of material fact preclude granting summary judgment that

four of those five categories are non-infringing substitutes.

Regarding the first three categories – redesigned G6 and G5 CGMs and

manufacturing of the G6 in Mexico – Abbott argues that any product modifications and

offshoring of manufacturing is "nothing more than mere speculation, conclusory

assertions, or substitutes only theoretically possible." (D.I. 340 at 86 (internal quotation

marks and citation omitted).)  But DexCom has presented enough evidence supporting

those potential substitutes to create triable issues of fact.

Abbott contends that Medtronic's CGMs are not non-infringing substitutes

because those products lack the advantages of the patented inventions, namely "factory

calibration (*e.g.*, no fingerstick calibrations for the wear life of the sensor), as enabled by

the [']954 [P]atent." (D.I. 340 at 87.)  As I have concluded that the '954 Patent is invalid

under 35 U.S.C. § 101, however, that argument fails.  Abbott raises a similar argument

that traditional blood glucose monitoring is not a non-infringing substitute because it

"lacks *all* of the patented features and therefore would not have been … acceptable[.]"

(D.I. 340 at 87.)  On that point, I agree.  Dr. Lori Laffel, DexCom's expert, submitted a

report explaining why some patients might use traditional blood glucose monitoring as an

acceptable substitute to CGMs, but absent from her analysis is any claim that traditional

blood glucose monitoring has any of the advantages of the inventions claimed in the

patents-in-suit. (*See* D.I. 390 at 1827–29.)  Thus, no reasonable juror could conclude that

traditional blood glucose monitoring contains the patented features claimed in the

56

patents-in-suit. For that reason, traditional blood glucose monitoring cannot constitute an acceptable non-infringing substitute. *See TWM Mfg. Co., Inc. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986) ("A product lacking the advantages of that patented can hardly be termed a substitute 'acceptable' to the customer who wants those advantages.").

>   3.   *The Hypothetical Negotiation Date for Purposes of Reasonable Royalty Calculations*

The Federal Circuit has stated that "[t]he hypothetical-negotiation approach to calculating reasonable-royalty damages 'attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began.'"[30] *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1375-76 (Fed. Cir. 2017) (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009)); *Boston Sci. Corp. v. Cordis Corp.*, 777 F. Supp. 2d 783, 792 (D. Del. 2011) (noting that the date of hypothetical negotiation may be determined as a matter of law).

---

[30] I note that the Federal Circuit has also held that "[i]n general, the date of the hypothetical negotiation [for a reasonably royalty analysis] is the date that the infringement began." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 75 (Fed. Cir. 2012) (citing *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1123 (S.D. N. Y. 1970)); *Wang Lab'ys, Inc. v. Toshiba Corp.*, 993 F.2d 858, 870 (Fed. Cir. 1993) (holding that hypothetical negotiations are "determined to have occurred when the infringement began, which was the date the patent issued"). Despite *LaserDynamics* and *Wang* stating that the hypothetical negotiation occurs when infringement began, I follow *Prism*'s and *Lucent*'s more recent holdings that the hypothetical negotiation occurs just before infringement began.

Abbott and DexCom entered a covenant not to sue that expired on March 31,

2021. (D.I. 340 at 88; D.I. 345, Exhibit 84.) Abbott argues that, because the Federal

Circuit equates a covenant not to sue with a non-exclusive patent license, *Molon Motor &*

*Coil Corp. v. Nidec Motor Corp.*, 946 F.3d 1354, 1360 (Fed. Cir. 2020) ("A covenant not

to sue is equivalent to a nonexclusive … license[.]"), the hypothetical date for

negotiations has to be March 31, 2021, because DexCom could not infringe the patents-

in-suit until April 1, 2021. (D.I. 340 at 88.); *see also Vectura Ltd. v. GlaxoSmithKline*

*LLC*, 2019 WL 1352767, at *2 (D. Del. Mar. 26, 2019) (holding "the proper date for the

hypothetical negotiation as a matter of law is … the day before the covenant not to sue

expired and infringement began"). DexCom, on the other hand, asserts that the

hypothetical date for negotiations is November 3, 2020, the date the first of the patents-

in-suit issued. (D.I. 388 at 67.) Since it is presumed during a hypothetical negotiation

that the patent in question is valid and would be infringed if there were no license, *Lucent*

*Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009), DexCom states that,

although its proposed date was during the covenant not to sue, "a rational economic actor

facing certain infringement wouldn't wait idly for the [covenant not to sue] to expire ….

