IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - -

ABBOTT DIABETES CARE, INC. and: CA No. 21-977 KAJ
ABBOTT DIABETES CARE LIMITED  :
                              :
        vs.                   :
                              :
DEXCOM, INC.                  :

-----

BEFORE THE HONORABLE KENT A. JORDAN

-----

J. CALEB BOGGS FEDERAL BUILDING
844 NORTH KING STREET
WILMINGTON, DELAWARE 19801

COURTROOM 6C

MONDAY, FEBRUARY 5, 2024
10:00 A.M

PRETRIAL CONFERENCE

KIMBERLY A. BURSNER, RPR

```
 1     COUNSEL APPEARED AS FOLLOWS

 2                        Morris, Nichols, Arscht &
                          Tunnell, LLP
 3                        BY: JACK B. BLUMENFELD, ESQUIRE
                              RODGER DALLERY SMITH, ESQUIRE
 4                                for the Plaintiffs

 5                        McAndrews, Held & Malloy
                          BY:  LELAND HANSEN, ESQUIRE
 6                             PAUL McANDREWS, ESQUIRE
                                  for Plaintiffs
 7
                          Latham & Watkins
 8                        BY:  MICHAEL MORIN, ESQUIRE
                               RACHEL BLITZER, ESQUIRE
 9                                 for Plaintiffs

10                        Shaw Keller, LLP
                          BY:  JOHN W. SHAW, ESQUIRE
11                             NATHAN HOESCHEN, ESQUIRE
                                   for Defendants
12
                          Keker, VanNest & Peters
13                        BY:  ROBERT VAN NEST, ESQUIRE
                               MATTHEW M. WERDEGAR, ESQUIRE
14                             ADAM LAURIDSEN, ESQUIRE
                               PUJA V. PARIKH, ESQUIRE
15                             SOPHIE HOOD, ESQUIRE
                                   for Defendants
16

17

18

19

20

21

22

23

24

25
```

```
 1                    THE COURT:  Good morning, counsel.
 2          I received your many gifts.  This box is just
 3          a small sample.
 4                    Let's go ahead and get our
 5          appearances on the record.
 6                    Before we do that, is there a sheet
 7          where it's written down?
 8                    MR. BLUMENFELD:  Good morning, Your
 9          Honor.  Jack Blumenfeld from Morris Nichols on
10          behalf of plaintiffs.
11                    With me are Leland Hansen and Mike
12          Morin, who you met before.  Behind them, Paul
13          McAndrews from the McAndrews firm.  Rachel
14          Blitzer from Latham.  Rodger Smith, my
15          partner.
16                    Behind them and well involved from
17          McAndrews, Rachel Boch, who is in-house at
18          Abbott, and behind them Tony Sammi who is at
19          Lathem and Watkins.
20                    THE COURT:  Okay.  Thank you, Mr.
21          Blumenfeld.
22                    MR. SHAW:  Good morning, Your Honor.
23          John Shaw for Dexcom.  Joining me is Bob
24          VanNest, Adam Lauridsen, Sophie Hood, Puja
25          Parikh and Matt Werdegar.
```

1            In the gallery is Kellin Chatfield

2     Nicoletti and my partner Nathan Hoeschen.

3            THE COURT:  Okay.  Thank you, Mr.

4     Shaw.  Welcome, counsel.  Let's go ahead and

5     get started.

6            I have -- I've got your submissions

7     on the 2nd.  And let me tell you how I think

8     we will proceed.

9            By the way, the letter from Mr. Smith

10    on behalf of both parties on the 2nd was

11    helpful.  We will go ahead and proceed with

12    the motion in limine in the order in which you

13    have agreed would be most comfortable to you.

14           I appreciate counsel discussing that

15    and providing that suggestion.  And I actually

16    was happy to get a red line of the pretrial

17    order, but I don't know whether that's here or

18    there at this point.

19           We are going to work through what we

20    can work through today.

21           In addition to handling the motions

22    in limine, there is multiple witness

23    objections, demonstrative or cross-examination

24    issues, counter designations.  We'll get to

25    those things to the extent we can.  We will do

```
 1          the preliminary jury instructions and voir

 2          dire as well.

 3                    But I think the most useful thing

 4          would be to start with the motions in limine

 5          and we will go ahead and do that.  We will

 6          begin with Abbott's motion in limine number

 7          one.

 8                    So is this yours, Mr. --

 9                    MR. HANSEN:  Hansen, Your Honor.

10          Yes.  Thank you, Your Honor.

11                    So you made mention that we seem to

12          bury you in many gifts.  I do have a few

13          slides, if I could approach.  I also have

14          transcripts from two depositions last week

15          that I would like to hand up that I will be

16          referring to, if that's okay.

17                    THE COURT:  Okay.  Is this something

18          you put the other side on notice of,

19          Mr. Hansen?

20                    MR. HANSEN:  Yes, it is.  We've

21          spoken about, corresponded about it and we

22          have spoken about it, yes.

23                    THE COURT:  Please proceed.

24                    MR. HANSEN:  Thank you, Your Honor.

25                    So the issue here are Dexcom's
```

1    patents that they contend cover their G6

2    product.

3              We believe that these patents are not

4    relevant and that even if there is some

5    marginal relevance, that the danger of

6    prejudices outweighs any such marginal

7    relevance.  And this is limited or directed to

8    the specific patents that have now been

9    identified.

10              All three of the patents that they

11    have now identified relate to software.  One

12    relates to calibration software.  Another to

13    data processing software.  Another one relates

14    to alert.  None of them relate to any of the

15    mechanical aspects of the device that are now

16    at issue in the case.

17              THE COURT:  I'm going to have some

18    questions for our friends over at the Dexcom

19    side about this.  But let me ask you this in

20    the first instance.

21              You say they don't have anything to

22    do with what is at issue -- the alert issue;

23    right?

24              MR. HANSEN:  Not in this case, no.

25              THE COURT:  So none of the patents

1          that you are seeking any damages on in this
2          case deal with alerts at all?
3                    MR. HANSEN:  They do not, Your
4          Honor.  There are other patents in one of
5          your --
6                    THE COURT:  How about the device
7          itself?  Is -- because I understand the
8          argument generally being about what's driving
9          demand here.
10                   So there is a lot going on in this
11         case and I may have not gotten it straight,
12         but I thought one of the things that was still
13         going on was alerts.  Correct me.  Sounds like
14         I'm wrong.
15                   MR. HANSEN:  Well, so let me try to
16         be clear.  None of our patents in this case,
17         the ones that we're asserting in this case
18         relate to alerts.
19                   So I don't think you can say I didn't
20         willfully infringe this mechanical insertive
21         patent because I got a patent on an alert.
22         There are two.
23                   THE COURT:  That may be willfulness.
24         And I'm not talking about willfulness right
25         now.  I just mentioned demand drivers because

```
1          they made arguments about damages; right?
2                    MR. HANSEN:  Yes.
3                    THE COURT:  So speak to that.
4                    MR. HANSEN:  So I would make two
5          important points.  The first important point
6          is that they can argue about demand drivers
7          without having to point to a patent.  The
8          patent -- the fact that they have a patent on
9          it has little relevance, if any, to whether
10         it's a demand driver.  They can talk all they
11         want about what the demand driver is.  They
12         don't need to say that it's covered by a
13         patent.
14                   THE COURT:  Why can't they -- you
15         know, they'll speak to this themselves.
16                   MR. HANSEN:  Okay.
17                   THE COURT:  Maybe I shouldn't say
18         what their argument is because maybe I don't
19         understand it, but I thought the argument was
20         somehow along these lines:  We've got
21         patented technology.  They don't have
22         advantage of and it has to do with alerts.
23         That drives the demand.  Why can't they --
24                   MR. HANSEN:  They do make that
25         argument.
```

1          THE COURT:  And why isn't that

2     relevant to the issue of damages?  I mean, I

3     don't want to do -- we're not getting in to

4     mini trials on alerts and things like that.

5     We're just -- we're not going to do that.

6     Period.

7          But why isn't it relevant for the

8     jury to know from an expert's perspective that

9     they claim a right, have a right assuming it's

10    valid, that in their position drives the

11    demand rather than your patent?  What is wrong

12    with the jury accepting that?  Why is that

13    either irrelevant or unfairly prejudicial to

14    your position?

15         MR. HANSEN:  If you look at the

16    cases, including the cases that they have

17    cited in their briefs, you will see that

18    other courts have found that on this point

19    the issue -- the potential prejudice

20    outweighs any marginal relevance and the

21    reason is --

22         THE COURT:  I saw you cited that.

23    Yeah.  Good.  You are getting to it.  Thanks.

24    The reason is.  I'm not interested in there

25    are cases because there are cases on both

1          sides.

2                    Explain your reasoning.

3                    MR. HANSEN:  So the reason is -- and

4          I'm going to get to this in a minute, but

5          last week when I deposed their inventors on

6          these patents, which you ordered, the

7          inventors told me that the low soon alert

8          does not drives sales.  That it's not very

9          important.  And that's one of the reasons

10         that we've handed you this deposition

11         testimony so that you can see what their

12         examiners said about the low what they call

13         the low -- urgent low soon alert.  The urgent

14         low soon alert.  That's the feature that they

15         say drives sales for G6.

16                   THE COURT:  Assuming that the

17         inventors knowingly know about what demand

18         drivers are, which they may disagree with on

19         the other side, why is that not something for

20         your cross-examination instead of keeping it

21         out?

22                   MR. HANSEN:  Because it -- because

23         there is substantial potential prejudice

24         associated with them telling the jury that

25         they have patents on whatever.

1            THE COURT:  Why?  What -- what is

2      the prejudice?

3            MR. HANSEN:  Because jurors are

4      often confused and jurors often believe

5      despite instructions -- and many courts have

6      found this -- that if I have got a patent, it

7      gives me the right to do something.  A patent

8      doesn't give you the right to do anything.  A

9      patent gives you the right to stop other

10     people from doing something, but it doesn't

11     give you the affirmative right to do

12     anything.

13           But that point is almost -- you know,

14     I've observed many mock jurors deliberate and

15     they are almost uniformly confused and they

16     almost always believe that if a party has a

17     patent that covers their product, that that's

18     permission from the patent office to sell

19     their product, even though it might infringe

20     some other party's patent.  That's not the

21     law, but that's what jurors often believe.

22           And leaving the patents out of it,

23     leaving the Dexcom patents out of it, doesn't

24     prevent them from arguing that the low -- I'm

25     trying to get it right -- that the urgent low

```
1         soon alert drives sales.  They can argue that
2         if they want to.  But they don't need to say
3         we have a patent to cover it.
4                  Why is the fact that they have a
5         patent to cover it relevant to whether or not
6         it's a sales driver?  Whether you have a
7         patent on it doesn't mean that it's a sales
8         driver or not a sales driver.  The fact that
9         you have a patent that covers it, is really
10        irrelevant to whether it's a sale driver.
11        There is other factors.
12                  And I would point out that yes.
13        Mr. Simpson and Mr. Kamath are the inventors
14        of these patents.  Mr. Kamath is an inventor
15        on all three.  Mr. Simpson is an inventor on
16        one of them.
17                  But in Mr. Kamath's position within
18        Dexcom, he oversees the group whose
19        responsibility it is to study user needs and
20        how to meet user needs.  There is no one --
21                  THE COURT:  What do you think -- let
22        me ask this:  You've been soaking in this,
23        Mr. Hansen.
24                  What do you think they plan to say
25        about it?  What do you think they plan to say
```

1          about it?  What do you think they want to say

2          in front of the jury?  What do they want these

3          people to say?

4                   MR. HANSEN:  Well, it's a little

5          hard for me to answer that question.  I

6          think -- but I --

7                   THE COURT:  You are asking me to

8          answer the question and you are asking me to

9          keep everything off about the patent.  I

10         would like you to be a little more specific.

11         What do you think they are going to say

12         that's going to be problematic?

13                  MR. HANSEN:  I think what they're

14         going to say is along the lines of I think

15         what you said which is that people buy G6 not

16         because it has this nice new inserter, not

17         because it no longer uses a harpoon inserter,

18         but they buy G6 because it has an urgent low

19         soon alert and, by the way, we have a patent

20         on that urge low soon alert.

21                  Now, why the last part of that is

22         relevant, I would contend that it's not.  Let

23         them say that the fact that they have an

24         urgent low soon alert drives sales, we will

25         rebut them with the testimony of their own

1    witnesses, including Mr. Kamath, but we can

2    deal with that, but then having them say that

3    that is what drives sales and, by the way, we

4    have a patent on it, that's the problem.

5              THE COURT:  Okay.  Now, they have

6    gotten -- paragraph 111 in their expert's

7    report says, I understand Dexcom's G6

8    practices many of Dexcom's own patent

9    inventions.  These include patents relating

10   to the important demand drivers, unrelated to

11   the patents-in-suit, such as realtime data,

12   AID integration, and predictive alerts.

13             We have been talking about predictive

14   alerts.  Right.  And I think I understand

15   that.

16             Tell me what the realtime data and

17   the AID integration issues are?  Why those are

18   trouble?

19             MR. HANSEN:  So AID integration, I

20   may not get the acronym right.  But AID is a

21   situation where you have your pump

22   coordinating with an insulin delivery device,

23   so that the pump -- I'm sorry -- so that the

24   sensor.  I misspoke.  You have your CGM

25   product that is measuring the blood glucose

1          lever in the user.  Some users may need

2          insulin.  They can look at the data from the

3          CGM and they can decide on their own to

4          administer insulin or they may have a pump

5          that supplies insulin and if your -- if

6          approved by the FDA, some CGM systems can

7          tell the pump when and how much insulin to

8          deliver.

9                    So they're integrated.  And they

10         intend to argue that that integration is a

11         sales driver, but none of their patents relate

12         to that.

13                   So there is no possible relevance to

14         that sales driver for those three patents.

15         It's completely unrelated and, by the way,

16         Mr. Kamath and Mr. Simpson also testify that

17         that is actually not a sales driver or a

18         demand driver, whatever we want to call it.

19                   I'm sorry.  There was a third one

20         that you mentioned?

21                   THE COURT:  Realtime data.

22                   MR. HANSEN:  So I'm not a hundred

23         percent sure what they mean by realtime data,

24         except that CGM products generally provide

25         what's known as realtime data.

1          So, if you compared a CGM to what's

2     called the finger stick method, a traditional

3     way of measuring your blood glucose.  You

4     prick your finger.  You put a sample of blood

5     on a test strip.  You put the test strip in a

6     meter.  The meter tells you, here is your

7     current blood glucose level.  Okay.

8          The CGM device is providing a

9     continuous, continuous glucose monitor, set of

10    realtime data, actual data that's current in

11    time.  It's not retrospective data.  There

12    have been some CGM products where it would

13    measure your blood glucose, but it didn't give

14    you a value until you later went in to your

15    doctor's office and things like that.

16         So, again, none of the patents that

17    they have relate to that.  None of the three

18    patents that they're asserting have any

19    relation to that whatsoever.

20         There is -- there's an additional

21    important reason why our motion should be

22    granted.  And it's addressed on the next

23    slides.

24         You will recall I think this is the

25    second time we've had a pretrial conference.

1           At the first pretrial conference, you granted

2      this motion.  And then you decided to continue

3      the case to continue the trial date.

4                 And after you decided to continue the

5      trial date you said, all right, Dexcom.  I'm

6      going to give you one last chance.  Make your

7      inventors available for deposition.  Why did

8      you say that?  And this is important.

9                 During discovery we served a 30B6

10     notice for testimony on this topic.  Dexcom

11     flat refused to provide any testimony on this

12     topic on the grounds that it was for expert

13     discovery, not fact discovery.  And they never

14     disclosed any expert opinions on this topic

15     whatsoever.

16                THE COURT:  Wait.  Hold on.  On this

17     topic.  Which topic are you -- like be

18     specific on, quote, this topic.  Because I

19     just read you from your expert report where

20     they talk about demand drivers.  So when you

21     say "this topic," you mean what exactly?

22                MR. HANSEN:  The patents that cover

23     G6, the topic was any patents that cover the

24     accused products and the person at Dexcom

25     most knowledgeable about the subject matter

1        of this topic.  That was our 30B6 document.

2        The patents that cover.

3                They said, we are not going to give

4        you a 30B6 witness on this because this is for

5        expert discovery, not fact discovery.

6                Then at the first pretrial conference

7        they flip flopped.  And they said, well, we

8        are going to actually put this on through our

9        inventors.  They never mentioned this before

10       the first pretrial conference.  We are not

11       going to do it through experts.  We are going

12       to put it through the inventors.

13               You told them -- well, after you

14       continued it you said, make those inventors

15       available for deposition.  And because this

16       was a 30B6 topic and because they had

17       identified these inventors as the people that

18       they were going to put this on through, we

19       felt that we were entitled to witnesses who

20       had been prepared like a 30B6 witness had been

21       prepared.  That's not what we got.

22               I deposed Mr. Simpson last week.  He

23       testified that before his deposition he

24       glanced at his patent and specifically he

25       glanced at the figure on the cover page and

1      claimed one of the patent.  That was it.  When

2      I asked him about the interrogatory response

3      that they had on this, they objected in a sort

4      of privilege and would not let him answer any

5      questions as to whether he was involved in

6      preparing that interrogatory response or

7      whether he even had any knowledge of it.

8           And when I ask him is it your

9      testimony that this patent, the 461 patent

10     covers the product, he says, I cannot confirm.

11     He couldn't answer my question.  He said he

12     could only do it with speculating.

13          Next, I deposed Mr. Kamath.  He's an

14     inventor on three patents.  He said he hadn't

15     reviewed them at all.  He hadn't even glanced

16     at them.  And he couldn't remember the last

17     time he had seen them.

18          Again, when I asked him about the

19     interrogatory response, they objected.  They

20     wouldn't let him say whether he had knowledge

21     of it, whether he contributed to it in any

22     way.

23          And then when I ask him, does the G6,

24     in fact, cover or do these patents cover the

25     G6, he said, I'm not equipped to answer from a

```
 1          legal perspective and then he proceeded to
 2          give a sort of haphazard answer tantamount to
 3          the prior interrogatory response which at the
 4          last pretrial conference Your Honor described
 5          as inadequate and lame because it didn't
 6          systemically address all the claim elements.
 7          It just arbitrarily picked a claim element
 8          here or there.  That's all these inventors
 9          were prepared to do.
10               THE COURT:  Okay.
11               MR. HANSEN:  They don't have a
12          witness that they can -- they were obligated.
13          You ordered them to make these witnesses
14          available because they said this is how we're
15          putting this on at trial.  They should have
16          prepared these witnesses like 30B6 deponents.
17          They didn't.
18               THE COURT:  I got you.  I got you.
19          Who is speaking from the other side?
20               MR. VAN NEST:  Mr. Lauridsen will,
21          Your Honor.
22               THE COURT:  Mr. Lauridsen?
23               MR. LAURIDSEN:  Adam Lauridsen for
24          Dexcom.
25               If I can approach, I have a few
```

1    slides for you.  Thank you.

2              Good morning, Your Honor.  This

3    motion in limine, there's two important things

4    I want to point out and then I am going to

5    dive directly in to your question of relevance

6    because I think that's the core of it.

7              Briefly this was already decided at

8    the last pretrial conference.

9              THE COURT:  Yeah.  That's what they

10   said.  They said it was decided against you

11   so, you know, go ahead.  Tell me why you are

12   right and they're wrong.

