IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ABBOTT DIABETES CARE INC. and
ABBOTT DIABETES CARE LIMITED,

    Plaintiffs,

    v.

DEXCOM, INC.,

    Defendant.

)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 21-977 (KAJ)
**FILED UNDER SEAL**

## MEMORANDUM OPINION

John W. Shaw, Andrew E. Russel, Nathan R. Hoeschen, SHAW KELLER LLP, 1105 N. Market Street, 12th Floor, Wilmington, DE 19801, *Counsel for DexCom, Inc.*
    Of Counsel:  Robert A. Van Nest, Leo L. Lam, Eugene M. Paige, Sophie Hood, Elizabeth A. Egan, R. Adam Lauridsen, Matan Shacham, Matthew M. Werdegar, William S. Hicks, David J. Rosen, Eric B. Hanson, JD Schneider, Andrew S. Bruns, Puja Parikh, Bilal Malik, Michael K. Deamer, Stephanie J. Goldberg, Oliver J. Fong, Yena Lee, Jacquie P. Andreano, Ellen G. Watlington, KEKER, VAN NEST & PETERS LLP, 633 Battery Street, San Francisco, CA 94111-1809
                Theodore D. Kwong, HILGERS GRABEN PLLC, 10000 N. Central Expy., Ste. 400, Dallas, TX 75231
                Nathan Hamstra, QUINN EMANUEL URQUHART & SULLIVAN, 191 N. Wacker Drive, Ste. 2700, Chicago, IL 60606

Jack B. Blumenfeld, Rodger D. Smith, II, Anthony D. Raucci, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, 1201 N. Market Street, Wilmington, DE 19899, *Counsel for Abbott Diabetes Care, Inc., Abbott Diabetes Care Ltd.*
    Of Counsel:  Leland G. Hansen, James M. Hafertepe, Sharon A. Hwang, Paul W. McAndrews, Michael J. Carrozza, Scott P. McBride, Thomas J. Wimbiscus, Carey J. Prill, Manuela Cabal, Alex M. Vogler, Rocco J. Screnci, Amanda C. Jackson, Dorien J. Clark, McANDREWS, HELD & MALLOY, LTD., 500 W. Madison Street, 34th Fl., Chicago, IL 60661

Michael A. Morin, Michael Evan Bern, Tyler Bryan Latcham, Richard Lowry, LATHAM & WATKINS LLP, 555 Eleventh Street, NW, Ste. 1000, Washington, DC  20004
Rachel Renee Blitzer, Christine I. Nam, P. Anthony Sammi, LATHAM & WATKINS LLP, 1271 Avenue of the Americas, New York, NY  10020
S. Giri Pathmanaban, LATHAM & WATKINS LLP, 301 Congress Avenue, Ste. 900, Austin, TX  78701
Aaron Macris, LATHAM & WATKINS LLP, 200 Clarendon Street, Boston, MA  02116
Ryan Thomas Banks, LATHAM & WATKINS LLP, 650 Town Center Drive, 20th Fl., Costa Mesa, CA  92626
Melanie J. Grindle, LATHAM & WATKINS LLP, 12670 High Bluff Drive, San Diego, CA  92130
Ellisen Shelton Turner, KIRKLAND & ELLIS LLP, 2049 Century Park East, Ste. 3700, Los Angeles, CA  90067
Amanda J. Hollis, KIRKLAND & ELLIS LLP, 300 N. LaSalle, Chicago, IL  60654
Benjamin A. Lasky, KIRKLAND & ELLIS LLP, 601 Lexington Ave., New York, NY  10022
Jason M. Wilcox, KIRKLAND & ELLIS LLP, 1301 Pennsylvania Avenue, NW, Washington, DC  20004

November 13, 2024
Wilmington, Delaware

JORDAN, *Circuit Judge*, sitting by designation.

## I.      INTRODUCTION

Plaintiffs Abbott Diabetes Care Inc. and Abbott Diabetes Care Limited

(collectively, "Abbott") sued Dexcom, Inc. for patent infringement.  The parties tried the

case to a jury for two weeks, with four patents in dispute.  (*See* D.I. 683-92 ("Tr."[1]).)  The

result was a mixed verdict.  (D.I. 676.)  The jury found that Dexcom infringed claim 28

of U.S. Patent No. 10,945,649 ("the '649 Patent") but not willfully, that it did not infringe

claim 3 of U.S. Patent No. 10,945,647 ("the '647 Patent") or claim 22 of U.S. Patent No.

10,874,338 ("the '338 Patent"), and that claim 22 was invalid as obvious.  (D.I. 676 at 1-

2, 4.)  The jury was hung on whether Dexcom infringed claim 3 of U.S. Patent No.

11,000,216 ("the '216 Patent").  In light of that last occurrence, I instructed the jury not

to take up the issue of damages.  (D.I. 676 at 1, 3; Tr. 2364:12-25.)

Pending before me now are the parties' cross motions for judgment as a matter of

law (or "JMOL") and a new trial.  (D.I. 679, 680.)  Dexcom moves for a new trial on

infringement of the '649 Patent.  (D.I. 679 at 1.)  It also asks for judgment that it does not

infringe the '216 Patent, that it owes only nominal damages, and that, in the event of a

new trial on infringement of any patents in suit, its infringement was not willful.  (D.I.

679 at 1; D.I. 697 at 38-44.)  For its part, Abbott moves to overturn the verdict of, or

obtain a new trial on, noninfringement of the '647 Patent.  (D.I. 680 at 1-2.)  It also seeks

---

[1] The trial transcript from March 19, 2024, is not consecutively paginated with the
other trial transcripts, so it will be cited as "3/19/24 Tr."

a new trial on willfulness and a judgment that Dexcom infringes the '216 Patent and owes damages. (D.I. 680 at 1-2.)[2]

For the reasons that follow, Dexcom's Renewed Motion for Judgment as a Matter of Law and Motion for New Trial (D.I. 679) will be GRANTED-IN-PART insofar as it argues that it did not willfully infringe the patents in suit and DENIED-IN-PART insofar as it argues that no reasonable jury could find it infringed the '216 Patent, that it deserves a new trial on infringement of the '649 Patent, and that Abbott is entitled to only a nominal reasonable royalty and not entitled to lost profits. Abbott's Renewed Motion for Judgment as a Matter of Law (D.I. 680) will be GRANTED-IN-PART insofar as it argues that Dexcom infringed the '216 Patent, that it is entitled to a non-zero reasonable royalty, and that is entitled to a new trial on damages. Its motion will be DENIED-IN-PART insofar as it argues that Dexcom infringed the '647 Patent, that it is entitled to lost profits

---

[2] Abbott's motion mentions JMOL or a new trial on infringement and validity of the '338 Patent, but, by its own admission, it does not brief those issues (D.I. 699 at 2 n.1), so I deem them forfeited. *See* Fed. R. Civ. P. 50(a)(2) ("The motion must specify … the law and facts that entitle the movant to the judgment."); *Arkwright Mut. Ins. v. Phila. Elec. Co.*, 427 F.2d 1273, 1274 (3d Cir. 1970) (holding that the "requirement" to "file[] … reasons in support of [one's] motion … also applies to a motion for judgment n.o.v. since it is but a renewal of the motion for a directed verdict"); Fed. R. Civ. P. 7(b)(1)(B) (motions must "state with particularity the grounds for seeking the order"); *see also Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 404 (2006) ("[A] respondent's failure to comply with Rule 50(b) forecloses its challenge to the sufficiency of the evidence [on appeal.]"); *Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 859 (Fed. Cir. 1991) (reasoning that a post-verdict motion is needed, *inter alia*, for the district court to draft "a thorough written … opinion"). The same is true of its request for JMOL on willfulness (D.I. 680 at 1) and Dexcom's request for JMOL on infringement of the '649 Patent (D.I. 679 at 1; D.I. 697 at 44).

as a matter of law, and that it is entitled to a new trial on willfulness and on infringement of the '647 Patent.

## II.    BACKGROUND

The technology at issue relates to continuous glucose monitoring ("CGM") systems, which help diabetic patients track their blood glucose levels. Abbott manufactures the FreeStyle Libre CGM, and it accuses Dexcom, which manufactures the G6 CGM, of infringing the patents-in-suit.[3] The technology in dispute is described in relevant detail in other decisions in the case. *See, e.g.*, *Abbott Diabetes Care Inc. v. DexCom, Inc.*, No. 21-977, 2023 WL 2599516 (D. Del. Mar. 22, 2023); (D.I. 482). My understanding of the patents is explained below, in connection with the various issues.

## III.    DISCUSSION

### A.    Legal Standards

#### 1.    Judgment as a Matter of Law

In a patent case, as in all others, a district court must apply regional circuit law in deciding a motion for judgment as a matter of law. *EcoFactor, Inc. v. Google LLC*, 104 F.4th 243, 250 (Fed. Cir. 2024). Under Third Circuit law, judgment as a matter of law is "granted only if … there is insufficient evidence from which a jury reasonably could find" for the nonmovant. *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)

---

[3] DexCom makes various CGMs accused of infringement: the G6 CGM, the Pro Q CGM, the G6 Pro CGM, the G6 Glucose Program CGM, and the ONE CGM. (Tr. 178:21-179:3.) The parties stipulated that the G6 is representative of those products. (Tr. 179:4-6.)