It would instead seek to negotiate a royalty[.]" (D.I. 388 at 67-68.)

DexCom's proposed date may, through the lens of hindsight, capture a behavioral

reality, but a hypothetical negotiation is just that: hypothetical. *Vectura*, 2019 WL

1352767, at *3 ("While real world circumstances may be considered, they may not

replace the hypothetical negotiation or impact the willingness of either the licensee or

58

licensor."). The issue date of the first of the patents-in-suit cannot be the hypothetical negotiation date under Federal Circuit precedent because no infringement occurred until the covenant not to sue expired.[31] Abbott's proposed hypothetical negotiation date of March 31, 2021, is correct as a matter of law.

Ms. Stamm's reasonable royalty analysis is based on a hypothetical negotiation date of November 3, 2020, which she uses to conclude that DexCom would have had five months to design the G6 CGMs around the patents-in-suit and offshore its manufacturing and to modify the design and manufacture of the G5 CGMs. (D.I. 340 at 89.) Because she uses the incorrect hypothetical negotiation date, her opinions must be excluded to the extent they rely on the November 3, 2020, date. DexCom requests leave to supplement her report explaining "the non-impact of a changed negotiation date," which I will grant. *See Fairchild Semiconductor Corp. v. Power Integrations, Inc.*, No. 12-540-LPS, 2015 WL 1303643, at *2 (D. Del. Mar. 20, 2015) (granting both sides experts' an opportunity to serve supplemental expert reports limited to correcting the hypothetical negotiation date). Abbott is directed to submit a proposed order with deadlines for any additional discovery it requests related to the corrected hypothetical negotiation date.[32]

---

[31] DexCom cites to a case from the Northern District of California, *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. C 03-1431 SBA, 2006 WL 1390416 (N.D. Cal. May 18, 2006), as authority that supports its proposed hypothetical negotiation date. It is difficult to reconcile *Fresenius* with controlling Federal Circuit precedent stating that the proper date is immediately before the earliest incident of infringement.

[32] Abbott contests Ms. Stamm supplementing her report primarily for two reasons. (D.I. 414 at 44-45.) It argues that Ms. Stamm has not previously indicated that her

59

III.    *Daubert* Challenges[33]

    A.    **DexCom's Motion to Exclude Under *Daubert* Ms. Lawton's Opinions on a Reasonably Royalty, Lost Profits, and Alleged Copying**

Ms. Catherine Lawton, Abbott's damages expert, opines on Abbott's allegedly lost profits on sales of its CGMs had DexCom's G6 not been on the market. She also calculated a reasonably royalty for DexCom's allegedly infringing G6 sales. (D.I. 338 at 8-10.) DexCom seeks to exclude her lost profits analysis for failing to show causation, and it seeks to exclude her royalty analysis for failing to apportion the incremental value of the G6's features accused of infringing the patents-in-suit.[34] (D.I. 337 at 6-24.)

---

royalty opinions would not change under a March 31, 2022, hypothetical negotiation date, and that the substance of her opinion will drastically change. (D.I. 414 at 44-45.) Despite Abbott's protests, I will grant DexCom the leave it requests because DexCom has represented that Ms. Stamm's analysis will not change. Abbott's concerns are better left for cross examination, and I will give it the opportunity to depose Ms. Stamm on those issues, at DexCom's expense.

[33] Expert testimony is admissible if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue[,]" "the testimony is based on sufficient facts or data[,]" "the testimony is the product of reliable principles and methods[,]" and "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid 702.

[34] DexCom also seeks to exclude Lawton's opinion to the extent that she allegedly asserts that DexCom copied Abbott's patents. (D.I. 337 at 24.) Lawton does not make such a claim; rather, she recites Abbott's allegations, as taken from its complaint against DexCom, as part of a factual narrative. (*See* D.I. 338 at 11-13, 15-16.) In any event, Abbott has represented that "Lawton has not opined on DexCom's copying and does not intend to do so at trial." (D.I. 381 at 1.) I therefore deny that portion of DexCom's motion as moot.