13             MR. LAURIDSEN:  All right.  Let's go

14   look at first page of the slides that I

15   handed you.  That's your order.

16             Your order says that the relevance

17   has been established as to willfulness and as

18   to key demand drivers for the product.  So

19   there's a willfulness angle.  There's a

20   damages angle.

21             THE COURT:  All right.  What's the

22   willfulness angle because now I'm questioning

23   myself if I actually said that?  How is it

24   relevant to willfulness that you may have

25   some patents?

```
 1              MR. LAURIDSEN:  There is ample
 2      authority for the point that when they stand
 3      up as they plan to do and say that Dexcom is
 4      not an innovator and Dexcom needed to copy
 5      Abbott's technology to compete and,
 6      therefore, that's evidence that they are
 7      willful infringers, that Dexcom has the
 8      ability to put in evidence to rebut that and
 9      they are highly prejudiced if they can't
10      rebut that with their own culture of
11      innovation.
12              THE COURT:  So you are allowed to
13      say what?  Hey, we have patents, too, or you
14      are allowed to say we have these three
15      patents?
16              MR. LAURIDSEN:  The cases say that
17      you are allowed to demonstrate both.
18              THE COURT:  Why don't you just speak
19      directly to Mr. Hansen's position which is
20      you can -- you can argue because, you know,
21      candidly, you have no traction on this
22      unwillingness thing.  You lost on that.  So
23      talk about damages.
24              MR. LAURIDSEN:  Damages.  Let's use
25      the example that you brought up.  The urgent
```

```
 1          low soon alert.  Here is the specific
 2          relevance of the patents for urgent low soon
 3          alert.
 4                    There is a question in this case as
 5          Your Honor knows about what drives demand for
 6          these products.  And if the G6 wasn't on the
 7          market with the applicator that it currently
 8          has, would customers still buy the G6?  That's
 9          the demand point.
10                    THE COURT:  Right.  And their
11          argument, we heard it and read it is, well,
12          you can say that without saying "and we have
13          got patents."  To say "and we got a patent on
14          it" adds nothing to your argument that we
15          have this feature in our device and our
16          non-infringed alternative, and that's what is
17          important.
18                    MR. LAURIDSEN:  Here's what it adds.
19          They don't have an urgent low soon feature
20          because we have a patent on it.
21                    THE COURT:  Well, you can say they
22          don't have a low soon feature -- alert
23          feature and we do.  And that's what drives
24          demand.  You are telling me they're not
25          separate, Mr. Lauridsen.  You can say that
```

1          without saying and we have a patent.

2                    MR. LAURIDSEN:  The significance of

3          it is is that it's a result of our innovation

4          that when we are talking about why customers

5          are buying --

6                    THE COURT:  You can say that -- and

7          you can say that without saying "and we have

8          a patent."

9                    MR. LAURIDSEN:  But as the cases

10         have held, the fact that the government

11         grants a patent on your innovation is

12         relevant information that bolsters the idea

13         that you are the innovator.  That these are

14         true features.  That you are not someone who

15         just needs to copy everything in order to

16         compete.  And it's highly prejudicial for us

17         to have the inability to make that point when

18         they're claiming that we are copying it.

19                    THE COURT:  Your adverbs are not

20         helpful, highly prejudicial.

21                    MR. LAURIDSEN:  Understood, Your

22         Honor.

23                    THE COURT:  Why don't you speak to

24         the argument I've just heard which is, you

25         don't even have a witness.  You don't even

```
 1          have a witness to say that these patents
 2          cover the features.
 3                    MR. LAURIDSEN:  We do have
 4          witnesses, Your Honor.  We put them up for
 5          deposition last week.  We disagree --
 6                    THE COURT:  And I have just seen
 7          them, so --
 8                    MR. LAURIDSEN:  Your Honor, you have
 9          seen --
10                    THE COURT:  -- is he accurate or he
11          inaccurately says, Mr. Kamath said, I can't
12          tell you whether these are --
13                    MR. LAURIDSEN:  He's inaccurate.
14                    THE COURT:  Show me.
15                    MR. LAURIDSEN:  If you want to turn
16          to the presentation that I gave you.
17                    THE COURT:  Yep.
18                    MR. LAURIDSEN:  Well, let's go back
19          to page ten.  Can you explain claim one of
20          the 853 to me in your own words?  He
21          provides, he says, I can.  He provides an
22          explanation.
23                    Does Dexcom G6 practice claim one?
24                    I am not equipped to answer the
25          question with a legal definition.  He's not a
```

 1          lawyer.  That's a fair response.
 2                  My personal understanding -- and then
 3          he provides the explanation that it does
 4          practice claim one.
 5                  Is there any difference between the
 6          way it's done in the G6 and the way it's
 7          described here?
 8                  He answers that based upon his
 9          understanding at a high level.  He's provided
10          explanation.
11                  If you turn to the next page, page
12          11, there is further understanding that he
13          provides based upon how it practices it, the
14          way that he invented this, the way that he
15          incorporated it in to the product.  And if
16          Your Honor recalls when we started this, what
17          you were concerned about is do they have an
18          ability to test our claim that the G6 actually
19          does this.  They absolutely do with this
20          witness.
21                  This witness has explained how his
22          innovation, his invention is now incorporated.
23                  THE COURT:  Now -- well, why don't
24          you talk to me about what AID integration is
25          and what realtime data and why those things

1         are relevant.

2               MR. LAURIDSEN:  Yes.  Let's start

3         with realtime data.  Mr. Hansen gave a

4         characterization of realtime data that I and

5         my client disagree with.

6               As we explained realtime data, it's a

7         unique feature to Dexcom's products and here's

8         the difference.  For Dexcom's products, you

9         can hold a reader or your phone and receive

10        constant updates as to what your glucose level

11        is.

12              For the freestyle Libre two, the

13        freestyle Libre 14 day, you only receive the

14        data when you scan it.  When you hold the

15        reader up next to your arm, wait and have the

16        data transferred.  That is the feature that we

17        are talking about with realtime data.  It's a

18        unique market advantage to the Dexcom products

19        that we innovated.  We were the one's driving

20        with the FDA.  We received the patent on from

21        the government.

22              AID integration.  It's another

23        difference.  It's integration with insulin

24        pumps for even up to the present.  There is a

25        distinction between Dexcom products and Abbott

```
 1        products in that we're able to have your
 2        glucose readers speak directly to your insulin
 3        pump and tell your insulin pump how much
 4        insulin to provide.
 5               Abbott products can't do that.
 6        That's an innovation that we came up with that
 7        we had patented and that is crucial for us to
 8        explain that we're not here just copying
 9        other's technology.
10               THE COURT:  I get it when you say we
11        have got, you know -- even the other side is
12        saying they can talk about that.  They can
13        say we have got that.  They can make their
14        pitch that this is a demand driver.  We just
15        don't want them saying and patent 1,300 bla
16        bla bla to 877 or whatever number patent, we
17        have got a patent on that because that patent
18        does not assume whether it actually covers it
19        or not.  It's a question.  They don't have a
20        witness that can say it covers it.  They have
21        some lay witness that says, I think it covers
22        it.  You block them in discovery on it.
23        Wouldn't let them answer, et cetera, et
24        cetera.
25               So, you know, I'll give you one last
```

```
1              chance to sell me on the idea that's saying,
2              and there is a patent that is important.  It
3              is really something you are legally entitled
4              to.
5                   MR. LAURIDSEN:  The question for
6              damages of whether you have demand drivers --
7              the legal question is tied to whether your
8              patented technology covers drivers and
9              demand.
10                  THE COURT:  Why?  Why is -- why
11             is -- that does -- I'm not trying to be
12             obtuse, but I'll put it to you again.
13                  You can say we have a feature that
14             they lack.  We have an expert who will tell
15             you that that is what people buy these CGM's
16             for.  It's not for the stuff they're arguing.
17             It's not the patented stuff that drives
18             demand.  It's this feature that we have and
19             they don't have and we came up with this.
20             They didn't come up with it.  We came up with
21             it.  That's why we got it and they don't.
22                  You can say all that without saying
23             "and we have a patent."  What do the words
24             "and we have a patent" add?
25                  MR. LAURIDSEN:  It goes to the
```

 1          strength and defense-ability of the advantage

 2          because --

 3                    THE COURT:  I got you.  You don't

 4          have to go any further.  You made your

 5          argument.  I understand.

 6                    Do you have anything else you want to

 7          say on this, Mr. Lauridsen?

 8                    MR. LAURIDSEN:  Yes, Your Honor.  If

 9          there is concern about confusion, courts have

10          regularly provided simple instruction to the

11          jury to say simply because the defendant is

12          talking about their patents does not mean

13          that that is a defense to patent

14          infringement.  It's a common instruction.

15          It's the way the courts deal with this and

16          it's, again, prejudicial to multiple parts of

17          our defense, if we can --

18                    THE COURT:  How -- how -- don't give

19          me this -- the only thing you've said is, it

20          will strengthen our hand if we get to say

21          "and we have a patent."  That is the only

22          thing you have said.

23                    So now you tell me if there is

24          anything else you got, now is the time to say

25          it.

1          MR. LAURIDSEN:  It --

2          THE COURT:  Don't give me

3    generalities.  I want specifics.  If you've

4    got something else, now is the time to say

5    it.

6          MR. LAURIDSEN:  In arguing against

7    lost profit damages, they will argue that all

8    of our former sales go to their products and,

9    therefore, they're entitled to lost profit

10   damages.

11         We will argue that our customers have

12   a specific desire for our specific feature

13   which no one else in the market can offer

14   because it is patented.

15         THE COURT:  Well, because the --

16   that's the last piece.  Okay.  So here is

17   what I'm hearing:  You've got nothing else,

18   except it will strengthen our position if we

19   can say because it's patented.  You can

20   say -- and don't be saying you can't say --

21   right up to, we have a feature that they

22   don't have.  And that's what matters.  But

23   you want to say because it's patented and

24   that's the only thing you've got to say it

25   will strengthen our position on that point.

1          Have I got you right?

2          MR. LAURIDSEN:  We also believe the

3     willfulness point, but Your Honor has given

4     me your opinion on that.

5          We believe that they haven't shown

6     sufficient prejudice to outweigh the relevance

7     of our information.  I've explained the

8     relevance to you.  We have been talking about

9     the relevance.  There clearly is relevance.

10    And their prejudice is there is confusion.

11    And I've told you if there is confusion, one,

12    Your Honor can make these calls during the

13    trial.  You don't have to make this decision

14    now.  You can see how the evidence comes in.

15    What they open the door for.  And, two, if

16    there even is confusion despite that you can

17    give a curative instruction to cure that.

18         So we have established relevance on

19    this side.  We have been talking about that.

20    We don't have prejudice that outweighs this to

21    the point where it needs to be removed.

22         THE COURT:  Okay.  I got you.

23    Thanks.  You can have a seat.

24         MR. LAURIDSEN:  Thank you.

25         THE COURT:  It's your motion,

1        Abbott, Mr. Hansen, I'll give you a chance to

2        rebut, if you want.

3                MR. HANSEN:  Just a few quick

4        points, Your Honor.  At the time of the last

5        pretrial conference, they had not even

6        identified these three patents, so your --

7        whatever was in your previous ruling did not

8        address these three patents.  These three

9        patents were identified afterwards.

10               And they have identified three demand

11       drivers.  Realtime, integration and urgent low

12       soon alert.  The first two have absolutely no

13       connection to their three patents.  They don't

14       claim that they do.  Their inventors don't

15       claim that they do.  They have nothing to do

16       with them at all.

17               The only one they claim that one of

18       their patents relates to the urgent low soon

19       alert.  We are not -- and they're also, I

20       think, raising the strong in their argument.

21               We are not going to contend that this

22       trial that they don't innovate.  We are going

23       to contend that they spent four years trying

24       to develop a new inserter.  And when they

25       couldn't figure it out, they looked at our

```
 1          patent disclosures and our products, and then
 2          they figured it out.
 3                    We are going to argue that.  But
 4          that's related to the inserter and the mount,
 5          the mechanical aspects of the case.
 6                    We're not going to say, they don't
 7          innovate at all, but we're going to say when
 8          it came to developing this new inserter, you
 9          did look at our product.  You did look at our
10          patent disclosures.
11                    THE COURT:  I got you.  Thanks.  All
12          right.
13                    Here is my ruling:  I can't go back
14          and I haven't gone back and reread the entire
15          pretrial conference transcript.
16                    I did go back and look at it, but
17          that was weeks ago.  And so you all are more
18          up to speed about everything that might have
19          been said back then, but I can tell you on the
20          basis of the submissions today and arguments
21          today that I'm granting that motion.
22                    I don't think it adds anything
23          material to the other side to Dexcom's
24          position with respect to realtime data and AID
25          integration.
```

1          I don't -- you know, you are going

2      to -- you are going to want to say things

3      about your products and how good they are and

4      what the demand drivers are and you can say

5      that as much as you would like.

6          I'm agreeing with Abbott that there

7      is a potential and a real potential for

8      confusion and starting to talk about other

9      patents particularly when the witnesses you

10     are going to put forth can't say whether they

11     cover them or not.  They can say, I think they

12     cover them, but what do I know.  I'm not a

13     lawyer.  I can't tell you.

14         I'm not turning this in to a mini

15     trial about your patents.  You can getting

16     everything you need -- legitimately need

17     without saying "and we have these patents."

18         So those three identified patents,

19     opening the door, I hesitate to even say this,

20     but if they do open the door in some fashion,

21     you are all very smart lawyers, and I have no

22     doubt you will be on your feet in a flash and

23     I'll have to deal with it then.

24         But as things stand now, don't plan

25     on it.  So I'm granting the motion.

```
1              Let's move on -- and I should add
2        something, too.  As for willfulness.  Yeah.  I
3        can certainly talk about your future
4        innovation.  Nobody is going to stop you from
5        doing that.  If you need to reference these
6        three patents specifically to do that, no.  I
7        don't think you can.
8              I think it adds confusion to damage
9        of unfair prejudice outweighs the marginal
10       relevance it has.  That's my ruling.  All
11       right.
12             Let's turn to I think Dexcom's number
13       three.  Motion in limine three.
14             MR. WERDEGAR:  Good morning, Your
15       Honor.  Matt Werdegar on behalf of Dexcom and
16       I do have some slides for you.
17             Can I approach and hand them up?
18             THE COURT:  Yeah.  Please.  Go ahead
19       and proceed.
20             MR. WERDEGAR:  Sure.  Your Honor,
21       this motion relates to evidence that Abbott
22       seeks to introduce at trial with respect to
23       the determination that was made to remove
24       inventor Bradley Kelemen from the 443 patent.
25             Abbott intends to have its
```

1        prosecuting attorney for that patent, Glen

2        Liu, testify to the jury that he had a -- made

3        a determination that Kelemen wasn't an

4        inventor, had an ethical obligation to remove

5        him from the patent.

6              There is a series of additional

7        questions and answers that they want Mr. Liu

8        to be able to publish to the jury and they

9        have expert opinions that are, again, grounded

10       in the good faith, honest candor of Mr. Liu's

11       determination to remove Bradley Kelemen from

12       the patent.

13             Now -- and if you -- in the slide

14       presentation I handed up to you, if you look

15       at slide number three is a prime example of

16       what we're talking about, Your Honor.  And he

17       was asked what was your reason for removing

18       Mr. Kelemen as an inventor.  Mr. Liu answered

19       in deposition, I determined he was not an

20       inventor and, therefore, had an ethical

21       obligation to correct inventorship.

22             Now, when we try to find out what was

23       the basis for that determination, what was the

24       basis for his conclusion that he had an

25       ethical obligation to remove him from the

1          patent that is when Abbott blocked this

2          further discovery.

3                    Mr. Liu testified -- and this is on

4          page five of the slide.  Mr. Liu testified

5          that his determination that Bradley Kelemen

6          wasn't an inventor was based in part on what

7          Mr. Kelemen told him in a conversation, but

8          when we asked what did Mr. Kelemen tell you

9          that then made you have that determination,

10         there was an assertion of privilege and we

11         weren't allowed to find out the basis.

12                   Mr. Liu also said the determination

13         was based on conversations with other named

14         inventors on the patent, but when we asked,

15         well, what information were you provided by --

16         from those people, again, assertion of

17         privilege and we weren't allowed to find out.

18                   So they have put an issue here, Your

19         Honor, they put at issue a determination and

20         an alleged ethical obligation that was

21         admittedly based on information learned from

22         conversations with Mr. Kelemen and other

23         inventors, but they have prevented us from in

24         any way testing the veracity of that

25         determination, testing whether an actual

```
 1        ethical obligation existed that Mr. Liu --
 2        testing Mr. Liu's determination.
 3               The privilege assertions extend
 4        beyond just the questions in deposition.  They
 5        also block discovery in to any other
 6        communications, invention disclosures.  And so
 7        we're left with a situation, Your Honor, where
 8        they want to be able to tell the jury that
 9        this determination was made in good faith.
10        They had a duty to do it.  It was all honest
11        and ethical.  This is what their expert says.
12               But we can't -- there is no way to
13        cross-examine that.  There's no way to test
14        that because we can't find out what it was
15        based on.
16               THE COURT:  Right.  I got that in
17        writing.  This has bound up -- and I'm trying
18        to think about what's the best way to handle
19        this because this is bound up with the
20        argument Abbott is making about, in essence,
21        a jury shouldn't be dealing with this.  This
22        is -- issue is something about inventorship
23        that you, the judge, should be handling as an
24        equitable manner.
25               Are you speaking to that part as
```

1          well, Mr. Werdegar?

2                    MR. WERDEGAR:  Your Honor, I can

3          speak to that part, yes.

4                    THE COURT:  Because, you know, some

5          of this -- well, they seem to be pretty

6          related, so is this -- I read the voluminous

7          footnotes and the preliminary jury

8          instructions to really get what you guys rely

9          on.

10                    Why don't you tell me -- and I don't

11         want to get too far afield from your motion in

12         limine, but like I said, this feels like it's

13         related stuff.

14                    Is this something the jury ought to

15         be hearing at all?  Why should the jury be

16         hearing any of this?

17                    MR. WERDEGAR:  So I guess the

18         broader question about inventorship is, one,

19         whether they should be hearing about

20         Mr. Liu's determination is sort of a separate

21         one, more of a motion in limine.