(internal quotation marks omitted).  "A jury's inability to reach a verdict does not

necessarily preclude a judgment as a matter of law." *Shum v. Intel Corp.*, 633 F.3d 1067,

1076 (Fed. Cir. 2010); *accord Stewart v. Walbridge, Aldinger Co.*, 882 F. Supp. 1441,

1443 (D. Del. 1995) ("The fact that the jury was unable to reach a unanimous verdict

does not in any way affect this Court's duty to rule on the motion.")  "[T]he trial judge

must direct a verdict if, under the governing law, there can be but one reasonable

conclusion as to the verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

On the other hand, JMOL is improper "[i]f reasonable minds could differ on the import of

the evidence[.]" *Id.*

In assessing the sufficiency of the evidence, a district court must "view[] the

evidence in the light most favorable to the nonmovant and giv[e] it the advantage of

every fair and reasonable inference[.]" *Kars 4 Kids Inc. v. Am. Can!*, 8 F.4th 209, 218

n.8 (3d Cir. 2021).  Thus, I may not "weigh the evidence, determine the credibility of

witnesses, or substitute [my] version of the facts for the jury's version." *Id.*  Rather, I

must determine whether the evidence reasonably supports or indeed compels a jury

verdict. *Gomez v. Allegheny Health Servs. Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995).

### 2.    New Trial

Regional circuit law also applies to motions for a new trial. *Adasa Inc. v. Avery

Dennison Corp.*, 55 F.4th 900, 913 (Fed. Cir. 2022), *cert. denied,* 143 S. Ct. 2561 (2023).

A new trial is in order "when the great weight of the evidence cuts against the verdict and

6

a miscarriage of justice would result if the verdict were to stand." *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016) (cleaned up).

### B.    Patent Infringement

Patent infringement occurs when a person "without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent[.]" 35 U.S.C. § 271(a). "Determining infringement requires two steps: construing the claims and comparing the properly construed claims to the accused product." *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1316 (Fed. Cir. 2015). Claim construction is a question of law, *Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d 1347, 1360 (Fed. Cir. 2019), while the comparison step of an infringement analysis presents a question of fact, *TI Grp. Auto. Sys. (N. Am.), Inc. v. VDO N. Am., LLC*, 375 F.3d 1126, 1133 (Fed. Cir. 2004). In comparing the claims to the product, the patentee must prove by a preponderance of the evidence "that the accused product or process contains, either literally or under the doctrine of equivalents, every limitation of the properly construed claim." *Seal-Flex, Inc. v. Athletic Track and Ct. Const.*, 172 F.3d 836, 842 (Fed. Cir. 1999); *Duncan*, 914 F.3d at 1360. (*See also* Tr. 2284:9-16 (jury instruction)). "For literal infringement, the patentee must prove that the accused product meets all the limitations of the asserted claims; if even one limitation is not met, there is no literal infringement." *E.I. du Pont De Nemours & Co. v. Unifrax I LLC*, 921 F.3d 1060, 1073 (Fed. Cir. 2019).

7

### 1.    Claim 3 of the '216 Patent

I begin with what has been perhaps the most hotly contested issue of this case: the meaning of "axis" in claim 3 of the '216 Patent (*see* D.I. 698-1; D.I. 698-13 at 21 (claim chart)).  That patent is for a product and process for inserting an analyte sensor into a person's skin.  ('216 at 2:57-58.)  Claim 3, which depends from claims 1 and 2, teaches a system comprising three distinct axes:  the first axis is defined by "a button configured to be pressed … toward the interior of the insertion assembly[.]"  ('216 at 34:36-37.)  The "second axis" is "different from the first axis" and "is defined by the length of the straight track," which is a groove in the inserter's interior assembly.  ('216 at 34:31-33, 42-44.)  And the third axis, called the "insertion axis," is different from the first and second and is defined by the directional movement of the "sharp [i.e., a needle] and the glucose sensor."  ('216 at 34:45-50.)  Here are the axes as Abbott says they exist in Dexcom's G6:



**First Axis (button)**        **Insertion Axis** i.e. Third Axis



(D.I. 699 at 5-6 (citing PTX-860.9285, PDX 6-111, PTX-860.9377, PDX 6-106).)  Claim 3 also requires that, upon pressing the button of the apparatus, a spring is released causing a "sliding member to move within the straight track along [the] second axis … defined by the length of the straight track[.]" ('216 at 34:41-44.)[4]

---

[4] Here are claims 1-3 in their entirety:

[Claim 1:] A glucose monitoring system comprising:

an insertion assembly for inserting a glucose sensor into a subject, the insertion assembly comprising:

the glucose sensor, wherein a distal end of the glucose sensor is configured to be inserted under skin of the subject;

a distal surface including an adhesive layer, wherein the distal surface is configured to be positioned on the skin of the subject such that the adhesive layer adheres to the skin of the subject;

an interior of the insertion assembly including a first spring in a loaded position, a second spring, a sliding member, and a straight track having a length, wherein the sliding member is configured to move only within the straight track; and

9

Abbott accuses the G6 of literally infringing claim 3 of the '216 Patent. Abbott's expert, Karl Leinsing, provided testimony asserting that every claim limitation appears in the G6. (Tr. 769:2-783:25.) Dexcom disputed infringement by denying the existence in

a button configured to be pressed along a first axis toward the interior of the insertion assembly,

wherein the button is further configured to release the first spring from the loaded position upon being pressed, such that the first spring causes the sliding member to move within the straight track along a second axis different from the first axis, wherein the second axis is defined by the length of the straight track,

wherein movement of the sliding member within the straight track causes advancement of a sharp and the glucose sensor in a distal direction along an insertion axis different from the first axis and the second axis such that the distal end of the glucose sensor is inserted under the skin of the subject,

wherein the sliding member is further configured to continue moving within the straight track after the advancement of the sharp and the glucose sensor in the distal direction along the insertion axis,

wherein the second spring is configured to expand and retract the sharp in a proximal direction along the insertion axis while the distal end of the glucose sensor remains under the skin of the subject,

wherein the insertion assembly comprises a maximum height measured parallel with the insertion axis and a maximum width measured parallel with the length of the straight track, and wherein the maximum height is greater than the maximum width,

wherein the second spring is a compression spring, and

wherein the glucose sensor is configured to operate for a period of about seven days or more.

[Claim 2:] The glucose monitoring system of claim 1, wherein, after the release of the first spring from the loaded position, the first spring is configured to cause a rotatable member to rotate less than a full rotation.

[Claim 3:] The glucose monitoring system of claim 2, wherein the insertion assembly further comprises a stopping surface, wherein the stopping surface is configured to stop the rotation of the rotatable member.

its product of only a single limitation of claim 3 – that the sliding member moves along a "second axis … defined by the length of the straight track." (*See* Tr. 1401:15-23 (Dexcom expert testifying that the reason the G6 does not infringe claim 3 is because "it doesn't have a sliding member that's moving … along a second axis").)

Dexcom argues that the G6's sliding member does not move "*along* any axis" (D.I. 697 at 3), but "moves in a circle *across*" "a succession of different axes" defined by the straight track as it "moves first towards and then away from the insertion site" (D.I. 710 at 2). Dexcom's expert, Jack Griffis, testified that the G6 applicator employs a scotch yoke mechanism which translates rotational motion into linear motion. (Tr. 1398:12-21.) The G6 mechanism uses a drive wheel with a pin (the accused "sliding member") inserted in a groove (the accused "straight track") within the outer needle hub, which is the feature holding the sharp to be driven into the user's skin. (Tr. 1399:25-1400:6; *see* D.I. 710 at 2 (identifying accused claim limitations); Tr. 1194:12-14 (describing outer needle hub).) "As the wheel begins to rotate, the pin is rotating with it. As [the wheel] turns, [the pin is] pushing down on the outer needle hub. And as [the wheel is] continuing to turn, [the pin is] pulling up on the outer needle hub." (Tr. 1400:14-17.)

11



(D.I. 697 at 4 (citing DDX4-27).)  Griffis defined the word "axis" as "a straight line …

meant to note the path of something."  (Tr. 1402:4-6.)  An axis, Griffis said, is created by

"an object that moves from point A to point B" and is not defined prior to such

movement.  (Tr. 1402:18; *see* Tr. 1402:16-17 ("If you're moving along the lines or axis,

that defines that line.").)  Thus, "[e]very time the yoke moves towards the distal end" of

the G6 "it's defining an axis along its length," and the sliding member "is always moving

through these [multiple] axes.  It's never moving along any one of them."  (Tr. 1403:6-

13.)  Dexcom played an animation at trial to demonstrate its argument, as depicted in this

still:



(D.I. 697 at 5 (citing DDX4-33).)  Dexcom admits, however, that G6's sliding member moves horizontally along the straight track.  (*See* Tr. 1401:15-23 (contesting only the axis limitation).)

Abbott's expert, Leinsing, argued that the straight track does not create a new axis as it descends.  He emphasized that "[t]he axis is defined by the length of the straight track.  It stays with the straight track.  There's one axis and one axis only. … [W]hat we're calling the second axis moves with that track."  (Tr. 777:9-11, 15-16.)  Leinsing provided a couple of analogies, including that of a flight attendant walking down the aisle of an airplane – if an axis is said to be defined by the aisle, he reasoned, and the attendant walks its length, "the plane can move, and as the plane moves, that axis will tilt and move[.] … [B]ut the axis in the plane, it's still the same axis that you're looking at."  (Tr. 778:6-14.)  So, Leinsing said, because the sliding member indisputably moves within the straight track, it moves along a single axis – the so-called second axis – defined by the length of the straight track.  (Tr. 779:5-10.)