60

    *1.*  *Lawton's Lost Profits Opinions*

   In her lost profits analysis, Lawton characterizes the CGMs market as a two-supplier market between DexCom and Abbott. (D.I. 338 at 90.) In support of that theory, Lawton explains that a CGM can be "integrated" or "standalone." (D.I. 338 at 90.) In an integrated CGM, the CGM always operates with an insulin pump, which delivers insulin to manage a patient's diabetes, and the CGM interacts via software directly with the insulin pump to deliver insulin. (D.I. 381 at 2.) A standalone CGM, however, can be used without an insulin pump; when the system operates with a pump, the CGM does not directly interact with the pump. (D.I. 338 at 20-21; D.I. 381 at 2.) As an integrated and standalone CGM requires different regulatory approvals, Lawton separated the CGM market between the two. (*See* D.I. 337 at 3; D.I. 381 at 2-3.) She further opined that Abbott only sold standalone CGMs until its device received regulatory approval to be sold as an integrated CGM on March 6, 2023, whereas DexCom's G6 can be sold as either an integrated or standalone CGM. (D.I. 338 at 79; D.I. 337 at 3.)

   Lawton only seeks lost profits from sales of DexCom's standalone G6 CGMs – excluding sales of integrated G6 CGMs – because, during the damages period calculation, Abbott's CGM was not approved as an integrated CGM.[35] (D.I. 381 at 3.)

---

[35] Conversely, Lawton's reasonably royalty analysis includes sales of integrated G6 CGMs.

For that reason, she excludes Medtronic, Inc. ("Medtronic") from the market, asserting that Medtronic only sells integrated CGMs.[36] (D.I. 337 at 3.)

DexCom seeks to exclude Lawton's lost profits opinions because "ample evidence contradicts" her assumption that Medtronic's CGMs are not an acceptable non-infringing substitute, "rendering [her] entire lost profits opinion unreliable." (D.I. 410 at 7.)  As I stated earlier, however, a factual dispute exists regarding whether Medtronic's CGMs are a non-infringing substitute to DexCom's G6.  *See supra* Section II.C.2.  I will therefore deny DexCom's motion to exclude.[37]

_____

[36] DexCom moves to strike Abbott's third supplemental response to Interrogatory No. 8 and portions of Lawton's opinions "premised on fracturing the CGM market into separate 'Standalone CGM' and 'Integrated CGM' markets, and defining the former as a two-supplier market by excluding major CGM manufacturer Medtronic." (D.I. 335 at 1.) It states that Abbott did not disclose that damages theory until Lawton submitted her expert report, which occurred on March 16, 2023, almost two months after the close of fact discovery.  By way of prejudice, DexCom claims it would have pursued additional discovery related to Medtronic's role in the CGM market.  (D.I. 335 at 1.)
I am unpersuaded by DexCom's pleas.  DexCom was aware during the fact discovery period that Abbott seeks lost profits damages, as well as Abbott's position that Medtronic's CGMs are not an acceptable noninfringing substitute, indicating that it would be excluded from Abbott's lost profits analysis.  (D.I. 371 at 1, 3.)  Additionally, I am unpersuaded by DexCom's protestations of prejudice because it did not file its motion to strike for over two months after Lawton submitted her report.  I will therefore deny its motion.

[37] DexCom also contends that Lawton's lost profits opinions should be excluded because she failed to apportion the incremental value of the G6's features accused of infringing the patents-in-suit.  That argument is legally incorrect.  "[W]hen the *Panduit* factors are met," as is required for a showing of lost profits damages, "they incorporate into their very analysis the value properly attributed to the patented feature."  *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1290 (Fed. Cir. 2017).

62

### 2.   Lawton's Royalty Opinions

Lawton calculated royalties based on a hypothetical negotiation, resulting in separate royalty rates for standalone G6 and integrated G6 CGMs.  (D.I. 337 at 3–4.)  She concluded that the main differences between DexCom's G5 and G6 CGMs were Abbott's patented features.  (D.I. 381 at 4.)  As Lawton asserts that DexCom's G5 was not a highly successful product, she concludes that Abbott's patented features were responsible for the G6's sales.  (D.I. 381 at 3-4.)  She analyzed the differences between the G5 and G6 CGMs not related to the patents-in-suit and opines that those features did not increase the profitability of the G6 CGMs when compared to the G5 CGMs.  (D.I. 381 at 4.)  Lawton also employed an analytical method to calculate a reasonable royalty based on projected profit differences between DexCom's G5 and G6 CGMs.  (D.I. 337 at 4.)  She explained that such a comparison "is compelling evidence that the infringer would have been willing to pay an amount up to that ***incremental benefit*** for rights to the technology." (D.I. 381 at 13.)