22                    As to the -- go ahead, Your Honor.

23         Sorry.

24                    THE COURT:  Well, speak to the

25         broader point.  The invalidity point.  As I

```
 1              understand it, you've only got one invalidity
 2              point.  That is wrong.  They don't have the
 3              inventorship.  Right.
 4                   When I say "invalidity point," I'm
 5              not talking about your other invalidity
 6              arguments.  I'm talking about as to
 7              inventorship, you just said inventorship more
 8              broadly.  And then this issue.  I thought the
 9              inventorship issue and this issue were one in
10              the same because you don't have some other
11              inventorship.  You've got this inventorship
12              argument.
13                   MR. WERDEGAR:  That's correct.
14              That's correct.
15                   THE COURT:  So this is the whole as
16              to inventorship.  So is it an equitable issue
17              or not?
18                   MR. WERDEGAR:  It's not, Your Honor.
19              Whether or not Mr. Kelemen should properly be
20              named an inventor is an issue that goes to
21              the jury.
22                   THE COURT:  Why?
23                   MR. WERDEGAR:  Because the federal
24              circuit has reversed courts from taking it
25              away from the jury.
```

```
 1              THE COURT:  And they say that's all
 2      pre-AIA.  That's all irrelevant.  You're
 3      citing cases from 25, 30 years ago.  They are
 4      giving you the current state of law.  So
 5      stick with me as to matter of logic for a
 6      minute.
 7              I love those guys down in D.C., but I
 8      want to hear the logic.  What's the logic of
 9      why this goes to the jury?
10              MR. WERDEGAR:  Your Honor, it's --
11      it's bound up -- I mean, if he's not properly
12      named an inventor and it is a defense -- if
13      he is not properly named an inventor, the
14      patent would be invalid.
15              Now, they have an issue that maybe
16      you can correct it after the fact and
17      that's -- that is something we will fight
18      about after the fact, but it is an invalidity
19      defense that's traditionally gone to the jury.
20      It's been going to the jury here in this
21      courthouse and cited recent cases and recent
22      jury instructions.  There is still, obviously,
23      a federal model of jury instruction on it.  So
24      that's through the logic of it, Your Honor,
25      it's also the question's bound up with the
```

```
 1          question of --
 2                    THE COURT:  Let's stop for a minute.
 3          Your point on inventorship is they behaved
 4          inequitably, isn't it?  That they hid the
 5          ball on purpose.  They did something they
 6          shouldn't have done.  They messed with the
 7          system.
 8                    MR. WERDEGAR:  So that's where I
 9          think -- that's why I said this sort of
10          smaller issue and the larger issue.  Your
11          Honor, we're not saying they can't, you know,
12          in this motion in limine, they can't at trial
13          look at the testimony of Mr. Kelemen, look at
14          the testimony of Mr. Funderburk, the
15          inventors, about what they actually did at
16          the time.  Who was doing what on the project
17          at the time and who contributed what.  And
18          they have an expert that is going to talk
19          about that, too, and we do.  That's all I
20          think fair game here and that is what we
21          would have the jury talk about.
22                    THE COURT:  What does that have to
23          do with anything?  What does that have to do
24          with anything except for the question of
25          whether he's an inventor or not?  That has
```

1          nothing to do with anything in the case

2          except whether he's an inventor; right?

3                    MR. WERDEGAR:  Well, it also has to

4          do with whether he's an inventor, but whether

5          he's an inventor also drives the prior art of

6          the patent.  We have prior art that we are

7          asserting as a 103 defense.  Prior art that

8          if Bradley Kelemen is an inventor, it's prior

9          art.  They're claiming, no, he was not a

10         proper inventor.  This was conceived earlier.

11         Therefore, we are swearing behind this issue.

12                    So we're going to have to get in to

13         who did what when regardless because we are

14         going to have to figure out whether the prior

15         art that we say is prior art is actually prior

16         art.  They're saying no, that the invention

17         was conceived sooner and then reduced to

18         practice.

19                    So it is all bound up with our 103

20         defense with the issue of conception and

21         reduction to practice and whether Bradley

22         Kelemen was an inventor.

23                    So this is an issue we're happy to

24         present to the jury regardless, Your Honor.

25                    THE COURT:  And when you say "this

```
 1          issue," you mean --

 2                 MR. WERDEGAR:  Did Mr. Kelemen

 3          contribute to a claim element of the asserted

 4          claims of 403 patent.

 5                 Now what I don't think --

 6                 THE COURT:  Hold on just a second.

 7                 In one of their voluminous footnotes

 8          in response to one of your voluminous

 9          footnotes in the pretrial jury instructions

10          they say, you know, as a back up, there ought

11          to just be an interrogatory to the jury on

12          this and leave it to you, the judge, to decide

13          the matter as an equitable issue after the

14          fact.  What's your take on that?

15                 MR. WERDEGAR:  Well, Your Honor, I

16          guess my take on that is that it's not how

17          it's normally done.  They haven't pointed to

18          any case where any court has handled the

19          issue like that and I do think it would be

20          confusing potentially to the jury but, you

21          know, short of -- the answer is it doesn't go

22          to the jury or whether it's the

23          interrogatory, we prefer the interrogatory.

24          But we don't think the approach that we -- we

25          just posited where, again, just like the
```

 1        other things they are being asked on

 2        invalidity asked a question we don't see

 3        there being prejudice to them from that

 4        approach.

 5               So I guess ours is the normal path.

 6        They want to deviate from the normal path and

 7        I don't think they have articulated a

 8        completely compelling reason why.

 9               THE COURT:  What do you say to

10        Abbott anything --

11               MR. WERDEGAR:  Particularly

12        compelling.  I wasn't saying anything

13        compelling.

14               THE COURT:  Let me discuss this very

15        specifically.  Is it or is it not an

16        equitable matter whether or not there was

17        conduct here that would make Kelemen's

18        failure to list Kelemen as an inventor

19        invalidated?

20               MR. WERDEGAR:  So teasing this

21        apart, Your Honor, there is two.  There is

22        the inequitable conduct defense in the case

23        that will be tried to you.  That defense does

24        focus on whether the determination that

25        Mr. Liu made to remove Bradley Kelemen in

1      order to circumvent the preliminary

2      objection.  Whether that was done in good

3      faith, whether they withheld information, all

4      of the things that go in to inequitable

5      conduct defense.

6              That is where I was saying, you know,

7      the evidence that we're trying to exclude via

8      this motion in limine, we don't think that,

9      you know, any of that necessarily needs to

10     come in front of the jury to decide

11     inventorship and address the conception to

12     reduction to practice issues.

13             We don't think they should be hearing

14     that Mr. Liu thought he had an ethical duty or

15     obligation to remove Bradley Kelemen and did

16     it in good faith or their expert in their

17     excerpts from their expert report in the slide

18     where he says that, you know, Bradley -- Mr.

19     Liu acted honestly and it was all done on the

20     up and up.

21             That's what their expert wants to

22     say.  We don't think any of that needs to be

23     presented to the jury.  I mean, I think we

24     should -- they need to know chronologically

25     that Mr. Kelemen was originally on the

```
1          application and then there came a time when he
2          was removed.  And the issue for you, jury, is
3          whether he contributed and should not had been
4          removed.  But we don't need to get in to
5          anyone doing anything bad in front of the
6          jury.
7                    So we are not saying that we get to
8          say that it is something bad and they don't
9          get to respond in front of the jury.  We just
10         don't think that -- you know, we don't think
11         that should be in front of the jury, but the
12         evidence that they have designated and they
13         have never said that's for a limited purpose
14         or only for inequitable conduct, it's
15         certainly not appropriate for the jury to hear
16         that evidence, particularly given that we were
17         never entitled to find out.
18                    We can have the fight in front of
19         Your Honor for inequitable conduct, but we
20         were never entitled to find out what was the
21         true basis.  What did you hear that lead you
22         to believe that you had this ethical duty, et
23         cetera.
24                    THE COURT:  I got you.  Thank you
25         Mr. Werdegar.  Who is speaking on the other
```

1        side?

2                MR. HANSEN:  I am, Your Honor.  So

3        let me describe what the relevant facts and

4        the relevant issues are.  And Mr. Werdegar

5        focused on their Section 103 defense against

6        the 443 patent.  And there is a prior art

7        reference that they are relying on that --

8        whose date, whose effective date is August of

9        2002.

10               For purposes of their Section 103

11       defense, we intend to show that the inventions

12       were conceived and reduced to practice before

13       August of 2002.

14               The evidence that we will rely on

15       will include engineering drawings, product

16       specifications and a host of other evidence

17       that Mr. Liu testified he relied on.

18               THE COURT:  Hold on, Mr. Hansen.

19       Are you saying when they say we need this

20       evidence -- when they say this evidence would

21       have to come in front of the jury anyway

22       because we're swearing behind references that

23       they rely on, are you telling me that they

24       are just wrong?  Because even if they tried

25       to swear behind, it doesn't matter.  We are

1        arguing for conception earlier than that?

2        That's a yes or no.

3                MR. HANSEN:  I think the answer is

4        yes, but let me just finish explaining the

5        facts of the situation, if you will be

6        patient with me just a minute.

7                So the date we need to show for 103

8        is August.  Mr. Kelemen joined the company in

9        April.  Based on the evidence that he had,

10       Mr. Liu concluded that the inventions were

11       conceived in December.  That's why he took

12       Mr. Kelemen off and that's what he told them

13       in his deposition.  Because based on the

14       evidence that he saw, he took him off.

15               But it doesn't matter because

16       Mr. Kelemen joined in April of 2002.  So

17       whether he's an inventor or not is irrelevant

18       to the question of whether it happened before

19       August of 2002.  For purposes of Section 103,

20       that is what matters.  Not who did it.  It

21       does not matter whether Kelemen was part of it

22       or not.  He was at the company.  If he

23       contributed something between April and August

24       of 2002, fine.  If the Court decides that he

25       should have been named as an inventor, the

1          federal circuit says that should and can be

2          corrected and the patent should be -- not be

3          invalidated for that reason.

4                   So what I'm saying is for purposes of

5          Section 103 what matters is, was it conceived

6          and reduced to practice before August 2002.

7          Who did it, doesn't matter.  When it happened,

8          that does matter.

9                   THE COURT:  And what you're arguing

10         is, their assertion that Kelemen's presence

11         at the company or not at the company is

12         irrelevant?

13                  MR. HANSEN:  It's irrelevant to that

14         question of did it happen before 2002 or

15         August of 2002.

16                  THE COURT:  You just stay right

17         there.

18                  Mr. Werdegar, why don't you stand up

19         and just rebut that, if you can?

20                  MR. WERDEGAR:  Certainly, Your

21         Honor.

22                  First of all, I just want to make

23         clear if there was any confusion in my

24         comment, that we believe inventorship is a

25         separate legal defense.  It is not just about

1      the 103 issue because there are two defenses.

2             THE COURT:  I got you.  I understand

3      that completely.

4             MR. WERDEGAR:  Your Honor, they have

5      from time and memorial the 443 patent said

6      that the conception date was in 2001 before

7      Mr. Kelemen arrived.  That is what they told

8      the patent office.  That's in the

9      declarations from the inventors who declared

10     the declarations they rely on this happened

11     December of 2001.  They put it in

12     interrogatory responses.  That's always been

13     their position that is December of 2001.

14     Mr. Kelemen came in April, so he couldn't had

15     been an inventor.  He couldn't have

16     contributed.

17            They now or seem to be suggesting

18     that all of that we should ignore that, all of

19     that is irrelevant because they are now going

20     to argue something happened in the summer of

21     2002.  They certainly never explained what

22     that might be, but even if that's the position

23     they take, we can certainly now talk about the

24     fact that they claim this in December.  This

25     is what they said happened in December.

1      Mr. Kelemen showed up and said all this
2      happened.
3              I mean, it's not -- it's not at all
4      irrelevant whether or not he was there and
5      what he contributed to because of the story
6      that they have told and relied on in the
7      patent office to this Court and papers before.
8              THE COURT:  Got you.
9              MR. HANSEN:  I think there is two
10     issues applied here, Your Honor.  There is
11     their motion in limine and there is also the
12     question of what should be tried to the jury
13     and what should be tried to the Court.
14             THE COURT:  Yeah.
15             MR. HANSEN:  What I'm trying to say,
16     what I'm trying to explain on the second
17     point, what should be tried to the jury, what
18     should be tried to the Court.
19             We all agree that inequitable conduct
20     should be tried to the Court.  That's been
21     decided.  That's been resolved.  Inequitable
22     conduct should not be decided by the jury.  It
23     should be decided by the Court.
24             We also agree that the 103 defense
25     should be tried to the jury.  That should be

```
 1        tried to the jury.  The inventorship defense
 2        which under binding federal circuit precedent,
 3        if there was a determination that Kelemen
 4        should be named as an inventor, if he in some
 5        way contributed to the invention after he
 6        joined the company in April of 2002, then that
 7        is something that the federal circuit said
 8        should and can be corrected without
 9        invalidating the patent.
10              THE COURT:  Well, it should, but I'm
11        not -- I'm not going out in to the future.  I
12        mean, I'm not without certain gifts, but
13        prophecy is not one of them.  So I'm not
14        pretending to know what you guys are going to
15        do down the road.  I'm dealing with what I'm
16        dealing with right here and that's more than
17        enough.
18              So, I mean, I read that argument in
19        your briefing.  I understand your argument.
20        It's not moving me, Mr. Hansen.  That does not
21        get you any traction, that some day you might
22        do something.  I'm dealing with what I'm
23        dealing with right now.  Here is what I heard
24        Mr. Werdegar's argument on behalf of Dexcom to
25        be:
```

1          This is going to be -- this needs to

2     come in front of the jury anyway because they

3     have -- because we have evidence to

4     demonstrate that you contributed to it.  They

5     told a story that talked about conception as

6     of a certain date, that that makes no sense

7     because, in fact, he wasn't there and was a

8     contributor to the invention.  Therefore, not

9     about inequitable conduct, but about squaring

10    behind their references and that stuff we are

11    going to show and we are entitled to show to

12    the jury that, yeah.  He wasn't around and

13    that inventorship piece is problematic for a

14    story they want to tell.  Speak to that.

15          MR. HANSEN:  All right.  So let me

16    speak to that.  Yes.  So two points.  Let me

17    address the middle aspect of that.

18          THE COURT:  No.  No.  Maybe you

19    can't -- I'm sorry.  Maybe you can't do it

20    separately.  I've said these things kind of

21    get twisted up together and I understand

22    that.

23          But right now as to the first like

24    who gets to hear what, Mr. Werdegar has made

25    the argument the jury has got to hear it

```
 1          anyway, Judge.  So that issue really shouldn't
 2          be on the table because they got to hear this
 3          piece anyway as to what we're entitled to
 4          argue to make clear our position with respect
 5          to invalidating references.  All right.
 6                    That's what I want you to talk about.
 7                    MR. HANSEN:  So here's the way that
 8          I think this should be addressed and resolved
 9          at trial, at least the jury part at trial.
10                    So for purposes of 103, the jury will
11          have to decide did we or did we not invent
12          this subject matter, conceive this subject
13          matter before August of 2002.  That's what
14          they have to decide.
15                    We're going to present evidence that
16          we believe establishes that.  They're going to
17          say that evidence doesn't establish it.
18          They're going to say this evidence from
19          December of 2001 isn't enough.  And they're
20          going to say the evidence from March of 2002
21          wasn't enough.
22                    And at that point we're going to say,
23          but there is a whole bunch of additional
24          evidence that took place before August.  And
25          if the December stuff does not show it and the
```

 1          March stuff doesn't show it, the pre-August

 2          stuff certainly does.

 3                 So the jury is going to need to

 4          decide on the basis of all of this evidence

 5          was this determination.

 6                 Now, maybe they'll say, well, you

 7          told the patent office it happened in

 8          December.  Now it was conceived in December.

 9          Now you are saying it might have happened in

10          July or something of 2002.  Okay.  That's

11          fine.  They can say that.  We don't apologize

12          in any way for our position that it was

13          conceived in December of 2001.  We're very

14          confident in that position.  But if we have to

15          go to July of 2002 to show further, we will,

16          and that's what we will do, so --

17                 THE COURT:  So your primary position

18          is still what you told the patent office and

19          what your answer for discovery is; right?

20                 MR. HANSEN:  Yes.

21                 THE COURT:  Okay.  Well, then,

22          actually I think that kind of makes their

23          case that this is something that the jury

24          ought to hear, in any event they're -- that

25          this would be in front of the jury in any

```
 1        event, so let's turn to the motion in limine
 2        which specifically is -- and you shouldn't
 3        have the opportunity to say we did it because
 4        we had to.  Mr. Liu is a good man and very
 5        ethical.  We are all very ethical.  And we
 6        had to do it.  And then in response to
 7        questions in discovery, well, what did you
 8        base that on?  Say we can't tell you.  We are
 9        very ethical and we did it on an ethical
10        basis, but we are not telling you what we
11        heard.  Answer that.
12                MR. HANSEN:  So I'll speak frankly.
13        What they presented to you and in their
14        briefing is, in my mind, incredibly
15        misleading.  We did not say we will not
16        explain.  Mr. Liu did not say we will not
17        explain.
18                THE COURT:  Did you invoke the
19        privilege?
20                MR. HANSEN:  For -- for very limited
21        privileged information and they do not
22        contend that it's privileged, but for a host
23        of other information that they do not contend
24        is privileged, Mr. Liu testified, this is the
25        information I relied on.
```

```
 1              THE COURT:  Stop.  Here is what I
 2     understand the specific argument to be.  And
 3     maybe you can show me how this is very
 4     misleading.
 5              But here is what I understand the
 6     argument to be:  Mr. Liu said I had to take
 7     him off because of what the inventor told me.
 8     That's what they're saying.  I'm supposing
 9     that if I ask them, they could show me in the
10     deposition where this happened.
11              At that point an objection and an
12     attorney-client privilege was asserted.  Is
13     that an accurate statement or not?
14              MR. HANSEN:  I don't believe it is
15     accurate because when they asked Mr. Liu what
16     was your basis for doing this, he said,
17     because of all of this evidence, all of this
18     non-privileged evidence, that is why I did
19     it.  Did you also talk to the attorneys or
20     did you also talk to Mr. Kelemen.  Yes, I did
21     talk to Mr. Kelemen.  Well, what did
22     Mr. Kelemen tell you.  That's privileged.
23              But I defended Mr. Lieu's deposition
24     and I also told him, I'll let Mr. Liu tell you
25     what Mr. Kelemen told him factually if you
```

1      will agree that it does not open the door to

2      some big privilege waiver.  And they said no,

3      so I maintained my objection.  But Mr. Liu

4      identified a lot of evidence.

5              THE COURT:  Well, hold on.  This is

6      significant.  Why don't you guys give me

7      the -- point me to the specific portion of

8      the transcript we're talking about because

9      this -- this is a material point.  If the

10     offer was made -- if you want to hear what

11     Kelemen said, I will let you hear what

12     Kelemen said to the lawyer, but that does not

13     constitute a broader waiver.  And Dexcom's

14     assertion was, we don't agree to that.  You

15     opened a Kimono Sun.  You open it all the

16     way.  If that's what you are telling me

17     happened, I want to see it in the transcript.

18             MR. HANSEN:  Well, it's in their

19     slide, Your Honor.

20             MR. WERDEGAR:  It's in our slide,

21     Your Honor, and I'm happy to address that

22     point, but it's also in our slides.