Griffis countered by asserting that Leinsing was defining the second axis "in isolation" and ignoring the claim's other axes:  "[O]ne of the advantages offered by the '216 [Patent] is the fact that they had [this] unique orientation or unique combination of axes.  So I didn't understand why he was ignoring the [other] two[.]"  (Tr. 1405:20, 22-25.)  Dexcom argues that, in defining the second axis, "the appropriate frame of reference" is relative to the patent's other axes, so as the straight track descends

perpendicularly across those axes, "the accused straight track defines a new and different axis at each point in its movement." (D.I. 710 at 3, 6.)

In his rebuttal expert report, Griffis had argued, based on "the patent's preoccupation with axes," the prosecution history, and a preferred embodiment, that the '216 Patent's straight track had to remain stationary as the sliding member moved across it. (D.I. 417-1, Ex. 3 ¶¶ 223-28.) The second axis is not "fixed relative to the length of the straight track (whether or not the straight track moves)," he said, because a person having ordinary skill in the art would consider, as its "frame of reference," the second axis "relative to other axes recited in the claims," and not the axis *relative to itself*." (D.I. 417-1, Ex. 3 ¶¶ 223, 229-30.) According to Griffis, because a moving straight track relative to the other axes named in the patent would establish multiple axes, rather than a single, "second" one, the claim only contemplated a stationary straight track. (D.I. 417-1, Ex. 3 ¶ 221.)

The parties disputed whether Griffis's rebuttal report was a belated attempt at claim construction (D.I. 416 at 1; *see also* D.I. 467 (Pl.'s Br. Mot. to Str. Cl. Constr.)) or "giv[ing] claim terms their ordinary and customary meaning" (D.I. 442 at 2; *see also* D.I. 476 (Def.'s Br. Opp'n Mot. to Str.)). At the summary judgment hearing, I "ma[d]e a claim construction ruling" rejecting Griffis's contention, and said, "[i]t's not the case that the straight track must be stationary. It's not in [the claim]." (D.I. 454 at 30:24, 31:5-6.) Still, I sent the claim to the jury, reasoning that identifying the "frame of reference … implicates a question of fact" and a reasonable jury could credit Dexcom's assertion that

14

relative to the world outside the airplane, taking Abbott's analogy, "the axis necessarily changes" as the plane moves. (D.I. 482 at 45 & n.25.)

In retrospect, a definitive claim construction ruling on the meaning of "axis" was in order. The jury was evidently confused on this key point, as it sent a question out during its deliberations, asking, among other things, "[w]hat … the ordinary definition of axis" is. (D.I. 669.) Ultimately, the jury failed to arrive at a verdict on infringement of the '216 Patent. (D.I. 676.)

Post-trial, Abbott argues that no reasonable jury could credit Dexcom's noninfringement argument. (D.I. 699 at 3-4.) As at trial, Abbott relies on the fact that the "second axis" is "defined by the straight track[.]" (D.I. 699 at 4.) It also points to my ruling (and Dexcom's acknowledgment) that the straight track may move, and the fact that all agree the sliding member moves along the straight track as it descends. (D.I. 699 at 4.) Therefore, says Abbott, "as the sliding member moves along the straight track, it necessarily moves along the second axis defined by the straight track" and "[i]t is irrelevant whether the straight track (and the second axis defined by the straight track) move as the sliding member moves along the straight track." (D.I. 699 at 4.) Dexcom argues that I already rejected Abbott's identical argument at summary judgment – a reasonable juror, I had said, could credit Griffis's perspective argument and find that the moving straight track creates multiple axes. (D.I. 710 at 7-8 (citing D.I. 482 at 44-45 & n.25).)

15

This, unfortunately, is one of those cases where the point at issue is "such that only after the agony of a full-blown trial may it authoritatively be determined that there was never really the decisive issue of fact at all." *Newell Companies, Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 763 (Fed. Cir. 1988) (quoting *Robbins v. Milner Enters., Inc.*, 278 F.2d 492, 497 (5th Cir. 1960)). No earlier summary judgment ruling precludes that conclusion. *See Cangemi v. United States*, 13 F.4th 115, 139-140 (2d Cir. 2021) ("[D]istrict courts are by no means obligated to deny a Rule 50 motion simply because earlier in the litigation they denied a motion … for summary judgment on the same issue."); *Runyon v. Applied Extrusion Techs., Inc.*, 619 F.3d 735, 739 (7th Cir. 2010) ("[T]he district court [is] … free to change its mind after it ruled on the summary judgment motion[.]"). Indeed, "[t]he rules contemplate that a judge can take a first and a second and a third and a final look." *Robbins*, 278 F.2d at 497 & n.5 (citing, *inter alia*, Fed. R. Civ. P. 50(b)). In light of the more fully developed arguments and the opportunity for reflection after trial, I conclude that Dexcom's interpretation of claim 3 of the '216 Patent fails as a matter of law.[5]

---

[5] That the jury was confused and ultimately hung on this issue is noteworthy but not the reason for my decision. *See Keith v. Truck Stops Corp. of Am.*, 909 F.2d 743, 744-45 (3d Cir. 1990) ("A court uses the same standard in passing on a motion for a directed verdict as it uses in considering a JNOV motion[.]"); *see also Chaney v. City of Orlando*, 483 F.3d 1221, 1228 (11th Cir. 2007) ("[Because] a Rule 50(b) motion should be decided in the same way it would have been decided prior to the jury's verdict, … the jury's particular findings are not germane to the legal analysis.")

16

The claim teaches a second axis defined by the length of the straight track.[6] ('216 at 34:43-44.) That means the axis in question will move as the straight track does. And, as noted at summary judgment and as Dexcom admitted to the jury, the straight track moves. (D.I. 454 at 31:5-6; Tr. 300:16.) Dexcom's argument relies on defining the axis relative to other axes named in the patent, but the claim does not readily support that interpretation: by the terms of claim 3, the axis is "defined by" the length of the straight track.[7] While Dexcom fights for a wider frame of reference in understanding what "second axis" means, the claim itself gives the definition. Because the second axis is "defined by" the "length of the straight track," the axis remains the same even though the track moves. ('216 at 34:43-44.) Thus, because the G6's "sliding member … move[s] within the straight track along a second axis … defined by the length of the straight track" ('216 at 34:41-44) even as the straight track descends, the G6 satisfies that claim limitation. And, because Dexcom does not dispute that the G6 meets the claim's remaining elements, the G6 literally infringes claim 3 of the '216 Patent.

---

[6] To the extent that my decision today can be characterized as claim construction, it expresses a "meaning inherent in [my] previous construction" that the straight track need not be stationary. *Finjan LLC v. SonicWall, Inc.*, 84 F.4th 963, 971 (Fed. Cir. 2023). That construction (or guidance, as Dexcom frames it (D.I. 664 at 10 n.2)) implicitly rejected the basis upon which Griffis's stationary-axis opinion stood – that a moving straight track necessarily creates multiple axes as it moves, rather than remaining the axis defined by the straight track. (*See* D.I. 417-1, Ex. 3 ¶ 221.)

[7] *See* D.I. 454 at 22-23 (Abbott's counsel arguing that the reference to the *length* of the straight track is to distinguish that axis from one that could be defined by the *width* or *depth* of the straight track).

While I can be faulted for not recognizing it sooner, Dexcom's position now appears to me to be irreconcilable with the requirement that the second axis remains "defined by" the "length of the straight track," regardless of its motion. ('216 at 34:43-44.) Dexcom fights that "defined by" language in the claim, but it is binding. The claim says what it says.[8] Thus, I will grant Abbott's motion for JMOL that the G6 infringes claim 3 of the '216 Patent, and will deny Dexcom's contrary motion.

### 2.    Claim 3 of the '647 Patent

The jury found that Dexcom did not infringe claim 3 of the'647 Patent. (D.I. 676.) Abbott moves for judgment as a matter of law that Dexcom does and asks, in the alternative, for a new trial on the same. (D.I. 680.) Because the jury had sufficient evidence to find noninfringement, I will deny Abbott's motion.

The '647 Patent (D.I. 333, Ex. 30; *see* D.I. 709-1 (claim elements)) claims a method and system for aligning and retaining a transmitter unit atop an analyte sensor and enhancing electrical conductivity between them. ('647 at 2:13-19.) Claim 3, which depends from claim 1, teaches an assembly comprising a sensor mount with "a base and a locking mechanism[.]" ('647 at 9:62-63.)[9] Because I was not asked to construe any

---

[8] Dexcom's argument cannot be salvaged by appealing to the '216 Patent's inventors' testimony (*see* D.I. 697 at 5-6; D.I. 710 at 4-5) because that testimony, if understood as Dexcom suggests, conflicts with the meaning of the patent claim. *See Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.*, 540 F.3d 1337, 1346 (Fed. Cir. 2008) ("The testimony of an inventor cannot be relied on to change the meaning of the claims." (internal quotation marks omitted)).

[9] Here are claims 1 and 3 in their entirety:

terms in the '647 Patent, I instructed the jury to apply the plain and ordinary meaning of the claim language. (Tr. 2281:18-25.)

Abbott accused the G6 of literally infringing claim 3 of the '647 Patent. Abbott's expert, Neil Sheehan, testified that each claim limitation appears in the G6. (Tr. 918:6-21.) Dexcom disputed infringement of only a single claim limitation – that the G6 mount has a "locking mechanism." (*See* Tr. 1466:19-21 (Dexcom expert admitting he does not

---

[Claim 1:] An assembly comprising:

a sensor subassembly comprising an analyte sensor and a sensor seal, wherein the analyte sensor comprises a first portion configured to be electrically coupled with a transmitter and a second portion configured to be inserted through a skin surface and in fluid contact with a bodily fluid of a user;

a transmitter mount comprising a base and a locking mechanism; and

an insertion mechanism configured to position the sensor subassembly against the base of the transmitter mount by causing movement of the sensor subassembly until the locking mechanism engages the sensor subassembly, wherein the movement of the sensor subassembly is impeded while the locking mechanism is engaged;

wherein the assembly is configured to be applied to the skin surface of the user,

wherein the insertion mechanism is further configured to be removed from the transmitter mount after the second portion of the analyte sensor is inserted through the skin surface and in fluid contact with the bodily fluid of the user, and

wherein the transmitter mount is configured to receive a transmitter after the locking mechanism is engaged and the insertion mechanism is removed from the transmitter mount.