DexCom seeks to exclude both Lawton's hypothetical negotiation and analytical analysis as unreliable primarily "for failing to apportion out the incremental value of any of the [twelve] asserted patents."  (D.I. 337 at 10); (D.I. 337 at 7 (criticizing Lawton's hypothetical negotiation analysis for "fail[ing] to link" the G5 and G6 profit differential "to the specific accused G6 features")); (D.I. 337 at 8 (arguing that Lawton's analytical method for calculating a reasonably royalty is unreliable because the "analysis improperly depends on a profit differential for the entire G6 system with no logical

63

connection to the value of the specific accused features").)  Lawton, however, has made a

credible pass at isolating the value of the patented features because it is her contention

that the entire increase in demand between the G5 and G6 is due to the inventions

claimed by the patents-in-suit.  Furthermore, she analyzed technical differences between

the two CGMs unrelated to the patents-in-suit and concluded that those differences did

not contribute to the profit differential between the two CGMs.  Although Lawton did not

apportion incremental value to each of the twelve asserted patents, such apportionment is

not required.  *See Bio-Rad Lab'ys, Inc. v. 10X Genomics, Inc.*, 967 F.3d 1353, 1372 (Fed.

Cir. 2020) (affirming a damages award despite vacating a judgment of infringement of

two of the three asserted patents).  For those reasons, DexCom's motion to exclude

Lawton's opinions will be denied.

### B.     DexCom's Motion to Exclude Under *Daubert* Mr. Leinsing and Dr. Smith's Testimony Consisting of Factual Narratives and Opinions Regarding State of Mind

John Smith and Karl Leinsing are two of Abbott's technical experts that opine on

infringement and validity of some of the patents-in-suit.  (D.I. 381 at 24.)  In their

opening and rebuttal reports, both experts discuss the development of the G6, as well as

the prosecution history of the patents.  (D.I. 337 at 25.)  DexCom protests that testimony

and seeks to exclude their factual narratives about DexCom's product development

because "[a]n expert cannot simply narrate internal documents and form a conclusion

evident to a lay person from their face."  (D.I. 337 at 25 (quoting *Allscripts Healthcare,*

*LLC v. Andor Health, LLC*, No. cv 21-704-MAK, 2022 WL 3021560, at *42 (D. Del. July 29, 2022)).)

An expert witness must provide a written report containing, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them … [and] the facts or data considered by the witness in forming them[.]" Fed. R. Civ. P. 26(a)(2)(B). Part of Smith's and Leinsing's validity opinions relate to secondary considerations of nonobviousness. (D.I. 381 at 24.) In forming those opinions, they detail the factual evidence they relied on, recounting a narrative about problems DexCom's pre-G6 CGMs faced, before concluding that "after studying Abbott's technology as disclosed in Abbott's products and publications, DexCom changed the G6 designs by incorporating Abbott's patented technology." (D.I. 381 at 24.); *see Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1137 (Fed. Cir. 2019) ("It is well established that copying by a competitor is a relevant consideration in the objective indicia analysis [of obviousness]."). Smith's and Leinsing's technical and scientific knowledge certainly help the jury understand the recited evidence, which is technical in nature. Despite what DexCom suggests, Smith and Leinsing are not "form[ing] a conclusion evident to a lay person from the[] face" of the recited evidence; rather, they are providing a technical opinion on the validity of the patents. I therefore decline to exclude their recounting of the evidence.

DexCom also seeks to exclude portions of Smith's and Leinsing's opinions as it relates to DexCom's state of mind. For instance, in Leinsing's opening report, there are

65

several instances which could be interpreted as referring to DexCom's state of mind, including: that "DexCom had originally hoped to release a new inserter design by at least as early as 2012-13[,]" that "DexCom wanted its next product to have" a simplied sensor insertion design, and that DexCom "envisioned" a disposable applicator with a preloaded sensor assembly and adhesive patch, (D.I. 338 at 323, 332-33.)

Abbott recognizes that experts "generally cannot testify about another's mental state" but maintains that the disputed testimony is appropriate because "[t]hey cite direct evidence of DexCom's mental state and testify about technical evidence from which a jury could infer DexCom's state of mind[.]"  (D.I. 381 at 26-27.); *see First Quality Tissue, LLC v. Irving Consumer Prods. Ltd.*, No. 19-428-RGA, 2022 WL 958089, at *10 (D. Del. Mar. 30, 2022) (noting a difference between opinions on intent, motive, and state of mind and "simply repetitions" of one's own stated intent from internal documents).  I agree with DexCom that at least some of the excerpts it identifies contain improper opinions on intent, motive, or state of mind, but I nevertheless decline to undertake surgery on Smith's and Leinsing's reports.  Experts will not be permitted to testify about the state of mind of the opposing party or its agents, and the parties are directed to instruct their experts on this.  But, because DexCom's protests are best resolved through contemporaneous objections during trial, I will not now comb through Smith's and Leinsing's reports and determine if each individual statement refers to the expert's inference of DexCom's mental state or if the expert is simply repeating DexCom's own stated intent.