23             THE COURT:  Stay right there because

24     I want to hear --

25             MR. WERDEGAR:  If you look at, Your

```
 1          Honor slide --
 2                   THE COURT:  Five.
 3                   MR. WERDEGAR:  Slide five.  Exactly.
 4          So slide five is the question that follows
 5          the question and answer, you know, you
 6          determine that he was not an inventor and had
 7          an ethical duty.  This is the next question
 8          that followed.  I would like to put then the
 9          offer in to context when I had an
10          opportunity.
11                   THE COURT:  Was anything else said
12          surrounding this that is pertinent?  I'm
13          looking at a relatively small excerpt.
14                   MR. WERDEGAR:  So in slide six you
15          can see again he was -- Mr. Liu was asked
16          about what did you hear from the other
17          inventor besides Mr. Kelemen.  Mr. Hansen did
18          say, the same thing.  The context, I want to
19          add, if you want me to -- hear from me now,
20          Your Honor, on this, is that that offer which
21          came mid-deposition came at the tail end of a
22          string of assertions of privilege over this
23          subject matter.
24                   So, if you look at slide seven, Your
25          Honor, that's from the deposition of
```

1          Mr. Kelemen himself, and this what happened
2          before the depositions of Glen Liu.  We
3          deposed Mr. Kelemen.  We asked Mr. Kelemen
4          again.  Mr. Kelemen talked about a
5          conversation with Glen Liu prior to the time
6          he was removed from the patent.  We asked what
7          did you discuss.  There was an instruction not
8          to answer that question with no offer of a
9          partial, you know, we will give you the facts
10         as long as you don't say it's a waiver.
11              And the subsequent slide show that
12         they also withheld other communications
13         related to this topic.  They held invention
14         disclosure forms on privilege grounds.
15              So the offer was essentially, we will
16         let this one witness give you his version of
17         the conversation that happened, but we won't
18         let you actually talk to the other inventors
19         about what they said.  We don't let you see
20         the documents that reflect the communication
21         that was happening at the time a determination
22         was made.
23              So it was a you can -- Mr. Liu can
24         say this, but we have already blocked you from
25         hearing from Mr. Kelemen about it, and they

```
 1          later blocked other discovery, but this came
 2          at the tail end of us --
 3                    THE COURT:  I got you, Mr. Werdegar.
 4                    Go ahead, Mr. Hansen, respond to
 5          that, please.
 6                    MR. HANSEN:  So I did not defend
 7          Mr. Kelemen's deposition.  I think it is
 8          correct that there was no offer made, but
 9          let's -- so let's be very clear what we are
10          talking about here.
11                    Mr. Liu had a conversation with
12          Mr. Kelemen.  He also had a conversation with
13          Mr. Funderburk, one of the named inventors.
14          We asserted privilege for those conversations.
15          They do not contend that those are not
16          privileged conversations.  They agree that
17          they were privileged conversations.
18                    We also asserted privilege, Mr.
19          Werdegar just said, for invention disclosure.
20          Again, they do not contend that that -- they
21          do not dispute that that is privileged.  There
22          is very clear precedent on this from the
23          federal circuit.  That is privileged.  Our
24          assertion of privilege was proper.
25                    What they're leaving out of the story
```

1          is that we disclosed and Mr. Liu testified to

2          a host of -- to a mountain of non-privileged

3          evidence that supports his decision, his

4          determination is was conceived in December

5          and, therefore, I need to take Mr. Kelemen off

6          because he wasn't working at the company until

7          April.

8                    There is a host of non-privileged

9          evidence.  This is not a sword-and-shield

10         situation.  A sword-and-shield situation is

11         where I have a bucket of privileged

12         information and I decide, I'll disclose half

13         of it, but I'm going to shield the -- and use

14         that as a sword, but I'm going to shield the

15         other half with privilege.  This is not that

16         situation.  They don't argue that we're

17         withholding any privileged information.

18                    THE COURT:  No.  They -- they are

19         arguing that you are withholding privileged

20         information.

21                    MR. HANSEN:  I'm sorry.  They don't

22         argue that we have disclosed -- I misspoke.

23         They do not argue that we disclosed any

24         privileged information or that we are relying

25         on any privileged information and they don't

1       dispute that our privilege assertions are
2       correct.
3                   THE COURT:  Actually I think they
4       are arguing that you relied on privileged
5       information.  Maybe I'm misunderstanding or
6       not understanding -- well, let's just --
7       let's have -- I hate to keep having him pop
8       up again but --
9                   MR. WERDEGAR:  Your Honor is
10      correct.  I mean, they want to put an issue
11      the fact that Mr. Liu made this determination
12      and made it in good faith and honestly.  When
13      asked what was the determination based on, he
14      said conversations with Bradley Kelemen,
15      conversations with the inventors, so they put
16      at issue a determination that was made.
17                  THE COURT:  They say there is a
18      bunch of other stuff.  There is a whole host
19      of stuff.
20                  MR. WERDEGAR:  Well, the whole host
21      of other things is not so much.  Their
22      interrogatory response on this topic is slide
23      13, Your Honor, and Abbott said Mr. Liu made
24      the determination to remove Bradley Kelemen.
25      They sort of say this.  But just the bear

```
 1          fact, because he determined he wasn't -- it
 2          was conceived before Mr. Kelemen arrived at
 3          the company.
 4                    So that's their interrogatory
 5          response and they pointed us to Mr. Liu.  We
 6          asked Mr. Liu.  Oh, I spoke to Mr. Kelemen.  I
 7          spoke to the inventors.  He does say he also
 8          got some documents from the inventors that
 9          ended up in the declaration of the patent
10          office.  You know, that's a third leg of the
11          three-legged stool of things you relied upon.
12          But two out of the three legs are
13          conversations he had and we can't find out
14          what those conversations were.
15                    THE COURT:  I got you.  I
16          understand.
17                    So, Mr. Hansen, I understand that you
18          are saying we gave him some stuff, but I don't
19          hear you denying that there was an assertion
20          of privilege as to the things that Mr. Liu
21          invalidly relied on that you said we are not
22          telling you; is that right?
23                    MR. HANSEN:  That's true.  But we
24          are not trying to put that in front of the
25          jury.
```

```
 1              THE COURT:  Well, but you're trying
 2         to put Mr. Liu's statement that I had to do
 3         it in front of the jury.  That's -- maybe I
 4         should -- hold on just a second.  This pop
 5         you back up, jack in the box.
 6              Mr. Werdegar, what exactly is it that
 7         you want them to not be able to give Mr. Liu?
 8              MR. WERDEGAR:  I mean, you -- so
 9         it's in our brief and it's also in our slide,
10         Judge, for ease of reference, Your Honor.
11         And I believe they have missed another stray
12         reference, but it would be along the exact
13         same line.  It's Q and A on slide three.  The
14         Q and A which was solicited by Abbott counsel
15         and Mr. Liu on slide four where he's, you
16         know, basically being -- asking not dispose
17         anything.  Did you always comply with your
18         due candor, et cetera.
19              THE COURT:  So what could Mr. Liu --
20         in your view, your view is that Mr. Liu
21         should, if they put him on the stand, he
22         shouldn't get to say I felt I had to do it.
23         He should not get to say that.
24              So how would you see this playing
25         out?
```

1              MR. WERDEGAR:  So one important

2        point of clarification, Your Honor, is that

3        Mr. Liu is beyond the subpoena range and

4        Abbott has never indicated that they intend

5        to bring him live at trial.

6              So our understanding is that the jury

7        is going to hear what is in the deposition

8        transcript.

9              THE COURT:  Okay.  So is that right,

10       Mr. Hansen?

11             MR. HANSEN:  In terms of the jury

12       trial, we don't intend to bring Mr. Liu to

13       jury trial.  If there is -- we don't think a

14       bench trial would be necessary on inequitable

15       conduct or inventorship, but if it is, we

16       will have to make that decision.

17             THE COURT:  So when they start

18       talking about inventorship, and they put

19       evidence in on it, which I take it they are

20       planning to do.

21             MR. WERDEGAR:  (Nods heads up and

22       down.)

23             THE COURT:  What are you going to do

24       with respect to Mr. Liu?  Are you going to

25       put on his deposition -- deposition excerpts?

1          MR. HANSEN:  I don't think Mr. Liu

2     needs to be a part of it at all.  They keep

3     saying we put this at issue.

4          THE COURT:  Well, this is all going

5     to be fine if what -- boy, this could be done

6     in a real hurry if you say we don't care what

7     they put on.  We are not putting anything

8     from Mr. Liu in to evidence.

9          MR. HANSEN:  So let me be clear.

10          THE COURT:  Please.

11          MR. HANSEN:  We do not believe that

12     anything relating to Mr. Liu in any way is

13     material to inventorship.

14          THE COURT:  I understand that.

15     Stop.  Please.  I got your position on that.

16     What they're saying is it's -- we're going to

17     want to put it on.  And from what I'm

18     hearing, I am inclined to believe they are

19     entitled to get in to this in front of the

20     jury about, you know, was Kelemen inventor or

21     not.

22          So, if that happens, just assume that

23     for the sake of discussion here, that I

24     thought, okay, it's -- that's going to happen.

25     Then what are you -- my question to you is:

```
1          If you are saying whether that happens or not,
2          we're not putting anything from Liu in to
3          the -- in front of the jury, then this is over
4          because their motion is moot?
5                    MR. HANSEN:  We do not intend to do
6          so because I don't think what Mr. Liu's
7          intent was or was not has anything to do with
8          when the stuff was invented.
9                    THE COURT:  Good.  We're done.
10         Wait.  We are -- it's moot.
11                   MR. HANSEN:  But if they put his
12         intent at issue, if they put it at issue in
13         the trial, then maybe it's a different
14         question.
15                   THE COURT:  Okay.  Well, then, maybe
16         it's not moot.
17                   MR. HANSEN:  I don't see how they --
18         on what basis they can put -- again, the
19         question before the jury --
20                   THE COURT:  Just assume -- assume
21         they are going to -- it's going to be an
22         issue, assume it's going to be an issue.
23                   MR. HANSEN:  That Mister --
24                   THE COURT:  That they're going to
25         put something in to evidence and they are
```

```
 1        going to argue he was on, he was off.  It was
 2        a hokey pokey.  What's going on here?  This
 3        stinks.  Something is wrong here.  They're
 4        hiding the ball and you should draw an
 5        adverse inference that they are hiding the
 6        ball.  Assume that is what they are going to
 7        get in to and they are going to get in to it
 8        in part because they are going to be swearing
 9        behind references to say, you know, they
10        wanted you to know this is all irrelevant.
11        It's not irrelevant.  Assuming all that comes
12        in, is Liu coming in?  Are you going to put
13        Liu in or not?
14              MR. HANSEN:  Not under those
15        circumstances, no.
16              THE COURT:  Then mute.  We are done.
17        I don't have to rule on this and I'm not.
18              MR. WERDEGAR:  Can I make one point?
19              THE COURT:  You just won.  Unless
20        you really have to speak, I wouldn't.
21              MR. WERDEGAR:  I just wanted --
22        okay.  Fine, Your Honor.
23              THE COURT:  Okay.  Let's do the next
24        one.  Hold on just a second.  I just received
25        a good reminder from my law clerk that there
```

```
 1          is some expert speculation about what would

 2          had been said or -- is that accurate?

 3                    MR. VAN NEST:  About Mr. Liu, Your

 4          Honor?

 5                    THE COURT:  Yes.  Mr. Werdegar,

 6          let's --

 7                    MR. WERDEGAR:  That was the sort of

 8          point of clarification, Your Honor.

 9                    THE COURT:  Go ahead.

10                    MR. WERDEGAR:  I think for present

11          purposes the important piece is -- and I just

12          want to direct your attention to make sure

13          the Court was aware of it -- that slides 11

14          through -- I'm sorry -- 10, 11 and 12 on our

15          slide deck, which is where their expert has

16          opinions that are also kind of, you know,

17          it's grounded in the same subject matter and

18          we think it sort of falls within the same

19          scope of events.

20                    I just wanted to make sure that --

21          and we can cross the bridge if and when I

22          guess they have them say anything like that,

23          but that's that.

24                    THE COURT:  Right.  That's in the

25          expert report, but that does not mean it's
```

```
 1          coming out in front of the jury.
 2                  MR. WERDEGAR:  And I think in light
 3          of the Court's ruling and comments, I think
 4          that we also, we can probably handle the
 5          same -- the rest of the expert issues the
 6          same way.  If they try and do something that
 7          we believe is contrary to what you just said,
 8          we can even address it at that time.
 9                  THE COURT:  That's fine.  Let's move
10          on then to Abbott's motion in limine number
11          two.
12                  MR. McANDREWS:  Good morning, Your
13          Honor.  Paul McAndrews on behalf of Abbott.
14                  Bear with me for a second, please.
15                  MR. McANDREWS:  Permission to
16          approach?
17                  THE COURT:  Please.
18                  MR. McANDREWS:  Good morning, Your
19          Honor.  I will be presenting Abbott's motion
20          in limine number two that goes -- that's
21          Abbott requesting that Your Honor preclude
22          any empty chair arguments about Abbott's or
23          Dexcom's witnesses who do not testify live at
24          trial.
25                  I'll very briefly explain, Your
```

```
 1        Honor.  Well, what we're asking is that
 2        neither party should be permitted to argue
 3        that the absence of any witness at trial is
 4        the result of a party's strategic choice or
 5        that such absence implies that any testimony
 6        would be favorable or unfavorable to the other
 7        party.  There is a number of reasons to reach
 8        this result and, Your Honor, I'll go through a
 9        few of them, but some of the main ones are as
10        follows:
11              Most of the reference witnesses in
12        the parties briefing are not under Abbott's
13        control.  As to --
14              THE COURT:  Okay.
15              MR. McANDREWS:  Yes, sir.
16              THE COURT:  And assume I would be
17        inclined to say, yeah, they are not under
18        your control and they're outside the subpoena
19        power of the Court, that an empty chair
20        argument is inappropriate.
21              What about a witness that is under
22        your control and is outside the subpoena power
23        of the Court; that is, it's not somebody they
24        could call if they wanted them.  They couldn't
25        subpoena them because the subpoena power of
```

1          the Court would not reach that witness, but

2          they are somebody that you could bring if you

3          chose to?  What about a party like that?

4                    MR. McANDREWS:  Your Honor, you just

5          dealt with a motion in limine that sort of

6          raised some of the concerns with that.

7                    So one of the witnesses that Dexcom

8          referenced in their brief is Mr. Liu.  And

9          just for the sake of argument, let's say that

10         he's under Abbott's control, just as an

11         example.

12                   They should not be able to create

13         through attorney argument adverse inferences

14         that suggest that we might be hiding a

15         witness.  And in that particular case, I think

16         that is a particularly apt example because the

17         jurors not in a position to understand things

18         that all of us have trouble wrapping our

19         brains around such as privilege and

20         instructions not to answer.

21                   THE COURT:  Do you have anything

22         besides Mr. Liu?  Anybody besides Mr. Liu

23         that could fit that category?  The category

24         of under Abbott's control outside the

25         subpoena power of the Court?

```
 1              MR. McANDREWS:  Under Abbott's
 2       control outside the subpoena power of the
 3       Court.  Your Honor, if you are so inclined to
 4       grant the limitation as the people outside of
 5       Abbott's control, as to people inside of
 6       Abbott's control, it might be an appropriate
 7       response to do what one of the Courts that --
 8       one of the cases that Dexcom cited did in the
 9       Northern District of California, the
10       non-movement -- the non-movement agreed in
11       advance not to make any reference to the add
12       issue witness' absence in its opening
13       statement and then the Court deferred ruling
14       on any such issues until before closing
15       statements so the Court could assess the
16       evidence.  I think that might be an
17       appropriate response to witnesses within
18       Abbott's control.
19              THE COURT:  Okay.  Okay.
20       Mr. McAndrews, that -- that answers the
21       question that I ask.  Is there anything else
22       that you want to tell me before I hear from
23       Dexcom?
24              MR. McANDREWS:  I would just like to
25       ask, Your Honor.  I'm ready to address the
```

1          witnesses outside of Abbott's control, but it

2          sounds like you are telling me I don't need

3          to.  Is that a fair assessment?

4                    THE COURT:  That's what I'm inclined

5          to -- I've read the papers.  I understand.

6          Here is what, I don't think either side --

7          look, if it's -- if they are outside of

8          Abbott's control, and they're outside the

9          subpoena power of the Court, then, obviously,

10         try to imply that there is something sneaky

11         going on, and it be inappropriate and I doubt

12         that -- you know, I trust Dexcom would not be

13         filing some kind of greasy-spoon type of

14         thing because they would not get away with it

15         and they know they would not get away with

16         it.

17                    As to witnesses that are outside

18         either party's control, but with -- I mean,

19         but within the subpoena power of the Court,

20         both sides can subpoena whoever they want.

21         Right.  So they wouldn't be able to make that

22         argument.

23                    The only thing that's interesting to

24         me is outside the subpoena power of the Court,

25         but within Abbott's control, that's what is of

```
1          interest to me because then they couldn't call
2          them if they wanted and you could if you
3          wanted and maybe there is some reason that you
4          should have called them and maybe you should
5          be held accountable to that in some fashion.
6                    I understand I'm putting Mr. Liu in
7          his own little category and we will talk
8          about him.
9                    MR. McANDREWS:  Sure.
10                   THE COURT:  That's what I'm thinking
11         about right now and I think I understand your
12         argument which is, hey, you don't have to
13         decide this now, Judge.  Keep it out of the
14         opening.  See how the evidence comes in.
15         Have I understood you?
16                   MR. McANDREWS:  As to the witnesses
17         outside of Abbott's or inside of Abbott's
18         control, I think that is fair.  I do not
19         believe that Dexcom's proposed solution of us
20         objecting on the fly after they have rung the
21         proverbial bell is an appropriate response.
22                   THE COURT:  Yeah.  When you say
23         that, your solution is don't let them talk
24         about it in opening.
25                   MR. McANDREWS:  Don't let them talk
```

```
 1        about it in opening and if the only other
 2        place they would be allowed to do it would be
 3        closing, assess it prior to closing.
 4             THE COURT:  So are you saying like
 5        even if they want to ask -- if they want to
 6        ask a witness a question or, you know, if
 7        they are cross-examining your expert, they
 8        should not be able to say, well, you relied
 9        on this person, how come that person is not
10        here.
11             MR. McANDREWS:  I think the how come
12        this person is not here would probably be a
13        bridge too far, Your Honor.
14             THE COURT:  Yeah.  I understand that
15        and get that.  But -- yeah.  Yeah.  Okay.  I
16        got your position.
17             MR. McANDREWS:  Your Honor, might I
18        make just in the off chance that Your Honor
19        has not decided on the witnesses outside of
20        Abbott's control, I would just ask, I would
21        direct you to Dexcom's brief as to what they
22        had in mind or how they might use such --
23             THE COURT:  I think you have already
24        won on outside of Abbott's control.
25             MR. McANDREWS:  I'm going to have a
```

1    seat, Your Honor.  Thank you.

2              MR. VAN NEST:  Ms. Parikh will do

3    the next issue, Your Honor.

4              THE COURT:  All right.

5              MS. PARIKH:  Puja Parikh for Dexcom.

6    And to just kind of help clarify, I'm going

7    to pass up this deck.  This will kind of show

8    some of the witnesses that are, as we have

9    been talking about, within Abbott's control

10   outside the subpoena power of the Court,

11   these would be the witnesses that we would be

12   commenting on in closing as we have been

13   discussing.

14             THE COURT:  Well, I think what you

15   mean is if I let you.

16             MS. PARIKH:  Correct.  So, Your

17   Honor, there appears to be some discussion by

18   Mr. McAndrews about what would and wouldn't

19   be -- what Dexcom would purportedly say when

20   we get to trial.

21             The issue here really is Dexcom sees

22   it and I think we are in agreement with the

23   other side here is what Dexcom would say

24   during closing argument, as well as attorney

25   commentary that would be part of a

```
 1        cross-examination as Your Honor pointed out at

 2        trial.  That is what we're talking about.

 3               You know, to the extent that

 4        Mr. McAndrews put up one of our cases that

 5        said, let's keep it out of opening statement,

 6        but we can certainly talk about this in close,

 7        that is something that we, Dexcom, agrees

 8        with.  We are not anticipating discussing this

 9        during opening statement.

10               THE COURT:  Okay.  So that's off

11        then.

12               MS. PARIKH:  Okay.  Some of this is

13        a little premature because, of course, we

14        don't know what witnesses Abbott will or will

15        not bring, so we don't know what comments we

16        will be making at close.  And so, you know,

17        the first ask here is that we take a look at

18        this when we are in the midst of dealing with

19        these issues at trial.

20               THE COURT:  Let's take Mr. Liu out

21        of it.  Right.  Because I view this as

22        involving very close nice difficult questions

23        of attorney-client privilege, and so I'll

24        just take you right now.  You are not making

25        an empty chair argument about that, period.
```

1        Got it.

2             MS. PARIKH:  Yes.

3             THE COURT:  Everybody got it?  So

4        then that leaves a whole bunch of other folks

5        that are noted as inventors.