[Claim 3:] The assembly of claim 1, wherein the sensor seal includes a plurality of radial seal holes disposed on the sensor seal, and wherein each of the radial seal holes is configured to receive one of a plurality of electrical contacts.

19

"dispute that" "the other elements of the claim … are present in the G6"); *accord* Tr. 1422:8-12.) The jury heard that the G6 is made up of several components. Pertinent here, the accused glucose sensor has a portion implanted in the user's skin and a portion called the "subassembly" above the skin. (Tr. 912:10-15.) The subassembly is placed in a mount that rests on top of the skin, secured to the user by an adhesive patch. (*See* Tr. 881:2-3, 10-13 (Dexcom instructional video).) A transmitter, separate from the mount and sensor subassembly, is then placed inside the mount on top of the subassembly and thereby engages the sensor (*see* Tr. 292:6-10), as depicted in the picture below, supplied by Abbott's expert:



(D.I. 698-4 at 12 (PDX 7-11); *see* Tr. 881:2-3, 10-13 (Dexcom instructional video)).

The transmitter receives the blood glucose readings from the sensor and transmits that data to a display device. (*See* Tr. 292:10-14.) The base of the mount contains two small openings, which engage two protrusions or nubs on the sensor subassembly. (Tr. 913:24-914:3.) Abbott's expert calls the interaction of the nubs and openings a locking mechanism, as labeled in the following Abbott demonstratives:





(D.I. 699 at 13-14 (citing PTX-1282, PTX-3891, PDX 7-39, and PDX 7-41).)  According

to Abbott, the G6 system, by "pushing" protrusions on the subassembly "into an

opening," locks the sensor subassembly "in position" "because now it's up against the wall" of the mount. (Tr. 916:3-6.)

Dexcom argues that the holes and nubs do not constitute a "locking mechanism." (D.I. 710 at 9-10.) Dexcom's expert, Dr. Jeffrey Vaitekunas, testified that the holes are a different shape and bigger than the nubs and that their function is "to position and orient the" subassembly, not to lock it in place. (Tr. 1426:1-10.) He analogized the nubs to a cup of coffee and the holes to a car's cupholder: "The cup is not locked into the cup holder. It freely moves in and out." (Tr. 1425:15-25.) A member of the G6 design team, Jason Halac, demonstrated that the sensor subassembly toggled while the nubs engaged the holes and was immobile only when the transmitter was latched on top. (Tr. 1187:12-20, 1188:4-1189:12; 1224:25-1225:4.) Dr. Vaitekunas testified to the same effect. (Tr. 1427:19-1428:1.) The jury was entitled to credit Dexcom's witnesses over Abbott's, and its determination is supported by sufficient evidence. *See Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1362 (Fed. Cir. 2012) ("Because of this conflicting expert testimony, the jury was free to make credibility determinations and believe the witness it considers more trustworthy." (internal quotation marks omitted)).[10]

---

[10] It therefore does not matter that some G6 design consultants may have considered the holes a "locking mechanism." (*See* D.I. 699 at 14-15.) At this stage, I may not "weigh the evidence" or "determine the credibility of witnesses," *Kars 4 Kids Inc. v. Am. Can!*, 8 F.4th 209, 218 n.8 (3d Cir. 2021), and the jury chose to credit Dexcom's witnesses.

Abbott argues that Dexcom asked the jury "to apply a special meaning to the claim language" in arguing that, to constitute a locking mechanism, the protrusions must "inhibit *all* movement." (D.I. 699 at 15-16.) Furthermore, it argues, a separate limitation in claim 3 of the '649 Patent indicates that "the movement of the sensor subassembly" needs to merely be "*impeded* while the locking mechanism is engaged." (D.I. 699 at 17 (quoting, with added emphasis, '649 at 10:1-2).) But, as Dexcom notes, Abbott did not seek a construction of "locking mechanism" that would narrow its meaning to a mere impediment, nor did it make that argument to the jury. (D.I. 710 at 14-17.) "In the absence of such a construction, … the jury was free to rely on the plain and ordinary meaning of the term[, a]nd [Abbott] has not met its burden of showing that it has the only reasonable view of the claim [limitation]." *Comcast IP Holdings I LLC v. Sprint Commc'ns Co., L.P.*, 850 F.3d 1302, 1311-12 (Fed. Cir. 2017) (citations and internal quotation marks omitted). One definition of lock is "to make … *rigid* by the engaging of parts or the action of a restraint[.]" *Lock* (def. 3a), *Webster's Third New International Dictionary* 1328 (1986) (emphasis added). I will therefore deny Abbott's motion for judgment as a matter of law on the '647 Patent.[11] Moreover, the jury's verdict was not

---

[11] Generally, arguments presented for the first time post-trial are rejected. *See, e.g.*, *Freedom Mortg. Corp. v. LoanCare, LLC*, No. CV 16-02569, 2024 WL 3226942, at *13 (D.N.J. June 27, 2024); *Cipollone v. Liggett Grp., Inc.*, 693 F. Supp. 208, 217-18 (D.N.J. 1988) ("It would be unfair to set aside the jury's verdict for a reason that could have been presented, discussed, and resolved before the verdict and not after.") (subsequent history omitted).

against the "great weight of the evidence[,]" *Leonard*, 834 F.3d at 386, so, there is no need for a new trial.

### 3.    Claim 28 of the '649 Patent

The jury found that Dexcom infringed claim 28 of the '649 Patent.  (D.I. 676.) Dexcom argues that, "[i]f another trial is held, it should include a new trial on" infringement of the '649 Patent.  (D.I. 697 at 9.)  Because Dexcom's argument is based on what it considers prejudicial attorney argument (D.I. 697 at 9) and it failed to object to that argument, I will deny its motion.[12]

The '649 Patent (D.I. 333, Ex. 31) claims an apparatus for subcutaneous medical device insertion.  ('649 at 2:49-50.)  Claim 28, which depends from claim 18, claims an inserter assembly that requires, among other things, "an inserter housing comprising a recess" and a cylindrical rotor "disposed within the recess of the inserter housing[.]" ('649 at 44:47, 51-52.)[13]

---

[12] In its motion and at the end of its brief, Dexcom also asked for JMOL that it does not infringe the '649 Patent.  (D.I. 679 at 1; D.I. 697 at 44.)  It presents no argument on the matter, however, so I deem the issue forfeited.  (*See supra* note 2; D.I. 707 at 4 n.3.)  It also fails to argue in its brief that the jury's verdict was against the "great weight of the evidence[,]" *Leonard v. Stemtech Int'l Inc.*, 834 F.3d 376, 386 (3d Cir. 2016), so that argument is forfeited too.  It does, however, argue at length that a new trial is warranted because of Abbott's allegedly prejudicial attorney argument, as described herein.

[13] Here are claims 18 and 28 in their entirety:

[Claim 18:] An inserter assembly for inserting a glucose sensor into a subject, the inserter assembly comprising:

an inserter housing comprising a recess;

24

At trial, the parties disputed whether the G6's rotor sits in a recess.  (*See* Tr.

757:13-18; 1475:9-17.)  Abbott's expert, again Mr. Leinsing, testified that "the distinct

---

the glucose sensor disposed within the inserter housing, wherein a part of the glucose sensor is configured to be inserted under a skin surface of the subject;

a rotor comprising a cylindrical shape, wherein the rotor is disposed within the recess of the inserter housing, and wherein the rotor comprises a rotor follower projection;

a torsion spring received within the rotor, wherein the torsion spring is configured to cause rotation of the rotor and the rotor follower projection, wherein the torsion spring comprises a center aperture configured to receive a second projection of the inserter assembly, and wherein the torsion spring is configured to rotate around the second projection;

a first slidable body disposed within the inserter housing, the first slidable body comprising a slot, wherein the rotor follower projection is received within the slot, and wherein the rotation of the rotor and the rotor follower projection causes the first slidable body, a second slidable body, and the glucose sensor to advance within the inserter housing in a linear direction towards an insertion site on the skin surface of the subject;

a button configured to release the torsion spring when the button is depressed;

the second slidable body disposed within the inserter housing, wherein the second slidable body is coupled with a needle; and

a compression spring configured to expand and to retract the second slidable body and the needle in a linear direction away from the insertion site while the glucose sensor remains at the insertion site, wherein a first end of the compression spring is in contact with the first slidable body and a second end of the compression spring is in contact with the second slidable body, and

wherein the rotation of the rotor and the rotor follower projection causes the first slidable body and the second slidable body to advance simultaneously towards the insertion site.

[Claim 28:] The inserter assembly of claim 18, wherein the torsion spring is provided in a pre-loaded state.

25

space" in the G6 "where the rotor … can drop right into," satisfied the recess element. (Tr. 760:6-8.) On redirect, Leinsing testified about the "Lai" reference. That reference involved a U.S. Patent Office examiner considering U.S. Patent No. 10,292,632, a parent patent to the '649 Patent. (*See* '649 at 1:10-12.) The examiner called an alcove similar to the G6's a "recess." (Tr. 869:5-870:9; *see also* D.I. 707-1, Ex. 1 ¶¶ 46, 55 (Leinsing's expert declaration discussing the Lai reference).) Leinsing said the Lai reference "made [him] feel more comfortable of [his] understanding of 'recess[.]'" (Tr. 869:6-7.) Leinsing's expert declaration, where he first discussed the Lai reference, was never admitted into evidence. (Tr. 2339:3-6.)