C.      **Abbott's Motion to Exclude under *Daubert* Ms. Stamm's Opinions on Non-Infringing Substitutes**

As discussed above, three of DexCom's five categories of non-infringing substitutes are a redesigned G6 CGM that does not infringe any of the twelve patents-in-suit, a redesigned G5 CGM with modifications to its transmitter and automated manufacture, and manufacturing the G6 products sold outside of the United States in Mexico. (D.I. 340 at 77.) Abbott characterizes those as hypothetical non-infringing substitutes "that allegedly could have been, but were never actually, pursued by DexCom[.]" (D.I. 340 at 77.) It seeks to exclude under *Daubert* Ms. Stamm's opinions on those substitutes, as it contends her opinions are unsupported and unreliable.[38]

---

[38] Abbott also protests Ms. Stamm's opinions on the grounds that DexCom did not identify those non-infringing substitutes in response to an interrogatory. (*See* D.I. 345 Exhibit 71 at 5, 16-33.) Abbott says that, after the close of fact discovery, Ms. Stamm described several new categories of substitutes and provided additional details on how, when, and where DexCom could design the G6 around the patents-in-suit. (D.I. 340 at 79.) Assuming Abbott's characterizations are correct, which DexCom vigorously disputes, (*see* D.I. 388 at 48-56), its protests should have been raised in a motion to strike rather than in a *Daubert* motion. Even viewed as a motion to strike, however, Abbott's argument fails because it has not detailed any prejudice or bad faith stemming from Ms. Stamm's allegedly late disclosures, as is typically seen in a motion to strike. *See Meyers v. Pennypack Woods Home Ownership Assn.*, 559 F.2d 894, 904-05 (3d Cir. 1977). In its reply brief, Abbott alleges that "DexCom's belated disclosure prejudiced Abbott by preventing discovery on Stamm's hypothetical [non-infringing substitutes]." (D.I. 414 at 39.) But besides that general statement, Abbott makes no specific allegations of prejudice concerning what additional discovery, if any, it would have sought. Abbott had numerous opportunities to depose DexCom's witnesses related to non-infringing substitutes, and its own damages expert engaged with Ms. Stamm's opinions regarding potential G6 modifications in a lengthy analysis. (*See* D.I. 389 at 792-830.) I therefore decline to strike Ms. Stamm's opinion relating to non-infringing substitutes.

Abbott's criticisms of Ms. Stamm's opinions go to the weight rather than admissibility of the evidence. Abbott argues primarily that she relied on self-serving, biased testimony to arrive at implausible substitutes. Ms. Stamm relied primarily on witness interviews with DexCom employees, which have been disclosed. (D.I. 388 at 57.) She then explained in a detailed report why she relied on those technical facts. Additionally, Abbott had the chance to depose those witnesses on damages topics. (D.I. 388 at 57.) An expert relying on witness interviews is entirely permissible. *See ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012) (noting that a damages expert can rely on the estimates of others if they explain why they relied on such estimates and why those estimates are reliable).

Abbott also makes several arguments for why Ms. Stamm's opinions are implausible. For instance, Abbott states that DexCom spent ███████████████ ███████████████████████████ yet Ms. Stamm states that DexCom could have moved G6 manufacturing to Mexico ██████████████████████ (D.I. 340 at 85.) As another example, DexCom has sold over $4 billion of G6 products in under a two-year period, yet Ms. Stamm opines that DexCom could have designed around all twelve patents-in-suit in less than three months, costing only ███████████ (D.I. 340 at 85.) It posits that, if the G6 was so valuable and DexCom could have designed around the patents-in-suit at a low-cost relative to the G6's value and in such a short timeframe, "it defies logic as to why it did not do so and has not done so." (D.I.

340 at 85.)  Those criticisms, however, are best reserved for cross-examination and do not warrant the exclusion of expert testimony.  I will therefore deny Abbott's motion.

## IV.    CONCLUSION

For the reasons stated herein, I will rule on the pending motions as described above and in the accompanying order.