6             MS. PARIKH:  Correct, Your Honor.

7        And, for instance, Mr. Pace, Mr. Robinson,

8        both are, as far as we understand, employed

9        by Abbott.  Both are inventors.  Whether or

10       not Abbott calls them, we don't know.

11       They're currently not on their will-call

12       list.  We have no indication that Abbott

13       plans to call them.

14            THE COURT:  Okay.

15            MS. PARIKH:  And so it's our

16       understanding here that, you know, Dexcom is

17       entitled to say in closing that the jury did

18       not get to hear from these witnesses such as

19       the inventors at all in any capacity.  These

20       are witnesses Abbott didn't call, neither

21       live nor via deposition, and they're within

22       Abbott's control or were representative by

23       Abbott.

24            THE COURT:  And why don't you speak

25       to the argument that that's got -- that's

1          a -- that is, in essence, asking the jury to

2          draw some adverse inference because Abbott

3          didn't bring somebody in who, in Abbott's

4          view, and maybe rightly so, would have

5          nothing meaningful to add because they have

6          already called two or three inventors.  By

7          your own count here, we have got ten

8          inventors.  And if they put ten inventors on

9          the stand, I think you would be jumping up

10         and if you weren't jumping up, I would be

11         jumping up to say really, seriously.  Stop

12         it.

13               So you help me understand the

14         fairness argument here because I think if I

15         were to say, oh, no you can go ahead and make

16         that argument, then maybe they would have to

17         put ten people on the stand and waste

18         everybody's time.

19               MS. PARIKH:  So the first thing here

20         is -- and this would go both ways -- both

21         parties have the same trial limit, so to the

22         extent that they want to comment on the

23         absence of Dexcom witnesses we didn't call --

24               THE COURT:  That's not helping me at

25         all.

1           MS. PARIKH:  Okay.  So, to speak to

2       this particular issue of their ten inventors,

3       this is not only the witnesses they would

4       call to the stand, but also deposition

5       testimony that they would play, so it covers

6       both of those things.  They don't have to

7       physically bring them here on the stand.

8       That's not what we're talking about.  But

9       we're not going to go that extra step and

10      make that adverse inference.  We are just

11      going to simply say, look, the jury is --

12          THE COURT:  The only reasons -- that

13      gets zero traction.  The only reason to make

14      an empty chair argument is because you want

15      the jury to draw an adverse inference, Ms.

16      Parikh.  You want them thinking, oh, they

17      didn't bring that person in because that

18      person could have said something that would

19      hurt them.

20          So please -- I shouldn't say that.

21      I'm not the sharpest tack in the road.  You

22      may be.

23          So you tell me what other reason

24      would there be for making that argument?

25          MS. PARIKH:  Well, Your Honor, it's

```
 1          also a credibility assessment.  The jury is

 2          entitled to assess the credibility of a

 3          witness.

 4                    THE COURT:  Right.

 5                    MS. PARIKH:  When they are not

 6          presented with the witness at all, but the

 7          witness is on key documents, the witnesses

 8          are inventors of the patents-in-suit, we talk

 9          about the inventions that these witnesses

10          came up with.

11                    THE COURT:  So it's not about

12          credibility because, as you just said, they

13          are not witnesses, so they are not assessing

14          credibility.

15                    The only reason -- you are making my

16          point for me.  The only reason to bring this

17          up is you want an adverse inference.  I think

18          I understand your argument.

19                    MS. PARIKH:  Well, Your Honor, I

20          would also like to point you to Apple v

21          Samsung, which is strikingly similar to this

22          exact same case at hand.  And that case the

23          Court dealt with these exact same issues, so

24          in that case Samsung, which is taking the

25          same position Abbott is, sought to preclude
```

1          Apple, stand in for Dexcom here, from

2          eliciting testimony or providing attorney

3          commentary on Samsung's failure to call

4          certain witnesses to testify.  This was at

5          close.  It also dealt with inventors.

6                  Now, what the Court held here is that

7          both parties were subjected to the same time

8          limitations.  A party's decision to make

9          strategic calls about who to play via

10         deposition testimony, who to bring at trial,

11         that is all fair game for commentary during

12         close.

13                 Now, of course, there is that extra

14         step of saying, and if that person testifies,

15         they would completely agree with everything

16         Dexcom is saying.  That's not what we're

17         getting at.

18                 We're simply getting at the fact that

19         you have been presented with the invention of

20         these patents-in-suit.  Some people came up

21         with them.  You didn't get to hear about them.

22         You didn't get to hear about what they

23         created, what they intended, why they did it.

24         You didn't get to hear about any of that.

25                 THE COURT:  I do.  I have the

```
 1        arguments.  So I will give Mr. McAndrews a
 2        case for brief rebuttal.
 3                    MR. McANDREWS:  Thank you, Your
 4        Honor.
 5                    I'll just point out that in the Apple
 6        v Samsung case that counsel cited, the Court
 7        stated that the missing witness rule generally
 8        allows such argument, quote, provided that the
 9        party first establishes that the missing
10        witness was peculiarly within the adversary's
11        power to produce, so that goes to control.
12                    Additionally, Mr. Pace and Robinson
13        who counsel reference were deposed in this
14        case.  As to the other Abbott inventors,
15        Dexcom referenced something in their
16        opposition that did not paint a complete
17        picture of the discovery situation.
18                    THE COURT:  Let me just ask a
19        question.  Were all of these inventors
20        deposed?
21                    MR. McANDREWS:  Every named inventor
22        was not disclosed.  Very few of them are
23        still Abbott employees.  For example,
24        Mr. Funderburk hasn't worked for Abbott in
25        roughly 20 years.  Mr. Kelemen, who Dexcom
```

```
1           claims is an unnamed inventor in the 443, he

2           also hasn't worked for Abbott in nearly 20

3           years.

4                     THE COURT:  Who is still in the mix

5           and under Abbott's control under this list of

6           ten inventors?  On the list of ten inventors

7           on page three of the slide deck they gave us?

8                     MR. HANSEN:  So, if I could, Your

9           Honor, Mr. Pace and Mr. Robinson are both

10          presently employed and they were both deposed

11          in this.

12                    THE COURT:  Anybody else still

13          employed?

14                    MR. HANSEN:  I'm not sure about the

15          status of the others.  I know that Michael

16          Daniel Lee -- well, some of them were never

17          employed by Abbott.  Michael Love, Daniel Lee

18          are no longer employed by Abbott.  I believe

19          Steven Quinn was never employed by Abbott.

20          There is three here that, frankly, I don't

21          know if they're currently employed or not,

22          but Dexcom could have deposed them if they

23          wanted to.  They elected not to.

24                    THE COURT:  All right.  Good enough,

25          Mr. Hansen.
```

1           Mr. McAndrews, anything else you want

2      to say?

3           MR. McANDREWS:  Just additionally --

4      and I think the slides account for that --

5      but Gary Stafford is also an inventor that is

6      not on that page because he is being called

7      by Abbott at trial.

8           THE COURT:  Okay.  Thank you.  Here

9      is my semi-ruling.  Speaking generally, there

10     will be no empty chair arguments about people

11     who are within the subpoena power of the

12     Court.  If you want them, bring them in,

13     Dexcom.

14          There will be no empty chair argument

15     about people who are outside the subpoena

16     power of the Court and not under the control

17     of either party because we're just not going

18     to do that.

19          As for people who are under the

20     control of Abbott -- and we are leaving Mr.

21     Liu to the side again -- I've already ruled on

22     that.  Under the control of Abbott and outside

23     the subpoena power of the Court and my

24     understanding is that is only inventors,

25     there's nobody outside that universe within

1    that universe I just described which is not an

2    inventor.

3            Look, and it sounds like that's a

4    relatively limited universe because most of

5    these people are former employees or whatever

6    employees.  I guess we will deal with that if

7    and when we deal with it.  And the assertion

8    that it's too late, unring the bell.  If

9    something happens in the course of examination

10   that you think is inappropriate, jump up and

11   object.  I don't know whether it will happen

12   or not, so I'm not inclined to deal with it

13   now.

14           I will say this:  As caution to

15   Dexcom, I'm not favorably disposed to your

16   argument because the fact that they chose not

17   to call somebody that you could have deposed

18   if you wanted to, but didn't depose, you know,

19   if you wanted to depose them and you wanted to

20   put evidence in on it, you could have done it.

21           And to try to get the jury to draw an

22   adverse inference is not going to get a lot

23   of -- not going to get a lot of traction with

24   me.

25           MS. PARIKH:  May I address that

```
 1        point, Your Honor?  On the bottom of this
 2        chart here there is a list on the second row
 3        on page three, those -- we actually -- it's
 4        not that we didn't choose to depose them.
 5        What we did was we reached an agreement with
 6        Abbott.  We said, Abbott, if you don't bring
 7        these people to trial, then we won't depose
 8        them.  But if you do bring them to trial, we
 9        do get to depose them.
10                So Abbott made the strategic decision
11        about whether or not it wanted to bring them
12        to trial and then let us know.  And as a
13        result, that's why we don't have depositions
14        of those people.
15                THE COURT:  Because they said in
16        advance they are not going to do it.  All the
17        more reasons, if you guys have reached an
18        agreement, I'm not going to let you stand up
19        and say, well, you didn't bring them.  You
20        guys talked about it and they said in advance
21        we don't plan on bringing them.  And you said
22        okay.  Well, then, we are not going to depose
23        them.  Forget it.
24                The only reason to bring it up, I'll
25        repeat, is you want the jury to think there is
```

1          something ill about -- like some bad thing
2          that Abbott is hiding.  You could have deposed
3          them.  You chose not to because they said,
4          well, we are not going to -- we don't plan to
5          call them.  Okay.  Then you made a choice.
6          Live with your own choice.
7                 So I'm not favorably disposed to your
8          argument, but I'm not going to decide it
9          completely in advance because I don't know how
10         the jury is coming in or, I mean, how the
11         evidence is going to come in.
12                All right.  We are going to take a
13         break.  We have been at this for over an hour
14         and a half.  We will give the court reporter
15         five minutes.
16                Is that enough, ma'am?  We will take
17         five.  We will back here at 11:40.
18                            - - -
19         (Recess taken from 11:30 until 11:50 a.m.)
20                            - - -
21                THE COURT:  Next up, we've got
22         Dexcom motion in limine number one.
23                MR. WERDEGAR:  Matt Werdegar again,
24         Your Honor, for Dexcom.  And I do have a few
25         more slides for the Court, if I can approach.

1               THE COURT:  Sure.

2               MR. WERDEGAR:  Your Honor, this

3       motion is with respect to the deposition

4       testimony of Martin Gibler.  Martin Gibler is

5       a third-party consultant.  His deposition was

6       noticed by Abbott.  It was a trial deposition

7       in effect because he's out of the subpoena

8       range and not under either party's control.

9       And he was unrepresented at his deposition.

10              Abbott from start to finish almost no

11      exceptions in Martin Gibler's deposition

12      employed leading questions to solicit

13      testimony using exact phrasing, terminology,

14      wording that Abbott's counsel desired.

15              I think it's a textbook example of

16      what happens with leading questions in terms

17      of getting the witness to adopt the words and

18      phrasing that you choose.

19              THE COURT:  Yeah.  Objections to

20      form.

21              MR. WERDEGAR:  And we did object to

22      form throughout the deposition, Your Honor.

23              THE COURT:  Yeah.  Am I right or am

24      I wrong that there were long stretches of no

25      objections to form?

1              MR. WERDEGAR:  There were -- I guess

2       there were certainly stretches where there

3       was no objections to form, Your Honor.  There

4       were.

5              THE COURT:  Those aren't even on the

6       tape.  If you didn't preserve them, done.

7              So why don't you talk about the ones

8       that you did preserve?

9              MR. WERDEGAR:  I understand the

10      Court's ruling.  There is discretion on the

11      Court's part.

12             THE COURT:  I got it.  You were

13      represented.  You were there.  You could have

14      made your objections.  You didn't.  I don't

15      want to hear anything about it now.

16             MR. WERDEGAR:  As to those where an

17      objection to form was made contemporaneously,

18      Your Honor, there is really I don't think any

19      dispute from Abbott that the questions were

20      leading.  The only argument Abbott makes is

21      whether that leading examination of Mr.

22      Gibler was appropriate under the

23      circumstances.

24             They don't argue that he was adverse.

25      They don't argue that he was hostile.  I

```
 1        understand their argument to boil down to
 2        whether he was identified with Dexcom.  And by
 3        any measure of the definition of what it means
 4        to be identified as an adverse party,
 5        Mr. Gibler was not.  Mr. Gibler hadn't been --
 6        hadn't done any work for Dexcom for five years
 7        by the time of the deposition.  He and his
 8        company were actually at the time of
 9        deposition and still to this day doing work
10        for Abbott.
11             And so under those -- you know, just
12        using that measure, if any way he was
13        identified with Abbott.
14             And the case law really boils down
15        identified an adverse party to be people
16        who -- witnesses whose interest are nearly
17        identical or closely aligned in the comparable
18        significance to those of the adverse party to
19        whom they are supposed to be identified.
20             There is no evidence whatsoever that
21        Mr. Giblin falls in to that category.
22             THE COURT:  Now, before I get in to
23        the merits of this and asking questions about
24        that, I want you to respond to an argument
25        that Abbott made in response to this which
```

```
1        was -- this is just like taking it that I

2        give you this.  And I'll give it to you.  You

3        choose your motion in limine and you also

4        doubled up on it with a Daubert.  And so, you

5        know, once you argue you don't get a

6        substitute.  You decided how to frame it and

7        you framed it the way you framed it and I'm

8        so -- you know, but you're -- you're getting

9        an extra crack.  And the other side may take

10       an issue with you, but you're likely getting

11       another crack.

12             So I'll take the motion and discuss

13       it with you, even though I have got a question

14       about whether you, you know, your -- you are

15       taking advantage of the Court here.

16             What they have said on the other

17       side, Dexcom waived its leading questions

18       argument by not raising the issue in the

19       pretrial order which was filed on January 4th

20       with many designations and counter

21       designations.  Dexcom objected to that

22       testimony as leading.

23             What is your response to that?

24             MR. WERDEGAR:  Your Honor, we -- two

25       responses.  One, is we have amended our
```

```
 1        disclosures to make sure they're all in

 2        there.  We did object to the designations.

 3        We had a code of objections and the other

 4        part of it, that we were responding to about

 5        40 hours worth of designated testimony and

 6        they were not in there, the original version.

 7                 THE COURT:  Do you know what.  You

 8        guys have got this thing lawyered up to the

 9        max and now you are making an issue of it.

10        So we were too busy.  That doesn't get any

11        mileage either.

12                 Why should you not be held to waived

13        these objections?

14                 MR. WERDEGAR:  Because, Your Honor,

15        it's -- and I understand the Court's

16        frustration with the process.  And I wish it

17        hadn't happened that way, so I can tell you

18        that.

19                 But the testimony of Mr. Gibler that

20        they seek to rely upon here and, again, this

21        is a trial deposition.  He's not going to be

22        here.  This is it.

23                 THE COURT:  Yeah.

24                 MR. WERDEGAR:  Is going to be

25        extremely prejudicial.  Prejudicial to Dexcom
```

```
 1        because of the fact that he was led through

 2        basically questions framed around each and

 3        every claim, and there is several examples --

 4              THE COURT:  I have read it.  I saw

 5        his transcript that's highlighted.  Took a

 6        look at them.  Have the lawyers sitting right

 7        there.  Lawyer had an opportunity to make

 8        objections to form.  Sometimes did.

 9        Sometimes didn't.  Often didn't.  So it's not

10        like you weren't in the room.

11              MR. WERDEGAR:  Understood, Your

12        Honor, although Mr. Gibler himself was not

13        represented.  But even with objections to

14        form and we did contemporaneously object to a

15        number of the questions, you know, and we

16        should have obj -- made a standing objection

17        to the use of all the legal terminology

18        throughout the deposition.

19              But the fact of the matter is, even

20        if we had done that, Your Honor, they were

21        going to continue with what they were doing

22        and we were going to end up with a transcript

23        that looks like it looks which is a transcript

24        of a non-adverse, non-hostile neutral third

25        party at most being lead carefully through an
```

1        examination that, in turn, this is the danger

2        of leading questions.  Turned in to sort of

3        basically the mouthful for Abbott.

4              THE COURT:  How should they have

5        asked the question?  How should they have

6        said to him, hey, does this -- does this

7        torsion spring do this thing?

8              MR. WERDEGAR:  Your Honor, they

9        should have asked a direct question.  What

10       does this torsion spring do?  And there is an

11       example --

12             THE COURT:  If they wanted to know

13       whether it did the thing that was said in the

14       claim, how were they supposed to do that

15       without reading the claim?

16             MR. WERDEGAR:  Does the torsion

17       spring -- using your example, you know, does

18       the torsion spring interact with the inner

19       needle hub.  Can you explain how the

20       interaction with the inner needle hub works.

21       It's an open-ended question.

22             THE COURT:  And then follow that up

23       and say, so are you saying that the needle

24       does X, Y and Z.  And then read the language

25       of the claim.  You would have then said

1      that's leading.

2            MR. WERDEGAR:  That question would

3      be leading, Your Honor, but the question

4      where they asked him in his own words how to

5      describe the product.  There is an example on

6      slide nine of our deck where they asked him

7      what name would you give this component.  And

8      he answered, I don't know.  Puck carrier.

9      And then that is not the answer that I guess

10     was desired.  And so the question then is,

11     would it be fair to call it the seal

12     subassembly which is a term that comes -- you

13     know, is implicated in the patents.  And the

14     witness said, yeah, that would be an

15     acceptable term.

16            I mean, he never would have come up

17     with seal subassembly.  It's not his own.

18     These are not his words and he admits that in

19     his deposition.

20            THE COURT:  I have yours.  I

21     understand.  I got it, Mr. Werdegar.

22            Who is on the other side?

23            MR. MORIN:  It's me, Your Honor.

24     Mike Morin.

25            I'll be very brief, but happy to

```
1        answer Your Honor's questions.
2                On the question of what they objected
3        to, they had eight examples in their brief,
4        pages two through three.  And there was only
5        one form objection to your point.  There were
6        very few preserved.
7                I won't repeat our argument other
8        than to say we think that they waived it by
9        not putting it in the pretrial order.
10               They made leading objections to other
11       witnesses and other things, so they were
12       making leading objections, but never to this
13       witness at any time.
14               Very briefly on the question of
15       identified with.  They say he has not worked
16       with Dexcom for five years.
17               The case law is very clear that
18       identified with the leading questions is that
19       the relevant point of the factual issues so,
20       for example, in the Stewart versus Hooters
21       case, which is in their brief, there was the
22       accountant who was not an employee of his.  He
23       was a contractor like this.  Had not worked
24       for him in five years, but the Court found
25       that he was identified with the party because
```

1          at the relevant time when the tax returns were

2          prepared five years earlier he had worked with

3          him.