Dexcom's expert, Dr. Vaitekunas, countered that the G6's rotor was housed in a "projection," not a recess. (Tr. 1433:6-10.) On cross examination of Dr. Vaitekunas, Abbott displayed to the jury an excerpt from Leinsing's expert declaration comparing the G6's purported recess with the recess in the Lai reference (Tr. 1475:23-24), as depicted below:



(D.I. 697 at 10 (citing PTX2846.0).)  Vaitekunas acknowledged that he, in his expert

reports, never contended with the examiner's perspective on the Lai reference, but held

his ground, stating, "I disagree with this assessment of what a recess is." (Tr. 1481:9-11,

16-17.)  Dexcom did not object to the display or to the line of questioning. (*See* Tr.

1475:23-24; 1481:1-17.)

During closing arguments, Abbott once again displayed the slide depicted above

and said, "the Patent Office, when it decided to grant this patent, … said this is a recess.

[Dexcom is] saying the opposite of what the Patent Office specifically found." (Tr.

2157:5-10.)  Dexcom did not object to the slide as it was displayed, nor to the argument

by Abbott's attorney. (D.I. 697 at 14.)  During its deliberations, the jury asked about the

Lai reference twice.  First, it asked whether "the illustration/description of 'Lai's recess'

[was] admitted into evidence" (D.I. 670; Tr. 2338:14-15) and then asked to see "evidence

number PTX2846," i.e., the above-depicted slide (D.I. 673; Tr. 2354:7-9). I instructed

them that the illustration "was not admitted into evidence," but that "it was discussed, and

[they would] need to rely on [their] collective recollection[.]" (Tr. 2340:11-13; *see also*

Tr. 2356:18-22 (instructing that the slide "is not in evidence, so ... we can't give it to you

because [the] evidence is closed. So you'll have to rely on your collective recollection,

as you do in all these things").) The jury ultimately held that Dexcom infringed claim 28

of the '649 Patent. (D.I. 676.)

Dexcom argues it deserves a new trial on that issue because Abbott improperly

presented the Lai reference slide during closing arguments and such display was "highly

prejudicial[.]" (D.I. 697 at 9.) Abbott responds that its argument was not improper, that

Dexcom failed to object to the display, and that it cannot show a "miscarriage of justice"

would occur without another trial. (D.I. 707 at 5-8.) Abbott has the better argument.

Because Dexcom failed to object to the display, I must examine for plain error the

admission of the contested testimony and the related argument and display of

demonstrative evidence. Fed. R. Evid. 103(e); *see Bannister v. Knox Cnty. Bd. of Educ.*,

49 F.4th 1000, 1012 (6th Cir. 2022) (explaining that although the Federal Rules of Civil

Procedure do not contain a plain error rule, it is "well established" that courts may apply

it). "[I]n the civil context[,]" plain error review is discretionary, "should be exercised

sparingly," and "should only be invoked with extreme caution[.]" *Franklin

Prescriptions, Inc. v. N.Y. Times Co.*, 424 F.3d 336, 341 (3d Cir. 2005). I may only grant

a new trial if failing to do so would result in "a miscarriage of justice[,]" after considering

28

"the 'obviousness of the error, the significance of the interest' involved, and 'the reputation of judicial proceedings if the error stands uncorrected.'" *Id.* at 340-41. Dexcom cannot meet that standard.

First, Dexcom was the one to bring Leinsing's declaration into the case. (*See* Tr. 859:14-860:18.)[14] Second, the jury heard about the Lai reference during Leinsing's redirect (Tr. 869:5-870:9) and saw it during Vaitekunas's cross when Abbott questioned him heavily on the same (Tr. 1481:9-11, 16-17), all without a relevant objection from Dexcom. Finally, my instructions addressed any potential prejudice: I admonished the jury to "make [its] decision based only on the evidence," which "includes … the exhibits that I admitted into evidence" but not "[t]he lawyers' statements and arguments[.]" (Tr. 2270:18-19, 22, 24-25; Tr. 2271:2-3.) And when the jury twice asked if the Lai reference was in evidence (D.I. 670, 673), I said no (Tr. 2340:11-13; Tr. 2356:18-22). I must "presume that jurors follow the instructions given to them[.]" *Robinson v. First State Cmty. Action Agency*, 920 F.3d 182, 191 (3d Cir. 2019). Although Abbott incorrectly asserted that the Lai reference arose "when [the Patent Office] decided to grant *this* patent" (Tr. 2157:5-6 (emphasis added)), that inaccuracy does not create a circumstance extreme enough to warrant a new trial. Thus, I will deny Dexcom's motion for a new trial on the '649 Patent.

---

[14] During Leinsing's cross-examination, Dexcom requested and received permission to publish to the jury a portion of his declaration discussing the "recess" limitation. (Tr. 859:14-860:18.)

### C.    Willful Infringement

Willful infringement is an issue of fact established if "the patentee [can] show" by a preponderance of the evidence that "the accused infringer had a specific intent to infringe at the time of the challenged conduct." *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 987 (Fed. Cir. 2021). "[T]he concept of 'willfulness' requires a jury to find no more than deliberate or intentional infringement." *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021). Infringement is deliberate or intentional if "the defendant acted despite a risk of infringement that was either known or so obvious that it should have been known to the accused infringer[.]" *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1371 (Fed. Cir. 2017) (internal quotation marks omitted).

The jury found infringement of the '649 Patent but determined that the infringement was not willful. (D.I. 676.) Dexcom moves for judgment as a matter of law that, if another trial is held on infringement of any of the patents in suit, the jury's finding of non-willfulness should apply to those too, or, that JMOL is independently appropriate. (D.I. 697 at 37-44.) Abbott, in turn, moves for a new trial on willfulness, arguing that the jury's finding of non-willfulness was against the great weight of the evidence.[15] (D.I. 699 at 34.) I will grant Dexcom's motion and deny Abbott's.

---

[15] In its motion, Abbott also asked for JMOL on willfulness. (D.I. 680 at 1.) It has presented no supporting argument in its briefing, so I deem the issue forfeited. (*See supra* note 2.)

30

Abbott, as it rightfully acknowledged at oral argument (D.I. 720 at 41:11-12, 15-16), presented an undifferentiated willfulness case; that is, it did not make its case on a patent-by-patent basis.  It told the jury that Dexcom was "desperate to match Abbott's easy-to-use inserter technology" and succeeded in doing so only by copying the Abbott technology at issue in the case.  (D.I. 699 at 34 (citing Tr. 408:1-408:23, 1086:25-1087:15; PTX-3036.0009; PTX-554.0001, -0006; PTX-1934.0015; PTX-431.0001-2).)  It further argued that Dexcom sought several extensions to a preexisting covenant not to sue because it knew it had "copied Abbott's technology" and would continue to use it for "business reason[s]" and despite Abbott's patent rights.  (D.I. 699 at 34-35 (emphasis omitted) (quoting Tr. 1171:24-1172:9) (citing PTX-991; Tr. 485:17-486:16, 696:7-700:23, 739:1-740:4).)  Dexcom responded that the G6 was independently designed; that it did not incorporate Abbott's technology; that it was on the market three years before the applications leading to the patents in suit were filed; and that its non-infringement and invalidity defenses were legitimate.  (D.I. 710 at 43-44.)

The jury evidently gave greater credence to Dexcom's story, and that determination is not against the "great weight of the evidence[,]" *Leonard*, 834 F.3d at 386, so I will deny Abbott's motion for a new trial.  Moreover, in addressing Dexcom's cross-motion, I am required to "presume the jury resolved underlying factual disputes in favor of the verdict winner and leave those presumed findings undisturbed if supported by substantial evidence." *Arctic Cat*, 876 F.3d at 1358.  Because Abbott's theory as to all of the patents in the case relies on the same "underlying factual disputes" the jury decided

31

in Dexcom's favor, I conclude, as a matter of law, that the jury's verdict forecloses a finding of willfulness of any patent in suit as of the time of the verdict. (*See* D.I. 697 at 37-38.) Any argument for a ruling on new allegations of post-verdict willfulness (*see* D.I. 699 at 38) is not appropriate at this juncture. *See Trs. of Columbia Univ. v. Gen Digit. Inc.*, No. 3:13-cv-808, 2023 WL 8698915, at *4 n.4 (E.D. Va. Sept. 30, 2023) ("[T]he jury of course did not consider" "willful conduct that occurred *after* the verdict[.]"). Those allegations are to be resolved, if ever, at a later time.

### D.    Damages

There are two types of damages a patent owner can recover in a patent case: lost profits and reasonable royalties. 35 U.S.C. § 284; *Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1290 (Fed. Cir. 2011).