4                    So it's not a question of whether

5          this gentleman's at Dexcom now.  It's a

6          question of whether he was identified with at

7          the relevant times and I have several more

8          cases that stand for that same proposition.

9                    And beyond that, I would just be

10         happy to answer Your Honor's question if you

11         have any.

12                   THE COURT:  Okay.  Thank you,

13         Mr. Morin.

14                   Mr. Werdegar?

15                   MR. WERDEGAR:  Your Honor, just very

16         briefly.

17                   What would had been the appropriate

18         course for Abbott to do here if they thought

19         this was a witness that they needed to lead,

20         they thought this witness was genuinely

21         somehow aligned with Dexcom despite currently

22         doing work for Abbott, they could have asked

23         permission and that's what the Courts, you

24         know, commonly rule on motions for permission

25         to treat a witness as adverse.  It's what you

```
 1        do when you call them live on the stand in
 2        court.  If you want to -- if you call someone
 3        affirmatively, you generally have to ask
 4        permission if you are going to start by
 5        crossing them.
 6               They could have brought a motion.
 7        Courts rule on those motions.  There is a
 8        couple case cites that we have in our slide
 9        decks, Your Honor, where exactly that
10        happened.
11               And to Mr. Morin's point, that's on
12        slide six where that is.  To Mr. Morin's point
13        about to be aligned with Dexcom, the case he's
14        referring to I believe the accountant at
15        issue, tax returns that accountant had helped
16        prepare, were tax returns that were actually
17        the subject matter of the lawsuit.
18               So his credibility, his interests
19        were directly implicated there.
20               The same is true with other cases
21        that Abbott cites.  In contrast, there is
22        courts in the Vandermir case where there was a
23        motion to treat the plaintiff's treating
24        physician in a wrongful injury case as being
25        aligned with plaintiff.  And the Court there
```

1    ruled that even though they are ongoing

2    physician relationship, one was the long-time

3    family doctor, just that relationship alone

4    does not rise to the level of being an

5    interest.

6              You have to have something more.

7              THE COURT:  Thank you, Mr. Werdegar.

8    Okay.  I think this is pretty easy.  We have

9    already had our hard issues.  I don't think

10   this is hard.  You waived it.  There is a

11   pretrial order.  You had a chance to make

12   your objections in the deposition and you

13   hardly made them in the deposition.

14             As to the ones you did make in the

15   deposition, whether the counter designations

16   or designations were raised, you had a chance

17   to make your objections known then.  You

18   didn't.  You waived it.

19             So I don't even have to get in to the

20   merits.  If I were inclined to get in to the

21   merits -- and by the way, I'll repeat.  That's

22   giving you the benefit of looking at this when

23   you were not entitled to.  Number one.  You

24   chose to litigate it as you chose to litigate

25   it.  You made a Daubert motion and now you are

1        trying to get another bite.

2                So I don't think you deserve to get

3        even this much.  But given you this much time

4        even on the merits, I'm not persuaded by what

5        you are saying.

6                I do agree with you on the

7        identifying point, for what it's worth.

8                The guy is working for Abbott as a

9        contractor now.  Not with the other side.

10               So the notion that you were entitled

11       to do this because he's hostile, I'm not

12       buying that too much, but I just don't think

13       that's particularly pertinent because you had

14       a chance to deal with this at appropriate

15       times and you didn't.  More to the point.  I

16       think these are leading questions which would

17       be, even if uttered in the courtroom, largely

18       permissible because they are asking the

19       witness to agree or not agree with language in

20       the patent itself and I don't think that's

21       particularly objectionable.

22               So for a whole host of reasons, the

23       motion is denied.

24               All right.  We will take the next

25       one.  This is Abbott number three.

```
1                    MR. VAN NEST:  Your Honor, I think
2          this was resolved in the earlier discussion
3          you had with Mr. Hansen and Mr. Werdegar.
4          This is just the issue of whether
5          inventorship on Kelemen goes to the jury.
6                    This was the subject of summary
7          judgment motion and it was discussed at the
8          last pretrial.  I think this was encompassed
9          within what we discussed about an hour ago.
10                   MR. HANSEN:  I disagree, Your Honor.
11                   THE COURT:  Well, it's your motion.
12         Go ahead.
13                   MR. HANSEN:  So this motion is
14         directed to a critical issue and we believe
15         that the evidence and argument that Dexcom,
16         in large degree that Dexcom intends to
17         present on the issues of conception and
18         reduction to practice is misleading and
19         prejudicial and could only confuse the jury.
20                   When you judge conception and
21         reduction to practice, you have to do it
22         relative to the claimed invention.  Not
23         relevant to some commercial objective that the
24         company may have had.
25                   I deposed Mr. Simpson about their G6
```

1          product.  I ask him, when had you proven that
2          your design was suitable for its intended
3          purpose, talking about his inserter.  He said
4          that was way early.  When did you
5          commercialize it?  A long time later.  Did you
6          have to refine a lot of things to get from
7          when you have proven it was suitable for its
8          intended to purpose?  Yes, we did.
9                   And that gets at their testimony, in
10         particular their expert testimony is based on
11         majoring the invention against commercial
12         objectives rather than the invention is
13         defined in the patent.
14                  THE COURT:  Why isn't that argument
15         something you make in when you lay
16         foundations and ask questions and presented
17         to the jury?  Why would that -- are you
18         telling me there is a sharply defined time
19         line between conception and
20         commercialization?  There is a bright line
21         there.
22                  MR. HANSEN:  I think there is a
23         sufficiently bright line here to say that --
24         and let's take what seems to be their number
25         one example.  Okay.

1          THE COURT:  Okay.

2          MR. HANSEN:  Their number one

3    example is the adhesive.  So one element of

4    the claim is there has to be an adhesive to

5    hold this device on the skin.

6          THE COURT:  Right.

7          MR. HANSEN:  Now, there is no

8    dispute that the inventors had a design, a

9    complete design, with an adhesive reduced the

10   engineering drawings, reduced the product

11   specifications by December of 2001.  Were

12   they still testing the device?  Were they

13   still trying to improve on the adhesive?

14   Yes.  But the claim doesn't say you have to

15   have an adhesive that keeps it on the skin

16   for ten days.

17          THE COURT:  Why isn't this really a

18   motion for summary judgment, Mr. Hansen?

19   Aren't you asking me to rule as a matter of

20   law that there is no way for them to make an

21   argument about -- about conception and

22   inventorship?  Why isn't this a partial

23   motion for summary judgment that inventorship

24   and validity is off the table?

25          MR. HANSEN:  I'm not saying that

1          they can't make any arguments or present any

2          evidence.

3                    THE COURT:  You are.  It seems to me

4          that's exactly what you are saying.  You are

5          saying there is a bright line here and

6          clearly this falls on the side of

7          commercialization, no rational jury could

8          hear this and understand it as anything other

9          than about commercialization.  No reasonable

10         fact finder could look at this and say, this

11         is conception.  It's not commercialization.

12         Therefore, as a matter of law, they should

13         not be allowed to talk about this in front of

14         a jury.  That sure feels like a motion for

15         partial summary judgment.  Why isn't it?

16                   MR. HANSEN:  Because what they

17         shouldn't be able to do is have their experts

18         sit on the stand and say to the jury because

19         they had not yet found the perfect adhesive,

20         they hadn't conceded, let alone reduced it to

21         practice.

22                   THE COURT:  I don't think they are

23         going to have their experts say that.

24                   MR. HANSEN:  No.  That is what their

25         expert is going to say.

```
 1              THE COURT:  No.  I may misunderstand
 2         it, but I think what they may be saying is
 3         this thing wasn't fully conceived.  It wasn't
 4         something you could even reduce to practice
 5         until Kelemen showed up on the scene and made
 6         the contributions he made.
 7              It sounds to me like you are still
 8         making the argument I'm positing that you are
 9         making, which is no reasonable person could
10         look at this evidence and conclude anything
11         other than that this is commercialization.
12              MR. HANSEN:  Well, this is the
13         problem with what they're doing.  By what
14         standard are they -- is their expert going to
15         measure whether this had -- whether this was
16         conceived or reduced to practice?  Is he
17         going to measure it against the claim which
18         defines the invention, or is he going to
19         measure it against the product specification
20         that says, and would like to find an adhesive
21         good enough to keep it on the skin for X
22         number of days.  The --
23              THE COURT:  You'd agree, wouldn't
24         you, the adhesive has to keep it on the skin?
25              MR. HANSEN:  The claim -- not for
```

1    any particular amount of time.

2         THE COURT:  Well, maybe not for --

3    well, it's got to -- well, these things have

4    to be reasonably construed.  You said it

5    keeps it on the skin for three seconds.

6    You'd agree that that is not really an

7    adhesive that constitutes an embodiment of

8    the invention, wouldn't you?

9         MR. HANSEN:  Yeah.  But that's not

10   the situation we have with here.

11        THE COURT:  I know it's not.  That's

12   why I said, there's not a bright line here,

13   is there?  There is a question about whether

14   the adhesive works or not.  Either you

15   acknowledge it or there has to be an adhesive

16   that's functioning that actually does what

17   the invention indicates the invention is for

18   which is to allow you to have a continuous

19   glucose monitor, not a glucose monitor that

20   falls off every hour.

21        MR. HANSEN:  I would agree with

22   that.  But when their expert is measuring

23   this, there has to be a yardstick by which

24   you measure.  Was it conceived and reduced to

25   practice or have we now just talked about

1       commercialization?

2               THE COURT:  And you are saying their

3       expert did it wrong and so their expert

4       should be --

5               MR. HANSEN:  We're saying that their

6       expert is measuring this by looking to the

7       yardstick of the commercial specification.

8               THE COURT:  So it's really a Daubert

9       motion that's masquerading as a motion in

10      limine?  These are not fanciful questions

11      that I'm putting to you, Mr. Hansen.  We have

12      a process that we have tried to make orderly.

13      It's spun a little bit out of the ordinary

14      for reasons we don't have to go back in to,

15      but now we are trying this case in a month.

16      We are going to be in front of a jury in

17      about a month.  And what you are really

18      presenting to me is either a Daubert motion

19      or a motion for partial summary judgment

20      dressed up as a motion in limine.

21              Why would I let you do that?

22              MR. HANSEN:  Well, I -- I understand

23      your point.  I think that in this instance

24      there probably is some overlap between a

25      summary judgment issue, a Daubert issue or in

1    limine issue, but I think this is a proper in

2    limine issue.

3                    THE COURT:  I read your papers and I

4    understand your position.  Fine.

5                    Who is speaking to this on the other

6    side?

7                    MR. WERDEGAR:  Your Honor, me again.

8    I can be brief, Your Honor.  I think you

9    answered it already when you said this sounds

10   like a summary judgment motion.

11                   The Court probably already is

12   well-aware of this, but this was a summary

13   judgment motion.  They moved on this ground.

14   They made the very arguments they are making

15   today about, oh, they're looking at evidence

16   of commercialization.  They're looking at

17   things that aren't going to conception and the

18   Court denied the motion and this is a DI 42 38

19   and said, you know, given the evidence our

20   expert looked at and all the underlying

21   received, a reasonable juror could conclude

22   that Kelemen contributed to conception of the

23   443 invention.

24                   So you have already -- you have spent

25   a lot of time on that order.  I know you have

1      ruled on this.  I don't think there is -- I
2      don't see any daylight between what they are
3      asking for now and what they asked for in
4      summary judgment.  They didn't Daubert our
5      expert.  They didn't question his methodology
6      or credentials.
7              If we were to get back in to the
8      merits, again, he appropriately is tieing his
9      opinions to elements of the claims and that is
10     what he will do at trial.
11             THE COURT:  Sure.  The motion is
12     denied.  The last motion in limine, Dexcom's
13     number two.
14             MR. VAN NEST:  This will be
15     Mr. Lauridsen, Your Honor.
16             MR. LAURIDSEN:  Your Honor, may I
17     approach with some slides?
18             THE COURT:  Yes.
19             MR. LAURIDSEN:  Your Honor, Dexcom's
20     motion in limine number two concerns Abbott's
21     desire to introduce evidence regarding
22     Abbott's patents, other than the
23     patents-in-suit.
24             We don't think that there is a
25     justification for this, particularly given in

1      light of Your Honor's ruling earlier this

2      morning.  But walking you through the

3      different ways in which they intend to use it.

4              On page two of the slide deck is

5      paragraph 277 from Ms. Lawton's report.  Ms.

6      Lawton in highlighted text there says that the

7      FreeStyle Libre and the FreeStyle Libre two,

8      the FreeStyle Libre Pro all practice Abbott's

9      patents, over 75 patents or some of them.

10             The only thing she cites to is a web

11     page shown there in footnote 644 which simply

12     lists off the numbers of the patents that

13     Abbott believes that those various products

14     practice.

15             That's not sufficient evidence.  It's

16     not consistent with how we have handled it in

17     this case.  It's not relevant for her to do

18     this in the first place, given the prejudice

19     that could come from it, so she should be

20     precluded from doing this.

21             THE COURT:  What's the prejudice?

22             MR. LAURIDSEN:  The prejudice is by

23     piling on additional patents that Abbott

24     believes that it has for these products, they

25     will suggest that there are other patents

1              that the jury doesn't know about that would

2              prevent Dexcom from doing things.  And when

3              we were in a case in which Dexcom is arguing

4              about non-infringing alternatives, the

5              specter hanging out there that there are

6              other patents that are going to limit Dexcom

7              is prejudicial.

8                        THE COURT:  Okay.  Got your

9              argument.  Do you have something else you

10             want to say about it?

11                       MR. LAURIDSEN:  Second point, Your

12             Honor.  On point three, they come up with an

13             attempt to come up with a relevance for use

14             of their patents by pointing to Jack Griffis

15             who is an expert who provided a report in

16             November, a supplemental report related to

17             the G5, G6.  That doesn't provide relevance

18             for these patents.

19                       All Mr. Griffis says is that the

20             products at issue in this case don't practice

21             the patents-in-suit.  It's another example of

22             products that don't practice the

23             patents-in-suit.

24                       We have never claimed that the

25             FreeStyle Libres are a non-infringing

```
 1          alternative that we are going to rely upon, so
 2          that's a strong hand that does not provide
 3          relevance.
 4                  THE COURT:  All right.  Thank you,
 5          Mr. Lauridsen.
 6                  Mr. Hansen?
 7                  MR. HANSEN:  Thank you, Your Honor.
 8          So let me start with where Mr. Lauridsen
 9          ended, and that is their opinion from Jack
10          Griffis.
11                  The Court gave them leave to serve
12          some supplemental expert reports related to
13          their G5, G6 hybrid.
14                  THE COURT:  Wait.  I'm sorry, Mr.
15          Hansen.  Before you go in to that, can you
16          please tell me what it is that you want to
17          put in front of the jury precisely?
18                  They identified correctly in their
19          motion what you're planning to do, the way you
20          are planning to reference patents not in suit.
21                  MR. HANSEN:  Well, let me just -- I
22          don't have their motion in front of me.  Let
23          me just tell you what we do intend to have
24          offered.  So --
25                  THE COURT:  Yeah.  That's why I'm
```

```
 1          asking you because I do have their motion,

 2          but what I want to know, do you think -- no.

 3          They're right.  This is what we're going to

 4          do with those patents.  How we are going to

 5          be referring to them and using them at trial,

 6          if we have a chance.

 7               MR. HANSEN:  So, if Mr. Griffis

 8          testifies at trial that Libre is an example

 9          of how you can achieve the benefits of the

10          invention without practicing Abbott's

11          patents, which is what we understand that

12          they want him to say at trial, then we

13          believe it is appropriate for us to say, but

14          there are other patents that cover Libre and

15          so you couldn't do it.

16               And there are two patents

17          specifically.  We are giving them a detailed

18          claim chart.  Mr. Lauridsen's expert report

19          that will respond to Mr. Griffis is due on the

20          14th.  There will be two claim charts attached

21          to his expert report explaining how these two

22          patents --

23               THE COURT:  You still got expert

24          reports going back and forth?

25               MR. HANSEN:  We do.  Unfortunately,
```

1        we do, Your Honor.  There will be two claim

2        charts.  We gave them one of them in advance

3        so they can see, but there will be two claim

4        charts and so --

5                THE COURT:  And, in essence, your

6        argument is we have blocking patents and we

7        are entitled to -- that we are entitled to

8        show the jury that.

9                MR. HANSEN:  Yes.  If they are going

10       to have Mr. Griffis sit on the stand as he

11       does in his expert report and say Abbott's

12       own product, its Libre product, is evidence

13       that you can achieve the advantages of the

14       invention without practicing the asserted

15       patents -- and I believe the law is clear.

16       If you are going to make an argument like

17       that -- if Dexcom is going to make an

18       argument like that, we are entitled to

19       respond and we are entitled to say, no, you

20       couldn't because we have got other patents

21       that do cover that technology.

22               And they say that they're not trying

23       to characterize our Libre products as a

24       non-infringing alternative, but if they're

25       actually not going to do that, they are

```
 1        getting that close to doing it because, again,
 2        what the whole point of 40 pages in
 3        Mr. Griffis new expert report is a
 4        discussion -- they didn't have leave to do
 5        this.  They did this on their own.  They have
 6        got 40 pages in his expert report about
 7        FreeStyle Libre never discussed in any of
 8        their expert reports, and how by -- how Libre
 9        achieves some of the advantages of our claimed
10        inventions and is, therefore, evidence that
11        you can achieve those advantages without
12        practicing our asserted patents --
13             THE COURT:  Yeah.  Okay.  I
14        understand.  Thank you, Mr. Hansen.
15             Mr. Lauridsen?
16             MR. LAURIDSEN:  Mr. Hansen's
17        comments were not a fair characterization of
18        what we intend to do.
19             What we intend to do is exactly what
20        Jack Griffis puts here on slide three to
21        simply say, in the context of going through
22        the idea that these patents-in-suit are
23        incremental improvements, to say that there
24        are many different ways to do an applicator,
25        as he lays out, and he simply says that
```

1          evidence of the fact that there are many

2          different ways to do an applicator --

3                    THE COURT:  Is he going to reference

4          the FreeStyle Libre?

5                    MR. LAURIDSEN:  He's going to say

6          that Abbott's Libre provides an example of

7          yet another way to design an FDA-approved

8          commercially successful applicator --

9                    THE COURT:  And that's why you lose.

10         That's why you lose.  Denied.

11                   If you are going to put it in

12         evidence, you are going to live with them on

13         the inside.

14                   MR. LAURIDSEN:  Your Honor, they

15         have not provided us with one of the claim

16         charts yet.  This is the first we heard that

17         it's only going to be two patents.

18                   I would ask that they be held to the

19         two patent limitation so they don't file any

20         additional patents and --

21                   THE COURT:  And I'll tell you this,

22         Mr. Lauridsen.  I don't want to hear from

23         either side.  You guys have been -- we're in

24         the pretrial conference.  Stuff that was

25         supposed to have been done by a cut off

1    months and months and months ago is still

2    happening and it's happening, in part,

3    because Dexcom pulled a rabbit out of a hat

4    at the last minute.

5         And I'm not interested in who did

6    what to who at this juncture, but don't be

7    asking me for advanced rulings on things right

8    now.  You guys work it out.  Work it out and

9    show up in court ready to try the case.  I'm

10    not going to be dealing with stuff right now

11    that I don't even know what is going to be a

12    problem.