At trial, Abbott argued that Dexcom infringed all of the patents in suit and that, but for infringement, all G6 customers would become users of the Abbott Freestyle Libre CGM. (Tr. 1065:24-1066:6; 1050:18-1051:8; 1052:17-1053:5.) Abbott asked for $1.3 billion in damages, encompassing all the CGM sales that Dexcom made to standalone (as opposed to pump-integrated) CGM users aged four and older. (*See* Tr. 999:8-1002:9; 1027:13-1028:11; PDX 9-34, 9-35.) Once it was clear the jury could not reach a verdict on one of the patents,[16] I held that Abbott had not provided the jury an adequate

---

[16] The jury had written, "We are at an absolute impasse on one of the four patents. We do not believe further deliberation will result in a unanimous verdict." (D.I. 674; Tr. 2364:7-9.)

foundation to value the patents separately, and I therefore precluded the jury from

considering damages. (D.I. 676 at 4; Tr. 2364:20-25.) The parties agreed to retry issues

unresolved by the jury verdict and post-trial motions, including damages. (D.I. 694 at 2,

5-6.) In their motions for JMOL, both parties seek to narrow the issues a new jury will

hear in that upcoming trial. Abbott asks for judgment that, as a matter of law, it is

entitled to lost profits and a non-zero reasonable royalty, and Dexcom asks for judgment

that, as a matter of law, Abbott is not entitled to lost profits and deserves only a nominal

royalty. I will deny both parties' motions on lost profits but grant Abbott's motion with

respect to entitlement to a more-than-nominal reasonably royalty. That, of course, means

I will deny Dexcom's corresponding motion on that last point.

### 1.    Lost Profits

To recover lost profits, "the patent holder must show that the infringer actually

caused the economic harm for which the patentee seeks compensation." *Minco, Inc. v.

Combustion Eng'g, Inc.*, 95 F.3d 1109, 1118 (Fed. Cir. 1996). The factfinder must

construct a "hypothetical … but for world" where the infringing product was off the

market, and ask, "had the Infringer not infringed, what would the Patent [owner] have

made?" *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350 (Fed.

Cir. 1999) (quoting *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507

(1964)). The parties embrace the four-factor test outlined in *Panduit Corp. v. Stahlin

Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978), as the means to construct the but-

for market. (*See* Tr. 2298:13-2299:3 (jury instruction on lost profits).) Under that test

the patent owner must show "(1) demand for the patented product; (2) absence of acceptable non-infringing alternatives; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit it would have made." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1285 (Fed. Cir. 2017).

Dexcom does not dispute that Abbott demonstrated a demand for its CGM (*Panduit* factor one) and that it had the ability to exploit that demand in the but-for world (*Panduit* factor three). (D.I. 697 at 21-22; D.I. 699 at 19-20.) It argues, however, that Abbott failed to demonstrate an absence of non-infringing alternatives (*Panduit* factor two), and also failed to prove the amount of lost profits owed (*Panduit* factor four), so Abbott "is not entitled to lost profits as a matter of law." (D.I. 697 at 21-22.) Abbott, in turn, argues that it proved all of the *Panduit* factors and is entitled to some lost profits as a matter of law. (D.I. 699 at 20.) Abbott adds that it is "*not* asking the Court to award a specific quantum of lost profits[,]" and is content with leaving the precise number to another jury. (D.I. 713 at 4.) Because a genuine question of fact remains on the absence of non-infringing alternatives and because Abbott adduced evidence sufficient for a jury to award it some amount of lost profits, I will deny the parties' motions on lost profits.

### i.     *Absence of non-infringing alternatives*

"[I]f the realities of the market are that others" selling non-infringing alternatives "would likely have captured sales made by the infringer, despite a difference in the products, it follows that the 'but for' test is not met." *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1166 (Fed. Cir. 1991). Once the infringer asserts a

non-infringing alternative, "the patentee may prove either that the potential alternative was not acceptable to potential customers or was not available at the time." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1380 (Fed. Cir. 2017).

At trial, Dexcom argued that its purchasers would have migrated to one or more of four non-infringing alternatives instead of Abbott's products: (1) Dexcom's prior G5 product, (2) a hypothetical "G5/G6 Hybrid" product, (3) a hypothetical "Modified G6" product, and (4) Medtronic's Guardian Connect product. (D.I. 699 at 21 (citing DDX 7-5).) Abbott countered that those products were either unacceptable to purchasers of the FreeStyle Libre and G6 or unavailable during the damages period, beginning April 1, 2021. (D.I. 699 at 22-30.)

(a)     Acceptability

A non-infringing alternative must be acceptable to purchasers of the infringing product: "A product on the market which lacks the advantages of the patented product can hardly be termed a substitute acceptable to the customer who wants those advantages." *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1373 (Fed. Cir. 1991) (citations omitted); John Skenyon et al., *Patent Damages Law and Practice* § 2:39 (2023) ("The people to whom the substitutes must be acceptable … are only the infringer's own customers who actually bought the infringing products." (emphasis omitted)). Thus, "[i]f purchasers are motivated to purchase because of particular features of a product available only from the patent owner and infringers, products without such features would obviously not be *acceptable* noninfringing

35

substitutes." *SmithKline*, 926 F.2d at 1166.  (*See also* Tr. 2299:9-18 (instructing the jury the same).)

Determining whether a potential non-infringing alternative is acceptable entails a two-pronged inquiry: the factfinder "looks to the purchaser's motivation, first," then it determines whether the substitute has those features. *Joy Techs., Inc. v. Flakt, Inc.*, 954 F. Supp. 796, 803 (D. Del. 1996); *see Grain Processing*, 185 F.3d at 1355 ("Consumer demand defines the relevant market and relative substitutability among products therein.").  "And this determination is made on a customer-by-customer basis.  For this reason, it is quite common to see damage awards where … the patentee proves entitlement to lost profits for some of its sales, but not others." *Mentor Graphics*, 851 F.3d at 1286.  In other words, "if there is a noninfringing alternative which any given purchaser would have found acceptable and bought, then the patentee cannot obtain lost profits for that particular sale." *Id.*  A patentee may employ customer surveys to determine the percentage of its users preferring certain features, Skenyon et al., *supra*, § 2:39, or calculate its lost profits amount "using its market share among its competitors." *Mentor Graphics*, 851 F.3d at 1286 n.5 (citing *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1577–78 (Fed. Cir. 1989)).  The availability of an acceptable non-infringing alternative is a question of fact. *Radio Steel & Mfg. Co. v. MTD Prods., Inc.*, 788 F.2d 1554, 1556 (Fed. Cir. 1986).

Abbott claims that the key advantage of the infringed '649 Patent (and of the '216 Patent as well), and the reason for the parties' CGM-market dominance, is "an automatic

insertion device that quickly inserts and automatically retracts the needle, allowing for relatively pain-free, single-handed application." (D.I. 699 at 22.) Indeed, the jury heard testimony that Dexcom's CEO described a manual inserter (i.e., one requiring a user to physically push the sensor-inserter needle into the skin and then pull the needle out) as "kind of scary"; he conceded that an easy-to-use automatic inserter was "very, very important" to the success of the G6, and he said customers "won't go back" to using a manual inserter. (D.I. 699 at 22-24 (quoting PTX-0961.0011, PTX-1363.0019, PTX-1051.0009; *see* Tr. 229-30 (opening statement)).) Likewise, it heard that Dexcom's sales improved when the company moved from a manual inserter to an automatic one. (Tr. 996:2-997:23.) Thus, Abbott argues, the proffered non-infringing alternatives – all of which lacked automatic insertion – would not be acceptable to consumers who "'specifically want[ed] a device' with an easy-to-use inserter[.]" (D.I. 699 at 24 (quoting *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1458 (Fed. Cir. 1991)).)

Dexcom counters with evidence that the inserter was not important to every customer. (D.I. 710 at 21.) For example, Dexcom showed the jury a survey of G6 customers indicating that "[e]ase of use of sensor and applicator" ranked below eleven other features as a "primary reason[]" for choosing the product. (D.I. 709-7 at 35.) Abbott downplays the import of that survey by arguing that easy-to-use insertion was so ubiquitous that customers would not rate it as an important distinctive feature. (D.I. 713 at 5-6; *see also id.* at 6 n.3 ("For instance, if Apple and Samsung consumers were polled regarding features important to their phone choices, almost none would cite that the

37

phones access the internet, because that has long been the industry standard.").)  The fact is, says Abbott, the CGM market almost completely shifted to automatic insertion by the accounting period in 2021.  (D.I. 713 at 9.)  Dexcom moved its customers from the manual G5 to the automatic G6, as its own CEO disparaged the former.  (D.I. 713 at 9 (citing PTX-0679.1; PDX 9-31; Tr. 339:24-340:14; PTX-961.0011).)  By the accounting period, the jury was told, over 90% of CGM users only used automatic insertion (D.I. 707 at 18 (citing PTX-619.0016)).  A jury could rely on that evidence, and Abbott's experts' opinions (*see, e.g.*, Tr. 346:11-347:12 (Dr. John Anderson, a primary care physician with diabetes experience, testifying that all patients – aside from those who use an integrated insulin pump – "would pick the Freestyle Libre system" in a but-for world)), to find that easy-to-use insertion was a market standard desired by all G6 and FreeStyle Libre customers.  *See Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1361-62 (Fed. Cir. 2012) (affirming finding of no non-infringing alternative where "substantial evidence … support[ed] the market's migration away from" an unpatented design to the patented design).