13         MR. LAURIDSEN:  Your Honor, from a

14    fairness perspective, Your Honor required

15    Dexcom to put forward certain evidence and

16    certain discovery for patents to be

17    considered for inclusion in this case.

18         I'm not asking for an advanced

19    ruling.  I'm simply stating that Abbott has

20    not satisfied the standard of what we were

21    require to do to potentially bring the patents

22    in this case.

23         THE COURT:  If what you are saying

24    to me right now is, hey, Judge, this is

25    really a discovery dispute and we want to

1          make it a discovery dispute, a point of issue

2          right in this hearing, I'm going to repeat.

3          I'm not hearing you on that right now.  There

4          is a method for doing that and I'll say it

5          again.  You work it out and if you can't work

6          it out, then I guess I'll have to hear you,

7          but if I have to hear you, it will be

8          unfortunate.  It will be unfortunate.

9                    MR. LAURIDSEN:  I understand, Your

10         Honor.  We are not going to raise discovery

11         disputes in this hearing.

12                    THE COURT:  Okay.  I think that

13         then -- I think that covers all the motion in

14         limine.

15                    We ought to talk about the

16         preliminary jury instructions and the voir

17         dire and we ought to deal with if there are

18         anything -- there are multiple points of this

19         agreement with some of the designations and I

20         guess we ought to get it -- what I would like

21         to do, what I can do is put the voir dire and

22         the preliminary jury instructions to rest.

23         Okay.

24                    So actually before I do that, have we

25         covered everything associated with the motions

1          in limine?

2                    MR. VAN NEST:  Yes, Your Honor.

3                    MR. HANSEN:  Yes, we have.  But I

4          would make one point.  We had previously

5          filed a motion to strike as to the respect of

6          the time and cost estimate for --

7                    THE COURT:  With respect to what?

8                    MR. HANSEN:  Time and cost estimates

9          relating to their non-infringement alternate.

10         We filed a motion to compel or in the

11         alternative to strike.  Your court ordered

12         discovery that we believe and we're prepared

13         to discuss today and we discussed it with and

14         in advance of this, they have not provided

15         that discovery and, therefore, we think that

16         the opinion should be stricken.

17                   THE COURT:  So we are dealing with

18         discovery disputes in this hearing?

19                   MR. LAURIDSEN:  Your Honor, we, one,

20         dispute Mr. Hansen's characterization and,

21         two, think it's completely inappropriate to

22         handle this right now.

23                   This is a new issue that was raised

24         at the end of last week.  There's no briefing

25         on it.  As I understand Mr. Hansen, he's going

1    to want to get in to specific documents and

2    whether or not this was sufficient and that

3    was sufficient.

4            Your Honor would need briefing to be

5    able to make an educated ruling.

6            THE COURT:  I appreciate that.  I'm

7    not talking about it today, Mr. Hansen.  You

8    save your discovery stuff for later and I'll

9    just repeat, you ought to work it out.  You

10   ought to work it.  If you can't, I'll hear

11   you, but, oh my gosh.  Hearing discovery

12   disputes after the pretrial conference,

13   that's a first for me.  And I have been doing

14   this for 22 years.

15           You guys are setting records.  Okay.

16   Let's talk about preliminary jury

17   instructions.

18           MR. MORIN:  Yes, Your Honor.  Your

19   Honor, would you like me at the podium and to

20   go back and forth or would you like us from

21   counsel table to go back and forth?  I have

22   had judges handle it both ways.

23           THE COURT:  I will have people -- I

24   don't care whether you are at the desk or

25   stay at the podium.  Yes.

```
 1                    MR. MORIN:  As one preview point,
 2          Your Honor, if it's helpful is you asked
 3          about working out some of the designations,
 4          which is after, obviously, the voir dire and
 5          the preliminary jury instructions.
 6                    We have worked out with our friends
 7          in our pretrial order that we are going to
 8          have a much smaller set and we are going to
 9          exchange them closer to trial which will
10          obviate the need for the Court to deal with
11          the massive set.
12                    I mean, I haven't asked Bob yet about
13          this, but I would think that we could deal
14          with most of the deposition designations and
15          the objections in our slimmed down process
16          that we have as we get closer to trial.
17                    THE COURT:  Mr. VanNest?
18                    MR. VAN NEST:  I think that's fine,
19          Your Honor.
20                    THE COURT:  Do me a favor -- not in
21          here, but I just want to make clear in front
22          of the jury when you are speaking, I would
23          like you on your feet.
24                    MR. VAN NEST:  I was following your
25          lead that you didn't care whether we were
```

```
1          there or here, but I apologize, Your Honor.

2                    THE COURT:  You are good,

3          Mr. VanNest.

4                    MR. VAN NEST:  No problem.  No

5          problem.

6                    THE COURT:  I'm happy to have you do

7          that.  I'll say that was the purpose of today

8          is what I really hear you guys saying is, we

9          want more time to work it out and then we are

10         going to argue in front of you.  So it is

11         what it is, but --

12                   MR. MORIN:  The goal, Your Honor, if

13         I may explain?

14                   THE COURT:  I hope the goal is to

15         not have any disputes.

16                   MR. MORIN:  That is the goal.  So

17         there is two things that I --

18                   THE COURT:  But I'm also not stupid

19         enough to think we are going to hit that goal

20         based on the past.

21                   MR. MORIN:  All I'm saying is a

22         couple things.  One is that Mr. VanNest and I

23         have been working cooperatively on a number

24         of things that you haven't seen, but the

25         bigger issue is that like in most cases there
```

```
 1          is much more designations than the parties

 2          will actually play, so we should be able to

 3          work through things in two ways.

 4                    One is the volume will be ten percent

 5          of even what we talk about and we'd be talking

 6          about a bunch of moot things today, so we are

 7          trying to reduce it to you to what matters.

 8          And we have a process for doing that.

 9                    THE COURT:  Right.  That I

10          understand.  My only heart break is we didn't

11          get there before today, but there is a lot

12          going on.  There is a lot going on.

13                    MR. MORIN:  And let me say one other

14          thing before I forget.  We sent you on

15          October 4th an agreed jury questionnaire.

16          It's the same questionnaire.  We still would

17          respectfully jointly submit go out to the

18          jury pool.

19                    We can resubmit it if you would like,

20          but we sent it on letterhead on October 4th.

21                    THE COURT:  I'll need to see it.

22                    MR. MORIN:  Of course.

23                    THE COURT:  I hope you have a copy

24          here.

25                    MR. MORIN:  Yes.
```

1          MR. VAN NEST:  I agree that you did

2     resolve that at the last pretrial, Your

3     Honor, and we will resubmit it, but that was

4     decided and agreed.

5          THE COURT:  Let me -- let me see it.

6     Did we talk about it at the pretrial

7     conference or is that one of those things

8     that I decided without deciding?

9          MR. VAN NEST:  I think -- and it

10     wasn't a dispute and I think you indicated

11     you had it and it was fine.  That's my

12     recollection.

13          MR. MORIN:  May I approach, Your

14     Honor?  Just because we agree doesn't mean

15     you will send it.

16          THE COURT:  Right.  It's fine.

17     Thanks.  Go ahead and arrange to have that

18     sent out.

19          So let's start first with the

20     proposed -- let's take it actually in the

21     order in which we would have dealt with which

22     is -- which will happen in court, so talk to

23     me first about your proposed voir dire.

24          MR. MORIN:  Yes, Your Honor.  Would

25     you like us only to focus on the disputed --

```
 1        the few disputed limitations or how would you
 2        like to handle it, Your Honor?
 3                THE COURT:  I'll take one thing off
 4        the table right now.  And that's the one that
 5        you agreed to that I won't agree to and
 6        that's number 24, do you serve in a
 7        leadership position either at work or in a
 8        professional, religious or social group of
 9        some kind.  I don't think that's relevant
10        enough to be asked to the jury and I'm not
11        asking it, so you can strike that.
12                MR. MORIN:  Understood.
13                THE COURT:  Twenty-four is out.
14                MR. MORIN:  Yep.
15                THE COURT:  As I understand it,
16        then, the things that are in dispute are 18,
17        20 and 23.
18                MR. MORIN:  Correct, Your Honor.
19                THE COURT:  Is there anything you
20        want to say with respect to 18?  These have
21        already been covered.  Maybe that -- yeah.
22        Go ahead, if there is -- I understand that
23        you've got this -- that they have got this
24        tied to number 23.
25                What's your response to the assertion
```

1          that you should get to start talking about

2          Abbott's line of work to prescription

3          diabetes, et cetera?

4                    MR. MORIN:  I would say two things

5          very briefly, Your Honor.  The first is, I

6          don't see how 18 is tied to 23.  I can take

7          each of them very briefly.

8                    Eighteen, I think Dexcom -- they'll

9          correct me -- has a market cap of something

10          like $50 billion, so we don't see the David

11          and Goliath relevance of any of this.  That's

12          why we made our objection.  I will say nothing

13          more on it and leave it to Your Honor.

14                    On 23, Abbott does sell prescription

15          medications and some people have strong

16          feeling about that.  Some people have very

17          strong feelings about the pharmaceutical

18          industry, and so we'd like that question asked

19          because of that.

20                    I don't see the two of them relating

21          to one another, but that is the issue.  They

22          may identify us as pharmaceutical company.

23                    THE COURT:  Turn to 20, they say,

24          look, there is no reason to get any more

25          definitive than the question ethically has

```
 1          been framed previously?
 2                    MR. MORIN:  On 20, Your Honor?
 3                    THE COURT:  Yeah.
 4                    MR. MORIN:  Twenty, we don't have a
 5          strong feeling one way or the other.  We
 6          thought adding what a continuous glucose
 7          monitor is, but we are not going to object if
 8          you say no.
 9                    THE COURT:  Good.  Because I'll say
10          no.  That's done.
11                    MR. MORIN:  That's fine.
12                    THE COURT:  I got your position on
13          18 and 23.
14                    MR. MORIN:  Thank you, Your Honor.
15                    THE COURT:  Who's got these,
16          Mr. VanNest?
17                    MR. VAN NEST:  I don't feel strongly
18          about either one of these, Your Honor.  I do
19          think that it's a question of judgment.  We
20          would like to get the jurors talking, hear
21          their views, but I don't feel strongly about
22          either one.  I do think that 23 is
23          unnecessary.  This case is not about
24          medications.  It's not about treatment.  It's
25          not about prescriptions.
```

```
 1                    THE COURT:  But Abbott is a
 2      well-known pharmaceutical company.  So here
 3      is what I'm going to do:
 4                    I'll add in to question 17, do you
 5      have strong positive or negative opinions
 6      about the medical device or pharmaceutical
 7      industry.
 8                    MR. VAN NEST:  That's instead of 23?
 9                    THE COURT:  That's in 17.  Do you
10      have strong positive or negative opinions
11      about the medical device or pharmaceutical
12      industries?  And I will not ask question 23
13      and I will not ask question 18.
14                    MR. MORIN:  For the record, we have
15      no objection on Abbott's side.
16                    THE COURT:  All right.  All right.
17                    MR. VAN NEST:  That's fine, Your
18      Honor.
19                    THE COURT:  Done.  Then --
20                    MR. VAN NEST:  In 20, you are going
21      to ask as submitted?
22                    THE COURT:  As it was.
23                    MR. VAN NEST:  Okay.  Thank you.
24                    THE COURT:  When you say it like as
25      it was before, without Abbott as an issue.
```

```
 1              MR. MORIN:  Right.  Understood.

 2              MR. VAN NEST:  Thank you.

 3              MR. MORIN:  Procedurally, would you

 4         like us to resubmit this?

 5              THE COURT:  Absolutely.  Yes.  Thank

 6         you.  That will help.

 7              Let's look at the proposed

 8         preliminary jury instructions.  This will get

 9         us in to those issues we were wrestling with

10         before.

11              Let me ask you this because sitting

12         here right now, I don't remember whether you

13         had any disputes other than the ones

14         associated with the inventorship one.

15              Was there anything else?

16              MR. WERDEGAR:  In the preliminaries,

17         Your Honor?

18              THE COURT:  Yes.

19              MR. WERDEGAR:  I think there were

20         also some damages-related stuff, how to award

21         the damages, in light of the current state of

22         the damages case.

23              But those are the two I believe are

24         in here, inventorship on the one hand and some

25         damages.
```

1           MR. MORIN:   There is a third one.

2     There is a third one on claim construction

3     language that there is a dispute on one term.

4           THE COURT:   Okay.  I'm just going to

5     tell you what I'm going to do with the -- the

6     invalidity piece of this.

7           I'm going to say, in general -- this

8     is on page three of what you submitted to me.

9     In the second paragraph on that page it will

10    say in general, however, a patent is invalid

11    if, comma, among other things, comma, it is

12    obvious, et cetera, et cetera.  And then you

13    put a period after does not meet certain

14    requirements.

15          The jury does not have to hear about

16    every invalidity defense that might become

17    relevant in preliminary instructions, and I do

18    want to see how things come in, and I

19    understand how things are going to come in, so

20    I'm not going to get in to anything dealing

21    with whether Kelemen was an inventor or not,

22    or what -- who said to who or anything like

23    that.

24          So that will also pertain to the

25    bracketed language on page six.  That will not

1          be given.  Okay.

2                   MR. MORIN:  For the record, Abbott

3          has no objection to those modifications.

4                   THE COURT:  Yeah.  I'm pretty sure

5          you wouldn't have an objection.

6                   Who has got this?

7                   MR. WERDEGAR:  Your Honor, we

8          understand that this is -- so for the

9          preliminaries, we are not going to --

10                  THE COURT:  You are not waiving

11         anything by saying okay.  You made your --

12         you made your positions pretty clear here

13         today.  I'm sure that at the appropriate time

14         at trial where you need to make an objection,

15         you'll make it, but okay.

16                  MR. VAN NEST:  Your Honor, could you

17         just read that sentence?  I want to make sure

18         we got it right.  The one on page three.

19                  THE COURT:  Page three.

20                  MR. VAN NEST:  The sentence in the

21         second paragraph.

22                  THE COURT:  In the third line down

23         in that paragraph, after the word "if."  A

24         patent is invalid if, comma, among other

25         things, comma, it is obvious in view, et

1          cetera, et cetera.

2                    And then on the next line you put a

3          period after requirements.  And strike all the

4          bracketed language.

5                    MR. VAN NEST:  Got it.  Thank you.

6                    THE COURT:  Okay.  That takes us to

7          page 11 and we have disagreement about

8          damages, I guess.

9                    Go ahead.  I'll hear from Abbott

10         first on it.

11                   MR. MORIN:  Your Honor, we're

12         sticking with the federal circuit bar

13         association model instructions.

14                   I think the core of the dispute is

15         Dexcom is maintaining a position that we may

16         not prove entitlement to any damages and wants

17         to put that in the preliminary instructions.

18         We disagree that that's appropriate.

19         Statutorily, we are entitled to no less than

20         the reasonable royalty.

21                   I suppose when we get to the end of

22         the case, we'll hear whatever JMOLS that they

23         want to make, but the statute is the statute

24         and the instruction are the instructions and

25         we think that it's perfectly appropriate as

 1          it's listed in the model rules.

 2                   The jury does not have to be told

 3          preliminarily contrary to the statute that we

 4          may not be entitled to any damages.

 5                   THE COURT:  Okay.  Thanks.

 6          Mr. Lauridsen?

 7                   MR. LAURIDSEN:  Dexcom's edits here

 8          are because of the unusual circumstances we

 9          have where there is no reasonable royalty

10          opinion being put forth by the plaintiff.

11          That puts us in to a situation where there

12          could be potentially a zero damage award or a

13          nominal damage award.

14                   We simply want a jury instruction

15          that leaves open that possibility and does not

16          incorrectly assert that that's impossible to

17          get to.

18                   THE COURT:  And why does -- you will

19          then need to decide any money damages not

20          covered exactly because any could mean

21          nominal.

22                   MR. LAURIDSEN:  Give me a moment.

23          I'm just looking at the two proposals here.

24                   I believe the key part here is right

25          before it.  If Abbott has shown --

```
 1                    THE COURT:  I know that's the key
 2          part, from your perspective.  I understand
 3          that.  My question to you is:  Why is it not
 4          sufficient to say you will then need to
 5          decide any money damages?  The word "any"
 6          could mean nominal because I think you would
 7          have to agree, statute says you got to give
 8          them something.  It may be nominal, but you
 9          have to give them something.  Right?
10                    MR. LAURIDSEN:  There are situations
11          in which a zero damage award could be
12          appropriate, but, yes, the statute says that.
13                    Your Honor, to answer your question,
14          by saying you will then need to decide any
15          money damages to Abbott suggests that there
16          will be money damages appropriated.
17                    THE COURT:  I don't think you are
18          going to have to worry about that with the
19          jury instruction, Mr. Lauridsen.  I'm not
20          going to take your proposal.
21                    Now, there is a second piece here
22          says, this is a preliminary jury instruction.
23          I don't think I need to give the bracketed
24          language that Abbott proposes.  We can just
25          say, any money damages to be awarded to Abbott
```

```
 1          for compensated infringement and then skip
 2          down to the damages awards are meant to
 3          compensate Abbott and not to punish Dexcom.
 4                    The immediate information, frankly,
 5          at preliminary stage I don't think is
 6          essential or needed, and it avoids the
 7          disputes you got.  So that's how we will
 8          handle it.
 9                    MR. MORIN:  Your Honor, our only
10          point of clarification would be, I'm sure in
11          the opening one or both sides would refer to
12          that the damages would be no less than a
13          reasonable royalty.
14                    THE COURT:  You can -- you can in
15          your opening make a statement like that if
16          you want.  I'm telling you what I'm going to
17          say to them.
18                    MR. MORIN:  I understand, Your
19          Honor.
20                    THE COURT:  And I'll ask you to fix
21          that.
22                    MR. LAURIDSEN:  No objection, Your
23          Honor.
24                    THE COURT:  And then there is a
25          claim term problem on page 16.
```

1          MR. MORIN:  May I approach, Your

2     Honor?

3          THE COURT:  Yes.

4          MR. MORIN:  I will be brief.  The

5     only issue here is in the summary judgment

6     decision, although it was not in the claim

7     construction order, you ruled that it, quote,

8     it is not the case that a straight track must

9     be stationary.  I think it's form over

10    substance as to whether that was in the

11    summary judgment decision of the claim

12    construction.

13         We would like that read to the jury

14    because that's your ruling of what the term

15    means.  And we are a little worried about how

16    hard the other side is protesting.  Why don't

17    they want that in there unless they intend to

18    argue that straight tracks must be stationary.

19         So we don't -- we are a little

20    worried that they're objecting to what you

21    already held is the meaning of that term.

22         THE COURT:  Mr. Werdegar?

23         MR. WERDEGAR:  Two points, Your

24    Honor.

25         The agreed upon portion of this

1       instruction follows, just repeats what's in

2       the claim construction order.  We do certainly

3       understand the guidance provided in the

4       summary judgment hearing and, of course, of

5       our expert runs contrary to that.  I'm sure

6       they will stand up and object and you will be

7       telling the jury an instruction.

8               So I don't think this is a necessary

9       addition, particularly for a preliminary

10      instruction.  But I'll also add that even if

11      it were, they're trying to sneak in --

12      sneak -- sorry.  They're trying to add in to

13      this, Your Honor, second access and access and

14      your summary judgment order does not include

15      anything about those terms, so I think it

16      would be inappropriate on this to put those in

17      certainly.