On the other hand, Dexcom is correct that sufficient evidence exists to support a finding that some users are motivated by features other than an easy-to-use inserter.  (D.I. 697 at 24; D.I. 710 at 24-25, 27.)  If a jury credits that evidence, it could conclude that Abbott failed to adequately prove its lost profits because it chose to forgo a theory of recovery "where *any* customers would purchase *any* alternatives."  (D.I. 710 at 35.)  *See W.R. Grace & Co. – Conn. v. Intercat, Inc.*, 60 F. Supp. 2d 316, 321 (D. Del. 1999)

("[Patent owner] has the burden of proving … that the adjudged infringing activity of defendants caused it to lose profits …, and providing sufficient evidence to compute the loss."). Abbott's damages expert candidly testified that she did not "offer a lost profits number, an amount, for [the] scenario" where Dexcom "would retain some customers during the [accounting] period[.]" (Tr. 1052:22-1053:5; *see also* Tr. 1051:2-8 ("Q: If the jury concludes that G6 customers [during the accounting period] would to some extent choose the Guardian Connect or another Medtronic product, you don't model that outcome in your analysis; correct? A: That's right."); Tr. 1048:9-17 (stating, regarding Modified G6, "My lost profits opinion is based on my conclusions that there are no acceptable available non-infringing alternatives"); Tr. 1051:9-25 (same testimony about G5).) Abbott maintains that theory post-trial (*see* D.I. 699 at 22 (arguing that "easy-to-use inserter … is crucial to consumer acceptance[]," so "none of Dexcom's alleged substitutes would have been acceptable to consumers")), and "a patent owner may waive its right to a damages award when it deliberately abandons valid theories of recovery in a singular pursuit of an ultimately invalid damages theory." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1291 (Fed. Cir. 2020).[17]

---

[17] A reasonable jury could also find that only the Guardian Connect was a non-infringing alternative (because only it was available during the accounting period, *see infra* Section III.D.1.i(b)) and award Abbott the quantum of Dexcom's profits minus the Medtronic Guardian Connect's small share using a "market" or *Mor-Flo* "approach." (D.I. 707 at 20-21.) Dexcom argues that Abbott waived that approach (D.I. 697 at 26-27), but Dexcom's damages expert, on cross, admitted that the jury could apply it. (3/19/24 Tr. 301:4-12.) That is sufficient evidence.

Thus, "reasonable minds could differ" on whether the insertion mechanism is the single thing that drove customers to the G6 and, accordingly, whether Abbott is entitled to lost profits. *See Anderson*, 477 U.S. at 250. A reasonable jury might accept Abbott's contention, rendering all manual-insertion CGMs unacceptable, or it could accept Dexcom's evidence and damages argument. Each party presented sufficient evidence to preclude the other's motion for JMOL, so I will deny both. "Whether any given noninfringing alternative is an *acceptable* substitute for the patented product is a question of fact that the jury at the retrial will have to decide." *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-CV-01846-LHK, 2013 WL 5958178, at *3 (N.D. Cal. Nov. 7, 2013).

(b)    Availability

Likewise, the next jury will have to make a judgment about the availability of the non-infringing alternatives. A viable non-infringing alternative must be available during the damages period. *Grain Processing*, 185 F.3d at 1353. "Without the infringing product, a rational would-be infringer is likely to offer an acceptable noninfringing alternative, if available, to compete with the patent owner rather than leave the market altogether." *Id.* at 1351. The infringer must show that it had "the necessary equipment, know-how, and experience" to make the non-infringing alternative during the damages period. *Id.* at 1348. But it may not rely on "[m]ere speculation or conclusory assertions" in so doing. *Id.* at 1351.

Abbott argues that the three proffered non-infringing alternatives made (or hypothetically to be made) by Dexcom – the G5, G5/G6 hybrid, and modified G6 –

40

"were indisputably not on the U.S. Market … during the infringement period" and
Dexcom only offered "witness speculation" to support the claim it could have brought
them to market. (D.I. 699 at 26.) For example, Abbott's expert, Mr. Leinsing, testified
that Dexcom would need thousands more employees and new tooling equipment to
provide its customers with the G5. (Tr. 789:15-18, 25-790:1.) G5 production, too, he
said, is slower, and Dexcom "wouldn't be able to meet that demand." (Tr. 789:2-9.) The
hybrid G5/G6 – a G6 sensor with a G5 applicator, a product Dexcom manufactured under
the name "Mutombo" (3/19/24 Tr. 20:23-21:11) – was never commercialized nor
received FDA approval, Dexcom's expert, Dr. Lori Laffel, admitted (Tr. 1562:20-23,
1566:10-13), and Dexcom did not "verify" with suppliers "that [its] time lines were
realistic[,]" according to Dexcom executive Aidan O'Sullivan. (3/19/24 Tr. 29:21-25.)
The modified G6 – like its namesake but with a manual needle retraction (Tr. 793:5-6) –
was considered and rejected by Dexcom in 2014, was never commercialized, and,
according to Abbott, would take Dexcom a while to produce, to secure third-party
partners during the COVID-19 pandemic, and to obtain FDA approval. (D.I. 699 at 28-
29 & n.4; *see* Tr. 795:17-799:3.) In sum, Leinsing opined that the modified G6 was in
"early feasibility stage" and would require "three-and-a-half years … to bring it from
feasibility stage to commercialization." (Tr. 798:22-799:3.)

Dexcom, in response, proffered several witnesses who attested to the feasibility of
ramping up production on any one of its non-infringing alternatives. For the G5,
O'Sullivan testified that Dexcom had experience manufacturing the product, had been

doing so during the damages period, and was ramping up G6 production with the ability to divert resources back to the G5 if necessary. (3/19/24 Tr. 16:16-17:16; *see id.* 19:8-12 ("I am absolutely convinced that we could have" ramped up G5 production "based on the people that we have, the expertise that we have, [and] the relationship with our suppliers[.]").)

The G5/G6 hybrid, too, required minimal changes to preexisting products, like a "[v]ery simple" keying change allowing the G6 sensor to work with a G5 applicator, and would quickly obtain FDA approval – at least that is what Dexcom executives and an FDA regulation expert, Dr. Christine Brauer, said. (Tr. 1316:7-1317:18; 3/19/24 Tr. 22:10-23:2, 121:7-12.) And O'Sullivan testified that scaled-up production would entail "[v]ery simple tasks" and take just two to four weeks to implement. (3/19/24 Tr. 23:8-12.)

As to the modified G6, two Dexcom executives and a third-party consultant testified that Dexcom had developed, "prototype[d]," and "tested" the product (Tr. 1242:24-1243:5, 1303:11-19) and met with manufacturers on design, production, and assembly (Tr. 1244:20-1245:13); that it was similar enough to the G6 so as to require only a "smaller subset" of testing and design change (Tr. 1305:8-13, 1314:8-14); and that Dexcom had the institutional know-how and capacity to make these "small" changes to the preexisting G6 (Tr. 1249:24-1250:7 (testifying that modified G6 was "fully developed and vetted to be manufactured at a high volume" and "assembled at high volume" by 2014)), 1641:9-14 (testifying that it would take a "couple days" to get soft molds and a

42

few months to obtain hard ones)).  Dr. Brauer testified that Dexcom could apply for an expedited FDA review of the modified G6 (3/19/24 Tr. 132:20-24), and a Dexcom executive testified that comparable reviews took a few weeks during the damages period (3/19/24 Tr. 54:21-55:4, 60:3-10, 61:16-21).  That is sufficient evidence for a jury to conclude Dexcom had "the necessary equipment, know-how, and experience" to make its three non-infringing alternatives during the damages period.  *Grain Processing*, 185 F.3d at 1348.[18]

    At summary judgment, Abbott sought to exclude Dexcom's damages expert for similar reasons.  It argued that she "relied on self-serving, biased testimony to arrive at implausible substitutes." (D.I. 482 at 67-68.)  I denied the motion, reasoning that Abbott could cross-examine the expert and try to convince the jury of its version of the facts. (D.I. 482 at 68-69.)  That logic remains.  "[A]n expert opinion that is sufficiently reliable to be admitted also provides support for a jury's verdict."  *Dasso Int'l, Inc. v. Moso N. Am., Inc.*, No. 17-CV-1574, 2023 WL 5349374, at *10 (D. Del. Aug. 21, 2023).

---

    [18] Abbott also claims that the Medtronic CGM "would not have been available to the vast majority of G6 users" because of its small market share.  (D.I. 699 at 30.)  That, however, that does not negate availability.  *See Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1381 (Fed. Cir. 2017) ("The fact that [the defendant] only sold the [non-infringing alternative] to a single customer does not establish that it was unavailable[, and] the fact that the [non-infringing alternative] was not widely advertised … does not show a lack of availability.")  Moreover, Dexcom does not claim that every G6 customer would migrate to Medtronic, only that Abbott would have to subtract from its lost profits sum the sales Medtronic would have captured – a task Abbott failed to do.  (D.I. 710 at 26-27.)

On the other hand, Abbott's experts offered sufficient evidence to plant doubt in a reasonable jury about Dexcom's capacity to produce non-infringing CGMs, especially considering that the factfinder "must proceed with caution in assessing proof of the availability of substitutes not actually sold during the period of infringement." *Grain Processing*, 185 F.3d at 1353. Dexcom, after all, maintains a burden on this issue. *See id.* ("The accused infringer … has the burden to overcome" the assumption that a product off the market is unavailable). Thus, I will deny both parties' motions for JMOL on availability, and let a jury decide whether Dexcom could have done as it claims it could.

ii.    *Apportionment*

A patent owner may only retrieve "[w]hat is taken[,]" that is, "the value of the infringing features of an accused product." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). So, "[w]hen the accused infringing products have both patented and unpatented features, … a jury must ultimately 'apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features' using 'reliable and tangible' evidence. *Id.* (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)). "[A]pportionment is required even for non-royalty forms of damages." *WesternGeco LLC v. ION Geophysical Corp.*, 913 F.3d 1067, 1073 (Fed. Cir. 2019) (alteration in original).

Dexcom argues that Abbott failed to do anything to apportion damages. (D.I. 697 at 29.) Although the jury found the '649 Patent infringed, Dexcom argues that "Abbott never presented a patent-specific lost profits analysis that could stand absent

44

infringement" of the remaining patents. (D.I. 697 at 31.) Abbott responds that, under

*Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275 (Fed. Cir. 2017), it did not have

to do so. (D.I. 707 at 23.)