18              THE COURT:  I'm not putting it in.

19      I'm not putting it in.  We will see how stuff

20      comes in in trial and we can deal with --

21      there has to be some kind of instruction I

22      guess -- we will deal with it when we deal

23      with it.  My order said what it said and the

24      experts are entitled to rely on it.

25              So deal with it at trial.  But I'm

1        not putting it in a preliminary instruction.

2                MR. MORIN:  We understand, Your

3        Honor.  And similar to the voir dire, we will

4        work with our friends to submit a revised

5        preliminary jury instruction with everyone

6        agreeing we're not waiving any objections,

7        but we will submit it to Your Honor.

8                THE COURT:  Yeah.  That will be a

9        help.  Okay.  Here is what I -- based on what

10       Mr. Morin said earlier, I understand both

11       sides are suggesting to me hold off talking

12       about these other things because you believe

13       you will substantially narrow them, maybe

14       even eliminate your disputes on it.  But I

15       guess we will find out about that.

16               So let me ask you this:  When should

17       we have our third pretrial conference?

18               MR. MORIN:  Your Honor, of course,

19       we are at the Court's discretion, but I would

20       think the week prior to trial.  Both trial

21       teams will be here.  Things will be fairly

22       crystalized.

23               I've found it useful in the past to

24       do that towards the end of -- middle to the

25       end of the week before, but I also invite the

1       views of our friends.

2              MR. VAN NEST:  I think that makes

3       good sense, Your Honor.  We will all be here

4       that week, the week before.  And if we could

5       do a Wednesday or Thursday.  By then maybe

6       we, as you say, the word eliminate might keep

7       in to the lexicon here in terms of disputes.

8       That would be, I think, good.

9              THE COURT:  I have to go down and

10      look at my calendar and I'll try to see what

11      I can do for you.  I hear -- you know, I have

12      a day job with the U.S. Appeals Court for the

13      Third Circuit.  And I will be hearing

14      argument that week in Philadelphia, so I will

15      try to get back here on Friday.

16             I think that may be the best I can do

17      for you, but I will -- I will have my judicial

18      assistant reach out to, Mr. Blumenfeld and Mr.

19      Shaw, your excellent local counsel, and we

20      will work something out with both teams.

21      Okay.

22             MR. VAN NEST:  That's great.

23             MR. MORIN:  I have two observations,

24      if I may.  The first is that I think it will

25      be useful to have some time together.  The

1      parties have proposed, just some I'm a little

2      clearer, articulated process for deposition

3      designations and exhibits so that you have to

4      identify them several days in advance of

5      being used with the witness and played and

6      then the parties can negotiate.  And what we

7      would hope to be that there be very little --

8      and maybe the morning before the jury comes

9      in or outside the presence of the jury, we

10     could relegate it to very few issues.

11             I find that the pressure of being at

12     trial makes people more reasonable and so I'm

13     hoping, I think it is good to get time then,

14     but our process also envisions bringing fewer

15     issues to Your Honor.

16             THE COURT:  Good.  Don't -- don't

17     think I'm confused about this, Mr. Morin.  I

18     fully expect that I'll be seeing you each

19     morning at eight o'clock.

20             MR. MORIN:  I'm hoping little.

21             THE COURT:  I would like to be

22     surprised, but I will be surprised if I'm not

23     seeing you every morning at eight o'clock the

24     way things have gone.

25             Now you have worked a lot of stuff

```
 1          out.  That's great.  I'm sure that behind the
 2          scenes there is professional cooperation going
 3          on for which I am genuinely grateful and I
 4          hope both sides will continue to do that in
 5          the best spirit of the profession, this
 6          facility and with due regard to, not just the
 7          Court's time, but the time that's going to be
 8          asked of the jury because what I really don't
 9          want is side bars.  Sometimes that's
10          unavoidable.
11               And I'm glad you mentioned this
12          because it reminds me of something I want to
13          make very clear.  If you are on your feet, the
14          time is counting against you unless I choose
15          otherwise.  It may be that you make an
16          objection and I think that's just not sensible
17          and I am not going to penalize the other side
18          for defending against it.  The time is going
19          against you or contrary-wise, an objection is
20          made and it's completely well-founded.  And if
21          I have to take a side bar, I'll count it
22          against the party who is asking the question
23          that got objected to.
24               That's my role as the representative
25          in this and I have been in the courtroom with
```

1      some of you already in trial and I hope I left
2      you with the sense that I'm just -- I got no
3      interest except in a fair trial.  That's it.
4      I will do my very best in that regard.
5              But I will call those as I see them
6      and that might mean -- and that should prompt
7      you to work stuff out where you can work it
8      out and to make sure objections are
9      well-founded because if I think, you know,
10     this could have gone either way, then the
11     person who objected, they will heed their
12     time.  And the person who defended will heed
13     their time.
14             And the clerk in the courtroom, the
15     courtroom deputy will do his or her utmost to
16     make sure it's divided fairly.  I don't want
17     somebody arguing, hey, you took two minutes
18     that you shouldn't have taken from me.  Just
19     we are going to do the best we can and we are
20     going to do the best we can.
21             MR. MORIN:  You are the ultimate
22     judge.
23             THE COURT:  Right.  I'm not going to
24     be -- if somebody stands up -- we're not
25     doing this down to the tenth of a second.  We

```
 1        will do the best we can.  Just be smart about
 2        where you choose to burn your time because if
 3        you burn it in a way I think is unnecessary
 4        and you cause the other side to have to use
 5        time, I'm going to count it all against you.
 6        Okay.
 7                    MR. MORIN:  My last comment, Your
 8        Honor, but it invites more comments is there
 9        are two other items on the agenda which I
10        think would be worthwhile resolving not the
11        week before trial, but now.
12                    THE COURT:  When you say "on the
13        agenda."
14                    MR. MORIN:  Yes, Your Honor.  We
15        sent you the letter of February 2.
16                    THE COURT:  Yeah.  Hold on.  Thank
17        you for reminding me.
18                    MR. MORIN:  Thank you, Your Honor.
19        Whenever you are ready, Your Honor.
20                    THE COURT:  I'm ready.
21                    MR. MORIN:  One of them has to deal
22        with the Sayer comments that's on page two
23        and our colleague, Rodger Smith, will handle
24        that one.  And one of them has to deal with
25        undisputed elements.  That's on page three
```

1     and Mr. Blumenfeld will handle that one.

2              But we appreciate the Court's

3     guidance and think it will be helpful not to

4     wait until the week before trial on those

5     issues.

6              So Sayer with Mr. Smith -- with Mr.

7     Smith, and undisputed elements with

8     Mr. Blumenfeld.

9              THE COURT:  This is Dexcom's

10    projection; right?

11             MR. MORIN:  I think it is

12    procedurally, Your Honor.

13             THE COURT:  Okay.  Dexcom gets the

14    first crack.

15             MR. VAN NEST:  Thank you, Your

16    Honor.

17             I'll take the Sayer comments first.

18    I don't think this is something that can be

19    addressed in an omnibus fashion.  This should

20    be addressed case by case.

21             That's because a lot of these 30

22    different items of evidence have substantial

23    evidentiary problems.

24             I have agreed that where we have

25    something like an earnings call that Dexcom

1          prepared a summary of, a transcript, and

2          it's -- we know it's authentic.  We know where

3          it came from.  Fine.  We have withdrawn our

4          objection to those and there are about six of

5          those.

6                    The rest of these are all third-party

7          things pulled off the internet.  None of these

8          have been authenticated.  They're podcasts.

9          They're interviews.  Some are audiotapes.

10                    What I have said about those is, I'm

11          willing to consider them one at a time.  Tell

12          me which ones are really really important to

13          you.  They've got about 22 dozen of them.

14          But, for example, these are all things that

15          were created by third parties.  These podcasts

16          have lots of hearsay material in them.  They

17          weren't authenticated by anybody.  They didn't

18          go to third parties and try to get a

19          declaration or business records exception or

20          any of that stuff.  They just pulled it off

21          the internet.  They dumped it in to Ms.

22          Lawton's report.

23                    In some cases, the way they are using

24          them is putting questions and answers together

25          as though they're a continuous discussion

1    when, in fact, they are 20, 30 minutes apart

2    in the interview.

3            So I'm very suspicious that this

4    could be handled by a broad stipulation that

5    all this stuff is fine.

6            I have different objections to

7    different ones of these, but I have as to the

8    ones that I know are authentic, and those are

9    the transcripts that we, the third parties,

10   prepared of earning calls which are official

11   Dexcom events.  I have agreed to withdraw our

12   objections as to those.

13           But, for example, they have a number

14   of audio interviews which are podcasts by a

15   woman who continual who asks a very long

16   question with lots of hearsay and speculation

17   in it, and Mr. Sayer might -- might or might

18   not make a short comment at the end of it.

19   Obviously, that's objectionable.  They not

20   only didn't authenticate that.  It's largely

21   hearsay in the first case.

22           So what I said is I'm willing to

23   continue to work with you guys on which ones

24   of these, if any, are important to you.  It's

25   one thing to use it in an expert report.  They

1          want to stand up in the opening and play these
2          audios as though they are testimony under oath
3          when, in fact, all they are is audio
4          interviews that they pulled off the internet.
5                    I think this is better handled in the
6          course of a trial, but I know that the reason
7          they want it dealt with today is they want to
8          play a bunch of audio tapes from third-party
9          podcasters where they didn't bother to get any
10         sort of declaration.  And they want to play it
11         in the opening as though it's testimony.
12                   Mr. Sayer himself is not on anybody's
13         witness list.  He's not going to be a witness
14         in the trial.  He's never been confronted with
15         any of this stuff and I would say particularly
16         with respect to these podcasts pulling out
17         bits and pieces of a 30 minute or a 40-minute
18         interview is completely inappropriate.  But I
19         don't think we can deal with it as a blanket
20         stipulation.
21                   I'm willing to work with them on
22         things they think are important, but I'm not
23         willing to stipulate broadly to anything they
24         found on the interview being fairly game for
25         opening statement.

```
 1                    THE COURT:  I understand,
 2        Mr. VanNest.
 3                    MR. VAN NEST:  Thank you.
 4                    MR. SMITH:  Good afternoon, Your
 5        Honor.
 6                    Mr. VanNest accurately described many
 7        of these documents, but these podcasts, for
 8        example, there is no question that's Mr.
 9        Sayer's voice on the podcast.  I can go listen
10        to it on --
11                    THE COURT:  When you say "there is
12        no question," look, the rules of evidence are
13        the rules of evidence.
14                    MR. SMITH:  That's right, Your
15        Honor.
16                    THE COURT:  How do you authenticate
17        them?
18                    MR. SMITH:  Well, if they will not
19        withdraw their objections, then I guess we
20        are going to have to ask for a deposition of
21        Mr. Sayer, a trial deposition of their CEO.
22                    THE COURT:  You are not going to get
23        that.  We're not doing that.  You are way
24        late for that.  Forget it.
25                    So how are you going to authenticate
```

1      them?

2            MR. SMITH:  Your Honor, we will

3      investigate that, but that was going to be

4      our ask.  That if they don't withdraw their

5      objection because this is not a hearsay

6      problem.  These are party opponent

7      admissions, statements by their CEO.  They

8      want to come in to court and particularly on

9      the G5, G6 issue they want to come in to

10     court and say it would had been no problem

11     going back from G6 to G5, and their CEO in

12     one of these podcasts says, I have told my

13     people -- I, Kevin Sayer, will not go back.

14     I will not go back.  I will never go back to

15     G5.  At one point he refers to it and he

16     agrees with the podcaster, it's a torture

17     device.

18            So it's fundamentally unfair to have

19     them come in to court and suggest patients

20     would be fine going backwards in time to G5

21     when their CEO publicly to investors and to

22     customers and patients has said the exact

23     opposite.

24            THE COURT:  Well, if you got

25     evidence, bring your evidence.

1          I will say this:  Until I see the
2      evidence and until the proper foundation is
3      laid, it's not evidence.  So do not deal with
4      it in the opening, period.
5          MR. SMITH:  Your Honor, I guess the
6      other point to make here is that there was
7      discovery requests where these things, we
8      have every reason to believe, is in their
9      possession.  They're --
10          THE COURT:  I hear you, Mr. Smith.
11      It's irrelevant.  What is relevant to me is
12      do you have a foundation for it.  They're
13      standing on their objection.  They're
14      entitled to stand on their objection.
15          So until you've laid a foundation,
16      you are not putting it in front of a jury, so
17      by definition you are not doing it in opening
18      statement.
19          If you are able to lay a foundation
20      at trial and put it in, you can put it in.
21          MR. SMITH:  Your Honor, my
22      understanding is the only objection at this
23      point is to authentication.  There has been
24      no articulations that Mr. Sayer's statements
25      are not 801 D2 party admissions.

1             THE COURT:  Admissions?

2             MR. SMITH:  Yeah.

3             THE COURT:  Well, I just heard him

4     make a hearsay objection, but I'll deal with

5     your argument on that if and when I got to

6     deal with it.  Right now what I'm saying is

7     you don't have a foundation for it that I'm

8     aware of and I will wait to hear your

9     foundation laid at trial.  Until you've laid

10    a foundation, you don't refer to it in

11    opening statement.  Okay.

12            MR. SMITH:  Thank you, Your Honor.

13            THE COURT:  Thanks.  And by "it," I

14    mean podcasts, things like that.  I

15    understand that you have worked out some

16    things about the investor calls and what I

17    just said doesn't go to that.

18            MR. SMITH:  Your Honor, let me just

19    on that point.  There are -- there has been a

20    podcast at one end of the spectrum and

21    there's earnings calls at another.  They have

22    agreed, I think, to all, but one of the

23    earnings calls.  We will talk to them about

24    the last one, but there is also investor

25    presentations, too, where there is

1        transcripts made.  We have talked to them

2        about where they are made and by whom.

3                 THE COURT:  If you work it out and

4        they say they are not going to fight

5        admission of that, okay.

6                 MR. SMITH:  I just didn't want to

7        leave the impression that we are dropping our

8        attempt to introduce it.

9                 THE COURT:  Understood.  Thank you,

10       Mr. Smith.  All right.

11                 The second one is Jack Blumenfeld.

12                 MR. BLUMENFELD:  Your Honor, I

13       thought we had already discussed this at one

14       of the previous conferences.  I don't know

15       which.

16                 Our only point is that the parties

17       shouldn't be putting in evidence of things

18       that aren't contested.  This goes to

19       infringement on our side.  It goes to validity

20       on their side.  There is limitations that

21       aren't contested, the parties just ought to

22       just stipulate to it.  We shouldn't be taking

23       the jury's time on things that aren't issues.

24                 And the response that we got was,

25       well, you should drop some patents.  And I

1          thought we were past that issue, also, but I

2          don't see how that makes any sense in terms of

3          what we are going to present to the jury.

4                  It just seems to me that the parties

5          ought to be encouraged, if not ordered, to,

6          you know, agree on uncontested limitations,

7          not by taking the jury's time giving them

8          evidence on things that they're not being

9          asked to decide.

10                 So we hope that Your Honor will, at

11         least encourage, if not order, the parties to

12         do that.

13                 THE COURT:  All right.  I

14         understand.  Thank you, Mr. Blumenfeld.

15                 Mr. VanNest?

16                 MR. VAN NEST:  What I told

17         counsel -- and they've raised this a number

18         of times, and I know Your Honor has said the

19         same thing every time.

20                 We have a time limit.  We're going to

21         use our time wise.  I don't intend to waste

22         people's time.  I did say to them, look, you

23         guys are the ones that want to try seven

24         patents and Judge Jordan has allowed you to do

25         that.  Okay.  Then you are going to have to

```
 1            prove those up.  And I'm going to be picking
 2            my spots.  They say, well, we will do it on
 3            your invalidity, too.  Sure.  Their experts
 4            contest every single element practically of
 5            any prior art I've got.  They've got some of
 6            the most trivial objections, so that's like
 7            giving away snow in winter.
 8                       I'm happy to work with them.  And
 9            what I did say was, I think this trial would
10            be a lot more understandable and a lot more
11            simple and clear for jurors if we had a
12            reasonable number of patents to try.  As it is
13            now with what we have -- and I have said this
14            before and Your Honor is -- I'm not asking for
15            anything from you.  I've said it.  You want to
16            try seven patents, then that is going to be
17            your problem.  You have got your 22 hours.
18            I've got mine.  And I will use my time wisely,
19            but I'm not going to give you stipulation to
20            waiver on the courtroom and say Dexcom admits
21            this this this this and the other.
22                       Dexcom is going to challenge those
23            elements where we think they have not met
24            their burden and I'm going to stay within my
25            22 hours and I assume they will as well.
```

```
 1                THE COURT:  All right.  I
 2     understand.  I do understand both sides of
 3     the issues and I'm not going to tell anybody
 4     to stipulate to anything.
 5                I will say this:  I, of course, will
 6     not tolerate somebody coming up with some new
 7     argument that they never had suggested to the
 8     other side before.  So, when you say things
 9     that aren't contested, you know, if you have
10     to have a witness get on the stand and prove
11     something on your side and they don't bring
12     forth any evidence on the other side, I think
13     they're right.  It's your burden.  You don't
14     have to take too long to do it because they
15     are not going to do anything on the other side
16     to stop it.
17                But that's all I'm going to say about
18     it.  I'm not going to make people stipulate to
19     things.  I'm not going to tag them on their
20     time because you have to carry the burden of
21     proof.  You choose to go to trial.  Bring it
22     to trial.  You have your time frame in which
23     to do it.  Everybody knew the time that you
24     were dealing with.
25                You say you could try seven patents
```

1          in that time.  It's okay.  Try it in that

2          time.

3                    Now, of course, I think the parties

4          should be working together to make this as

5          easy for the jury as possible.  I think that

6          makes sense.  And I hope you'll continue to do

7          that, but I'm just repeating myself.

8                    I'm not going to ask Dexcom to

9          stipulate to elements of proof for your case

10         in chief.  Okay.

11                   Now, those were the -- oh, I better

12         take another look at Mr. -- there is one other

13         thing that says other issues disputed.

14                   MR. VAN NEST:  That's the discovery

15         issue, Your Honor.

16                   THE COURT:  That's the discovery

17         issue.  We will deal with that when we deal

18         with it.  You will have to address that by

19         arranging for your time and my hope is that

20         you can figure it out without further Court

21         intervention, but if you can't, that's what

22         I'm here for, and I will try to help you out

23         with it.

24                   Is there anything else we need to

25         deal with today, Mr. Morin?

```
1              MR. MORIN:  Not from the Abbott
2        side, Your Honor.
3              MR. VAN NEST:  Not for Dexcom, Your
4        Honor.  Thank you very much.
5              THE COURT:  All right.  Thank you to
6        our court reporter.  Thank you to counsel.
7        Just a moment to pack my bag.  We're in
8        recess.
9              COURT CLERK:  All rise.
10             (At 1:05 p.m. proceedings were
11          concluded.)
12                           -  -  -
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    C E R T I F I C A T E

 2

 3

 4            I, KIMBERLY A. BURSNER, Registered

 5     Professional Reporter, do hereby certify that

 6     the foregoing is an accurate transcript of the

 7     proceedings, as reported by me, in the

 8     case herein stated, and that I am neither

 9     counsel nor kin to any party or participant in

10     said action, nor interested in the outcome

11     thereof.

12

13

14                           _____

15                           Kimberly A. Bursner
                             Registered Professional
16                           Reporter

17

18

19

20

21

22

23

24

25
```