*Mentor Graphics* stands for the proposition "that, when the *Panduit* factors are

met, they incorporate into their very analysis the value properly attributed to the patented

feature." *Id.* at 1290. That is because *Panduit* is satisfied only when the patented feature

drove customers' demand for the product. *Id.* at 1286. As discussed (*supra*, Section

III.D.1.i(a)), Abbott may not obtain lost profits for any customer who was not driven by

the easy-to-use inserter and who "would have bought the infringing product without the

patented feature[.]" *Mentor Graphics*, 851 F.3d at 1286. If the jury had credited

Abbott's theory that every G6 customer was mainly driven by the inserter, then none of

the non-infringing alternatives – lacking the inserter – would capture those sales, and

Abbott's lost profits would be tied to that patented feature. *See id.* at 1290 (explaining

that the owner of a patent on an extended life battery can obtain lost profits for the entire

laptop for customers who would "refuse to purchase" other laptops). Of course, the jury

could have credited Dexcom's theory and denied Abbott lost profits altogether (*supra*,

Section III.D.1.i(a)). But because this is an issue of disputed fact, I will deny Dexcom's

motion on this issue.

Dexcom claims that Abbott forfeited a damages trial by accepting my decision to

send infringement, but not damages, to the jury. (D.I. 697 at 15, 30 (citing Tr. 2362:25-

2363:5); D.I. 720 at 4:15-5:15.) Not so. Abbott's theory was predicated on the easy-to-

use automatic inserter creating consumer demand and defining the acceptability of non-infringing alternatives.  (D.I. 699 at 22.)  Indeed, Abbott's only argument for the unacceptability of Dexcom's non-infringing alternatives is that they lack such an inserter.  (*See* D.I. 699 at 22 ("Because none of Dexcom's four purported alternatives offer this kind of easy-to-use inserter (that is crucial to consumer acceptance), none of Dexcom's alleged substitutes would have been acceptable to consumers."); D.I. 707 at 16-17.)  That feature was captured primarily by the '216 (axis) Patent, with the '649 (recess) Patent in a more minor supporting role.  (D.I. 699 at 22; D.I. 710 at 23-24.)  But Abbott also asserted two "mount" patents, the '318 (breakable mount) and '647 (locking mechanism) Patents.  Had the jury found one of the "mount" patents but neither of the "inserter" patents infringed, or if it had hung on one of two patents in either category, I did not see a way the jury could give Abbott the damages it sought ($1.38 billion – all of Dexcom's sales), nor a number that separated out the value of the mount.  (*See* Tr. 2362:21-2363:5.)  There was no serious argument presented that the mount drove Dexcom's sales, rendering its non-infringing alternatives unacceptable.  Because the jury was asked to "render[] a single verdict on damages, without breaking down the damages attributable to each patent," I thought it most reasonable to "require a new trial as to damages." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1310 (Fed. Cir. 2007).  That said, I do not take Abbott's position as forfeiting the right to a new trial.  Far from it.  I offered Abbott the option of obtaining a liability verdict and leaving damages for a different jury, and it accepted.  (*See* Tr. 2363:6-12; D.I. 720 at 6:1-8:4.)  That was no forfeiture.

46

### iii.    Entity

The plaintiffs here are Abbott Diabetes Care, Ltd. ("ADC Ltd.") and Abbott

Diabetes Care Inc. ("ADC Inc."). ADC Inc. owns the infringed patents-in-suit. "[L]ost

profits must come from the lost sales of a product or service the patentee itself was

selling." *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 778 F.3d 1365, 1376 (Fed. Cir.

2015) (subsequent history omitted). Accordingly, "a patentee may not claim, as its own

damages, the lost profits of a related company." *Id.* at 1375.

Dexcom claims that Abbott is doing just that. (D.I. 697 at 34-36.) Abbott's

executive Jason Pederson testified that plaintiff ADC Ltd., based in the United Kingdom,

uses an American subsidiary, non-party Abbott Diabetes Care Sales Corp. ("Sales

Corp."), to "mak[e] the final transaction in the U.S." (Tr. 962:14-25.) Its profits go to

ADC Ltd., which transfers an 8% royalty to plaintiff ADC Inc. and a 2% distributor rate

to be collectively shared by plaintiff ADC Inc. and non-party Sales Corp. (Tr. 960:1-4,

963:1-8.) Dexcom argues that, because Sales Corp. would make Abbott's sales in the

but-for world, plaintiffs ADC Inc. and ADC Ltd. cannot claim those lost profits. (D.I.

697 at 35-36.) Dexcom contends that although some district courts allow a parent to

obtain a subsidiary's lost profits if it "inexorably" flows "up to the parent[,]" *Mars, Inc.*

*v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1367 (Fed. Cir. 2008), the 2% distributor rate "is

subject to change annually" through a vague process, making the profit flow non-

"automatic[.]" (D.I. 697 at 35-36 (quoting *Advanced Fiber Techs. (AFT) Trust v. J&L*

*Fiber Servs., Inc.*, No. 1:07-CV-1191, 2015 WL 1472015, at *25 (N.D.N.Y. Mar. 31,

47

2015).)  Nor would Abbott be entitled to the entire distributor rate because it is shared between plaintiff ADC Inc. and non-party Sales Corp.  (D.I. 697 at 36.)

Abbott counters by framing Sales Corp. as a distributor and conceiving of the profit as accruing directly to ADC Ltd. (on sales made by a distributor), not "flowing" from Sales Corp. to it.  (D.I. 707 at 27.)  I agree.  The lost profits question is, "had the Infringer not infringed, what would Patent Holder-Licensee have made?"  *Aro Mfg.*, 377 U.S. at 507.  Had Dexcom not infringed, plaintiffs ADC Inc. and ADC Ltd. would have made at least 98% of the ensuing profits.  And a plaintiff may establish lost profits for products sold through a distributor.  *See Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1372-73 (Fed. Cir. 2006) (affirming lost profits award for sales sold through a distributor).  My decision is not based on the inexorable flow theory – the 98% accrues directly to the plaintiffs.  I do, however, agree with Dexcom that Abbott failed to demonstrate its entitlement to the full 2% distributor rate.  At the next trial, it must do so or subtract the entire 2% from its damages amount.[19]

### 2.    Reasonable Royalty

Upon a finding of infringement, a patent owner is entitled to at least a reasonable royalty.  35 U.S.C. § 284.  Before trial, I excluded Abbott's expert's reasonable royalty

---

[19] Dexcom makes another argument based on "recent actions by the Internal Revenue Service" (D.I. 697 at 36), though I precluded them from mentioning it to the jury.  (3/8/24 Tr. 22:17-21 ("The issue that Abbott has raised about this being irrelevant and prejudicial, I agree with that entirely.  We're not getting into tax stuff.  It has nothing to do with this case.")  That logic remains post-trial.

opinion for failing to apportion between the patented and unpatented features of the infringing product. (D.I. 602.) At a hearing, I asked Dexcom's counsel how Abbott could demonstrate a reasonable royalty. (D.I. 601 at 6:2-6.) He said Abbott could utilize Dexcom's expert, "Ms. Stamm's[,] analysis. She provides a reasonable royalty analysis, a methodology and explanation, for what the reasonable royalty should be for each of the patents in the event there's infringement found." (D.I. 601 at 6:7-11.) At trial, Stamm testified that a reasonable royalty of $30 to $38 million would be appropriate depending on which patents were found infringed. (3/19/24 Tr. 160:22-161:2; *see* D.I. 707 at 10 (summarizing the record).) Abbott, however, told the jury to decide the amount on their own: "I'm not going to tell you a number for [reasonable royalty]. I'm going to tell you it's many, many multiples of $38 million." (Tr. 2185:15-17.) The jury found infringement of the '649 Patent but did not determine damages. (D.I. 676.)

Dexcom argues that "[t]he Court should award no more than nominal damages of $1" as a matter of law, because Abbott failed to assert its own reasonable royalty amount while undermining Stamm's number. (D.I. 697 at 17-20.) Abbott, for its part, asks for "a non-zero reasonable royalty" as a matter of law (D.I. 699 at 30-31), arguing that the jury could have credited Stamm's number or its arguments that changing "the assumptions underlying her royalty calculation" would allow the jury to adjust her royalty amount "in kind" (D.I. 707 at 10, 13-14).

A jury may rely on any probative and properly admitted evidence produced at trial in awarding a reasonable royalty. *See Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365,

1372 (Fed. Cir. 2015) (reversing a grant of summary judgment of no reasonable royalty when the defendant's expert's deposition testimony existed to support a royalty amount). This is true even if Abbott tried to undermine it. *See MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1168 (Fed. Cir. 2015) ("[W]hen there is conflicting testimony at trial, and the evidence overall does not make only one finding on the point reasonable, the jury is permitted to make credibility determinations and believe the witness it considers more trustworthy."). When pressed at oral argument, Dexcom could think of no case that awarded nominal damages when the defendant's expert offered an opinion on a reasonable royalty. (D.I. 720 at 36:6-21.) Thus, I will grant Abbott's motion and deny Dexcom's. Abbott may use Stamm's testimony as a basis for a reasonable royalty award, and may, if it has access in the record to "credible economic testimony" and not mere "speculation," *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1033 (Fed. Cir. 1996),[20] ask the jury to adjust Stamm's royalty number.

## IV.    CONCLUSION

For the reasons stated herein, I will rule in an accompanying order on the pending motions as described above.

---

[20] This is not to imply that Abbott is free to come forward with new expert testimony. That issue is not before me.